UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GEOFFREY VARGA and WILLIAM
CLEGHORN, solely in their capacity as Joint
Voluntary Liquidators of Bear Stearns High-Grade
Structured Credit Strategies (Overseas) Ltd. and
Bear Stearns High-Grade Structured Credit
Strategies Enhanced Leverage (Overseas) Ltd.,
and not individually,

                                    Plaintiffs,

-against-

BEAR STEARNS ASSET MANAGEMENT
INC., THE BEAR STEARNS COMPANIES,
INC., BEAR, STEARNS & CO. INC., RALPH
CIOFFI, MATTHEW TANNIN, RAY
MCGARRIGAL, and DELOITTE & TOUCHE
LLP,

                                    Defendants.

---

08-CV-03397 (BSJ)

ORAL ARGUMENT
REQUESTED

ECF CASE

## NOTICE OF MOTION

PLEASE TAKE NOTICE that, upon the complaint, a copy of which is

annexed hereto, the Memorandum of Law in Support of the Motion by Deloitte &

Touche LLP to Dismiss for Lack of Subject Matter Jurisdiction or, in the alternative, for

Failure to Comply with Fed. R. Civ. P. 9(b), the Affidavit of Max R. Shulman, dated

May 6, 2008, and the Affidavit of Gary Bottfeld, dated May 5, 2008, Defendant

Deloitte & Touche LLP will move this Court, before Hon. Barbara S. Jones, at the United

States Courthouse, Courtroom 18B, 500 Pearl Street, New York, New York, for an order

pursuant to Rule 12(b)(1), or, in the alternative, Rules 12(b)(6) and 9(b) of the Federal

Rules of Civil Procedure dismissing the complaint as against Deloitte & Touche LLP in

its entirety and with prejudice and granting such other and further relief as the Court deems just and proper.

Dated:  May 7, 2008

CRAVATH, SWAINE & MOORE LLP,

by _____

Max R. Shulman
A member of the Firm

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
mshulman@cravath.com

Attorneys for Defendant Deloitte &
Touche LLP

To:

Robert Nicholas, Esq.
Reed Smith, LLP
559 Lexington Ave, 29th Floor
New York, NY 10022
(212) 837-6000

Attorneys for Plaintiffs

Marc A. Weinstein
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY  10004
(212) 837-6000

Attorneys for Defendant Ralph Cioffi

Stephen M. Sinaiko
   Kramer Levin Naftalis & Frankel LLP
      1177 Avenue of the Americas
       New York, NY  10036
          (212) 668-1900

Attorneys for the Bear Stearns Defendants


Catherine L. Redlich
   Driscoll & Redlich
      521 Fifth Avenue, Suite 3300
       New York, NY  10175
          (212) 715-9100

Attorneys for Defendant Raymond McGarrigal


Theresa Trzaskoma
   Brune & Richard LLP
      80 Broad Street
       New York, NY  10004
          (212) 668-1900

Attorneys for Defendant Matthew Tannin

JUDGE JONES **ORIGINAL**

08 CV 03397



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- x

GEOFFREY VARGA and WILLIAM
CLEGHORN, solely in their capacity as
Joint Voluntary Liquidators of Bear Stearns
High-Grade Structured Credit Strategies
(Overseas) Ltd. and Bear Stearns High-
Grade Structured Credit Strategies Enhanced
Leverage (Overseas) Ltd., and not
individually,

                            Plaintiffs,

              -against-

BEAR STEARNS ASSET MANAGEMENT
INC., THE BEAR STEARNS
COMPANIES, INC., BEAR, STEARNS &
CO. INC., RALPH CIOFFI, MATTHEW
TANNIN, RAY MCGARRIGAL, and
DELOITTE & TOUCHE LLP,

                       Defendants.

-------------------------------------------------- x

**COMPLAINT**

**(JURY TRIAL DEMANDED)**



Plaintiffs, as Joint Voluntary Liquidators of Bear Stearns High-Grade

Structured Credit Strategies (Overseas) Ltd. (the "High-Grade Overseas Fund")

and Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage

(Overseas) Ltd. (the "High-Grade Enhanced Overseas Fund"; together with the

High-Grade Overseas Fund, the "Overseas Funds"; and both together with their

domestic counterparts, the "Funds"), by their attorneys, Reed Smith LLP, for their

Complaint against the above-named Defendants, respectfully allege as follows:

## NATURE OF ACTION

1.      This action seeks recovery of more than $1 billion of losses

sustained by the Overseas Funds as a direct and proximate result of a sophisticated

fraud perpetrated by Bear Stearns & Co. Inc., its co-defendant affiliates,

subsidiaries and employees (collectively, the "Bear Stearns Defendants"), and co-

defendant Deloitte & Touche LLP.

2.      Specifically, the Bear Stearns Defendants conceived, marketed

and managed hedge funds that they knew would be viable so long as – but only so

long as – the U.S. housing market continued to rise, and concealed the fact that

these funds were  never designed to withstand even a slight downtick in the

housing market.  As <u>Business Week</u> recently reported, it is now clear that these

"hedge funds were built so they were virtually guaranteed to implode if market

conditions turned south."  Matthew Goldstein & David Henry, *Bear Stearns' Bad*

*Bet*, Bus. Wk. (Oct. 11, 2007), *available at*

*http://www.businessweek.com/print/bwdaily/dnflash/content/oct2007/db20071011_*

*175964.htm*.

3.      In structuring, marketing, and reporting the performance of the

Overseas Funds, the Bear Stearns Defendants represented that the funds would be

principally comprised of favorably risk-rated slices of large pools of residential

mortgages, known as collateralized debt obligations ("CDOs"), and that the Bear

- 2 -

Stearns Defendants would utilize their substantial risk management expertise and

experience to ensure that the funds were relatively safe, conservative investment

vehicles. Defendant Deloitte & Touche LLP ("Deloitte") further assured investors

that it was conducting independent, thorough, and objective audits – including,

among other things, testing the Bear Stearns Defendants' "manager marks."

    4.    Instead of living up to any of these assurances, it appears that

all of the Defendants instead acted in their own, individual, best interests, to the

catastrophic detriment of the Overseas Funds and their investors.

    5.    First, while the Bear Stearns Defendants appear to have initially

structured the Overseas Funds utilizing tranches of CDOs that individually were

deemed by the Ratings Agencies to be among the safest available – attaining AAA

to AA- ratings or their equivalents – the Bear Stearns Defendants knew throughout

(and Deloitte later learned, or was obligated to discover and willfully or recklessly

failed to do so), that the ways in which these otherwise relatively safe components

were assembled and leveraged into portfolios doomed the Overseas Funds to

failure. These structural defects included, among others, repackaging of AAA and

AA rated CDO tranches to unreasonably magnify the Overseas Funds' aggregate

exposure to risky (sub-prime and other) components of those tranches'

investments, and structuring the investments in such a way that their aggregate

embedded leverage (use of borrowed capital) in certain instances appears to have

exceeded 30x – with average leverage dramatically, unreasonably, and ultimately

fatally, exceeding what was disclosed to, or could reasonably have been foreseen

by, investors. Moreover, due to the opacity of the Overseas Funds, no investor

could reasonably have been able to discover any of the foregoing.

6.    Second, the Bear Stearns Defendants perpetuated their fraud

through improperly "marking" the performance of each of the Overseas Funds, by

way of the Manager Mark Scheme described below. Deloitte knowingly or

recklessly facilitated this scheme, through its unqualified opinions endorsing the

Overseas Funds' financial reporting.

7.    Finally, following the initial structuring of each of the Overseas

Funds, the Bear Stearns Defendants expanded their fraud by using each of the

Overseas Funds as dumping grounds for toxic investments held on Bear Stearns'

books – including through a series of impermissible insider transactions.

8.    In short, it appears that the Bear Stearns Defendants constructed

funds that would yield substantial fees for them – and their professionals – so long

as the housing market grew, leaving others (i.e., investors and creditors) holding

grossly overvalued mortgage derivatives upon occurrence of the housing market's

inevitable downtick.

9.    Thus, when this downtick did occur, the Funds collapsed due to

their inherent flaws – while other funds structured in fashions similar to those in

which the Bear Stearns Defendants promised to structure the funds here at issue suffered losses, but survived.

10.     The Bear Stearns Defendants could do all of this because, from the birth of the industry through the first half of 2007, the investment professionals at Bear, Stearns & Co. Inc. ("Bear Stearns") were regarded as the best of the best mortgage-backed securities analysts and traders. They were seen to set the standard by which the performance, knowledge and creativity of other such professionals the world over were measured.

11.     For these reasons, the Bear Stearns Defendants were uniquely positioned to convince the institutional and high net worth investing public that any product they branded – any product to which they lent their good name – was precisely as represented. If Bear Stearns said that a substantially illiquid mortgage-backed securities investment vehicle – one from which no cash flowed out to investors in the ordinary course, and from which the investment managers might not be able to create free cash flow in a reasonable timeframe – had a particular value, that valuation was likely to be accepted by investors in the same way that a market-tested valuation would be. This was so much more the case if most of the underlying composition of the illiquid investment vehicle could be touted as having traditionally "investment-grade" "ratings" from the "Ratings Agencies" – Standard & Poors, Moody's and Fitch.

- 5 -

12.    As such, by exploiting their reputations and investors'
confidence in them, in 2003 the Bear Stearns Defendants embarked upon an
investment scheme to generate substantial fees and other benefits for themselves
by defrauding investors and counterparties through the creation, marketing and
ongoing manipulation of a new class of investment products – the High-Grade
Overseas Fund, its domestic counterpart, and a Yen-denominated Unit Trust
(collectively, the "High-Grade Funds").

13.    The Bear Stearns Defendants assembled the High-Grade Funds
in these ways to create new fee generation opportunities for themselves, where
such opportunities were otherwise greatly limited by the volume of existing CDOs
and similar products.  They did this with unique knowledge that even a slight
downturn in the U.S. housing market – resulting from either a small percentage
drop in home prices, or sales volumes, from their meteoric highs – would cause the
High-Grade Funds to sustain such disproportionate, multiplicative losses that all
investor capital would vanish, and the funds' creditors and counterparties would be
put at great risk.

14.    In 2006, running out of capacity to generate additional fees
within the High-Grade Funds, the Bear Stearns Defendants furthered their fraud by
creating and marketing the High-Grade Enhanced Overseas Fund and its domestic
counterpart (together, the "High-Grade Enhanced Funds").

15.    The new High-Grade Enhanced Overseas Fund was marketed to existing investors, as well as new investor candidates, as better and safer versions of the original High-Grade Overseas Fund, but one that was designed to generate greater returns through the "enhanced" use of "leverage" – the borrowing of money to multiply the invested cash.

16.    The High-Grade Enhanced Overseas Fund was marketed as "safer" because it would invest in even greater concentration of the "safest" tranches of CDOs – as measured by Ratings Agency rating levels.

17.    However, the Bear Stearns Defendants failed to disclose that, as constructed, all of these Funds – both the original, and the new "enhanced" funds – were doomed to failure, owing to their untenable sensitivity to even the most miniscule risks of default in the mortgages underlying the CDOs in which they invested, and to even a small fractional slowdown in the unprecedented growth of the U.S. residential real estate market.

18.    Following the collapse and total decimation of the Overseas Funds and their domestic counterparts over just a few days in June 2007, investors in the High-Grade Enhanced Overseas Fund commenced the corporate governance process that ultimately led to Plaintiffs' appointment to control the Overseas Funds.

- 7 -

19.     Plaintiffs now bring this action for fraud, breach of fiduciary duty, breach of contract, inducing breach of contract, inducing breach fiduciary duty, recklessness, gross negligence, negligence, accounting malpractice, conspiracy to commit fraud and breach of fiduciary duty, aiding and abetting fraud and breach of fiduciary duty and unjust enrichment, to recover damages from the Defendants, each of which was a fiduciary and/or contractual service provider to the Overseas Funds or a control person thereof, for injury and losses suffered by the Overseas Funds as a result of the acts and failures to act by Defendants.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, each named plaintiff being a citizen of a country other than the United States and each named defendant being a citizen of a state of the United States and not of a foreign country, and the matter in controversy exceeding the sum or value of $75,000 exclusive of interest and costs.

21.     Jurisdiction is proper in New York, and venue is proper in this district pursuant to 28 U.S.C. § 1391(a), in that each defendant resides in this district and/or a substantial part of the events or omissions giving rise to the claims occurred in this district.

- 8 -

## **PARTIES**

### **Plaintiffs**

22.     Plaintiffs Geoffrey Varga and William Cleghorn are the Joint Voluntary Liquidators (the "Liquidators") of each of (a) the High-Grade Overseas Fund and (b) the High-Grade Enhanced Overseas Fund.  Plaintiff Varga is a citizen of Canada and a resident of the Cayman Islands.  Plaintiff Cleghorn is a citizen and resident of the United Kingdom.

23.     Plaintiffs were appointed as liquidators by the Grand Court of the Cayman Islands by Order dated March 20, 2008, a copy of which is attached hereto as Exhibit 1.  Under Cayman law, Plaintiffs have all right and power to act for the Overseas Funds, including, without limitation, the power to bring suit to recover for the benefit of those Funds' losses caused to them by third parties.

24.     The Overseas Funds are both Cayman Islands exempted companies, organized under the Companies Law of the Cayman Islands.  Prior to the events here complained of, they had their principal place of business at the offices of Defendant Bear Stearns Asset Management, Inc., at 383 Madison Avenue, New York, New York 10179, and they operated as "feeder funds" for, respectively, Bear Stearns High-Grade Structured Credit Strategies Master Fund

Ltd., and Bear Stearns High-Grade Structured Credit Strategies Enhanced

Leverage Master Fund Ltd. (collectively the "Master Funds").

25.    At all times, the shareholders of these Overseas Funds had

decision making and control powers conferred upon them by the Overseas Funds'

governing documents (including, but not limited to, the right by majority vote, at

any time, to remove and replace the directors of the Overseas Funds.) With the

exception of a small number of shareholders affiliated with Bear Stearns, the

Overseas Funds' shareholders were unaware of – and could not have discovered –

the wrongful acts pled herein and had they been so aware, could and would have

taken immediate steps to prevent such wrongful acts and avoid the damages that

flowed proximately therefrom to the Funds.

**Defendants**

26.    Defendant Bear Stearns Asset Management Inc. ("BSAM") is a

corporation organized under the laws of the State of New York, with its principal

place of business at 383 Madison Avenue, New York, New York 10179. As here

relevant, BSAM held itself out as a market leader in the area of structured credit

services, and an expert in managing structured credit assets. BSAM also held itself

out as expert in risk management, describing risk management as the cornerstone

of its business practice. BSAM acted as investment manager to the High-Grade

Overseas Fund and the High-Grade Enhanced Overseas Fund, and was responsible

not only for the operation of these feeder funds, but also for the operation and

investment management of the Master Funds.  BSAM is registered with the U.S.

Securities and Exchange Commission ("SEC") as an investment advisor under the

Investment Advisors Act of 1940, as amended, and is a wholly-owned subsidiary

of defendant The Bear Stearns Companies, Inc.

      27.    Defendant The Bear Stearns Companies, Inc. ("Bear Stearns

Companies") is a corporation organized and existing under the laws of the State of

Delaware, with its principal place of business at 383 Madison Avenue, New York,

New York 10179.  Bear Stearns Companies, through its various subsidiaries,

provides a broad range of financial services to clients and customers worldwide.  It

is the direct corporate parent of defendants BSAM and Bear, Stearns & Co. Inc.,

and the indirect corporate parent of Bear Stearns Securities Corp. ("BSSC") Bear

Stearns Companies has held itself out as a leading financial services firm serving

governments, corporations, institutions and individuals worldwide.  Its core

business lines have included institutional equities, fixed income, investment

banking, global clearing services, asset management, and private client services.

      28.    Defendant Bear, Stearns & Co. Inc. (as previously defined,

"Bear Stearns") is a corporation organized and existing under the laws of the State

of Delaware with its principal place of business at 383 Madison Avenue, New

York, New York 10179. Bear Stearns is a subsidiary of defendant Bear Stearns

Companies and is registered with the SEC as a broker-dealer and an investment

advisor under the Investment Advisors Act of 1940, as amended. Among other

things, Bear Stearns acted as a placement agent to the High-Grade Overseas Fund

and the High-Grade Enhanced Overseas Fund, for the purpose of finding investors

willing and able to invest in the Overseas Funds.

        29.    Defendant Ralph Cioffi ("Cioffi") is a citizen and resident of

the State of New Jersey, and as relevant to this action was a Senior Managing

Director of both BSAM and Bear Stearns and a member of the Board of Directors

of Bear Stearns. Through BSAM, Cioffi acted as Senior Portfolio Manager of the

High-Grade Overseas Fund, the High-Grade Enhanced Overseas Fund, and the

Master Funds, sharing with defendants Matthew Tannin and Ray McGarrigal

responsibility for the management of the investment portfolios for the High-Grade

Overseas Fund, the High-Grade Enhanced Overseas Fund, and the Master Funds.

        30.    Defendant Matthew Tannin ("Tannin") is a citizen and resident

of the State of New York, and was as relevant to this action a Senior Managing

Director of BSAM and Chief Operating Officer of the High-Grade Enhanced

Overseas Fund, and through BSAM a Portfolio Manager of the High-Grade

Overseas Fund, sharing with defendants Cioffi and Ray McGarrigal responsibility

for the management of the investment portfolio for the High-Grade Overseas Fund, the High-Grade Enhanced Overseas Fund, and the Master Funds.

31.    Defendant Ray McGarrigal ("McGarrigal") is a citizen and resident of the State of New York, was as relevant to this action a Managing Director or Senior Managing Director of BSAM and a Portfolio Manager of both the High-Grade Overseas Fund and the High-Grade Enhanced Overseas Fund, sharing with defendants Cioffi and Tannin responsibility for the management of the investment portfolio for the High-Grade Overseas Fund, the High-Grade Enhanced Overseas Fund, and the Master Funds.

32.    Until the events giving rise to this action, Cioffi, Tannin and McGarrigal (collectively the "Management Defendants," and together with Bear Stearns Companies, Bear Stearns and BSAM, the "Bear Stearns Defendants") were responsible for, among other things, the composition and risk management of the High-Grade Overseas Fund and the High-Grade Enhanced Overseas Fund, as well as the Master Funds.

33.    Defendant Deloitte & Touche LLP ("Deloitte") is a Delaware limited liability partnership, engaged in business as an accounting firm with offices located in (among other places) New York, New York.  No member of Deloitte is a citizen or resident of a country other than the United States.  As relevant to this action, Deloitte was engaged as the outside auditor of the High-Grade Overseas

Fund and the High-Grade Enhanced Overseas Fund, as well as the Master Funds, and issued various certified audit reports to and in respect of these funds.

**Other Relevant Entities**

34.    Bear Stearns High-Grade Structured Credit Strategies Master Fund Ltd. (the "High-Grade Master Fund") is a Cayman Islands exempted company organized under the Companies Law of the Cayman Islands.  The High-Grade Master Fund had BSAM as its investment manager.  The Management Defendants all shared responsibility for the management of the High-Grade Master Fund investment portfolio, and all of the High-Grade Overseas Fund Directors were also directors of the High-Grade Master Fund.

35.    Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Master Fund Ltd. (the "High-Grade Enhanced Master Fund") is a Cayman Islands exempted company organized under the Companies Law of the Cayman Islands.  The High-Grade Enhanced Master Fund had BSAM as its investment manager.  The Management Defendants all shared responsibility for the management of the High-Grade Enhanced Master Fund investment portfolio, and the High-Grade Enhanced Overseas Fund Directors were also directors of the High-Grade Enhanced Master Fund.

36.    The Master Funds, at Bear Stearns' instance, were placed into official court-directed liquidation in the Cayman Islands in August 2007, with

KPMG Cayman Islands as Bear Stearns' designated liquidators. To date, that foreign liquidation has not been recognized in the United States because, by reason of domination of these Master Funds by Bear Stearns and its agents, the center of main interest of the Master Funds has been held to be New York rather than the Cayman Islands. See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd., 374 B.R. 122 (Bankr. S.D.N.Y. 2007). The foregoing U.S. Bankruptcy Court decision is presently *sub judice*, on appeal to the U.S. District Court for the Southern District of New York.

## FACTUAL ALLEGATIONS

37.    Plaintiffs, solely in their capacities as Joint Voluntary Liquidators of the Overseas Funds, make the following allegations, in each instance based upon information and belief, such information and belief being based upon documents and other information heretofore obtained by Plaintiffs or their counsel.

### The High-Grade Overseas Fund

38.    In 2003, the Bear Stearns Defendants, eager for investment management fees in an increasingly saturated investment market, created and began selling to investors the High-Grade Overseas Fund, along with its contemporaneously established domestic counterpart. By so doing, the Bear Stearns Defendants sought to capitalize on the then-booming United States housing

market in ways beyond those available through the existing, sizeable, yet increasingly saturated, CDO and related structured products markets.

39.    The High-Grade Overseas Fund and its contemporaneously established domestic counterpart were designed to raise money to invest in the new High-Grade Master Fund, also created by the Bear Stearns Defendants. The High-Grade Master Fund, in turn, would invest the capital it received from these two "feeder funds" as directed by defendant BSAM, which was the Investment Manager of the High-Grade Master Fund, as well as the Investment Manager of the High-Grade Offshore Fund, and the sole general partner of the High-Grade Domestic Fund. Although the High-Grade Overseas Fund and High-Grade Overseas Master Fund had boards of directors that included facially independent directors, to manage their affairs, Bear Stearns Asset Management ("BSAM") had virtually complete control over the operations of both, as the majority of such directors were BSAM employees, and operated as directed by Bear Stearns.

40.    Although marketed as an investment fund seeking to obtain a safe rate of return for its investors – higher than LIBOR, but not dramatically higher – the High-Grade Overseas Fund appeared to have little to no regard to generating investor returns, or to protecting investor capital. Rather, it was structured in knowing contravention of its stated purposes, and was at all times operated by Defendants in furtherance of the interests of BSAM and its parent and

affiliates – and not the interests of the fund or its investors – notwithstanding the fiduciary and other duties the Bear Stearns Defendants owed to the High-Grade Overseas Fund.

41.    As of 2003, housing prices were generally continuing to increase at a brisk pace throughout the United States. This, along with the Bear Stearns Defendants' then-stellar reputation for mortgage-backed securities analysis, allowed them to solicit institutional and high net worth investors into committing capital to the new "High-Grade" Funds.

42.    Bear Stearns represented that the new High-Grade Overseas Fund would be principally comprised of favorably risk-rated slices of CDOs. But while these tranches of CDOs, individually, were deemed by the Ratings Agencies to be among the safest available – attaining AAA or AA ratings or their equivalents – as the Bear Stearns Defendants and their retained professionals knew – and, due to the opacity of the High-Grade Funds, were solely able to know – the ways in which the Bear Stearns Defendants assembled and leveraged these otherwise relatively safe components into portfolios doomed the High-Grade Funds to failure.

43.    The Bear Stearns Defendants therefore had unique knowledge, not readily available to investors or others, of the fact that even a slight downturn in the U.S. housing market – whether resulting from either a small percentage drop

in home prices or sales volumes – would cause the High-Grade Funds to sustain

such disproportionate, multiplicative losses, that all investor capital would vanish,

and the High-Grade Funds' creditors and counterparties would be put at great risk.

44.    The Bear Stearns Defendants, of course, could not disclose any

of this information to investors and have any hope of achieving their goals of

securing investors for the High-Grade Funds.  Instead, they inveigled investors into

committing their capital to the High-Grade Funds through the use of the Bear

Stearns reputation and branding.  They started by affixing the brand name to them,

starting each fund's name with "Bear Stearns."  Immediately after the name, they

affixed the grossly misleading label "High-Grade."  They then went on to create

the High-Grade Overseas Fund's Confidential Offering Memorandum ("High-

Grade Overseas COM"), dated as of October 31, 2004.

45.    In the High-Grade Overseas COM, the Bear Stearns Defendants

outlined the High-Grade Overseas Fund's investment strategy – with elaborate

emphasis on the high grade of the collateral, as well as the sophistication of

BSAM's management and risk control techniques.  Specifically, the Bear Stearns

Defendants knowingly made the following false and intentionally misleading

representations:

> The Investment Manager [BSAM] will use its structuring and
> research experience to identify structured finance securities
> with fundamentally strong credit risk profiles that are priced
> attractively.  A significant portion of the investment return of

the Master Fund is expected to be current income resulting from a positive yield spread between the investment income of the investments (together with any corresponding hedging instruments) of the Master Fund and the associated borrowing costs. Additionally, to the extent that the Master Fund's assets increase in value, the Master Fund may realize capital appreciation.   High-Grade Overseas COM at p. 11.

*          *          *          *

The Investment Manager carries out the Master Fund's investment process and risk control procedures by analyzing the potential interest and principal flows on the CDO or structured finance securities owned by the Master Fund. Various models and valuation tools are used to quantify the likelihood of future payments on both the underlying assets held by a CDO or structured finance vehicle as well as securities issued by the CDO or structured finance vehicle. These tools are derived from internally constructed, broker-dealer and third-party vendor analytical systems. The Investment Manager also utilizes default modeling and credit-adjusted spread pricing applications to assess relative value opportunities in the structured finance market. High-Grade Overseas COM at p. 12.

*          *          *          *

The primary focus of the Investment Manager will be to assess the credit risk inherent in every potential investment and to monitor the credit risk of the investments held by the Master Fund. The objective of the analysis is to determine how the frequency and severity of defaults of the underlying assets of each of the structured finance securities will impact the interest and principal payments on those securities. Because each of the investments held by the Master Fund is essentially a construct of a large and diversified collection of individual assets, it is possible to monitor the performance of the underlying assets in a quantitative way. Unlike investments in corporate fixed-income securities where the credit performance of the issue is binary (the bond is either current in its obligations to make interest and principal payments or it is in default) the credit performance of a structured finance security is directly related

- 19 -

to the observable cash flow characteristics of the underlying assets. In addition, it is anticipated that substantially all of the structured finance securities purchased by the Master Fund will have credit enhancement mechanisms which, when the underlying pool of assets experiences credit degradation beyond objectively defined levels, cause cash flow to be diverted away from the more junior structured finance securities and towards the securities held by the Master Fund. High-Grade Overseas COM at p. 13.

*          *          *          *

The Master Fund intends to concentrate its investments in the investment-grade classes of structured finance securities. For all investments (excluding Repackaging Vehicle Junior Interests) the Master Fund has targeted a portfolio rating composition of approximately 90% structured finance securities rated from AAA to AA- by Standard & Poor's, from Aaa to Aa3 by Moody's or from AAA to AA- by Fitch. The 10% balance of the portfolio (excluding Repackaging Vehicle Junior Interests) may be rated below such ratings or be unrated. The above percentages are target concentrations only. The Master Fund will not be required to sell any security that is downgraded subsequent to its purchase by the Master Fund. It is anticipated that no more than 30% of the Master Fund's Net Asset Value will be invested in Repackaging Vehicle Junior Interests at the time any Repackaging Vehicle Junior Interest investment is made. The Repackaging Vehicle Junior Interests will generally not be rated. High-Grade Overseas COM at p. 14.

*          *          *          *

As [investment] situations may involve conflicts between the interest of the Investment Manager or its related persons, on the one hand, and the interests of the Investment Manager's clients, on the other, the Investment Manager has established internal policies to ensure that the Investment Manager and its personnel do not prefer their own interests to those of the Investment Manager's clients and that clients are treated fairly. High-Grade Overseas COM at p. 26.

- 20 -

\*          \*          \*          \*

Asset Valuation:  The fees payable to the Investment Manager are based directly on the Net Asset Value of the Fund as of various dates.  There may be no public market price for a portion of the Fund's assets.  The Investment Manager will generally value the Fund's assets.  Any financial instruments for which market quotations are not readily available will be valued at fair value as reasonably determined in good faith by the Investment Manager.  The Investment Manager will have a conflict of interest in making such valuations because the valuations directly affect the Net Asset Value of the Fund and thus the amount of the Management Fee and Incentive Fee that the Investment Manager receives in respect of its services.  Such valuations, however, will be performed by the Investment Manager in accordance with the methodology described in this Memorandum.  High-Grade Overseas COM at p. 29.

\*          \*          \*          \*

Transactions between the Fund and the Investment Manager or its Affiliates:  Members of the boards of directors of the Fund and the Master Fund who are not affiliated with the Investment Manager or their delegates or other authorized representatives of the Fund or the Master Fund will have the responsibility for approving any transactions between the Fund or the Master Fund and the Investment Manager or its affiliates involving significant conflicts of interest (including principal trades).

More particularly, Directors unaffiliated with the Investment Manager or any delegate designated by such Directors will be responsible for approving any principal transactions for which Master Fund consent is required pursuant to Rule 206(3) of the Advisers Act.  High-Grade Overseas COM at pp. 35-36.

\*          \*          \*          \*

The Net Asset Value per Share of each Series shall be the Net Asset Value of such Series divided by the number of Shares outstanding in such Series.  The valuation of positions held by the Master Fund (or the Fund) will be made by the Investment

Manager and reported to the Administrator.  High-Grade
Overseas COM at p. 45.

*          *          *          *

If for specific assets the official close of business prices do not,
in the opinion of the Investment Manager, reflect their fair
value or are not available, the value shall be calculated with
care and in good faith by the Investment Manager (or its duly
appointed agent) with a view to establishing the probable
realization value for such assets as at the close of business on
the valuation date.  High-Grade Overseas COM at p. 46.

*          *          *          *

There is no active market for Repackaging Vehicle Junior
Interests.  The Investment Manager will use a fair-value
methodology for determining the value of Repackaging Vehicle
Junior Interests.  This methodology will consist of taking the
present value of the future stream of projected cash flows to the
Repackaging Vehicle Junior Interests over the projected life of
the Repackaging Vehicle.  The discount rate used in this
analysis will be determined primarily by assessing the credit
quality of the collateral pool of the Repackaging Vehicle.

The foregoing valuations may be modified by the Investment
Manager or its designee, in its sole and absolute discretion, if
and to the extent that it shall determine that such modifications
are advisable in order to reflect restrictions upon marketability
or other factors affecting the value of assets or to obtain asset
valuations within the time frames set by the Investment
Manager.  Without limiting the generality of the foregoing, the
valuation of an asset by the Investment Manager or its designee
may reflect the amounts invested by the Fund in such asset,
notwithstanding that such amounts may not represent the
market value of such asset.

The Investment Manager (or its duly appointed agent) may
follow some other prudent method of valuation other than that
referred to above if it considers that in the circumstances such
other method of valuation should be adopted to reflect fairly the

values of relevant investments or liabilities or to otherwise protect the interests of the Shareholders.

The Investment Manager is entitled to exercise its reasonable judgment in determining the values to be attributed to assets and liabilities and provided it is acting bona fide in the interest of the Fund as a whole, such valuation is not open to challenge by current or previous investors.   High-Grade Overseas COM at pp. 46-47.

46.    The Bear Stearns Defendants reinforced these principles in their sales pitches respecting the High-Grade Overseas Fund, representing to numerous potential High-Grade Overseas Fund investors:

> a) Its "Primary focus is to buy and hold 'AAA' and 'AA' structured finance securities."
>
> b) "When market opportunities exist, recognize capital appreciation and restructure or unwind securities whose net asset value exceeds market price."
>
> c) "Experienced structured credit analysts make credit decisions."
>
> d) "Credit quality of assets is monitored using proprietary analytics system."
>
> e) "As experienced participants in this market, the portfolio managers have the knowledge, experience and resources to identify attractive assets and monitor the credit risk inherent in these assets."
>
> f)   "Targeted Portfolio Characteristics, Credit Quality:  At least 90% 'AAA' and 'AA-.'"
>
> g) "Credit Quality:  At least 90% 'AAA' and 'AA-' structured finance securities with up to 10% in higher yielding lower rated securities."

h) "Investment Process . . . Source and screen potential investments based on asset category and rating."

i) "Investment Process . . . Prioritize clean, new issue quality assets."

j) "Investment Process . . . Analyze potential qualifying secondary assets."

k) "Investment Process . . . Filter out assets based upon collateral quality test performance, concentration limitations, payment frequency, maturity as well as weighted average live, and ratings."

l) "Investment Process . . . Verify Robustness of Rating and perform Quantitative Analysis using: -Proprietary Models, -Rating Agency Discussions, -Underwriter Discussions."

m) "Investment Process . . . Portfolio Managers conduct final review: -Inspection of final Offering Memorandum, Computation Materials and Indentures. -Inspection of final portfolio. -Order goes firm."

n) "Surveillance Process . . . Using a proprietary surveillance system, *all* assets are reviewed monthly and those showing signs of future credit deterioration or poor performance are 'flagged for further review.'"

o) "Portfolio Management and Surveillance System . . . – [High-Grade] developed their own proprietary Surveillance, Portfolio Evaluation, Analysis and Risk System."

p) "Portfolio Management and Surveillance System . . . –The Surveillance System is a specialized database, reporting and analysis tool designed especially for structured products and their underlying portfolios."

47.    In an August 2005 response (the "AIMA Response") to an

Illustrative Questionnaire from the Alternative Investment Management

Association Ltd. ("AIMA") (a global, not-for-profit trade association for hedge

funds, managed futures and managed currency funds), BSAM reiterated that the

High Grade Funds' primary objectives were "to seek high current income and

capital appreciation relative to LIBOR primarily through leveraged investments in

investment-grade structured finance securities with an emphasis on triple-A and

double-A rated structured finance securities."  (AIMA Response at p. 14)

48.    In the AIMA Response, BSAM also stated that the High-Grade

Funds "generally take[] the position in the high end of the capital structure which

is primarily hedged through the use of credit default swaps" and that these

"investments coupled with broad diversification across positions and sectors

should mitigate a majority of credit oriented risks associated with fixed income."

(AIMA Response at p. 14)  In addition, BSAM described the operational risk

management policy in the AIMA Response, emphasizing:

> There are three layers of risk management, the broker dealer, BSAM
> and the portfolio managers.  The Fund's daily mark to market, which
> is done in house by Bear Stearns' repo desk and the team, keeps them
> in touch with any price movements that could foretell problems in any
> one of the Fund's investments.  The team receives monthly marks on
> each of the Fund's investments from up to 15 broker dealers.
>
> The team monitors their positions through two main analytical
> systems… [which] allow them to monitor… monthly trustee reports
> on each deal and use technology to effectively monitor each position.
>
> In addition to the portfolio management team, Bear Stearns' and
> BSAM's risk management departments monitor the Fund's position as
> well.  They monitor things such as minimum rating requirements,
> overall and net leverage and any portfolio concentrations.  On a
> monthly basis, the portfolio mangers meet with BSAM's CIO and

hedge fund risk management team to discuss the portfolio and its performance. The team also meets with Bear Stearns' global credit department to discuss their positions, risk management and hedging techniques. As part of managing the Fund's risk, the team actively engages in various hedging techniques in the credit derivatives market, monitor and maintain adequate liquidity and look to minimize leverage while attempting to achieve the Fund's cash on cash targets. AIMA Response at p. 17.

49.     Finally, the Bear Stearns Defendants represented in the High-Grade Overseas COM that the High-Grade Overseas Fund's books would be maintained in accordance with U.S. GAAP, and would be audited by Deloitte, a "big four" institutional accounting firm, in accordance with GAAS. See High-Grade Overseas COM at pp. 45-47, 53.

50.     By these representations, the Bear Stearns Defendants intended to and did communicate to the investing community that the High-Grade Overseas Fund was a relatively low yield but safe investment, which would permit investors to participate in the booming housing market with little risk of loss due to defaults. By so doing, the Bear Stearns Defendants were able to obtain over $1 billion in investments into the High-Grade Funds between the last quarter of 2003 and the last quarter of 2006.

51.     The Bear Stearns Defendants surely knew from the inception of the High-Grade Funds that at some point another new product would be needed if further fees were to be gained.

52.     The Bear Stearns Defendants also knew that a key to the success of marketing such new, similar products would be the perceived success of the High-Grade Funds.  They thus were highly motivated to ensure that, no matter what the reality, the High-Grade Funds appeared to be safe and successful.

53.     Success for an investment fund is usually measured by appreciation of its Net Asset Value per share ("NAV").   As such, the Bear Stearns Defendants engaged in a "Managers Mark" scheme, more fully described below, by "marking" the High-Grade Funds' investment portfolios to a "model" of the Bear Stearns Defendants' own creation on a month-to-month basis, without properly testing or adjusting this model to reflect market realities.

54.     In this way, the Bear Stearns Defendants were able to report substantial "gains" to investors – gains which would never be distributed, but merely grew on paper within the High-Grade Overseas Fund, until its ultimate collapse.

55.     As the Bear Stearns Defendants could easily predict, with investors led to believe that the securities were ever-increasingly more profitable, there were few, if any, investor redemptions during this period, and thus the true value of the underlying securities as against the valuation BSAM placed on them was not tested in actual marketplace practice.

56.    As such, BSAM – which was obligated by the High-Grade Overseas COM and law to use fair and reasonable methods to value the assets in the High-Grade Funds for which no independent market existed – had complete control over the reported NAV of the High-Grade Overseas Fund.

57.    The High-Grade Overseas Fund, from its inception through its collapse in the Spring and Summer of 2007, therefore was perceived as never having a losing quarter, and as having ever-increasing NAVs.

58.    Deloitte further perpetuated the Bear Stearns Defendants' fraud by certifying the "mark to model" valuations annually, in violation of GAAS and basic professional standards.

59.    Through these artifices, the Bear Stearns Defendants were able to present to the investing public the fiction that the High-Grade Overseas Fund and its domestic counterpart were successful and profitable.

**The High-Grade Enhanced Overseas Fund**

60.    The Bear Stearns Defendants' quest for increasing fee generation led them to create the High-Grade Enhanced Funds in 2006.

61.    As the Bear Stearns Defendants knew, by this time analysts and economists were warning ardently of the inevitable coming correction – if not collapse – of the U.S. housing market.  As such, the Bear Stearns Defendants knew that to make the High-Grade Enhanced Funds saleable – and thereby to succeed in

generating supra-normal fees for themselves – they had to persuade prospective investors that the High-Grade Enhanced Funds would be even more profitable and even safer investments than the High-Grade Funds, notwithstanding the foreseeable market changes.

62.     They did this, not by changing the structure of the funds to meet the forthcoming correction, but by falsely marketing the High-Grade Enhanced Overseas Fund to existing High-Grade Overseas Fund investors, as well as to new investor candidates, as a better, smarter and "safer" version of the original High-Grade Overseas Fund, and one that was designed to generate greater investor returns through the "enhanced" use of "leverage" – the borrowing of money to multiply the invested cash.

63.     This new "enhanced" fund was marketed as "safer" because the Bear Stearns Defendants represented it would invest in an even greater concentration of the "safest" tranches of CDOs – as measured by Ratings Agency rating levels.

64.     To further entice investors to participate in the High-Grade Enhanced Overseas Fund, a reduced management fee was offered (1%, as compared to the more standard 2%). Additionally, a reduced performance fee of 19% (as compared to the more standard 20%) was offered to High-Grade Overseas

Fund investors willing to transfer their positions into the High-Grade Enhanced Overseas Fund.

65.     However, the Bear Stearns Defendants failed to disclose with respect to this new High-Grade Enhanced Overseas Fund – as they had failed with respect to the "non-enhanced" High-Grade Overseas Fund – that, as constructed, it was doomed to failure; again, owing to its untenable sensitivity to even the most miniscule risks of default in the mortgages underlying the CDOs in which it invested, and to even a small fractional slowdown in the unprecedented growth of the U.S. residential real estate market.

66.     The Bear Stearns Defendants also failed to disclose that these risks were not and could not be effectively hedged through any offsetting investment strategy; and again, owing to the opacity of the Funds' structures, only Bear Stearns, Deloitte, and other trusted Bear Stearns' advisors knew – or could have known – of the nature and magnitude of these risks.

67.     As in the High-Grade Overseas COM, the Bear Stearns Defendants collaborated to make multiple misrepresentations in the High-Grade Enhanced Overseas Confidential Offering Memorandum ("High-Grade Enhanced Overseas COM"), dated August 2006.  These included:

> The Investment Manager [BSAM] will use its structuring and research experience to identify structured finance securities with fundamentally strong credit risk profiles that are priced attractively.  A significant portion of the investment return of

the Master Fund is expected to be current income resulting from a positive yield spread between the investment income of the investments (together with any corresponding hedging instruments) of the Master Fund and the associated borrowing costs. Additionally, to the extent that the Master Fund's assets increase in value, the Master Fund may realize capital appreciation. High-Grade Enhanced Overseas COM at p. 15.

\*          \*          \*          \*

The Investment Manager carries out the Master Fund's investment process and risk control procedures by analyzing the potential interest and principal flows on the CDO or structured finance securities owned by the Master Fund. Various models and valuation tools are used to quantify the likelihood of future payments on both the underlying assets held by a CDO or structured finance vehicle as well as securities issued by the CDO or structured finance vehicle. These tools are derived from internally constructed, broker-dealer and third-party vendor analytical systems. The Investment Manager also utilizes default modeling and credit-adjusted spread pricing applications to assess relative value opportunities in the structured finance market. High-Grade Enhanced Overseas COM at p. 16.

\*          \*          \*          \*

The primary focus of the Investment Manager will be to assess the credit risk inherent in every potential investment and to monitor the credit risk of the investments held by the Master Fund. The objective of the analysis is to determine how the frequency and severity of defaults of the underlying assets of each of the structured finance securities will impact the interest and principal payments on those securities. Because each of the investments held by the Master Fund is essentially a construct of a large and diversified collection of individual assets, it is possible to monitor the performance of the underlying assets in a quantitative way. Unlike investments in corporate fixed-income securities where the credit performance of the issue is binary (the bond is either current in its obligations to make interest and principal payments or it is in default) the credit

performance of a structured finance security is directly related to the observable cash flow characteristics of the underlying assets. In addition, it is anticipated that substantially all of the structured finance securities purchased by the Master Fund will have credit enhancement mechanisms which, when the underlying pool of assets experiences credit degradation beyond objectively defined levels, cause cash flow to be diverted away from the more junior structured finance securities and towards the securities held by the Master Fund. High-Grade Enhanced High-Grade Enhanced Overseas COM at p. 16.

$$*\qquad*\qquad*\qquad*$$

[T]he Master Fund intends to concentrate its investments in the investment-grade classes of structured finance securities. For all investments (excluding Repackaging Vehicle Junior Interests) the Master Fund has targeted a portfolio rating composition of approximately 90% structured finance securities rated from AAA to AA- by Standard & Poor's, from Aaa to Aa2 by Moody's or from AAA to AA- by Fitch. The 10% balance of the portfolio (excluding Repackaging Vehicle Junior Interests) may be rated below such ratings. The above percentages are target concentrations only. The Master Fund will not be required to sell any security that is downgraded subsequent to its purchase by the Master Fund. It is anticipated that no more than 30% of the Master Fund's Net Asset Value will be invested in Repackaging Vehicle Junior Interests at the time any Repackaging Vehicle Junior Interest investment is made. The Repackaging Vehicle Junior Interests will generally not be rated. High-Grade Enhanced Overseas COM at p. 19-20.

$$*\qquad*\qquad*\qquad*$$

The Investment Manager is responsible for the investment decisions made on behalf of the Fund and the Master Fund. There are no restrictions on the ability of the Investment Manager and its affiliates to manage accounts of other clients following the same or different investment objective, philosophy, and strategy as those used for the Fund. In fact, the Investment Manager and its affiliates currently manage and expect to continue to manage other portfolios that may invest

pursuant to the same or different strategies as those employed by the Fund.  High-Grade Enhanced Overseas COM at p. 35.

\*        \*        \*        \*

As [investment] situations may involve conflicts between the interest of the Investment Manager or its related persons, on the one hand, and the interests of the Investment Manager's clients, on the other, the Investment Manager has established internal policies to ensure that the Investment Manager and its personnel do not prefer their own interests to those of the Investment Manager's clients and that clients are treated fairly. High-Grade Enhanced Overseas COM at p.35.

\*        \*        \*        \*

Asset Valuation:  The fees payable to the Investment Manager are based directly on the Net Asset Value of the Fund as of various dates.  There may be no public market price for a portion of the Fund's assets.  The Investment Manager will generally value the Fund's assets.  Any financial instruments for which market quotations are not readily available will be valued at fair value as reasonably determined in good faith by the Investment Manager.  The Investment Manager will have a conflict of interest in making such valuations because the valuations directly affect the Net Asset Value of the Fund and thus the amount of the Advisory Fee and Incentive Fee that the Investment Manager receives in respect of its services.  Such valuations, however, will be performed by the Investment Manager in accordance with the methodology described in this Memorandum.  High-Grade Enhanced Overseas COM at p. 39.

\*        \*        \*        \*

Transactions between the Fund and the Investment Manager or its Affiliates: Members of the boards of directors of the Fund and the Master Fund who are not affiliated with the Investment Manager or their delegates or other authorized representatives of the Fund or the Master Fund will have the responsibility for approving any transactions between the Fund or the Master

Fund and the Investment Manager or its affiliates involving significant conflicts of interest (including principal trades).

More particularly, Directors unaffiliated with the Investment Manager or any delegate designated by such Directors will be responsible for approving any principal transactions for which Master Fund consent is required pursuant to Rule 206(3) of the Advisers Act.  High-Grade Enhanced Overseas COM at pp. 48-49.

*        *        *        *

The Net Asset Value per Share of each Series shall be the Net Asset Value of such Series divided by the number of Shares outstanding in such Series.  The valuation of positions held by the Master Fund (or the Fund) will be made by the Investment Manager and reported to the Administrator.  High-Grade Enhanced Overseas COM at p. 61.

*        *        *        *

If for specific assets the official close of business prices do not, in the opinion of the Investment Manager or its designee, reflect their fair value or are not available, the value shall be calculated with care and in good faith by the Investment Manager or its designee with a view to establishing the probable realization value for such assets as at the close of business on the valuation date.  High-Grade Enhanced Overseas COM at p. 61.

*        *        *        *

There is no active market for Repackaging Vehicle Junior Interests.  The Investment Manager will use a fair-value methodology for determining the value of Repackaging Vehicle Junior Interests.  This methodology will consist of taking the present value of the future stream of projected cash flows to the Repackaging Vehicle Junior Interests over the projected life of the Repackaging Vehicle.  The discount rate used in this analysis will be determined primarily by assessing the credit quality of the collateral pool of the Repackaging Vehicle.

The foregoing valuations may be modified by the Investment Manager or its designee, in its sole and absolute discretion, if and to the extent that it shall determine that such modifications are advisable in order to reflect restrictions upon marketability or other factors affecting the value of assets or to obtain asset valuations within the time frames set by the Investment Manager. Without limiting the generality of the foregoing, the valuation of an asset by the Investment Manager or its designee may reflect the amounts invested by the Fund in such asset, notwithstanding that such amounts may not represent the market value of such asset. The Investment Manager or its designee may also follow some other prudent method of valuation other than that referred to above if it considers that in the circumstances such other method of valuation should be adopted to reflect fairly the values of relevant investments or liabilities or to otherwise protect the interests of the Shareholders. The Investment Manager is entitled to exercise its reasonable judgment in determining the values to be attributed to assets and liabilities and provided it is acting bona fide in the interest of the Fund as a whole, such valuation is not open to challenge by current or previous investors. High-Grade Enhanced Overseas COM at p. 62.

68.     The Bear Stearns Defendants willfully made numerous other false representations to potential investors, which included existing investors in the High-Grade Funds. These representations included statements that the High-Grade Enhanced Funds would be "less risky" and composed of "more conservative assets" and that it would be "super stable."

69.     And, as with the High-Grade Funds, the Bear Stearns Defendants represented that the High-Grade Enhanced Funds' books would be maintained in accordance with U.S. GAAP, and would be audited by Deloitte, in accordance with GAAS.

- 35 -

70.    By these representations, the Bear Stearns Defendants intended to and did communicate that the High-Grade Enhanced Overseas Fund was designed to generate returns greater than its High-Grade predecessor, but still would be a relatively low yield, safe investment, which would permit investors to participate in the booming housing market with little risk of loss due to defaults. By so doing, the Bear Stearns Defendants were able to obtain over $500 million in investments into the High-Grade Enhanced Funds between the second quarter of 2006 and the second quarter of 2007.

71.    As with the High-Grade Overseas Fund, the Bear Stearns Defendants generated fictional paper returns by "marking" the investment portfolio to a "model" of Bear Stearns' own creation on a month-to-month basis, without properly testing or adjusting this model to reflect market realities. The flaws and divergences from market reality in this model must have been even more clear to the Bear Stearns Defendants than they were initially in respect of the High-Grade Overseas Fund's model.

## THE FRAUD

72.    In structuring, marketing, and reporting the performance of the Overseas Funds, the Bear Stearns Defendants represented that the funds would be principally comprised of favorably risk-rated slices of CDOs, and that the Bear Stearns Defendants would utilize their substantial risk management expertise and

experience to ensure that they were relatively safe, conservative investment vehicles. Deloitte further assured investors that it was conducting independent, thorough, and objective audits, including, among other things, testing the Bear Stearns Defendants' "manager marks."

73.    Instead of living up to any of these assurances, all of the Defendants acted in their own, individual best interests, to the catastrophic detriment of the Overseas Funds and their investors.

74.    First, while the Bear Stearns Defendants appear to have initially structured the Overseas Funds utilizing tranches of CDOs that individually were deemed by the Ratings Agencies to be among the safest available – attaining AAA or AA ratings or their equivalents – they knew throughout (and Deloitte later learned, or was obligated to discover and willfully or recklessly failed to do so), that the ways in which Bear Stearns assembled and leveraged these otherwise relatively safe components into portfolios doomed the Overseas Funds to failure. These structural defects included, among others, repackaging of AAA and AA rated CDO tranches to unreasonably magnify the Overseas Funds' aggregate exposure to risky (sub-prime and other) components of those tranches' investments, and structuring the investments in such a way that their aggregate embedded leverage in certain instances appears to have exceeded 30x – with

average leverage dramatically, unreasonably, and ultimately, fatally exceeding what was disclosed to, or could reasonably have been foreseen by, investors.

75.    Second, the Bear Stearns Defendants perpetuated their fraud through improperly "marking" the performance of each of the Overseas Funds, by way of the Manager Mark Scheme described below.  Deloitte knowingly facilitated this scheme.

76.    Finally, following the initial structuring of each of the Overseas Funds, the Bear Stearns Defendants expanded their fraud by using each of the Overseas Funds as dumping grounds for some of the worst, most dangerous securities on Bear Stearns' books – including through a series of impermissible insider transactions, as described in detail in the Blow-Up section below.

77.    Throughout each of these courses of conduct, Defendants' statements respecting the Overseas Funds were false; were known by the Defendants to be false when made; and were made with a reckless disregard for their truth or falsity for at least the following reasons:

**The Manager Mark Scheme**

78.    In hedge funds of the kind herein involved, underlying securities can be valued in a number of ways.  The best and most accurate is the "mark-to-market" valuation system, whereby at stated intervals, the investment manager will take a security and adjust its value to an external, published and

reliable market price. Thus, where a fund invests in, for example, Google or gold, on the first day of a given period, it will look to one of several available published sources for the price of Google or gold at the end of the preceding monthly or other defined period – and be able to compute that the value of the fund's investments has increased by some specified amount per unit.

79.    The mark-to-market system is the most desirable one because where a readily verifiable market exists, the correct valuation is relatively simple and not subject to dispute.

80.    However, with respect to the CDOs and like securities in which the Master Funds were investing, there was no active market. Such securities do not trade on the New York Stock Exchange, the NYMEX, or any other recognized exchange. The valuation of such securities is thus left to a more subjective "manager marks" methodology – in other words, the investment manager is responsible for determining at specific time periods the then-fair market value of the relevant securities, i.e., what value the securities would bring, liquidated in an arms' length transaction.

81.    While a provision of "manager marks" is, by definition, a subjective exercise, especially where the manager has not itself sold the underlying securities in fair market transactions, managers are supposed to seek to ensure the reasonability of their marks by external validation. This may include

- 39 -

communications with brokers and other third parties who have had actual instances of buying or selling like securities, or who can otherwise provide objective, good faith estimates of value in the absence thereof.

82.    BSAM recognized its obligations to ensure that its "manager marks" were not merely arbitrary, self-serving or based on no or insufficient factual information, stating in both the High-Grade Overseas COM and the High-Grade Enhanced Overseas COM that such valuations would be calculated with care and in good faith in order to establish probable realization values, and that prudent methods of valuation would be used to reflect fairly the values of all investments and liabilities where such valuation methods were utilized.

83.    In a purported effort to minimize the arbitrary and potentially inaccurate qualities of "manager marks" and thereby to discharge its duties to the Funds, BSAM asserted that it utilized various computer models that were supposed to provide a reasonable, fair value for the securities in which the Overseas Master Fund invested.

84.    However, utilization of such models can be reasonable only where a manager, among other things, periodically evaluates the model against its own sales of securities in the open market to see whether the model comports with reality or, failing that, looks to comparable sales by third parties of the same or

similar securities, and adjusts the model if those comparable sales reflect that the model does not comport to market realities.

85.    Although there were few, if any, redemptions from the High-Grade and High-Grade Enhanced Overseas Funds such as to require a liquidation of collateral – something which would have permitted the Bear Stearns Defendants to test whether the models they had developed comported with market realities – there were innumerable sales of underlying securities the same as, or similar to, those which were invested in by the High-Grade and High-Grade Enhanced Overseas Funds from their inception until the time of the events giving rise to this action.  BSAM could have looked – and in fact, was required to look – to those transactions for purposes of testing the fairness and reliability of its computer model and the "manager marks" being generated pursuant to that model.

86.    Additionally, BSAM could easily have seen – and in fact, was required to analyze and adjust for – the fact that market values of CDOs worldwide were declining precipitously during the latter part of 2006 and early in 2007.  It also may have found and any prior time that its models failed to reflect market reality regarding a portion of its CDO investments even before the 2006 decline began.  Yet BSAM failed to engage in any such market testing.

87.    Had BSAM satisfied either of the foregoing duties, it would have found that its computer models systemically overvalued the true market

prices of the securities in which the High-Grade and High-Grade Enhanced Overseas Funds were investing, with the concomitant result that its "manager marks" were overvalued.

88.     Because securities that were "manager marked" rather than "marked-to-market" were, at all times relevant hereto, a significant – and likely majority – portion of the Funds' overall assets, and the manager marks were grossly overvalued, this led to the Funds having NAVs that were willfully overstated in material amounts.

89.     By so doing, BSAM significantly enhanced the amount of fees that it, and the Bear Stearns Defendants, earned, and was enabled to keep its fraudulent scheme alive so as to continue earning excessive fees in the future.

90.     Further, given Bear Stearns' pre-eminence in the relevant investment community, and its access to and constant communication with others investing in and selling the same or similar securities underlying the Funds' investments (including in Bear Stearns' role as a broker), it is inherently incredible that BSAM did not have actual knowledge that its computer models were flawed and systemically overvaluing the relevant securities and NAVs of the Funds.

91.     Finally, BSAM reported returns to investors listing investments by categories (not by individual security).  Although these forms had a category "Sub-prime Market" and reflected that only 6.1% of the High-Grade Enhanced

Master Fund's exposure was in the volatile and risky Sub-prime Market, it is now clear that, as structured, the Funds' embedded sub-prime exposure through other reported categories brought the total sub-prime exposure to a multiple of the asserted 6.1%.

## Deloitte & Touche LLP

92.    One objective check on the ability of a manager to abuse the "manager mark" system is that investment funds of this sort must be subject to timely audits by a reputable "independent" third-party auditor.  Without such audits, the funds, which are otherwise non-transparent – i.e., investors are not able to see what investments they have made or verify their financial reporting – would be unsaleable.

93.    Accordingly, such funds frequently utilize "household name" auditors in an effort to acquire credibility by association – in other words, the engagement of a Deloitte, or another "big four" auditor, will increase a fund's value in a greater quantum than if the fund was to hire a "no-name" auditor, by reason of the market perception that the brand name auditor will ensure there is no material misrepresentation in respect of valuations, or other material balance sheet items, by management, whether deliberate or accidental.

94.    Bear Stearns thus caused the High-Grade and High-Grade Enhanced Overseas Funds, and their respective Master Funds, to engage Deloitte

(Bear Stearns' regular auditor of choice) as their independent auditor. Deloitte, in turn, rendered reports to the Overseas Funds on the financial condition of the Master Funds' investments and the valuations contained therein.

95.    As here relevant, on April 24, 2007, Deloitte rendered reports for the fiscal year ending December 31, 2006 for the Overseas Funds, which reports the Bear Stearns Defendants and Deloitte intended that the Overseas Funds, and the investors therein, would rely upon. With respect to the manager marks being utilized by the High-Grade Overseas Fund, Deloitte stated the following at page 20 of its report:

> As described in Note 2 [to the audited financial statements], securities with a total market value of $616,023,080, 70.19% of the Master Fund's net assets, represents securities which were fair valued by the Master Fund's management. The Master Fund's management has estimated the fair value of these securities in the absence of readily ascertainable market values. These values may differ from the values that would have been used ha[d] a ready market for these investments existed, and the differences could be material.

With respect to the manager marks being utilized by the High-Grade Enhanced Overseas Fund, Deloitte stated the following at page 20 of its report:

> As described in Note 2 [to the audited financial statements], 63.10% of the Master Fund's net assets, represents securities which were fair valued by the Master Fund's management. The Master Fund's management has estimated the fair values of these securities in the absence of readily ascertainable market values. These values may differ from the values that would have been used had a ready market for these investments existed, and the differences could be material.

96.    Nonetheless, Deloitte delivered "clean" audit opinions on each
of the Overseas Funds' financial statements "as a whole" purportedly in
accordance with GAAS, stating at page 2 of each report:

> We conducted our audit in accordance with auditing standards
> generally accepted in the United States of America.
>
> In our opinion, the financial statements present fairly, in all
> material respects, the financial position of the Fund as of
> December 31, 2006, the results of its operations, changes in its
> net assets, and its cash flows for the year then ended, in
> conformity with accounting principles generally accepted in the
> United States of America.

97.    However, applicable auditing standards require otherwise.
Specifically, AU 508.11, states: "Certain circumstances, while not affecting the
auditor's unqualified opinion, may require that the auditor add an explanatory
paragraph." The standard goes on to give examples and illustrations. However, it
makes clear that such an explanatory paragraph is not intended to provide the
auditors a free-pass or an "out" if the asset being valued by management is a
departure from GAAP; i.e., it is not reported at fair value.

98.    The explanatory paragraph in the Deloitte audit opinion
references Note 2 of the Master Fund's financial statements, which simply states
that the fund records its investments in the Master Fund at fair value, uses marks
developed by management for a large portion of the portfolio, these marks may
differ from marks had there been a ready (liquid) market for these investments, and
that valuation of securities is discussed further elsewhere in the report. In any

event, the auditors are required to test the validity of management's representations and assertions.

99.    As the audit report does not identify any testing, it appears that the auditors merely relied on management's representations (which is insufficient under GAAS), or undertook insufficient steps to test the marks, and failed to meet the standards in the area of "Due Professional Care" and obtaining "Competent Evidential Matter," especially for an asset line item that represents a very substantial percentage of total assets.  As such, it appears that Deloitte did not perform an audit in accordance with U.S. GAAS, but rather should have performed (or in fact did perform) a compilation instead of an audit.

100.    Given the relevant standards and Deloitte's ignoring them, it further appears that Deloitte acted in a reckless disregard of its contractual and fiduciary obligations to the Funds, or possibly succumbed to pressure from the Bear Stearns Defendants to ignore the inaccurate and improper valuations being used by BSAM, and Deloitte thereby furthered the Bear Stearns Defendants' fraudulent scheme, to provide continuing and substantial fees for its.

**The Blow-Up**

101.    As a result of the fiduciary duty to manage conflicts of interest, investment managers generally maintain internal controls, compliance managers and a board of directors to police conflicts of interest and safeguard their client

- 46 -

investors. BSAM represented that it would do so. However, BSAM and its officers and directors deliberately disregarded, or at a minimum, seriously failed to manage, conflicts of interest for the Overseas Funds, which was in violation of their fiduciary duties.

102. In recognition of the possibility for conflicts of interest, each of the Overseas Funds' Confidential Offering Memorandum provided that the funds' operating procedures required disclosure, consent and approval from an "unaffiliated director" before a deal with BSSC – the Bear Stearns broker-dealer – could be completed. But BSAM did not follow those operating procedures and hundreds of related-party transactions did not obtain the approvals required by federal law and promised in the Confidential Offering Memoranda. Of the transactions that required prior approval from the Unaffiliated Directors, 78.95% were missing such approval in 2006, 58.66% in 2005, 29.73% in 2004, and 18% in 2003.

103. BSAM utilized untrained and unsupervised personnel to oversee these conflict screening procedures. And when pressure began to mount on the "unaffiliated directors" of the High-Grade Overseas Fund who had the duty to ensure the fund's compliance, Bear Stearns replaced these unaffiliated directors with persons from Walkers Fund Service – a commonly owned and controlled affiliate of Bear Stearns' long time Cayman law firm, Walkers. As such, those

- 47 -

new directors were not independent, and in critical instances, took their direction

from Bear Stearns and further ignored the relevant conflict screening requirements.

Bear Stearns also utilized the same Bear Stearns-affiliated directors in the High-

Grade Enhanced Overseas Fund.

104.   As the U.S. housing market downturn continued, it became

impossible for BSAM to keep up its fraudulent Manager Mark scheme.  The

situation became so dire that in September 2006, Cioffi considered closing the

High-Grade Funds altogether.  However, Cioffi knew that he could not risk any

meaningful volume of redemptions from the High-Grade Funds, as that would

expose the total absence of liquidity, and the fraudulent manager mark scheme.  He

therefore considered requesting that all of the High-Grade Funds' investors

voluntarily transfer into the High-Grade Enhanced Funds' structure:

> What I was thinking was to build up 6 [months] of returns then
> send a letter to all the remaining investors and tell them we are
> closing the [High-Grade Funds] and ask everyone to convert to
> [the Enhanced Funds].  We'd have to handle it like we did thru
> an exchange of assets[.]  I would not want to have to sell
> everything.  This is the riskiest way to go because you know
> some [limited partners] will not convert but I feel comfortable
> that we can get almost all of them to.  (Barclays complaint ¶
> 118)

105.   Ultimately, Cioffi and the other Bear Stearns Defendants made

the decision that there was no need to shut down one revenue stream from their

massive fraud in favor of another.  They would just ask High-Grade Funds

investors to "double down," investing in the new High-Grade Enhanced Funds as well. This had the dual beneficial effects of avoiding meaningful redemptions from the High-Grade Funds, and paving the way for launch of the High-Grade Enhanced Funds, with a baseline of investors that had already fallen prey to the scheme.

106.    To do this, the Bear Stearns Defendants knew they had to ensure there were no redemptions from the High-Grade Funds, while selling existing and prospective investors on the new "Enhanced" Funds – quite a challenge as the U.S. housing market was turning down in the second half of 2006.

107.    Accordingly, Cioffi and his cohorts provided investors with financial updates and projections, which they knew to be false and unrealistic. These resulted, among other things, in certain investors shifting their investments from the High-Grade Funds to the High-Grade Enhanced Funds, and some High-Grade Funds investors putting new, additional money into the High-Grade Enhanced Funds.

108.    When concerns later surfaced respecting all of the Funds, on March 31, 2007, BSAM sent letters to investors stating that the concerns were unfounded and that they were:

> "...the result of fear of an unprecedented increase in the cumulative losses these portfolios will suffer over time, not an actual deterioration in credit on the underlying bonds in our portfolio." Hedge Fund Alert (June 6, 2007), p. 2.

- 49 -

109.    BSAM also hosted a conference call in the latter part of April, at or about the time the Deloitte audit report was released.  On that call, Cioffi advised the funds would have a loss of less that 1% for the month of April.

110.    When certain High-Grade Enhanced Overseas Fund investors gave notice of their intention to redeem their investments, BSAM provided "future outlooks" designed to show that the Funds were strong and flourishing, in an effort to persuade the investors to withdraw their redemption requests.

111.    During this period, to enable the Bear Stearns Defendants to mitigate investment risks in other Bear Stearns-branded investment vehicles that were subject to closer investor scrutiny, while continuing to generate multiple levels of fees for the entire Bear Stearns family, the Bear Stearns Defendants decided to use the Funds as dumping grounds for certain risky assets acquired, or created, by other Bear Stearns entities.  This accelerated, and further assured, the demise of the High-Grade and High-Grade Enhanced Overseas Funds.

112.    For example, on or about February 28, 2007, the Bear Stearns Defendants caused the High-Grade Enhanced Fund to buy all of the equity securities, and several risky debt tranches, of a CDO-squared deal (with a combined price of approximately $140 million).

113.    In May 2007, Bear Stearns sold large portions of two tranches of another extremely risky offering that it was underwriting into the High-Grade

Enhanced Fund, even though it knew that the previously asserted value of the High-Grade Enhanced Fund was quickly unraveling.

114.    The Bear Stearns Defendants further caused the High-Grade Enhanced Fund to buy all of the securities in all the tranches of an extremely risky April 18, 2007 Tahoma CDO-squared offering (with a combined price of approximately $150 million) that BSAM was managing.

115.    The Bear Stearns Defendants also were, throughout the period, accumulating illiquid assets in the High-Grade Enhanced Fund that were sold in non-arms-length transactions, to help BSAM succeed in other roles. In the process, BSAM was collecting fees as the CDO arranger and manager, and collecting another set of fees from the High-Grade Enhanced Fund structure.

116.    As late as May 24, 2007, when it was becoming clear even to investors that the value of the High-Grade Enhanced Fund was plunging, the Bear Stearns Defendants caused the High-Grade Enhanced Fund to buy large portions of the securities (with a combined price of approximately $500 million) from the six riskiest tranches (omitting only the safer A1A tranche) of another CDO-squared offering (BSAG 2007-1A) for which BSAM served as manager. The Bear Stearns Defendants caused the High-Grade Enhanced Fund to purchase the majority of each of those six tranches, and then caused the High-Grade Fund to purchase the remainder of each tranche.

117.   The Bear Stearns Defendants attempted to conceal this obvious misconduct and self-dealing by promptly transferring the High-Grade Enhanced Fund's highest-risk assets – CDO Squareds that contained the lowest rated tranches and unrated "equity" – out of the High-Grade Enhanced Fund and into another new BSAM-led entity – Everquest Financial Ltd. ("Everquest").

118.   By so doing, the Bear Stearns Defendants knew they would not have to report these low-quality investments on the Balance Sheet for the High-Grade Enhanced Fund, but the fund would still indirectly own the exact same assets because it held a significant percentage of the equity in Everquest.

119.   The Bear Stearns Defendants sought to further grow and diffuse their fraud's reach by conducting an IPO of Everquest.

120.   Everquest was jointly run by BSAM and Stone Tower LLC. Cioffi, in addition to his roles at BSAM, was also co-chief executive of Everquest.

121.   On May 9, 2007 Everquest filed a Form S-1 with the SEC for its planned IPO. Everquest's filing disclosed that a significant portion of the assets (valued by Everquest and BSAM at $548.8 million) in its approximately $720 million portfolio had been purchased in 2006 and 2007 from the High-Grade and High-Grade Enhanced Funds. In return, the funds received 16 million shares of Everquest (valued by Everquest and BSAM at $25 per share) and $148.8 million in cash.

122.   The largest transfer from the High-Grade and High-Grade Enhanced Funds to Everquest involved the lower/riskier tranches of Parapet, a BSAM-managed vehicle that created CDOs out of CDO-squared and other CDO securities (potentially creating the first ever CDO Cubed), many of which were also from vehicles managed by BSAM.

123.   The Everquest S-1 listed Cioffi as a beneficial owner of Everquest shares. In addition, upon the IPO, BSAM would receive new share grants representing 2.5% of Everquest's outstanding shares for BSAM's designees.

124.   BSAM also benefited from the Everquest arrangement because it was entitled to management and incentive fees from Everquest, in addition to its fees associated with the High-Grade and High-Grade Enhanced Fund structures. Likewise, the other Bear Stearns Defendants would benefit from an Everquest IPO through underwriting fees.

125.   In addition to executing the above-referenced insider transfer, the Bear Stearns Defendants also planned the Everquest IPO without regard to the interests and rights of the High-Grade and High-Grade Enhanced Funds' shareholders.

126.   But numerous press articles began describing BSAM's misconduct in connection with Everquest, bringing unwanted security onto the Bear Stearns Defendants. *BusinessWeek* on May 11, 2007 said:

> "Everquest is a fledgling financial-services company that has
> been buying up equity interests in risky bonds backed by
> subprime mortgages form hedge funds managed by Bear
> Stearns…. The deal appears to be an unprecedented attempt by
> a Wall Street house to dump its mortgage bets."

127.    The article further noted that Everquest's portfolio of $720

million dollars of CDOs was primarily purchased from hedge funds managed by

Bear Stearns and noted that the interrelationships between Bear Stearns and

Everquest created significant conflicts of interest than could impact the success of

the investments.

128.    Shortly, thereafter, on June 5, 2007, the *New York Post* ran an

article regarding the alleged manipulation of the Sub-prime Market by Bear

Stearns:

> "At issue is the motivation behind efforts by Bear's EMC
> Mortgage unit to renegotiate subprime home loans, and whether
> it's solely to prevent homeowners from losing their houses,
> or… simply 'to artificially inflate the value of derivative
> securities.'"

129.    In face of this public scrutiny, the Bear Stearns Defendants

realized they could no longer keep their fraud in check.  While the High-Grade

Enhanced Funds first told investors in late May that their loss for April was only

about 1%, Cioffi later "adjusted" that number to minus 6% and, on June 5, 2007,

admitted to investors that the High-Grade Enhanced Fund needed to remark its

portfolio because four bonds were significantly overstated in April values.  The

- 54 -

effect would be to drive the April 2007 return from minus 6 to minus 16, and to reduce the fund's cash position from $250 million to $100 million. Cioffi further indicated that the High-Grade Enhanced Fund would be unable to liquidate positions to cover the redemptions that had been placed.

130. The house of cards that was the High-Grade Enhanced Overseas Fund was so weakly supported that it did not tremble, but collapsed. Thus, on June 7, 2007, BSAM held a conference call to inform High-Grade Enhanced Fund investors that the losses in April had now been revised to minus 19, and that the Funds were suspending all redemptions.

131. By July 18, 2007, the Bear Stearns Defendants finally admitted that the Funds had not just lost profitability, but viability, and that liquidation was BSAM's only strategy. In a letter dated July 17, 2007 to investors, Bear Stearns stated as follows:

> Dear Client of Bear, Stearns & Co. Inc.:
>
> Let me take this opportunity to provide you with an update on the status of the High-Grade Structured Credit Strategies and High-Grade Structured Credit Strategies Enhanced Leveraged Funds managed by Bear Stearns Asset Management. A team at BSAM has been working diligently to calculate the 2007 month-end performance for both May and June for the Funds. This process has been much more time-consuming than in prior months due to increasingly difficult market conditions.
>
> As you know, in early June, the Funds were faced with investor redemption requests and margin calls that they were unable to meet. The Funds sold assets in an attempt to raise liquidity, but

- 55 -

were unable to generate sufficient cash to meet the outstanding margin obligations.

132.   In the same letter, Bear Stearns stated that it was restructuring the risk management function at BSAM.  Shortly thereafter, Bear Stearns announced the resignation of its co-president and chief operating officer, Warren Spector, stating that "In light of recent events concerning BSAM's... High Grade and Enhanced Leverage funds, we have determined to make changes in our leadership structure."  Associated Press Financial Wire (August 5, 2007)

133.   But by then, of course, word of the Funds' collapse was out, and the Funds were, by every meaningful measure, dead.

## THE AFTERMATH

134.   Although BSAM had represented that the only viable strategy after July 2007 was an "orderly wind down" of the Funds, the shareholders of the High-Grade Enhanced Overseas Fund did not agree.  In particular, desirous of taking over the destiny of the fund, in no small part to ensure that it would make a truly independent investigation of the causes for its downfall and with an eye toward pursuing litigation or other remedies belonging to the fund, these shareholders began an initiative to eject Bear Stearns' directors, or the "Bear Board" (comprised of three Bear Stearns employees and two employees of Walkers Funds Services), and to replace them with independent directors other investors' choosing.

135.   Although the investors were successful in replacing the Bear Board with their chosen representatives, BSAM, in conjunction with its U.S. and Cayman advisors, prior to the director change had taken actions to place the Overseas Funds into liquidation, thereby neutralizing any power of the newly elected board.

136.   Immediately thereafter, Bear Stearns' lawyers sought to convert the voluntary liquidation to a court supervised liquidation in the Cayman Islands.

137.   In response to this, and citing claims of improper liquidation resolutions, as well as independence and conflict of interest issues, the investor group commenced actions in the Cayman Courts seeking to undo the liquidations, or in the alternative, an order removing the Bear Stearns-designated liquidators and replacing them with Plaintiffs herein, with the latter being the ultimate outcome.

138.   Following the conclusion of a trial, the Bear Stearns lawyers requested that the Cayman Court put the entire record of proceedings under seal. The Cayman Court has issued an interim order to this effect, as a consequence of which, Plaintiffs can state nothing further in respect of those proceedings except that, on March 20, 2008, the Cayman Court issued an order (Exhibit 1) appointing them as the new liquidators of the Overseas Funds.

## IN AND FOR A FIRST CLAIM
## <u>UPON WHICH RELIEF CAN BE BASED</u>
### (Fraud)

139.    Paragraphs 1 through 138 are repeated and incorporated by reference as though more fully stated herein.

140.    In creating and managing the Overseas Funds, the Bear Stearns Defendants engaged in a series of misrepresentations and schemes and artifices to defraud, as more fully set forth in paragraphs1-138 above.

141.    At all times during the pendency of these misrepresentations and schemes, the Overseas Funds had independent parties with relevant decision making power who were not aware of, nor complicit in the Bear Stearns Defendants' fraudulent scheme, and such parties, had they known the truth, would have taken immediate steps to stop it.

142.    In reliance upon the integrity of the market, and what the Bear Stearns Defendants made the Funds appear to be, these independent decision makers refrained from taking action until a time when it was too late, and the Plaintiff Funds were driven into liquidation as a direct and proximate cause of the Bear Stearns Defendants' misconduct.  Because these independent decision makers did not have, nor could they reasonably have acquired, knowledge of the Bear Stearns Defendants' fraudulent scheme, they took no such action, as a consequence

of which, the Bear Stearns Defendants, individually and collectively, were able to continue the fraud.

143.   As a consequence of the foregoing, the Plaintiff Funds have ceased to exist as functional, viable entities, and have lost all equity value.

144.   As a further consequence of the foregoing, the Bear Stearns Defendants are jointly and severally liable to the Plaintiff Overseas Funds, as the direct and foreseeable victims of the aforesaid fraudulent scheme, in an amount to be determined at trial but believed to be no less than $1 billion.

145.   Because the conduct of the Bear Stearns Defendants was willful and aimed at the market generally, these Defendants should, in addition, be liable for punitive damages in an amount to be determined at trial.

## IN AND FOR A SECOND CLAIM
## UPON WHICH RELIEF CAN BE BASED
### (Breach of Fiduciary Duty)

146.   Paragraphs 1 through 145 are repeated and incorporated by reference as though more fully stated herein.

147.   As fiduciaries, the control persons of fiduciaries, or persons who assumed for themselves the role in fact of fiduciaries, the Bear Stearns Defendants owed the Plaintiff Funds uncompromising fiduciary duties of care, full and candid disclosure, loyalty and the highest good faith, integrity and fair dealing.

148.   Defendants violated these duties in, among other ways, structuring the Overseas Funds so as not to be able to function in the very marketplace in which they intended the Funds to participate; by mismanaging the Funds and failing to provide adequate managerial oversight and risk management; by causing the Funds to engage in a pattern of misrepresentations and deceptive conduct; and by placing their own interests ahead of the interests of the Overseas Funds for which they were fiduciaries.

149.   In creating and managing the Overseas Funds, the Bear Stearns Defendants also engaged in a series of misrepresentations and schemes and artifices to defraud.

150.   As a direct and proximate result of the Bear Stearns Defendants' wrongful conduct, the Overseas Funds suffered damages in an amount to be determined at trial for which the Bear Stearns Defendants are jointly and severally liable to Plaintiffs.

151.   The conduct of the Bear Stearns Defendants in disregarding their duties to, and the interests of, the Overseas Funds was purposeful, knowing, malicious, and without regard for the rights and interests of the Overseas Funds and departed in the extreme from the norms expected of fiduciaries. Accordingly, the Bear Stearns Defendants should, in addition, be liable for punitive damages in an amount to be determined at trial.

## IN AND FOR A THIRD CLAIM
## <u>UPON WHICH RELIEF CAN BE BASED</u>
### (Breach of Contract and Inducing Breach of Contract)

152.   Paragraphs 1 through 151 are repeated and incorporated by reference as though more fully stated herein.

153.   Defendants BSAM and Deloitte had contractual obligations to the Funds – BSAM as Investment Manager to the Overseas Funds and Deloitte as auditor of the Overseas Funds.

154.   These contractual obligations were breached by said defendants.

155.   The other Bear Stearns Defendants, if not legally deemed parties to such contracts, knowingly procured the breach thereof without privilege or justification by, among other things, use of their control positions and power with the fund's contract partners, but for which tortious misconduct the contracts would not have been breached.

156.   As a direct and proximate result of the Bear Stearns Defendants' wrongful conduct, the Overseas Funds suffered damages in an amount to be determined at trial for which the Bear Stearns Defendants are jointly and severally liable to Plaintiffs.

## IN AND FOR A FOURTH CLAIM
## UPON WHICH RELIEF CAN BE BASED
### (Inducing Breach of Fiduciary Duty)

157.    Paragraphs 1 through 156 are repeated and incorporated by reference as though more fully stated herein.

158.    The Bear Stearns Defendants knew that certain other persons, including some that are not parties hereto, owed fiduciary duties to the Overseas Funds.  These other persons include, but are not limited to, Walkers, Deloitte, and Sidley Austin LLP, formerly known as Sidley Austin Brown & Wood LLP (Bear Stearns' U.S. counsel for the Overseas Funds), as well as the individual directors of the Overseas Funds.

159.    The Bear Stearns Defendants, knowingly procured the breach of those other persons' fiduciary duties to the Overseas Funds without privilege or justification, by use of their control positions and power with those other persons, but for which such other persons' fiduciary duties would not have been breached.

160.    As a direct and proximate result of the Bear Stearns Defendants' wrongful conduct, the Overseas Funds suffered damages in an amount to be determined at trial for which the Bear Stearns Defendants are jointly and severally liable to Plaintiffs.

161.    The conduct of the Bear Stearns Defendants in inducing such breaches of fiduciary duty was willful, wanton, knowing, malicious and without

regard for the rights and interests of the Overseas Funds. Accordingly, the Bear Stearns Defendants should, in addition, be liable for punitive damages in an amount to be determined at trial.

**IN AND FOR A FIFTH CLAIM**
**UPON WHICH RELIEF CAN BE BASED**
**(Recklessness, Gross Negligence and Negligence)**

162.   Paragraphs 1 through 161 are repeated and incorporated by reference as though more fully stated herein.

163.   At all relevant times, the Bear Stearns Defendants owed the Overseas Funds a duty to exercise reasonable care, skill and diligence in performing their respective services.

164.   The above actions by the Bear Stearns Defendants, if not knowing and purposeful, were reckless, grossly negligent or negligent and in derogation of the duties that they owed to the Overseas Funds.

165.   As a direct and proximate result of the Bear Stearns Defendants' wrongful conduct, the Overseas Funds suffered damages in an amount to be determined at trial for which the Bear Stearns Defendants are jointly and severally liable to Plaintiffs.

166.   Because the conduct of the Bear Stearns Defendants was willful and/or reckless and aimed at the market generally, these Defendants should, in addition, be liable for punitive damages in an amount to be determined at trial.

- 63 -

## IN AND FOR A SIXTH CLAIM
## <u>UPON WHICH RELIEF CAN BE BASED</u>
### (Negligence and Accounting Malpractice)

167.   Paragraphs 1 through 166 are repeated and incorporated by reference as though more fully stated herein.

168.   At all times relevant hereto, Deloitte was the auditor for the Overseas Funds and owed contractual, fiduciary and profession duties unto the Overseas Funds.

169.   At all times relevant hereto, Deloitte was the auditor for the Master Funds, and prepared audit reports knowing that a small, discreet group – the Feeder Funds and, specifically, the Overseas Funds – would rely upon those reports, that the reports were being prepared with their sole aim and purpose of utilization by the Master Funds to secure investments from the Feeder Funds and the Feeder Funds' investors, and Deloitte communicated directly to the Overseas Funds its understanding and agreement that they could so rely upon Deloitte's audits of the Master Funds for this purpose.

170.   For the reasons set forth, Deloitte's preparation of the Overseas Funds' audits was at a minimum negligent.  In any event it was rendered in violation of applicable GAAS, and was of such a high departure from professional standards as to indicate a gross negligence or recklessness tantamount to fraud on the part of Deloitte.

171.    For the reasons set forth above herein, Deloitte's preparation of the Master Funds' audits was at a minimum negligent.  In any event it was rendered in violation of applicable GAAS, and was of such a high departure from professional standards as to indicate a gross negligence or recklessness tantamount to fraud on the part of Deloitte.

172.    But for Deloitte's faulty, if not fraudulent audits, the Overseas Funds would not have suffered the damage that occurred.  In particular but not in limitation, proper audits by Deloitte reflecting the impropriety of the manager marks, or in the alternative an inability of Deloitte to certify as a whole the balance sheets of the Overseas Funds and Master Funds, would have been a red flag to the shareholders and the investment community and would have resulted in the termination of the Bear Stearns Defendants' fraudulent scheme.

173.    As a direct and proximate result of Deloitte's wrongful conduct, the Overseas Funds suffered damages in an amount to be determined at trial.

174.    Because Deloitte's conduct was willful and/or reckless and without regard for the rights and interests of the Overseas Funds, Deloitte should, in addition, be liable for punitive damages in an amount to be determined at trial.

## IN AND FOR A SEVENTH CLAIM
## <u>UPON WHICH RELIEF CAN BE BASED</u>
### (Conspiracy to Commit Fraud and Breach of Fiduciary Duty or Aiding and Abetting Fraud and Breach of Fiduciary Duty)

175.   Paragraphs 1 through 174 are repeated and incorporated by reference as though more fully stated herein.

176.   Each of the Defendants had actual knowledge of the fraudulent scheme here involved; each of the Defendants, with such knowledge continued in or joined the fraud, rendered substantial assistance to it, and derived substantial benefit therefrom.

177.   No Defendant withdrew from the scheme prior to the date of this complaint.

178.   As a consequence, each Defendant is liable for conspiracy to commit fraud or to commit breach of fiduciary duty or, in the alternative, for the aiding and abetting of fraud and/or the breach of fiduciary duty.

179.   As a direct and proximate result of Defendants' wrongful conduct, the Overseas Funds suffered damages in an amount to be determined at trial.

180.   Because Defendants' conduct was willful and/or reckless and without regard for the rights and interests of the Overseas Fund, Defendants should, in addition, be liable for punitive damages in an amount to be determined at trial.

- 66 -

## IN AND FOR A EIGHTH CLAIM
## UPON WHICH RELIEF CAN BE BASED
### (Unjust Enrichment)

181.   Paragraphs 1 through 180 are repeated and incorporated by reference as though more fully stated herein.

182.   As a result of the fraudulent scheme described above and participated in by the Defendants, the Overseas Funds have been rendered worthless, yet Defendants, individually and collectively, have reaped substantial fees.

183.   Defendants have therefore been unjustly enriched and should be forced to disgorge to the Plaintiffs an amount to be determined at trial.

## JURY TRIAL DEMAND

184.   Plaintiffs demand a trial by jury on each issue triable thereby.


WHEREFORE, Plaintiffs demand judgment:

A      on the First Cause of Action, for damages in an amount to be determined at trial, but not less than $1 billion, jointly and severally, against BSAM, Bear Stearns Companies, Bear Stearns, Cioffi, Tannin and McGarrigal, together with punitive damages;

B.    on the Second Cause of Action, for damages in an amount to be determined at trial, but not less than $1 billion, jointly and severally, against BSAM, Bear Stearns Companies, Bear Stearns, Cioffi, Tannin and McGarrigal, together with punitive damages;

C.    on the Third Cause of Action, for damages in an amount to be determined at trial, but not less than $1 billion, jointly and severally, against BSAM, Bear Stearns Companies, Bear Stearns, Cioffi, Tannin and McGarrigal;

D.    on the Fourth Cause of Action, for damages in an amount to be determined at trial, but not less than $1 billion, jointly and severally, against BSAM, Bear Stearns Companies, Bear Stearns, Cioffi, Tannin and McGarrigal, together with punitive damages;

E.    on the Fifth Cause of Action, for damages in an amount to be determined at trial, but not less than $1 billion, jointly and severally, against BSAM, Bear Stearns Companies, Bear Stearns, Cioffi, Tannin and McGarrigal, together with punitive damages;

F.    on the Sixth Cause of Action, for damages in an amount to be determined at trial, but not less than $1 billion, against Deloitte, together with punitive damages;

G.      on the Seventh Cause of Action, for damages in an amount to

be determined at trial, but not less than $1 billion, jointly and severally, against all

Defendants, together with punitive damages;

H.      on the Eighth Cause of Action, for damages in an amount to be

determined at trial, but not less than $1 billion, jointly and severally, against all

Defendants; and

I.      on all Causes of Action, an award of interest, Court costs,

attorneys' fees and such other and further relief as the Court deems just and proper

against all Defendants.

Dated:      April 4, 2008

REED SMITH LLP

Robert A. Nicholas (RN - 2335)
599 Lexington Avenue
New York, New York 10022
Tel:  212-521-5400
Fax:  212-521-5450
e-mail:  rnicholas@reedsmith.com

**ATTORNEYS FOR PLAINTIFFS**

IN THE GRAND COURT OF THE CAYMAN ISLANDS

CAUSE NO. 551 of 2007

IN THE MATTER OF THE COMPANIES LAW (2007 REVISION)

AND IN THE MATTER OF BEAR STEARNS HIGH-GRADE STRUCTURED CREDIT STRATEGIES ENHANCED LEVERAGE (OVERSEAS) LTD. (IN VOLUNTARY LIQUIDATION)

---

### ORDER

UPON hearing the Applicants' Ordinary Application filed herein on 7 December 2007

AND UPON reading the documents recorded on the Court file as having been read

AND UPON hearing Counsel for the Applicants, the Joint Voluntary Liquidators of the Company, Walkers SPV Limited and Bear Stearns Asset Management Inc

AND UPON no order being made on paragraphs 1-3 of the Ordinary Application

IT IS ORDERED AS FOLLOWS:

1.  The voluntary winding up of the Company should continue subject to the supervision of the Court.

2.  Geoffrey Varga and William Cleghorn of Kinetic Partners be appointed pursuant to section 153 of the Companies Law as liquidators of the Company in place of Simon Whicker and Kris Beighton of KPMG.

3.     The Applicants' costs of and occasioned by their Ordinary Application be borne equally by Walkers SPV Limited and Bear Stearns Asset Management Inc, such costs to be taxed if not agreed.

Dated this 22nd day of February 2008

Filed this   2ⁿᵈ day of March 2008

Hon. Justice Smellie, Q.C.
Judge of the Grand Court

APPROVED AS TO FORM AND CONTENT

*Appleby*

Appleby
Attorneys for the Applicants

*Conyers Dill & Pearman*

Conyers Dill & Pearman
Attorneys for the Joint Voluntary Liquidators

*Nelson + Company*

Nelson & Company
Attorneys for Walkers SPV Limited

*Turner + Roulstone*

Turner & Roulstone
Attorneys for Bear Stearns Asset Management Inc

Filed by Appleby, Attorneys-at-Law for the Applicants, whose address for service is that of its said Attorneys, namely Clifton House, 75 Fort Street, PO Box 190, Grand Cayman KY1-1104, Cayman Islands (Ref.: JST/12742.001).

IN THE GRAND COURT OF THE CAYMAN ISLANDS

CAUSE NO. 552 of 2007

IN THE MATTER OF THE COMPANIES LAW (2007 REVISION)

AND IN THE MATTER OF BEAR STEARNS HIGH-GRADE STRUCTURED CREDIT STRATEGIES (OVERSEAS) LTD. (IN VOLUNTARY LIQUIDATION)



**ORDER**

UPON hearing the Applicants' Ordinary Application filed herein on 14 December 2007

AND UPON reading the documents recorded on the Court file as having been read

AND UPON hearing Counsel for the Applicants, the Joint Voluntary Liquidators of the Company, Walkers SPV Limited and Bear Stearns Asset Management Inc

AND UPON no order being made on paragraphs 1–3 of the Ordinary Application

IT IS ORDERED AS FOLLOWS:

1.    The voluntary winding up of the Company should continue subject to the supervision of the Court.

2.    Geoffrey Varga and William Cleghorn of Kinetic Partners be appointed pursuant to section 153 of the Companies Law as liquidators of the Company in place of Simon Whicker and Kris Beighton of KPMG.

J:\12\12742\001\Court Documents\Cayman\Cause No 552 of 2007\Order 080222(5).doc

3. The Applicants' costs of and occasioned by their Ordinary Application be borne equally by Walkers SPV Limited and Bear Stearns Asset Management Inc, such costs to be taxed if not agreed.

Dated this 22nd day of February 2008

Filed this 20th day of March 2008

Hon. Justice Smellie, Q.C.
Judge of the Grand Court

APPROVED AS TO FORM AND CONTENT

_Appleby_

Appleby
Attorneys for the Applicants

_Conyers Dill & Pearman_

Conyers Dill & Pearman
Attorneys for the Joint Voluntary Liquidators

_Nelson & Company_

Nelson & Company
Attorneys for Walkers SPV Limited

_Turner + Roulstone_

Turner & Roulstone
Attorneys for Bear Stearns Asset Management Inc

Filed by Appleby, Attorneys-at-Law for the Applicants, whose address for service is that of its said Attorneys, namely Clifton House, 75 Fort Street, PO Box 190, Grand Cayman KY1-1104, Cayman Islands (Ref.: JST/12742.001).