**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------- x

GEOFFREY VARGA and WILLIAM
CLEGHORN, as Joint Voluntary Liquidators of
Bear Stearns High-Grade Structured Credit
Strategies (Overseas) Ltd. and Bear Stearns
High-Grade Structured Credit Strategies
Enhanced Leverage (Overseas) Ltd., and as
assignees of shares in Bear Stearns High-Grade
Structured Credit Strategies Enhanced Leverage
(Overseas) Ltd.; and STILLWATER CAPITAL
PARTNERS L.P. and ESSEX FUND LIMITED,
individually and derivatively on behalf of Bear
Stearns High-Grade Structured Credit Strategies
Fund, L.P., and Bear Stearns High-Grade
Structured Credit Strategies Enhanced Leverage
Fund, L.P.,

                           Plaintiffs,

                 -against-

THE BEAR STEARNS COMPANIES, INC.,
BEAR STEARNS ASSET MANAGEMENT
INC., BEAR STEARNS & CO. INC., RALPH
CIOFFI, MATTHEW TANNIN, RAYMOND
MCGARRIGAL, GEORGE BUXTON, BARRY
JOSEPH COHEN, GERALD R. CUMMINS,
DAVID SANDELOVSKY, GREG QUENTAL,
MICHAEL ERNEST GUARASCI, DELOITTE
& TOUCHE LLP, DELOITTE & TOUCHE
(CAYMAN), WALKERS FUND SERVICES
LIMITED, SCOTT LENNON AND MICHELE
WILSON-CLARKE; and BEAR STEARNS
HIGH-GRADE STRUCTURED CREDIT
STRATEGIES FUND, L.P., AND BEAR
STEARNS HIGH-GRADE STRUCTURED
CREDIT STRATEGIES ENHANCED
LEVERAGE FUND, L.P., nominal defendants,

                          Defendants.

------------------------------------------------------- x

Case No. 08-CV-
03397(BSJ)(HBP)


**AMENDED COMPLAINT**

**(JURY TRIAL DEMANDED)**

RECEIVED 08 JUN 30 PM 6:3I U.S. DISTRICT COURT S.D.N.Y.

# TABLE OF CONTENTS

**Page**

DEFINED TERMS ................................................................................... iii

I.    NATURE OF THE ACTION ................................................................ 3

II.   JURISDICTION AND VENUE ........................................................... 10

III.  PARTIES ................................................................................................ 11
      A.    Plaintiffs ...................................................................................... 11
      B.    Defendants ................................................................................... 14
      C.    Other Relevant Entities ............................................................. 21

IV.   FACTS .................................................................................................... 22
      A.    The High-Grade Funds Fraud ................................................... 22
            1.    Structure and Initial Marketing of the High-Grade Funds ....... 22
            2.    The Bear Stearns Defendants' Management of, and
                  Dealings with, the High-Grade Funds ..................................... 34

      B.    The High-Grade Enhanced Funds Fraud ................................. 51
            1.    Structure and Initial Marketing of The High-Grade
                  Enhanced Funds ....................................................................... 51
            2.    The Bear Stearns Defendants' Management of, and
                  Dealings With, the High-Grade Enhanced Funds .................. 64
      C.    All Funds' Pervasive Insider Transactions with Bear Stearns
            and BSAM .................................................................................... 72

      D.    The Bear Stearns Defendants' Ongoing Fraud, and Failed
            Efforts to Foist the Funds' Risks Upon the Public Through the
            Everquest IPO ............................................................................. 80
      E.    The Blow-Ups That Helped Launch the Worldwide Credit
            Crisis ............................................................................................ 83

      F.    The Deloitte Defendants' Unique Role in the Fraud ............... 91
            1.    The Deloitte Defendants' Years of Clean Audit Opinions ...... 95
            2.    The Ever-Growing Number of Improper Insider
                  Transactions ............................................................................. 98
            3.    Generally Accepted Accounting Principles Specifically
                  Relating to Manager Estimates of Asset Values ................... 105
            4.    Standards for a Proper Audit .................................................. 106
            5.    The Deloitte Defendants Failed to Fulfill the Proper
                  Auditing Standards .................................................................. 109
            6.    The Deloitte Defendants' Specific and Multiple Failings ..... 111
                  a.    Evidential Matter (AU § 326) ....................................... 113
                  b.    The Everquest Debacle and the Overstatement of
                        Year End 2006 NAVs ..................................................... 117
                  c.    Subsequent Events (AU § 560) ..................................... 125
                  d.    The Egregious Overstatement of Assets in the
                        2006 Fiscal Year Financial Statements ........................ 129
                        (i)    The ABX Index ...................................................... 130

(ii)    Subprime Lenders Face Significant
Problems ................................................. 132

(iii)    Everquest's Revised December 2006 NAV ...... 136

e.    The Deloitte Defendants Were Familiar With the
Requirements of AU § 560 ............................................. 137

f.    The Deloitte Defendants Failed to Advise that the
Funds Lacked the Ability to Continue as a Going
Concern (AU § 341) ...................................................... 139

G.    The Deloitte Defendants Have Significant Contacts With the
United States and New York_ ............................................................. 144

H.    The Dereliction of Duties by the BSAM Directors ........................... 147

I.    The Walkers Defendants' Unique Role in the Fraud ....................... 150

1.    The Walkers Group ................................................................. 151

2.    The Walkers Defendants' Duties With Respect to the
Overseas Funds ...................................................................... 154

3.    The Walkers Defendants' Pervasive Breaches and Other
Wrongful Acts During the Lives of the Funds ...................... 155

4.    The Walkers Defendants Worked With the Bear Stearns
Defendants to Thwart Any Exercise of Investor Rights,
and Avoid Commencement of This Action ........................... 166

J.    The Walkers Defendants Have Significant Contacts With the
United States and New York ............................................................. 178

V.    DERIVATIVE ALLEGATIONS ................................................................. 182

VI.    CLAIMS FOR RELIEF ........................................................................... 191

VII.    JURY TRIAL DEMAND .......................................................................... 231

## DEFINED TERMS

<u>ABS CDOs:</u>  Asset-backed collateralized debt obligations-related investments.

<u>Advisers Act:</u>  U.S. Investment Advisers Act of 1940.

<u>AICPA:</u>  American Institute of Certified Public Accountants.

<u>AIMA Questionnaire:</u>  Questionnaire prepared by the Bear Stearns Defendants, in 2005, for the Alternative Investment Management Association.

<u>"AU §":</u>  Sections of the Statements of Auditing Standards, which are codified by the American Institute of Certified Public Accountants.

<u>Bear Measurisk:</u>  Bear Measurisk, LLC, a wholly-owned subsidiary of BSAM and provider of risk measurement tools and analytics to the investment community.

<u>Bear Stearns:</u>  Bear Stearns Companies, Bear Stearns Co., and BSAM.

<u>Bear Stearns Co.:</u>  Bear, Stearns & Co. Inc.

<u>Bear Stearns Companies:</u>  The Bear Stearns Companies, Inc.

<u>Bear Stearns Defendants:</u>  Bear Stearns Companies, Bear Stearns Co., BSAM, Ralph Cioffi, Matthew Tannin, Ray McGarrigal, George Buxton, Barry Joseph Cohen, Gerald R. Cummins, David Sandelovosky, Greg Quental and Michael Ernest Guarasci.

<u>Beighton:</u>  Kristin Beighton, of KPMG Cayman, appointed as one of the liquidators of the Master Funds.

<u>BSAM:</u>  Bear Stearns Asset Management Inc.

<u>BSAM Directors:</u>  Defendants Cohen, Cummins, Sandelovsky, Quental and Guarasci.

<u>Buxton:</u>  Defendant, George Buxton, who was a Senior Managing Director of Bear Stearns Co.

<u>CDOs:</u>  Collateralized debt obligations.

<u>CDO-squareds:</u>  CDOs comprised of slices of other CDOs.

<u>CDO Report:</u>  Report issued by an employee of BSAM, on April 19, 2007, showing that the CDOs in the Funds were worth substantially less than previously thought.

<u>Cerberus:</u>  Cerberus Capital Management.

<u>Chapter 15 Petition:</u>  Petition filed in the Bankruptcy Court in New York, by Whicker and Beighton, in August 2007, seeking to have the liquidation proceedings pending in the Cayman Islands with respect to the Master Funds

recognized as "foreign main proceedings" or "foreign nonmain proceedings," pursuant to Chapter 15 of Title 11 of the United States Bankruptcy Code.

Cioffi:  Defendant, Ralph Cioffi, who was a Senior Managing Director of both BSAM and Bear Stearns Co. and a member of the Board of Directors of Bear Stearns Co.

Cleghorn:  Plaintiff, William Cleghorn.

Cohen:  Defendant, Barry Joseph Cohen, who was a director of the High-Grade Overseas Funds and its Master Fund, a Senior Managing Director and Director of Alternative Investments (Hedge Funds) for BSAM, and a member of the board of directors of Bear Stearns Co.

COMs (or Offering Memoranda):  Confidential offering memoranda.

Cummins:  Defendant, Gerald R. Cummins, who was a director of the High-Grade Overseas Fund and its Master Fund beginning in August 2006, a director of the High-Grade Enhanced Overseas Fund and its Master Funds at all relevant times, and a Managing Director of BSAM responsible for hedge fund-middle office support and firm-wide operations risk.

Deloitte Cayman:  Deloitte & Touche.

Deloitte Defendants:  Deloitte US and Deloitte Cayman.

Deloitte US:  Deloitte & Touche LLP.

Domestic Funds:  The High-Grade Domestic Fund and the High-Grade Enhanced Domestic Fund.

DTT:  Deloitte Touche Tohmatsu.

Everquest:  Everquest Financial Ltd.

Essex:  Plaintiff, Essex Fund Limited.

FTI:  FTI Capital Advisors, LLC.

Funds:  The High-Grade Domestic Fund, the High-Grade Enhanced Domestic Fund, the High-Grade Overseas Fund, and the High-Grade Enhanced Overseas Fund.

GAAP:  U.S. Generally Accepted Accounting Principles.

GAAS:  Generally Accepted Accounting Standards.

Guarasci:  Defendant, Michael Ernest Guarasci, who was a director of the High-Grade Overseas Fund and its Master Fund from September 2003 until October 2005, and a Senior Managing Director and Chief Financial Officer of BSAM, responsible for financial reporting, operations, information technology and risk management.

**Heis:**  Richard Heis, of KPMG (Canada), appointed as one of the liquidators of the High-Grade Enhanced Domestic Fund.

**High-Grade Domestic Fund:**  Bear Stearns High-Grade Structured Credit Strategies Fund, L.P.

**High Grade Enhanced COM:**  June 2006 Confidential Offering Memoranda for the High-Grade Enhanced Fund.

**High-Grade Enhanced Domestic Fund:**  Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Fund, L.P.

**High-Grade Enhanced Funds:**  The High-Grade Enhanced Domestic Fund and the High-Grade Enhanced Overseas Fund.

**High-Grade Enhanced Funds COMs:**  The High-Grade Enhanced Fund COM and the High-Grade Enhanced Overseas COM.

**High-Grade Enhanced Overseas Fund:**  Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage (Overseas) Ltd.

**High-Grade Enhanced Overseas COM:**  August 2006 Confidential Offering Memorandum for the High-Grade Enhanced Overseas Fund.

**High-Grade Funds:**  The High-Grade Domestic Fund and the High-Grade Overseas Fund.

**High-Grade Overseas Fund:**  Bear Stearns High-Grade Structured Credit Strategies (Overseas) Ltd.

**IPO:**  Initial public offering.

**Lennon:**  Defendant, Scott Lennon, is a Senior Vice President of Walkers FS, which provided services to many of the Funds managed by the Bear Stearns Defendants, and served on the Board of Directors of both of the Overseas Funds.

**Liquidators:**  The joint voluntary liquidators of the Overseas Funds, Varga and Cleghorn.

**Management Defendants:**  Cioffi, Tannin, McGarrigal and Buxton.

**Massachusetts Complaint:**  Administrative complaint filed by the Securities Division of the Office of the Secretary of the Commonwealth of Massachusetts, on November 14, 2007, against BSAM (Docket No. E-2007-0064).

**Master Funds:**  Bear Stearns High-Grade Structured Credit Strategies Master Fund Ltd. and Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Master Fund Ltd.

**McGarrigal:**  Defendant, Ray McGarrigal, who was a Managing Director or Senior Managing Director of BSAM and a Portfolio Manager of both the High-Grade Overseas Fund and the High-Grade Enhanced Overseas Fund.

**Milsom:** John Milsom, of KPMG (Canada), appointed as one of the liquidators of the High-Grade Enhanced Domestic Fund.

**NAV:** Net asset value.

**New Century:** New Century Financial Corp.

**NovaStar:** NovaStar Financial Corp.

**Offering Memoranda (or COMs):** Confidential offering memoranda.

**Overseas Funds:** The High-Grade Overseas Fund and the High-Grade Enhanced Overseas Fund.

**Quental:** Defendant, Greg Quental, who was a director of the High-Grade Overseas Fund and its Master Fund beginning on March 28, 2007, President and Chief Executive Officer of Bear Measurisk from February 2004 through April 2005, and a Senior Managing Director, Director of Hedge Funds and Chairman of Bear Measurisk's Board of Directors, responsible for BSAM's HedgeSelect business and Due Diligence Group.

**Petitioning Investor:** An investor holding more than 10% interest in both the Overseas and Domestic High-Grade Enhanced Funds, who, on August 10, 2007, sent Removal Petitions to the Board of the High-Grade Enhanced Overseas Fund and to BSAM, as general partner of the High-Grade Enhanced Fund.

**Principal Trade Letters (or PTLs):** Consent letters that, pursuant to the Investment Advisers Act of 1940, are required to be obtained from independent directors prior to any "principal trades," trades between the High-Grade Master Fund and other Bear Stearns entities or Bear Stearns clients which posed conflict of interest issues.

**Ratings Agencies:** U.S. commercial credit rating agencies Standard & Poors, Moody's and Fitch.

**Removal Petitions:** Petitions to remove the Board of the High-Grade Enhanced Overseas Fund, and BSAM, as general partner of the High-Grade Enhanced Fund, served on August 10, 2007, by an investor holding more than 10% of all outstanding shares.

**Sandelovsky:** Defendant, David Sandelovosky, who was a director of the High-Grade Overseas Fund and its Master Fund from October 2005 until March 28, 2007, a director of the High-Grade Enhanced Overseas Fund and its Master Fund from its inception until March 28, 2007, and a Senior Managing Director of Alternative Investments (Hedge Funds) for BSAM.

**SEC:** The Securities and Exchange Commission.

**Stillwater:** Plaintiff, Stillwater Capital Partners L.P.

**Tannin:** Defendant, Matthew Tannin, who was a Senior Managing Director of BSAM and Chief Operating Officer of the High-Grade Enhanced Overseas Fund, and through BSAM a Portfolio Manager of the High-Grade Overseas Fund.

<u>The Exchange Act:</u>  Securities Exchange Act of 1934, codified as 15 U.S.C. §78(a).

<u>Varga:</u>  Plaintiff, Geoffrey Varga.

<u>Walkers Defendants:</u>  Walkers FS and the Walkers Independent Directors.

<u>Walkers Firm:</u>  The Walkers law firm.

<u>Walkers FS:</u>  Walkers Fund Services Limited, an entity that provided services to the Overseas Funds, Master Funds, and many other funds managed by the Bear Stearns Defendants.

<u>Walkers Group:</u>  The Walkers Group

<u>Walkers Independent Directors:</u>  Scott Lennon and Michele Wilson-Clarke.

<u>Walkers SPV:</u>  Walkers SPV Limited.

<u>Whicker:</u>  Simon Whicker, of KPMG Cayman, appointed as one of the liquidators of the Master Funds.

<u>Wilson-Clarke:</u>  Defendant, Michele Wilson-Clarke, who is a Senior Vice President of Walkers FS and served on the Board of Directors of both of the Overseas Funds.

<u>2003 Fiscal Year:</u>  Fiscal year for the year ended December 31, 2003.

<u>2006 Fiscal Year:</u>  Fiscal year for the year ended December 31, 2006.

Plaintiffs Geoffrey Varga and William Cleghorn, as Joint Voluntary Liquidators of Bear Stearns High-Grade Structured Credit Strategies (Overseas) Ltd. (the "High-Grade Overseas Fund") and Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage (Overseas) Ltd. (the "High-Grade Enhanced Overseas Fund"; and together with the High-Grade Overseas Fund, the "Overseas Funds"), and as assignees of Essex Fund Limited ("Essex") of its shares in the High-Grade Enhanced Overseas Fund; and Stillwater Capital Partners L.P. ("Stillwater") and Essex, individually and derivatively, on behalf of Bear Stearns High-Grade Structured Credit Strategies Fund, L.P. (the "High-Grade Domestic Fund") and Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Fund, L.P. (the "High-Grade Enhanced Domestic Fund"; and together with the High-Grade Domestic Fund, the "Domestic Funds"), respectively, by their attorneys, Reed Smith LLP, as and for their Complaint against the above-named Defendants, respectfully allege as follows:

## NATURE OF THE ACTION

1.      This action seeks recovery of more than $1.5 billion of losses

sustained by investors in the Overseas Funds and Domestic Funds (collectively, the

"Funds") as a direct and proximate result of a sophisticated fraud perpetrated by

the Bear Stearns Companies, Inc. ("Bear Stearns Companies"), their co-defendant

affiliates and subsidiaries, Bear, Stearns & Co. Inc. ("Bear Stearns Co.") and Bear

Stearns Asset Management ("BSAM," and together with the Bear Stearns

Companies and Bear Stearns Co., "Bear Stearns"), and their officers, directors and

employees, Ralph Cioffi, Matthew Tannin, Raymond McGarrigal, George Buxton,

Barry Joseph Cohen, Gerald R. Cummins, David Sandelovosky, Greg Quental and

Michael Ernest Guarasci (collectively, with Bear Stearns, the "Bear Stearns

Defendants").

2.      The Bear Stearns Defendants' fraud resulted in the Funds'

highly publicized collapse in July 2007, which is widely believed to have been a

significant precipitating factor in the global credit crisis through which we all

continue to suffer.

3.      Defendants Cioffi and Tannin, high level Bear Stearns

executives who, with others, managed the Funds at issue, have recently been

indicted in the Eastern District of New York for mail fraud and conspiracy for their

roles in orchestrating and perpetuating the fraud with respect to the Funds, as detailed in this Amended Complaint.

4.      Co-defendants Deloitte & Touche LLP ("Deloitte US") and Deloitte & Touche ("Deloitte Cayman," and together with Deloitte US, the "Deloitte Defendants"), as well as Walkers Fund Services Limited ("Walkers FS"), Scott Lennon and Michele Wilson-Clarke (the "Walkers Independent Directors," and together with Walkers FS, the "Walkers Defendants") each materially participated in and facilitated the Bear Stearns Defendants' fraud.

5.      From their inception, the Funds were doomed to fail, because the Bear Stearns Defendants conceived, managed, and deceptively marketed them knowing that they would be viable so long as – but only so long as – the U.S. housing market continued to experience an unprecedented rise. The Bear Stearns Defendants also knew, however, that so long as they were viable, the Funds would generate massive, unprecedented fees and other benefits for each of the Bear Stearns Defendants.

6.      In short, in orchestrating this fraud, it appears that the Bear Stearns Defendants did not fail to plan, but rather, planned to fail.

7.      As <u>Business Week</u> reported in the months following the Funds' implosion, it is clear that these "hedge funds were built so they were virtually

- 4 -

guaranteed to implode if market conditions turned south." Matthew Goldstein &

David Henry, *Bear Stearns' Bad Bet*, Bus. Wk. (Oct. 11, 2007).

8.    In structuring, marketing, and reporting the performance of the

Funds, the Bear Stearns Defendants represented that the Funds would invest in

broadly diversified pools of credit-related investment instruments, including,

among other things, favorably risk-rated tranches of collateralized debt obligations

("CDOs"). They represented that at least 90% of all investments would have

'AAA' or at worst 'AA' default and valuation risk ratings conferred upon them by

one or more of the three primary U.S. commercial credit rating agencies, Standard

& Poors, Moody's and Fitch (the "Ratings Agencies").

9.    The Bear Stearns Defendants expressly represented that the

Funds would have minimal exposure to sub-prime residential mortgages, and that

the Bear Stearns Defendants would utilize their substantial, industry-leading risk

management expertise and experience to ensure that the Funds were relatively safe,

conservative investment vehicles. The Deloitte Defendants assured investors that

they were conducting independent, thorough, and objective audits – including,

among other things, testing the Bear Stearns Defendants' estimates of the fair value

of the assets in the Funds. The Walkers Defendants promised investors that they

would independently analyze, scrutinize and ultimately approve or disapprove any

insider transactions between and among the Funds and other Bear Stearns-related entities.

10.    Following the initial structuring of the High-Grade Domestic and Overseas Funds in 2003, the Bear Stearns Defendants began to systematically expose them to ever-increasing concentrations of aggressive and risky investments, including re-assembled CDO tranches and mortgage pools, as well as multiple "CDO-squareds" (CDOs comprised of slices of other CDOs). The High-Grade Enhanced Domestic and Overseas Funds were immediately exposed to high concentrations of these sorts of investments from their inception in 2006. These then-undisclosed investments caused each of the Funds to have disproportionate exposure to sub-prime residential mortgages – far beyond the exposure that was permitted under the Funds' governing documents, or that was disclosed to, or reasonably discoverable by, investors.

11.    Further, although the Bear Stearns Defendants at times represented in their monthly performance reports that only 6-8% of each Fund's portfolio was invested in sub-prime mortgage-backed securities, the Bear Stearns Defendants failed to inform investors that investments within the Funds that were collateralized by sub-prime mortgages reached in certain instances as high as approximately *60%* of the Funds' asset composition.

12.    The Bear Stearns Defendants also caused the Funds to use dramatically more borrowed capital (leverage) to multiply the size – and therefore, risk – of their investments than that which was disclosed to, or reasonably discoverable by, investors. This was done through greater than disclosed (or prudent, by any measure) use of short-term financings, known as 'repo' or repurchase transactions, and through the leveraged purchase of re-assembled investment pools and CDO-squareds that already included significant multiples of leverage.

13.    The Bear Stearns Defendants further perpetuated and expanded their fraud by, among other things, (i) knowingly (and without regard for existing market conditions) inflating the net asset value ("NAV") of the Funds, and (ii) using each of the Funds as dumping grounds for toxic investments held elsewhere on Bear Stearns' books – including through an enormous number of impermissible insider transactions.

14.    The Deloitte Defendants knowingly or recklessly facilitated the scheme through their continual issuance of unqualified, "clean" audit opinions, endorsing the Funds' financial statements.

15.    Additionally, the Walkers Defendants willfully disregarded their duties to provide independent review and approval of the vast majority of insider transactions executed by the Funds. On November 14, 2007, the Securities

Division of the Office of the Secretary of the Commonwealth of Massachusetts

filed an administrative complaint, Docket No. E-2007-0064 (the "Massachusetts

Complaint"), against BSAM alleging violations of the Massachusetts Uniform

Securities Act, and recounting BSAM's failure to obtain approval from unaffiliated

directors for numerous related-party transactions.  The Massachusetts Complaint

attaches documents establishing that hundreds of related-party "principal

transactions" – including 78.95% of 342 principal transactions that took place in

2006 – were processed without prior approval by the Walkers Independent

Directors.

      16.    These pervasive, fraudulent courses of conduct exposed the

Funds to untenable risks.  Thus, when the inevitable U.S. housing market downtick

began, while other funds structured in fashions similar to those in which the Bear

Stearns Defendants promised to structure the funds here at issue suffered losses,

but survived, the Funds' collapse was relatively quick and decisive.

      17.    When the Funds began suffering growing losses during the

decline in the U.S. housing and subprime markets in late 2006 and into the first

quarter of 2007, the Bear Stearns Defendants continued to deceive investors by

painting a rosy picture of the Funds' financial condition, even though the Bear

Stearns Defendants knew that the Funds' situation was dire.

18.    For example, in an April 25, 2007, investor conference call, Defendants Cioffi and Tannin told investors that the funds had "significant amounts of liquidity," "margin calls had easily been met," there were only a "couple of million [dollars] of redemptions," and they were "very comfortable" with the Funds' "portfolio construction."

19.    Just weeks before, however, Cioffi had redeemed $2 million of his personal investment in one of the Funds.  On April 22, 2007 – three days before the investor call – Tannin noted in an email to Cioffi that the subprime market looked "pretty damn ugly" and argued for closing and liquidating all four of the Funds.  Yet, Tannin's opening remarks on the April 25, 2007 investor call, included a statement that "the key sort of big picture point for us at this point is our *confidence that the structured credit market and the sub-prime market in particular, has not systemically broken down* … So, from a structural point of view, from an asset point of view, from a surveillance point of view, *we're very comfortable with exactly, you know, where we are*."

20.    These representations, which were material to investors who were concerned about the Funds' performance and the impact of general market conditions at that time on the Funds, were patently false and misleading, and harmed investors in the Funds.  In addition, after the April 25th call, approximately $23 million in new investor subscriptions were received for the May 1, 2007

subscription date.   These new investors equally were harmed by the Defendants'
actions.

21.    The Bear Stearns Defendants, the Walkers Defendants, and the
Deloitte Defendants each engaged in the improper behavior detailed herein to
generate substantial fees and other benefits for themselves.

22.    On June 19, 2008, Ralph Cioffi and Matthew Tannin were
indicted for mail fraud and conspiracy for their roles in orchestrating and
perpetuating the fraud detailed herein.   The Securities and Exchange Commission
("SEC") contemporaneously commenced a civil action against both.
Investigations by the U.S. Justice Department and the SEC are ongoing.

23.    Plaintiffs now bring this action for violations of the federal
securities law, fraud, breach of fiduciary duty, breach of contract, gross negligence,
negligence, accounting malpractice, aiding and abetting fraud and breaches of
fiduciary duty and unjust enrichment, in order to recover damages from the
Defendants, each of which was a fiduciary and/or contractual service provider to
the Funds, for injury and losses suffered by the Funds and their investors as a result
of the Defendants' acts and/or failures to act.

## JURISDICTION AND VENUE

24.    This Court has subject matter jurisdiction over this action
pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) under §§ 10(b) and 20

of the Securities Exchange of 1934, codified as 15 U.S.C. §78(a) (the "Exchange Act"), and 28 U.S.C. § 1367 (supplemental jurisdiction) as jurisdiction is proper over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy."

25.    Jurisdiction is proper in New York, and venue is proper in this District pursuant to 28 U.S.C. §1391(a), in that each defendant resides in this District and/or a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

### Plaintiffs

26.    Plaintiffs Geoffrey Varga ("Varga") and William Cleghorn ("Cleghorn") are the Joint Voluntary Liquidators (the "Liquidators") of each of (i) the High-Grade Overseas Fund and (ii) the High-Grade Enhanced Overseas Fund. Plaintiff Varga is a citizen of Canada and a resident of the Cayman Islands. Plaintiff Cleghorn is a citizen and resident of the United Kingdom.

27.    Plaintiffs Varga and Cleghorn were appointed as liquidators by the Grand Court of the Cayman Islands by Order dated March 20, 2008, a copy of which is attached hereto as Exhibit 1. Under Cayman law, Plaintiffs Varga and Cleghorn have all right and power to act for the Overseas Funds, including,

without limitation, the power to bring suit to recover for the benefit of those funds'
losses caused to them by third-parties.

28.    Plaintiffs Varga and Cleghorn are also assignees of shares of
Essex in the High-Grade Enhanced Overseas Fund.

29.    The Overseas Funds are both Cayman Islands exempted
companies, organized under the Companies Law of the Cayman Islands.  Prior to
the events here complained of, they had their principal place of business at the
offices of Defendant BSAM at 383 Madison Avenue, New York, New York
10179, and they operated as "feeder funds" for, respectively, Bear Stearns
High-Grade Structured Credit Strategies Master Fund Ltd., and Bear Stearns
High-Grade Structured Credit Strategies Enhanced Leverage Master Fund Ltd.
(collectively, the "Master Funds").

30.    Plaintiff Stillwater, an investor in, among others, the High-
Grade Domestic Fund, is a privately owned investment manager with its principal
place of business at 41 Madison Avenue, New York, New York 10010.
Throughout the periods referenced herein, Stillwater had full economic exposure to
limited partnership interests in the High-Grade Domestic Fund through a leverage
counterparty through which it initially invested in the High-Grade Domestic Fund.
Thereafter, direct ownership of such interests was transferred to Stillwater, in a
transaction approved by authorized representatives of the High-Grade Domestic

Fund, and thereby, Stillwater is a limited partner of the High-Grade Domestic Fund as of the date of filing of this Amended Complaint.

31.    Plaintiff Essex, an investor in, among others, the High-Grade Enhanced Domestic Fund, is a privately-held investment fund with its registered office at West Bay Road, Grand Cayman, Cayman Islands. Throughout the periods referenced herein, Essex had full economic exposure to shares in the High-Grade Enhanced Domestic Fund through a leverage counterparty through which it initially invested in the High-Grade Enhanced Domestic Fund. Thereafter, direct ownership of such shares was transferred to Essex, in a transaction approved by authorized representatives of the High-Grade Enhanced Domestic Fund, and thereby, Essex is a limited partner of the High-Grade Enhanced Domestic Fund as of the date of filing of this Amended Complaint.

32.    The Domestic Funds are each Delaware limited partnerships. Prior to the events here complained of, they also had their principal place of business at the offices of Defendant BSAM at 383 Madison Avenue, New York, New York 10179, and operated as "feeder funds" for the Master Funds.

33.    At all times, investors in the Funds had decision making and control powers conferred upon them by the Funds' governing documents – including, but not limited to, the right by majority vote, at any time, to remove and replace the parties in control of the Funds. With the exception of a small number

- 13 -

of investors affiliated with Bear Stearns, the Funds' investors were unaware of –

and could not reasonably have discovered – the wrongful acts pled herein, and had

they been so aware, could and would have taken immediate steps to prevent such

wrongful acts and avoid the damages that flowed proximately therefrom to the

Funds.

**Defendants**

34.    Defendant Bear Stearns Companies, at all relevant times, was

organized and existing under the laws of the State of Delaware, with its principal

place of business at 383 Madison Avenue, New York, New York 10179.  Bear

Stearns Companies, through its various subsidiaries, provides a broad range of

financial services to clients and customers worldwide. Bear Stearns Companies has

held itself out as a leading financial services firm serving governments,

corporations, institutions and individuals worldwide.  Its core business lines have

included institutional equities, fixed income, investment banking, global clearing

services, asset management, and private client services.

35.    On May 30, 2008, a wholly-owned subsidiary of JPMorgan

Chase & Co. merged with and into, Defendant Bear Stearns Companies, with Bear

Stearns Companies continuing as the surviving corporation and now as a

subsidiary of JPMorgan Chase & Co.

36.    Defendant BSAM, at all relevant times, was organized and existing under the laws of the State of New York, with its principal place of business at 383 Madison Avenue, New York, New York 10179. BSAM held itself out as a market leader in the area of structured credit services, and an expert in managing structured credit assets. BSAM also held itself out as an expert in risk management, describing risk management as the cornerstone of its business practice. BSAM acted as investment manager to all or substantially all hedge funds developed by Bear Stearns, including, among others, the Funds, and was responsible not only for the operation of these feeder funds, but also for the operation and investment management of the Master Funds to which the Funds' monies were entrusted. BSAM is registered with the SEC as an investment advisor under the Investment Advisors Act of 1940, as amended, and continues to exist as a wholly-owned subsidiary of defendant Bear Stearns Companies.

37.    Defendant Bear Stearns Co., at all relevant times, was a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 383 Madison Avenue, New York, New York 10179. Bear Stearns Co. continues to exist as a subsidiary of defendant Bear Stearns Companies and is registered with the SEC as a broker-dealer and an investment advisor under the Investment Advisors Act of 1940, as amended. Among other things, Bear Stearns Co. acted as a placement agent to the High-Grade Domestic

- 15 -

Fund and the High-Grade Overseas Fund (collectively, the "High-Grade Funds"), as well as the High-Grade Enhanced Domestic Fund and the High-Grade Enhanced Overseas Fund (collectively, the "High-Grade Enhanced Funds"), for the purpose of finding investors willing and able to invest in the Funds.

38.    Defendant Ralph Cioffi ("Cioffi") is a citizen and resident of the State of New Jersey and, as relevant to this action, was a Senior Managing Director of both BSAM and Bear Stearns Co., and a member of the Board of Directors of Bear Stearns Co.  Through BSAM, Cioffi acted as Senior Portfolio Manager of the High-Grade Overseas Fund, the High-Grade Enhanced Overseas Fund, and the Master Funds, sharing with defendants Matthew Tannin and Raymond McGarrigal responsibility for the management of the investment portfolios for the High-Grade Overseas Fund, the High-Grade Enhanced Overseas Fund, and the Master Funds.

39.    Defendant Matthew Tannin ("Tannin") is a citizen and resident of the State of New York and, as relevant to this action, was a Senior Managing Director of BSAM and Chief Operating Officer of the High-Grade Enhanced Overseas Fund, and through BSAM a Portfolio Manager of the High-Grade Overseas Fund, sharing with defendants Cioffi and Raymond McGarrigal responsibility for the management of the investment portfolio for the High-Grade Overseas Fund, the High-Grade Enhanced Overseas Fund, and the Master Funds.

40.    Defendant Raymond McGarrigal ("McGarrigal") is a citizen and resident of the State of New York and, as relevant to this action, was a Managing Director or Senior Managing Director of BSAM and a Portfolio Manager of both the High-Grade Overseas Fund and the High-Grade Enhanced Overseas Fund, sharing with defendants Cioffi and Tannin responsibility for the management of the investment portfolio for the High-Grade Overseas Fund, the High-Grade Enhanced Overseas Fund, and the Master Funds.

41.    Defendant George Buxton ("Buxton") is a citizen and resident of the State of New York and, as relevant to this action, was a Senior Managing Director of Bear Stearns Co.

42.    Until the events giving rise to this action, Cioffi, Tannin, McGarrigal and Buxton (collectively, the "Management Defendants") were responsible for, among other things, the composition and risk management of the High-Grade Funds and the High-Grade Enhanced Funds, as well as the Master Funds.

43.    Defendant Barry Joseph Cohen ("Cohen") is a citizen and resident of the State of New York and, as relevant to this action, was a director of both of the High-Grade Overseas Fund and its respective Master Fund at all relevant times.  Cohen was also a Senior Managing Director and Director of

- 17 -

Alternative Investments (Hedge Funds) for BSAM and was a member of the board of directors of Bear Stearns Co.

44.    Defendant Gerald R. Cummins ("Cummins") is a citizen and resident of the State of New York and, as relevant to this action, was a director of the High-Grade Overseas Fund and its Master Fund beginning in August 2006 and was also a director of the High-Grade Enhanced Overseas Fund and its Master Fund at all relevant times.  Cummins was also a Managing Director of BSAM responsible for hedge fund-middle office support and firm-wide operations risk.

45.    Defendant David Sandelovosky ("Sandelovsky") is a citizen and resident of the State of New Jersey and, as relevant to this action, was a director of the High-Grade Overseas Fund and its Master Fund from October 2005 until on or about March 28, 2007, and was also a director of the High-Grade Enhanced Overseas Fund and its Master Fund from its inception until on or about March 28, 2007.  Sandelovsky was also a Senior Managing Director of Alternative Investments (Hedge Funds) for BSAM.

46.    Defendant Greg Quental ("Quental") is a citizen and resident of the State of Connecticut and, as relevant to this action, was a director of both the High-Grade Overseas Fund and its respective Master Fund beginning on or about March 28, 2007.  Quental is also a Senior Managing Director, Director of Hedge Funds and Chairman of Bear Measurisk, LLC ("Bear Measurisk"), a wholly-

owned subsidiary of BSAM and provider of risk measurement tools and analytics to the investment community. Quental joined BSAM in 2003, and from February 2004 through April 2005 served as President and Chief Executive Officer of Bear Measurisk. In April 2005, Mr. Quental was appointed Chairman of Bear Measurisk's Board of Directors and made responsible for BSAM's HedgeSelect business and Due Diligence Group.

47.    Defendant Michael Ernest Guarasci ("Guarasci") is a citizen and resident of the State of New Jersey and, as relevant to this action, was a director of the High-Grade Overseas Fund and its Master Fund from September 2003 until October 2005. Guarsci was also a Senior Managing Director and Chief Financial Officer of BSAM and was responsible for financial reporting, operations, information technology and risk management.

48.    Defendants Cohen, Cummins, Sandelovsky, Quental and Guarasci are collectively referred to as the "BSAM Directors."

49.    Defendant Deloitte US is a Delaware limited liability partnership engaged in business as, among other things, an accounting and auditing firm with offices located in (among other places) New York, New York.

50.    Defendant Deloitte Cayman is a member firm of Deloitte Touche Tohmatsu, a Swiss Verein with global headquarters located in New York, New York, and is engaged in business as, among other things, an accounting and

- 19 -

auditing firm with offices located in (among other places) Grand Cayman, Cayman

Islands. The Deloitte Defendants were engaged as the independent outside auditor

of the Funds, as well as their respective Master Funds and numerous other Bear

Stearns-related entities, for each fiscal year between at least 2003 and 2006, and

issued various certified audit reports to, and in respect of, these entities in

connection with each of its engagements.

     51.    Defendant Walkers Financial Services Limited ("Walkers FS")

is a Cayman entity with its principal place of business located at Walker House, 87

Mary Street, George Town, Grand Cayman, Cayman Islands. As discussed below,

Walkers FS provided services to the Overseas Funds, Master Funds, and many

other funds managed by the Bear Stearns Defendants.

     52.    Defendant Scott Lennon ("Lennon") is a citizen of Canada, and

a resident of the Cayman Islands. Lennon was – and still is – a Senior Vice

President of Walkers FS and, as discussed below, served on the Board of Directors

of both of the Overseas Funds.

     53.    Defendant Michele Wilson-Clarke ("Wilson-Clarke") is a

citizen of the United States, and a resident of the Cayman Islands. Wilson-Clarke

also was – and still is – a Senior Vice President of Walkers FS and, as discussed

below, served on the Board of Directors of both of the Overseas Funds.

**Other Relevant Entities**

54.    The High-Grade Master Fund is a Cayman Islands exempted company organized under the Companies Law of the Cayman Islands.  BSAM was the investment manager for the High-Grade Master Fund.  The Management Defendants all shared responsibility for the management of the High-Grade Master Fund investment portfolio, and all of the High-Grade Fund Directors were also directors of the High-Grade Master Fund.

55.    The High-Grade Enhanced Master Fund, is a Cayman Islands exempted company organized under the Companies Law of the Cayman Islands. BSAM was the investment manager for the High-Grade Enhanced Master Fund. The Management Defendants all shared responsibility for the management of the High-Grade Enhanced Master Fund investment portfolio, and the High-Grade Enhanced Fund Directors were also directors of the High-Grade Enhanced Master Fund.

56.    The Master Funds, at Bear Stearns' insistence, were placed into official court-directed liquidation in the Cayman Islands in August 2007, with KPMG Cayman Islands as Bear Stearns' designated liquidators.  That foreign liquidation was not recognized under Chapter 15 of the U.S. Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York because, by reason of domination of these Master Funds by Bear Stearns and its

- 21 -

agents, the center of main interest of the Master Funds has been held to be New York rather than the Cayman Islands.  See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd., 374 B.R. 122 (Bankr. S.D.N.Y. 2007), aff'd, Civ. Case. No. 07-8370, 2008 WL 2198272, at *1 (S.D.N.Y. May 27, 2008).

57.    The Walkers Group ("Walkers Group") is an international organization with offices located in the Cayman Islands, London, Hong Kong, the British Virgin Islands, Jersey and Dubai.  The principal place of business of the Walkers Group is located at Walkers House, 87 Mary Street, George Town, Grand Cayman, Cayman Islands.

58.    Walkers SPV Limited ("Walkers SPV") is a Cayman entity with its principal place of business located at Walker House, 87 Mary Street, George Town, Grand Cayman, Cayman Islands.  As discussed below, Walkers SPV served as Star Trustee in relation to the Overseas Funds.

## FACTS

### The High-Grade Funds Fraud

#### Structure and Initial Marketing of the High-Grade Funds

59.    In March 2003, the Bear Stearns Defendants, eager for investment management fees in an increasingly saturated investment market, created and began selling to investors the High-Grade Funds.  By so doing, the

Bear Stearns Defendants sought to capitalize on the then-booming United States housing market in ways beyond those available through the existing, sizeable, and increasingly efficient CDO and related structured products markets.

60.    As of 2003, housing prices were increasing at a generally brisk pace throughout the United States.  This, along with the Bear Stearns Defendants' then-stellar reputation for mortgage-backed securities analysis, allowed them to solicit institutional and high net worth investors to commit capital to the "High-Grade" Funds.

61.    The High-Grade Funds were designed to raise money to invest in the High-Grade Master Fund, also created by the Bear Stearns Defendants.  The High-Grade Master Fund, in turn, would invest the capital it received from these two "feeder funds" as directed by defendant BSAM, which was the Investment Manager of the High-Grade Master Fund, as well as the Investment Manager of the High-Grade Funds, the sole general partner of the High-Grade Domestic Fund, and whose officers comprised the majority of the board of directors of the High-Grade Overseas Fund and the High-Grade Master Fund.

62.    Throughout, BSAM's role with regard to the High-Grade Funds was principally controlled by defendant Cioffi, who also was an officer and director of Bear Stearns Co.  Working in concert with Cioffi throughout was

defendant Tannin, who was a Senior Managing Director of BSAM; and they were later joined by defendants McGarrigal and Buxton.

63.    The Bear Stearns Defendants had unique knowledge, not available to investors or others, of the fact that even a slight downturn in the U.S. housing market – whether resulting from either a small percentage drop in home prices or sales volumes – would cause the High-Grade Funds to sustain such disproportionate, multiplicative losses, that all investor capital would vanish, and the High-Grade Funds' creditors and counterparties would be put at great risk.

64.    The Bear Stearns Defendants could not, and therefore did not, disclose any of this information to investors and have any hope of achieving their goals of securing investors for the High-Grade Funds. Instead, they inveigled investors into committing their capital to the High-Grade Funds through the use of the Bear Stearns reputation and branding. They started by affixing their brand name to the funds, starting each fund's name with "Bear Stearns." Immediately after the name, they affixed the grossly misleading label "High-Grade." They then went on to create the Confidential Offering Memoranda ("Offering Memoranda" or "COMs") for the High-Grade Funds.

65.    Although marketed as relatively safe, conservative investment funds seeking to obtain a moderate rate of return for investors – "high current income and capital appreciation relative to LIBOR" (High-Grade Overseas COM,

p. 1) – the High-Grade Funds were run with little or no regard to generating investor returns, or to protecting investor capital. Rather, they were structured in knowing contravention of their stated purposes, and were at all times operated by the Bear Stearns Defendants and the other Defendants in furtherance of their own interests – and not the interests of the funds or their investors – notwithstanding the fiduciary and other duties the Bear Stearns Defendants, Deloitte Defendants and Walkers Defendants owed to the High-Grade Funds and their investors.

66.     The Bear Stearns Defendants represented that the High-Grade Funds would be comprised of broadly diversified credit investments, including favorably risk-rated slices of CDOs. But while the tranches of CDOs in which the High-Grade Funds invested appear to have been individually deemed by the Ratings Agencies to be among the safest available – attaining AAA or AA ratings or their equivalents – as the Bear Stearns Defendants and their retained professionals knew and, due to the opacity of the High-Grade Funds, solely were able to know, the ways in which the Bear Stearns Defendants assembled and leveraged these otherwise relatively safe components into portfolios destined the High-Grade Funds for failure.

67.     Moreover, due to the knowing misrepresentations of the Bear Stearns Defendants, and the willful neglect and abandonment by the Deloitte Defendants and Walkers Defendants of their obligations, the Bear Stearns

Defendants had free reign – in manners wholly inconsistent with the representations made to investors – to manipulate the High-Grade Funds' investments, and reported returns, as they saw fit, throughout the lives of the funds.

68.    In the High-Grade Domestic COM, the Bear Stearns Defendants outlined the High-Grade Funds' investment strategy, with elaborate emphasis on the "high grade" of the collateral, as well as the sophistication of BSAM's management and risk control techniques.  Specifically, in the High-Grade Domestic COM and in sales pitches concerning the High-Grade Funds, the Bear Stearns Defendants knowingly made false and intentionally misleading representations concerning the credit quality of securities in which the High-Grade Funds would invest, the Bear Stearns Defendants' ability to manage risk, the methods that would be used to evaluate the High-Grade Funds' performance, and controls that were in place to resolve conflicts arising from related party transactions.

69.    For example, with regard to the quality of securities in which the High-Grade Funds would invest, the Bear Stearns Defendants made the following false and misleading representations:

> The Investment Manager [BSAM] will use its structuring and research experience to identify structured finance securities with fundamentally strong credit risk profiles that are priced attractively. A significant portion of the investment return of the Master Fund is expected to be current income resulting from a positive yield spread between the investment income of

- 26 -

the investments (together with any corresponding hedging instruments) of the Master Fund and the associated borrowing costs. Additionally, to the extent that the Master Fund's assets increase in value, the Master Fund may realize capital appreciation. (High-Grade Domestic COM at p. 11; High-Grade Overseas COM at p. 11).

*          *          *          *

The Master Fund intends to concentrate its investments in the investment-grade classes of structured finance securities. For all investments (excluding Repackaging Vehicle Junior Interests) the Master Fund has targeted a portfolio rating composition of approximately 90% structured finance securities rated from AAA to AA- by Standard & Poor's, from Aaa to Aa3 by Moody's or from AAA to AA- by Fitch. The 10% balance of the portfolio (excluding Repackaging Vehicle Junior Interests) may be rated below such ratings or be unrated. The above percentages are target concentrations only. The Master Fund will not be required to sell any security that is downgraded subsequent to its purchase by the Master Fund. It is anticipated that no more than 30% of the Master Fund's Net Asset Value will be invested in Repackaging Vehicle Junior Interests at the time any Repackaging Vehicle Junior Interest investment is made. The Repackaging Vehicle Junior Interests will generally not be rated. (High-Grade Domestic COM at p. 14; High-Grade Overseas COM at p. 14).

*          *          *          *

Targeted Portfolio Characteristics, Credit Quality: At least 90% 'AAA' and 'AA-.' (Sales pitch concerning High-Grade Funds).

*          *          *          *

[the High-Grade Funds' p]rimary focus is to buy and hold 'AAA' and 'AA' structured finance securities. (Sales pitch concerning High-Grade Funds).

*          *          *          *

- 27 -

> Credit Quality: At least 90% 'AAA' and 'AA-' structured finance securities with up to 10% in higher yielding lower rated securities. (Sales pitch concerning High-Grade Funds).

70. Notwithstanding BSAM's multiple, facially conflicting roles with regard to the High-Grade Funds, the Bear Stearns Defendants nonetheless touted the independent governance of the High-Grade Funds, including the presence of independent directors of the High-Grade Overseas Fund and High-Grade Master Fund, who would be charged with making all decisions relevant to insider transactions engaged in by the funds and any affiliated entity.

71. In the High-Grade COMs, the Bear Stearns Defendants made the following false and misleading representations with regard to conflict management:

> As [investment] situations may involve conflicts between the interest of the Investment Manager or its related persons, on the one hand, and the interests of the Investment Manager's clients, on the other, the Investment Manager has established internal policies to ensure that the Investment Manager and its personnel do not prefer their own interests to those of the Investment Manager's clients and that clients are treated fairly. (High-Grade Domestic COM at p. 26; High-Grade Overseas COM at p. 26).

*     *     *     *

> Members of the boards of directors of the Fund and the Master Fund who are not affiliated with the Investment Manager or their delegates or other authorized representatives of the Fund or the Master Fund will have the responsibility for approving any transactions between the Fund or the Master Fund and the Investment Manager or its affiliates involving significant conflicts of interest (including principal trades).

More particularly, Directors unaffiliated with the Investment Manager or any delegate designated by such Directors will be responsible for approving any principal transactions for which Master Fund consent is required pursuant to Rule 206(3) of the Advisers Act. (High-Grade Domestic COM at p. 36; High-Grade Overseas COM at pp. 35-36).

72.    Through their Offering Memoranda, as well as through conversations with Stillwater, Essex, and other investors, the Bear Stearns Defendants represented that the High-Grade Funds were fully diversified investment vehicles, comparable to specialty finance companies, with investments across more than 10 asset classes falling within the broad category of fixed income securities.

73.    These representations were later reaffirmed in a questionnaire prepared by the Bear Stearns Defendants for the Alternative Investment Management Association in 2005 (the "AIMA Questionnaire"), which questionnaire was disseminated to, and relied upon by, investors.

74.    BSAM reiterated in the AIMA Questionnaire that the High-Grade Funds' primary objectives were "to seek high current income and capital appreciation relative to LIBOR primarily through leveraged investments in investment-grade structured finance securities with an emphasis on triple-A and double-A rated structured finance securities." (AIMA Questionnaire at p. 14).

75.    In the AIMA Questionnaire, BSAM also assured investors that the High-Grade Funds "generally take[] the position in the high end of the capital

- 29 -

structure which is primarily hedged through the use of credit default swaps" and that these "investments coupled with broad diversification across positions and sectors should mitigate a majority of credit oriented risks associated with fixed income." (AIMA Questionnaire at p. 14)  In addition, BSAM represented in the AIMA Questionnaire that "[c]urrently, there are no conflicts of interest to date [which may affect its trading, or trading flexibility, including use of an associated broker/dealer." (AIMA Questionnaire at p. 20)  Finally, BSAM described the Funds' operational risk management in the AIMA Questionnaire, emphasizing:

> There are three layers of risk management, the broker dealer, BSAM and the portfolio managers.  The Fund's daily mark to market, which is done in house by Bear Stearns' repo desk and the team, keeps them in touch with any price movements that could foretell problems in any one of the Fund's investments.  The team receives monthly marks on each of the Fund's investments from up to 15 broker dealers.

> The team monitors their positions through two main analytical systems… [which] allow them to monitor… monthly trustee reports on each deal and use technology to effectively monitor each position.

> In addition to the portfolio management team, Bear Stearns' and BSAM's risk management departments monitor the Fund's position as well.  They monitor things such as minimum rating requirements, overall and net leverage and any portfolio concentrations.  On a monthly basis, the portfolio mangers meet with BSAM's CIO and hedge fund risk management team to discuss the portfolio and its performance.  The team also meets with Bear Stearns' global credit department to discuss their positions, risk management and hedging techniques.  As part of managing the Fund's risk, the team actively engages [sic] in various hedging techniques in the credit derivatives market, monitor and maintain adequate liquidity and look to minimize leverage while attempting to achieve the Fund's cash on cash targets. (AIMA Questionnaire at p. 17).

76. The AIMA Questionnaire was publicly available to investors, and investors such as Stillwater and Essex therefore reasonably relied upon it.

77. These representations were false and misleading from the start, and, as discussed in detail below, became increasingly further separated from reality throughout the lives of the High-Grade Funds.

78. In addition to the representations in the AIMA Questionnaire, the Bear Stearns Defendants explained to Stillwater, Essex, and other investors, through the High-Grade Funds' Offering Memoranda and through direct communications, that the High-Grade Funds' strategy – and a core feature of the Bear Stearns Defendants' overall structured credit strategies' business model – was to select and monitor portfolio assets in a highly informed and careful way that would manage, and hedge against, any significant risks associated with fluctuations in particular segments of the credit market, including in asset-backed securities based on sub-prime mortgages. The Bear Stearns Defendants fraudulently portrayed their intent and ability, through their unmatched market presence, and proprietary systems, to use up-to-the-minute information to contain risk and to profit from a diversified, complex array of asset-backed securities:

> The Investment Manager carries out the Master Fund's investment process and risk control procedures by analyzing the potential interest and principal flows on the CDO or structured finance securities owned by the Master Fund. Various models and valuation tools are used to quantify the likelihood of future payments on both the underlying assets held by a CDO or

- 31 -

structured finance vehicle as well as securities issued by the CDO or structured finance vehicle. These tools are derived from internally constructed, broker-dealer and third-party vendor analytical systems. The Investment Manager also utilizes default modeling and credit-adjusted spread pricing applications to assess relative value opportunities in the structured finance market. (High-Grade Domestic COM at p. 12; High-Grade Overseas COM at p. 12).

\*            \*            \*            \*

The primary focus of the Investment Manager will be to assess the credit risk inherent in every potential investment and to monitor the credit risk of the investments held by the Master Fund. The objective of the analysis is to determine how the frequency and severity of defaults of the underlying assets of each of the structured finance securities will impact the interest and principal payments on those securities. Because each of the investments held by the Master Fund is essentially a construct of a large and diversified collection of individual assets, it is possible to monitor the performance of the underlying assets in a quantitative way. Unlike investments in corporate fixed-income securities where the credit performance of the issue is binary (the bond is either current in its obligations to make interest and principal payments or it is in default) the credit performance of a structured finance security is directly related to the observable cash flow characteristics of the underlying assets. In addition, it is anticipated that substantially all of the structured finance securities purchased by the Master Fund will have credit enhancement mechanisms which, when the underlying pool of assets experiences credit degradation beyond objectively defined levels, cause cash flow to be diverted away from the more junior structured finance securities and towards the securities held by the Master Fund. (High-Grade Domestic COM at p. 13; High-Grade Overseas COM at p. 13).

\*            \*            \*            \*

When market opportunities exist, [the High-Grade Funds will] recognize capital appreciation and restructure or unwind

securities whose net asset value exceeds market price.  (Sales pitch concerning High-Grade Funds).

*　　　*　　　*　　　*

Credit quality of assets is monitored using proprietary analytics system.  (Sales pitch concerning High-Grade Funds).

*　　　*　　　*　　　*

As experienced participants in this market, the portfolio managers have the knowledge, experience and resources to identify attractive assets and monitor the credit risk inherent in these assets.  (Sales pitch concerning High-Grade Funds).

*　　　*　　　*　　　*

Investment Process . . . Filter out assets based upon collateral quality test performance, concentration limitations, payment frequency, maturity as well as weighted average live, and ratings.  (Sales pitch concerning High-Grade Funds).

*　　　*　　　*　　　*

Investment Process . . . Verify Robustness of Rating and perform Quantitative Analysis using:  -Proprietary Models, -Rating Agency Discussions, -Underwriter Discussions.

*　　　*　　　*　　　*

Investment Process . . . Portfolio Managers conduct final review:  -Inspection of final Offering Memorandum, Computation Materials and Indentures.  -Inspection of final portfolio.  -Order goes firm.  (Sales pitch concerning High-Grade Funds).

*　　　*　　　*　　　*

Surveillance Process . . . Using a proprietary surveillance system, *all* assets are reviewed monthly and those showing signs of future credit deterioration or poor performance are "flagged" for further review.  (Sales pitch concerning High-Grade Funds).

*　　　*　　　*　　　*

> Portfolio Management and Surveillance System . . . –The
> Surveillance System is a specialized database, reporting and
> analysis tool designed especially for structured products and
> their underlying portfolios. (Sales pitch concerning High-
> Grade Funds).

79.    Stillwater, Essex and other investors relied to their ultimate

detriment upon the Bear Stearns Defendants' misleading representations with

regard to the low-risk nature of the High-Grade Funds, as well as the Bear Stearns

Defendants' ability to manage any potential risk, and avert the risks of any

conflicts.

### The Bear Stearns Defendants' Management of, and Dealings with, the High-Grade Funds

80.    Following their launch, the High-Grade Funds quickly became

the prime engines driving BSAM's revenues. Fees derived from the High-Grade

Funds contributed approximately 75% of BSAM's annual revenues in 2004 and

2005, according to Derivative Fitch.

81.    These massive fees were paid to BSAM based upon what

appeared to be stellar performance by the High-Grade Funds. In fact, through

August 2006, the High-Grade Funds had reportedly enjoyed cumulative returns in

excess of 36%. As of January 31, 2007, they reportedly had not experienced a

single down month in their 40 months of existence, and had earned a cumulative

return of 50%. Only later, when the Bear Stearns Defendants were called upon to

- 34 -

make actual payment in respect of these "on paper" returns, would their utterly fictitious nature be exposed.

82.     To create the false impression of such returns in funds like the High-Grade Funds, while surviving even cursory scrutiny by internal and external parties, the Bear Stearns Defendants had to engage in both fraudulent modeling of the High-Grade Funds' returns, and impermissible use of leverage far beyond that which was disclosed to, or reasonably foreseeable by, investors, so as to disguise the true nature of the High-Grade Funds' holdings.  The Bear Stearns Defendants further compounded the High-Grade Funds' risk exposure through the direct borrowing of money, utilizing repurchase (or "repo") financing, and also by repackaging existing, highly-rated CDO tranches into new vehicles that, as reassembled by the Bear Stearns Defendants, never could or would have received ratings as high as their individual components.  The Bear Stearns Defendants did this through, among other things, creating and/or purchasing new investment vehicles known as CDO-squareds – unrated vehicles comprised of highly rated investment tranches of existing CDOs.

83.     In furtherance of these schemes, unknown to and undiscoverable by investors, beginning in 2003, and continuing throughout 2004, 2005, 2006 and 2007, the Management Defendants, BSAM, and the BSAM Directors were failing, on a widespread basis, to secure the independent directors'

or a majority of investors' approvals that they had promised to secure in the High-Grade Funds' offering materials before engaging in "principal trades" between the High-Grade Master Fund and other Bear Stearns entities or Bear Stearns clients – trades that posed conflict of interest issues. The Investment Advisers Act of 1940 required such consents (so-called "Principal Trade Letters" or "PTLs"), and prohibited principal transactions without them.

84.    The Bear Stearns Defendants willfully failed to secure PTLs for these many insider transactions to conceal from outside scrutiny the off-market prices at which they were executing insider trades among the High-Grade Funds and other groups within Bear Stearns. They also had to do this to obscure the transactions that resulted in their creation of re-assembled CDO investment vehicles, CDO-squareds.

85.    Throughout much of this period, the Walkers Defendants knew of these failings, and deliberately ignored their duties to correct them, or to reveal them.

86.    By the summer of 2006, the failure to secure timely PTLs had reached epidemic proportions. BSAM had been willfully neglecting this necessary step in over 50% of its principal transactions in 2005, over 75% in 2006, and had persisted in this compliance failure despite repeated warnings that it must improve. The Walkers Defendants knew, or were obligated to – but did not – know of these

failings, and willfully took no action to correct them or to report them to investors. None of these failings were known, or could have been known, by Stillwater, Essex, or any of the other non-Bear Stearns-affiliated investors in the High-Grade Funds.

87.     Defendant Cioffi scrambled in the summer of 2006 to conceal his and the Bear Stearns Defendants' true reasons for failing chronically to secure PTLs, including through an e-mail to fellow Bear Stearns employee, Joanmarie Pusateri, on August 9, 2006, wherein he stated "… two people did not do their jobs on PTLs and BSAM did not have a process to catch the late PTLs.  There is this whole uproar over PTLs and they want to make it into a big story about how we are not organized."

88.     In or about August 2006, fearing discovery by outsiders and possible revelation of the broader fraud that it and the other Bear Stearns Defendants were perpetrating, Bear Stearns attempted to create an illusion of separation by officially barring all trading between Bear Stearns and BSAM, by placing a "moratorium" on any such related-party transactions.  The "moratorium" lasted well into 2007, and, as a result of its ineffectiveness and lack of teeth, resulted in additional harm to the Funds.

89.     This moratorium, on its face, appeared to deprive BSAM of the ability to engage in off-market priced insider trades on behalf of the High-Grade

Funds. In fact, however, it had no such effect, and as described in detail in Paragraphs 167-201, unregulated trading between the High-Grade Funds, BSAM and Bear Stearns, if anything, accelerated during the life of the moratorium. The moratorium did, however, deprive the High-Grade Funds of access to their principal repo financing counterparty – Bear Stearns. This harmed the Funds, as there are a limited number of counterparties willing to engaged in repo financing transactions on a portfolio such as this, and because such dealers, had they lent to the Funds, would have valued the collateral at lower, more accurate levels, exposing the fictitious nature of the moratorium. The risks of exposure motivated BSAM not to even seek to enter into such outside party transactions.

90.    A repurchase or "repo" agreement is the sale of securities coupled with an agreement by the initial holder to repurchase them at a later date. It is similar to a secured loan with the securities as collateral to protect against default, except that in a repo arrangement legal title to the securities actually passes to the lender. Thus, under certain margin call or default circumstances, the lender has the power to liquidate the assets and close out the agreement.

91.    In addition, repo agreements are short-term lending agreements and have to be "rolled over" or replaced frequently. If a repo lender to a fund declines to renew the agreement or establishes a moratorium, as Bear Stearns did,

the fund must find another lender or lenders to replace the liquidity that had been provided by that lender.

92.    Because Bear Stearns was a very large trader of CDOs and most other asset-backed securities on the secondary market, and CDOs are not widely traded after issuance, Bear Stearns was an important counterparty option for repo agreements.

93.    This moratorium came at a time when the High-Grade Funds were facing their first ever sizeable redemption requests – requests by investors to withdraw their capital.

94.    In mid-September 2006, in the midst of these problems, Cioffi and Tannin exchanged numerous emails discussing a "liquidity game plan." Cioffi told Tannin in a September 17, 2006 email, "[w]hat we need to figure out is how to get the majority of our [High-Grade Fund investors] into the enhanced fund. That will take some time but once we do that we have an easy liquidity source and that's Barclays."

95.    Tannin responded:

I've been working on that too.
There are three ways to **roll our investors into Barclays**
…
1.  Force them (I'm not really serious)

2. A sell out and sell in.  This is sticky because it forces us to raise liquidity in [the High-Grade Fund] – and over time would increase the more illiquid investments.

3. We do an in-kind exchange.  **The issue here is that we have to get a "real" mark on all the assets**.  I will speak to Jerry again about this.

(emphasis added.)

96.    In addition to scrambling for liquidity solutions, Tannin's e-mail demonstrates that BSAM was not using truthful, accurate or real marks (*i.e.*, values) for its portfolio assets as a matter of course, and indicates that marks used to transfer assets between the High-Grade Fund and the Enhanced Fund would not be truthful, accurate or real marks.

97.    In hedge funds of the kind here involved, underlying securities can be valued in a number of ways.  The best and most accurate is the "mark-to-market" valuation system, whereby at stated intervals, the investment manager will take a security and adjust its value based on an external, published and reliable market price.  Thus, where a fund invests in, for example, Google or gold, on the first day of a given period, it will look to one of several available published sources for the price of Google or gold at the end of the preceding monthly or other defined period, and be able to compute that the value of the fund's investments has increased by some specified amount per unit.

- 40 -

98.    The mark-to-market system is the most desirable one because where a readily verifiable market exists, the correct valuation generally is relatively simple to obtain and not subject to dispute or manipulation by a fund manager.

99.    However, with respect to the CDOs and like securities in which the Master Funds were investing, there was no active market.  Such securities do not trade on the New York Stock Exchange, the NYMEX, or any other recognized exchange.  The valuation of such securities is thus left to a more subjective "manager marks" methodology – in other words, the investment manager is responsible for determining at specific time periods the then-fair market value of the relevant securities, *i.e.*, what value the securities would bring, if liquidated in an arms-length transaction.

100.    While a provision of "manager marks" is, by definition, a subjective exercise, especially where the manager has not itself purchased or sold the underlying securities in fair market transactions, managers are required to seek to ensure the reasonableness of their marks by external validation.  This may include communications with brokers and other third parties who have had actual instances of buying or selling like securities, or who can otherwise provide objective, good faith estimates of value in the absence thereof.

101.    BSAM was well aware of its obligations to ensure that its

"manager marks" were not arbitrary, self-serving, or based on no or insufficient

factual information, stating in both the High-Grade Domestic COM and the High-

Grade Overseas COM that such valuations would be calculated with care and in

good faith in order to establish probable realization values, and that prudent

methods of valuation would be used to reflect fairly the values of all investments

and liabilities where such valuation methods were utilized:

> Asset Valuation:  The fees payable to the Investment Manager
> are based directly on the Net Asset Value of the Fund as of
> various dates.  There may be no public market price for a
> portion of the Fund's assets.  The Investment Manager [or
> General Partner] will generally value the Fund's assets.  Any
> financial instruments for which market quotations are not
> readily available will be valued at fair value as reasonably
> determined in good faith by the Investment Manager.  The
> Investment Manager [or General Partner] will have a conflict of
> interest in making such valuations because the valuations
> directly affect the Net Asset Value of the Fund and thus the
> amount of the Management Fee and Incentive Fee that the
> Investment Manager [or General Partner] receives in respect of
> its services.  Such valuations, however, will be performed by
> the Investment Manager [or the General Partner] in accordance
> with the methodology described in this Memorandum.  (High-
> Grade Domestic COM at p. 30; High-Grade Overseas COM at
> p. 29).

> *          *          *          *

> If for specific assets the official close of business prices do not,
> in the opinion of the Investment Manager, reflect their fair
> value or are not available, the value shall be calculated with
> care and in good faith by the Investment Manager (or its duly
> appointed agent) with a view to establishing the probable

- 42 -

realization value for such assets as at the close of business on the valuation date. (High-Grade Overseas COM at p. 46).

*         *         *         *

There is no active market for Repackaging Vehicle Junior Interests. The Investment Manager will use a fair-value methodology for determining the value of Repackaging Vehicle Junior Interests. This methodology will consist of taking the present value of the future stream of projected cash flows to the Repackaging Vehicle Junior Interests over the projected life of the Repackaging Vehicle. The discount rate used in this analysis will be determined primarily by assessing the credit quality of the collateral pool of the Repackaging Vehicle.

The foregoing valuations may be modified by the Investment Manager or its designee, in its sole and absolute discretion, if and to the extent that it shall determine that such modifications are advisable in order to reflect restrictions upon marketability or other factors affecting the value of assets or to obtain asset valuations within the time frames set by the Investment Manager. Without limiting the generality of the foregoing, the valuation of an asset by the Investment Manager or its designee may reflect the amounts invested by the Fund in such asset, notwithstanding that such amounts may not represent the market value of such asset.

The Investment Manager (or its duly appointed agent) may follow some other prudent method of valuation other than that referred to above if it considers that in the circumstances such other method of valuation should be adopted to reflect fairly the values of relevant investments or liabilities or to otherwise protect the interests of the Shareholders.

The Investment Manager is entitled to exercise its reasonable judgment in determining the values to be attributed to assets and liabilities and provided it is acting bona fide in the interest of the Fund as a whole, such valuation is not open to challenge by current or previous investors. (High-Grade Overseas COM at pp. 46-47; see also High-Grade Domestic COM at pp. 46 (expressing the same representation)).

102.    The Bear Stearns Defendants knew, or were reckless in not knowing, that the above misrepresentations, and others similar to them, were false and misleading.

103.    As noted above, in a purported effort to minimize the arbitrary and potentially inaccurate qualities of "manager marks" and thereby to discharge its duties to the Funds, BSAM asserted that it utilized various computer models that were supposed to provide a reasonable, fair value for the securities in which the Master Funds invested.

104.    However, utilization of such models can be reasonable only where a manager, among other things, periodically evaluates the model against its own sales of securities in the open market to see whether the model comports with reality or, failing that, looks to comparable sales by third parties of the same or similar securities, and adjusts the model if those comparable sales reflect that the model does not comport to market realities.  Indeed, BSAM specifically represented that it would obtain independent marks.

105.    BSAM could easily have seen – and, in fact, was required to analyze and adjust for – the fact that market values of CDOs worldwide were declining precipitously during the latter part of 2006 and early in 2007.  It also may have found at any prior time that its models failed to reflect market reality

regarding a portion of its CDO investments even before the 2006 decline began.

Yet BSAM failed to engage in any such market testing or adjustment of its models.

106.   Had BSAM satisfied any of the foregoing duties – or had it not willfully ignored the information it received – it would have found that its computer models systemically overvalued the true market prices of the securities in which the High-Grade and High-Grade Enhanced Funds were investing, with the concomitant result that its "manager marks" were overvalued.

107.   Because securities that were "manager marked" rather than "marked-to-market" were a significant – and likely majority – portion of the High-Grade Funds' overall assets, and the manager marks were grossly overvalued, this led to the High-Grade Funds having NAVs that were willfully overstated in material amounts.  For their part, the Deloitte Defendants failed to "pull the plug" on this scheme year after year and allowed these false marks to persist.

108.   In this way, the Bear Stearns Defendants were able to report substantial "gains" to investors such as Stillwater and Essex – gains that would never be distributed, but merely grew on paper within the High-Grade Funds, until their ultimate collapse.

109.   By so doing, BSAM significantly enhanced the amount of fees that it, and the other Bear Stearns Defendants, earned, and was able to keep its

fraudulent scheme alive so as to continue earning undue fees in the future, and avoid the day of reckoning which now has arrived.

110.   Further, given the Bear Stearns Defendants' pre-eminence in the relevant investment community, their access to, and constant communication with, others investing in and selling the same or similar securities underlying the Funds' investments, and Bear Stearns' role as a broker, it is inherently incredible that BSAM did not have actual knowledge that its computer models were flawed, and were systemically overvaluing the relevant securities and NAVs of the High-Grade Funds.

111.   In addition, BSAM misled investors by reporting returns in, among other documents, monthly Preliminary Performance Profile Reports that listed investments by categories, and not by individual security.  Although these reports had a category "Sub-prime Market" and reflected, for example, that as of March 31, 2007 only 6.0% of the High-Grade Master Fund's exposure was in the volatile and risky sub-prime market, it is now clear that, as structured, the Funds' embedded sub-prime exposure through other reported categories brought the total sub-prime exposure to a multiple of the asserted 6.0%.

112.   Sales of positions to fund redemptions were one method that would have permitted the Bear Stearns Defendants to test whether the values at which they carried the positions, and thus whether the NAVs comported with

market realities. However, when the Bear Stearns Defendants were faced with redemptions from their largest investor in the High-Grade Funds, they panicked because their scheme was on the verge of exposure, their model was flawed, and they were not able to pay any redemptions.

113. The Bear Stearns Defendants' desperate attempt to avoid these redemptions indicates that they well knew their model did not comport with market realities. Yet, instead of acknowledging that their model was flawed and revising it accordingly (as they were required to do), the Bear Stearns Defendants developed a plan to further conceal their scheme: they would create the High-Grade Enhanced Funds, promise investors these funds would have greater returns while remaining a relative low-risk investment, and convince investors to switch to these "enhanced" funds rather than redeeming from the High-Grade Funds if the High-Grade Funds were not performing at sufficiently high enough levels for them.

114. Sales based upon redemptions were not the only method to test the Bear Stearns model against reality. From the inception of the High-Grade Funds and the High-Grade Enhanced Funds, until the time of the events giving rise to this action, given their role in the marketplace, the Bear Stearns Defendants had access to figures and information for innumerable sales of the same (or similar) underlying securities in which the High-Grade and High-Grade Enhanced Funds

- 47 -

invested.  BSAM could have looked – and, in fact, was required to look – to those transactions for purposes of testing the fairness and reliability of its computer model and the "manager marks" being generated pursuant to that model.

115.   Moreover, as discussed above, the Bear Stearns Defendants' desperate acts to avoid redemptions – redemptions that they knew could not be paid – further establish that they were well aware that their models were flawed and that they were overvaluing the Funds.  Even after the Bear Stearns Defendants successfully avoided the largest High-Grade Fund investor's redemption in early 2006 by creating the High-Grade Enhanced Funds and convincing the investor to switch its investments from the High-Grade Funds to the High-Grade Enhanced Funds instead of redeeming, the Bear Stearns Defendants were constantly fearful of redemptions, because they knew that redemptions would reveal their scheme and their models that willfully overvalued the Funds.

116.   As the U.S. housing market downturn continued, it became impossible for BSAM to keep up its fraudulent manager mark scheme.  The situation became so dire that, beginning in September 2006, Cioffi considered closing the High-Grade Funds altogether.  However, Cioffi knew that he could not risk any meaningful volume of redemptions from the High-Grade Funds, as that would expose the total absence of liquidity, and the fraudulent manager mark scheme.  He therefore considered requesting that all of the High-Grade Funds'

investors voluntarily transfer into the High-Grade Enhanced Funds' structure as he had done with Essex:

> What I was thinking was to build up 6 [months] of returns then send a letter to all the remaining investors and tell them we are closing the [High-Grade Funds] and ask everyone to convert to [the Enhanced Funds]. We'd have to handle it like we did thru an exchange of assets[.] I would not want to have to sell everything. This is the riskiest way to go because you know some [limited partners] will not convert but I feel comfortable that we can get almost all of them to.

117. Ultimately, Cioffi and the other Bear Stearns Defendants made the decision that there was no need to shut down one revenue stream from their massive fraud in favor of another. They would just ask High-Grade Funds investors to "double down," investing in the new High-Grade Enhanced Funds as well. This had the dual benefit of avoiding meaningful redemptions from the High-Grade Funds, and paving the way for the launch of the High-Grade Enhanced Funds, with a baseline of investors that had already fallen prey to the scheme.

118. To do this, the Bear Stearns Defendants knew they had to ensure there were no redemptions from the High-Grade Funds, while selling existing and prospective investors on the new "Enhanced" Funds – quite a challenge as the U.S. housing market was turning down in the second half of 2006.

119. Accordingly, BSAM, through Cioffi and his cohorts, provided investors with information, financial updates and projections which they knew to be false and unrealistic. For example, they told investors that the High-Grade

Enhanced Funds would generate higher profits than the High-Grade Funds, but that the enhanced funds would carry only a small amount of additional risk. Cioffi and Tannin also falsely represented to investors that they had invested their own money in the High-Grade Funds and the High-Grade Enhanced Funds.

120.    These misrepresentations resulted in, among other things, certain investors shifting their investments from the High-Grade Funds to the High-Grade Enhanced Funds, and some High-Grade Funds' investors putting new, additional money into the High-Grade Enhanced Funds.

121.    To further bolster the legitimacy of the High-Grade Funds' performance numbers, the Bear Stearns Defendants represented in the High-Grade Domestic COMs that the High-Grade Funds' books would be maintained in accordance with U.S. Generally Accepted Accounting Principles ("GAAP"), and would be audited by the Deloitte Defendants, a "big four" institutional accounting firm, in accordance with Generally Accepted Accounting Standards ("GAAS"). See High-Grade Domestic COM at pp. 40, 50; High-Grade Overseas COM at pp. 45-47, 53. This fact was critical to investors' decisions, including Stillwater's and Essex's decisions, to invest in the High-Grade Funds.

122.    As discussed in the "Insider Transactions," "Failed Everquest IPO," and "Blow-Up" sections below, each of the Bear Stearns Defendants, the Walkers Defendants, and the Deloitte Defendants continued to play a material role

- 50 -

in the frauds relating to the High-Grade Funds through their ultimate demise in July 2007.

123.    Finally, as discussed in detail below in the "Deloitte Defendants' Unique Role in the Fraud" section, from the High-Grade Funds' inception through their demise, the Deloitte Defendants further perpetuated the Bear Stearns Defendants' fraud by certifying the "mark to model" valuations by providing years of unqualified, clean audit opinions in violation of GAAS and GAAP and basic professional standards.  Indeed, although the Deloitte Defendants knew or should have known that (i) the model used by the Bear Stearns Defendants to value assets in the funds' portfolio was flawed and (ii) the values could not have been as reported by the Bear Stearns Defendants, the Deloitte Defendants nevertheless issued clean audit opinions each year certifying the financial statements.  Through these artifices, the Bear Stearns Defendants were able to present to the investing public the fiction that the High-Grade Funds were successful and profitable.

**The High-Grade Enhanced Funds Fraud**

Structure and Initial Marketing of
the High-Grade Enhanced Funds

124.    The Bear Stearns Defendants' quest for increasing fee generation, along with their inability to fulfill redemption notices for the High-

Grade Funds given in early 2006, led them to create the High-Grade Enhanced Funds by the summer of 2006.

125.   The High-Grade Enhanced Funds were continuations and expansions of the fraudulent scheme launched by the Bear Stearns Defendants in 2003 by way of the High-Grade Funds.

126.   The concept of the High-Grade Enhanced Funds appears to have originated in or around February 2006, when one of the High-Grade Funds' largest investors informed the Bear Stearns Defendants that it was going to redeem its investments in the High-Grade Funds because the High-Grade Funds were not performing as well as projected.

127.   Immediately upon receipt of that notice of redemption, the Bear Stearns Defendants panicked, because they were not able to pay the redemption as a result of the inherent illiquidity, and willful, substantial overvaluation of the High-Grade Funds.

128.   In order to avoid having to admit that the NAVs were not as represented and the redemption could not be paid, the Bear Stearns Defendants decided to create an "enhanced" version of the High-Grade Funds – the High-Grade Enhanced Funds – and sought to convince the redeeming investor, and other investors, to switch their investments from the High-Grade Funds into the High-

Grade Enhanced Funds, and/or to make additional investments in the High-Grade Enhanced Funds.

129.   As the Bear Stearns Defendants knew, by 2006, analysts and economists were urgently warning of the inevitable coming correction, if not collapse, of the U.S. housing market. As such, the Bear Stearns Defendants knew that to make the High-Grade Enhanced Funds saleable – and thereby to succeed in generating undue incremental fees for themselves, while at the same time avoiding having to admit that they could not pay redemptions – they had to persuade prospective investors that the High-Grade Enhanced Funds would be even more profitable than the High-Grade Funds, while remaining a relatively safe investment, notwithstanding the foreseeable market changes.

130.   They did this, not by changing the structure or investment strategy of the High-Grade Enhanced Funds to meet the forthcoming correction, but by falsely marketing the High-Grade Enhanced Funds to existing High-Grade Fund investors, such as Stillwater and Essex, as well as to new investor candidates, as a better, smarter and safer version of the original High-Grade Funds, designed to generate greater investor returns through the "enhanced" use of "leverage" – the borrowing of money to multiply the invested cash.

131.   This representation, that a fund employing greater leverage would be safer, bordered on the absurd, and the Bear Stearns Defendants

succeeded in selling sophisticated investors on it only by virtue of their then-stellar reputation as mortgage-backed securities industry leaders and their masterful execution of the ongoing sophisticated High-Grade Funds' fraud from 2003 through that time.

132.   This new "enhanced" fund was further marketed as a safe investment because the Bear Stearns Defendants represented it would invest in an even greater concentration of the "safest" tranches of CDOs – as measured by Ratings Agency rating levels.

133.   However, as with the High-Grade Funds, to create the false impression of such returns in funds such as the High-Grade Enhanced Funds while surviving even cursory scrutiny by internal and external parties, the Bear Stearns Defendants had to engage in impermissible use of leverage.  In the case of the High-Grade Enhanced Funds, this went far beyond even the impermissibly inflated leverage employed in the High-Grade Funds, to levels which in certain instances exceeded 30 times.  This multiple was not disclosed to, or reasonably foreseeable by, investors.  It also made the High-Grade Enhanced Funds into ticking time bombs – destined to explode, and wiping out investor equity if a 3.4% value drop occurred.

134.   As in the High-Grade Funds, the Bear Stearns Defendants employed excessive leverage and false valuations tactics through the direct

- 54 -

borrowing of money, utilizing "repo" or repurchase financing, but also through even more extensive repackaging of, and purchasing of repackaged, existing, highly rated CDO tranches into new CDO-squared vehicles that, as reassembled by the Bear Stearns Defendants, could and would never have received ratings as high as their individual components. Also, as discussed in detail below, the Bear Stearns Defendants engaged in many impermissible insider transactions to take in ultra-risky CDO-squared investments created by other groups within Bear Stearns.

135.   Rather than disclose these increased risk exposures, the Bear Stearns Defendants magnified their fraud on an ongoing basis through their misrepresentations regarding the structure and characteristics of the High-Grade Enhanced Funds.

136.   For example, Defendant Tannin represented to Essex in an e-mail dated February 17, 2006 that, compared to the High-Grade Funds, the High-Grade Enhanced Funds' "returns should be higher but we will believe our volatility will remain low because we are implementing a funding strategy that will optimize financing at the underlying asset level and Fund level."

137.   Further, the Bear Stearns Defendants represented that they were fully capable of handling any possible risk associated with the use of increased leverage. For example, in an e-mail dated March 14, 2006, Defendants Tannin and Buxton represented to Essex that:

It is our belief that the combination of cash flow and market value leverage and the combination of asset based and portfolio based leverage on assets that have no interest rate volatility (they are all floating rate), very little credit volatility (AAA to A assets) and a short spread duration (currently 3 years) is a very efficient risk reward strategy. We have been very conservative until now—and we believe we have developed the tools and the systems and the risk infrastructure to run the portfolio [at these levels].

138.    Substantively similar misrepresentations were systematically made by Tannin, Buxton and other Defendants to many other investors to induce and maintain their investments.

139.    The Bear Stearns Defendants, at all times, knew or were reckless in not knowing, that such representations were false and misleading.

140.    To further entice investors to participate in the High-Grade Enhanced Funds, a reduced management fee was offered (1%, as compared to the more standard 2%). Additionally, a reduced performance fee of 19% (as compared to the more standard 20%) was offered to High-Grade Fund investors willing to transfer their positions into the High-Grade Enhanced Funds.

141.    Moreover, because the Bear Stearns Defendants were especially concerned about facing redemptions from one of the High-Grade Funds' largest investors, which they could not pay and put their scheme at risk of exposure, they made "special arrangements" just for Essex in order to ensure that Essex and other investors would cancel their redemptions in the High-Grade Funds, switch their

current investments in the High-Grade Funds to the High-Grade Enhanced Funds, and potentially invest new money into the High-Grade Enhanced Funds.

142.    For example, on or about March 14, 2006, Defendants Tannin and Buxton informed Essex that "because they have graciously agreed to hold off on their redemption pending the set-up of the leveraged classes," the Bear Stearns Defendants would "waive the notice period for any [future] redemption [Essex and other investors] may wish to make on the $48mm in redemption notices received for the March 31, 2006 redemption [from the High-Grade Fund]." This was a special arrangement "just for [Essex]" because the inability to pay out redemptions to Essex in the High-Grade Funds would have exposed the Bear Stearns Defendants' entire scheme.

143.    In addition, when Essex was dissatisfied with the liquidity terms of the High-Grade Enhanced Overseas Fund COM, the Bear Stearns Defendants changed the terms of the Offering Memorandum and issued a Supplement to the COM on July 28, 2006. The Bear Stearns Defendants were willing to do anything and everything to prevent the largest investor in the High-Grade Funds from redeeming.

144.    Despite the numerous false representations regarding the expected performance and risk level of the High-Grade Enhanced Funds, the Bear Stearns Defendants failed to disclose with respect to these new High-Grade

Enhanced Funds that, as constructed, they were doomed to failure, owing to their untenable sensitivity to even the most miniscule risks of default in the mortgages underlying the CDOs in which they invested, and to even a small fractional slowdown in the unprecedented growth of the U.S. residential real estate market.

145.    The Bear Stearns Defendants also failed to disclose that these risks were not, and could not be, effectively hedged through any offsetting investment strategy; and owing to the opacity of the Funds' structures, only the Bear Stearns Defendants, Deloitte Defendants, Walkers Defendants, and other trusted Bear Stearns advisors knew – or could have known – of the nature and magnitude of these risks.

146.    The Bear Stearns Defendants further failed to disclose the extreme amounts of leverage that would be utilized by the High-Grade Enhanced Funds, multiplying the capital contributed by investors – and therefore, the risk to which investors were exposed – by as much as 30 times.  This was more than triple the leverage level that was disclosed in the High-Grade Enhanced Funds' COM, and far more than reasonably could have been foreseen by investors.  (High-Grade Enhanced Overseas COM at p. 16).

147.    Instead, the Bear Stearns Defendants collaborated to make multiple misrepresentations in the Confidential Offering Memoranda for the June 2006 High-Grade Enhanced Fund ("High-Grade Enhanced COM") and the August

2006 High-Grade Enhanced Overseas Fund ("High-Grade Enhanced Overseas

COM", and together with the High-Grade Enhanced Fund COM, the "High-Grade

Enhanced Funds' COMs") regarding the risk-levels of securities that the High-

Grade Enhanced Funds would invest in, the risk-management skills of the Bear

Stearns Defendants, performance evaluations that would be conducted on the

High-Grade Enhanced Funds and controls that were in place with respect to

related-party transactions.

148.    For example, regarding the quality of the securities in which the

High-Grade Enhanced Funds would invest, the Bear Stearns Defendants made the

following representations:

> The Investment Manager [BSAM] will use its structuring and
> research experience to identify structured finance securities
> with fundamentally strong credit risk profiles that are priced
> attractively. A significant portion of the investment return of
> the Master Fund is expected to be current income resulting
> from a positive yield spread between the investment income of
> the investments (together with any corresponding hedging
> instruments) of the Master Fund and the associated borrowing
> costs. Additionally, to the extent that the Master Fund's assets
> increase in value, the Master Fund may realize capital
> appreciation. (High-Grade Enhanced COM at p. 12; High-
> Grade Enhanced Overseas COM at p. 15).

\*                \*                \*                \*

> [T]he Master Fund intends to concentrate its investments in the
> investment-grade classes of structured finance securities. For
> all investments (excluding Repackaging Vehicle Junior
> Interests) the Master Fund has targeted a portfolio rating
> composition of approximately 90% structured finance securities

- 59 -

rated from AAA to AA- by Standard & Poor's, from Aaa to Aa2 by Moody's or from AAA to AA- by Fitch. The 10% balance of the portfolio (excluding Repackaging Vehicle Junior Interests) may be rated below such ratings. The above percentages are target concentrations only. The Master Fund will not be required to sell any security that is downgraded subsequent to its purchase by the Master Fund. It is anticipated that no more than 30% of the Master Fund's Net Asset Value will be invested in Repackaging Vehicle Junior Interests at the time any Repackaging Vehicle Junior Interest investment is made. The Repackaging Vehicle Junior Interests will generally not be rated. (High-Grade Enhanced COM at pp. 16-17; High-Grade Enhanced Overseas COM at p. 19-20).

149.   The Bear Stearns Defendants knew, or were reckless in not knowing, that the above misrepresentations, and others similar to them, were false and misleading.

150.   With regard to their ability to manage risk, the Bear Stearns Defendants represented that:

The Investment Manager carries out the Master Fund's investment process and risk control procedures by analyzing the potential interest and principal flows on the CDO or structured finance securities owned by the Master Fund. Various models and valuation tools are used to quantify the likelihood of future payments on both the underlying assets held by a CDO or structured finance vehicle as well as securities issued by the CDO or structured finance vehicle. These tools are derived from internally constructed, broker-dealer and third-party vendor analytical systems. The Investment Manager also utilizes default modeling and credit-adjusted spread pricing applications to assess relative value opportunities in the structured finance market. (High-Grade Enhanced COM at p. 13; High-Grade Enhanced Overseas COM at p. 16).

\*          \*          \*          \*

- 60 -

The primary focus of the Investment Manager will be to assess the credit risk inherent in every potential investment and to monitor the credit risk of the investments held by the Master Fund. The objective of the analysis is to determine how the frequency and severity of defaults of the underlying assets of each of the structured finance securities will impact the interest and principal payments on those securities. Because each of the investments held by the Master Fund is essentially a construct of a large and diversified collection of individual assets, it is possible to monitor the performance of the underlying assets in a quantitative way. Unlike investments in corporate fixed-income securities where the credit performance of the issue is binary (the bond is either current in its obligations to make interest and principal payments or it is in default) the credit performance of a structured finance security is directly related to the observable cash flow characteristics of the underlying assets. In addition, it is anticipated that substantially all of the structured finance securities purchased by the Master Fund will have credit enhancement mechanisms which, when the underlying pool of assets experiences credit degradation beyond objectively defined levels, cause cash flow to be diverted away from the more junior structured finance securities and towards the securities held by the Master Fund. (High-Grade Enhanced COM at p. 14; High-Grade Enhanced Overseas COM at p. 16).

151.   The Bear Stearns Defendants knew, or were reckless in not knowing, that the above misrepresentations, and others similar to them, were false and misleading.

152.   With regard to performance evaluations of the High-Grade Enhanced Funds, the Bear Stearns Defendants represented that:

Asset Valuation: The fees payable to the Investment Manager are based directly on the Net Asset Value of the Fund as of various dates. There may be no public market price for a portion of the Fund's assets. The Investment Manager will generally value the Fund's assets. Any financial instruments

- 61 -

for which market quotations are not readily available will be valued at fair value as reasonably determined in good faith by the Investment Manager. The Investment Manager will have a conflict of interest in making such valuations because the valuations directly affect the Net Asset Value of the Fund and thus the amount of the Advisory Fee and Incentive Fee that the Investment Manager receives in respect of its services. Such valuations, however, will be performed by the Investment Manager in accordance with the methodology described in this Memorandum. (High-Grade Enhanced Overseas COM at p. 39; see also High-Grade Enhanced COM at p. 33 (expressing the same representation)).

*          *          *          *

If for specific assets the official close of business prices do not, in the opinion of the Investment Manager or its designee, reflect their fair value or are not available, the value shall be calculated with care and in good faith by the Investment Manager or its designee with a view to establishing the probable realization value for such assets as at the close of business on the valuation date. (High-Grade Enhanced Overseas COM at p. 61).

*          *          *          *

There is no active market for Repackaging Vehicle Junior Interests. The Investment Manager will use a fair-value methodology for determining the value of Repackaging Vehicle Junior Interests. This methodology will consist of taking the present value of the future stream of projected cash flows to the Repackaging Vehicle Junior Interests over the projected life of the Repackaging Vehicle. The discount rate used in this analysis will be determined primarily by assessing the credit quality of the collateral pool of the Repackaging Vehicle.

The foregoing valuations may be modified by the Investment Manager or its designee, in its sole and absolute discretion, if and to the extent that it shall determine that such modifications are advisable in order to reflect restrictions upon marketability or other factors affecting the value of assets or to obtain asset valuations within the time frames set by the Investment

Manager. Without limiting the generality of the foregoing, the valuation of an asset by the Investment Manager or its designee may reflect the amounts invested by the Fund in such asset, notwithstanding that such amounts may not represent the market value of such asset. The Investment Manager or its designee may also follow some other prudent method of valuation other than that referred to above if it considers that in the circumstances such other method of valuation should be adopted to reflect fairly the values of relevant investments or liabilities or to otherwise protect the interests of the Shareholders. The Investment Manager is entitled to exercise its reasonable judgment in determining the values to be attributed to assets and liabilities and provided it is acting bona fide in the interest of the Fund as a whole, such valuation is not open to challenge by current or previous investors. (High-Grade Enhanced Overseas COM at p. 62; see also High-Grade Enhanced COM at p. 30 (expressing the same representation)).

153. The Bear Stearns Defendants knew, or were reckless in not knowing, that the above misrepresentations, and others similar to them, were false and misleading.

154. Finally, with regard to related-party transactions, the Bear Stearns Defendants represented that:

As [investment] situations may involve conflicts between the interest of the Investment Manager or its related persons, on the one hand, and the interests of the Investment Manager's clients, on the other, the Investment Manager has established internal policies to ensure that the Investment Manager and its personnel do not prefer their own interests to those of the Investment Manager's clients and that clients are treated fairly. (High-Grade Enhanced Overseas COM at p.35; see also High-Grade Enhanced COM at p. 30 (expressing the same representation)).

\*          \*          \*          \*

- 63 -

Transactions between the Fund and the Investment Manager or its Affiliates: Members of the boards of directors of the Fund and the Master Fund who are not affiliated with the Investment Manager or their delegates or other authorized representatives of the Fund or the Master Fund will have the responsibility for approving any transactions between the Fund or the Master Fund and the Investment Manager or its affiliates involving significant conflicts of interest (including principal trades).

More particularly, Directors unaffiliated with the Investment Manager or any delegate designated by such Directors will be responsible for approving any principal transactions for which Master Fund consent is required pursuant to Rule 206(3) of the Advisers Act. (High-Grade Enhanced Overseas COM at pp. 48-49; see also High-Grade Enhanced COM at p. 32 (expressing the same representation)).

155.   The Bear Stearns Defendants knew, or were reckless in not knowing, that the above misrepresentations, and others similar to them, were false and misleading.

### The Bear Stearns Defendants' Management of, and Dealings With, the High-Grade Enhanced Funds

156.   As with the High-Grade Funds, the Bear Stearns Defendants generated fictional paper returns for the High-Grade Enhanced Funds, by "marking" the investment portfolio to a "model" of Bear Stearns' own creation on a month-to-month basis, without properly testing or adjusting this model to reflect market realities. The flaws and divergences from market reality in this model were even clearer than they were initially in respect of the High-Grade Funds' models.

157.   The Bear Stearns Defendants continued to face problems even after they were able to avoid redemptions in the High-Grade Funds. For example,

- 64 -

in the Fall of 2006, shortly after Essex first invested in the High-Grade Enhanced

Funds, Essex informed Defendant Buxton and other Bear Stearns Defendants that

Essex was not pleased with the Funds' performance and was considering

redeeming its shares in the High-Grade Enhanced Funds.  Buxton and other Bear

Stearns Defendants begged Essex not to redeem, and promised that performance

would improve, but insisted that it would take until the end of 2007 because the

leverage for the High-Grade Enhanced Funds was still "ramping up."

158.    When, in early 2007, the High-Grade Enhanced Funds'

performance still had not improved, and in fact was being outperformed by the

High-Grade Funds, Essex communicated to Buxton and the other Bear Stearns

Defendants that it was going to redeem its investments in the High-Grade

Enhanced Funds.  Considering that the Bear Stearns Defendants had told Essex

that the investments of the High-Grade Enhanced Funds were going to be the same

as the High-Grade Funds, with the only exception being that the High-Grade

Enhanced Funds would use additional leverage, it made no sense that the High-

Grade Funds were experiencing greater returns than the High-Grade Enhanced

Funds.

159.    Once again, the Bear Stearns Defendants, upon learning of a

possible sizeable redemption, were willing to go to any length to prevent Essex

from redeeming so that their scheme could continue undetected.  Upon learning of

- 65 -

Essex's intention to redeem, the Bear Stearns Defendants, and Buxton in particular, fraudulently represented to Essex that, as of February 13, 2007, 93% of the assets in the High-Grade Enhanced Funds and 90% of the assets in the High-Grade Funds were in AA or better-rated credits, and that they had increased their hedges, generating positive results, and the High-Grade and High-Grade Enhanced Funds' portfolios were continuing to perform consistently.  None of the Bear Stearns Defendants explained that AA and better-rated credits, as re-packaged and leveraged by the Bear Stearns Defendants, were in fact not high-quality credits.

160.   On February 28, 2007, still in the face of Essex's expressed intentions to redeem, Buxton represented to investors in the High-Grade and High-Grade Enhanced Funds that the Funds were "doing quite well in this environment. Hedges are working and the team is taking advantage of structuring opportunities that have arisen because of market activity."

161.   When Essex continued to express its intention to redeem, the Bear Stearns Defendants made a desperate attempt to stop the redemption and Buxton and Tannin insisted on meeting with Essex, offering to travel anywhere in the world for such a meeting.

162.   In or about mid-March 2007, Buxton met with senior Essex representatives.  During this meeting, Buxton falsely represented that the High-Grade Enhanced Funds were doing well, and stated that not only was this not the

- 66 -

time to redeem, but this was the time to invest more money in the High-Grade

Enhanced Funds. Buxton even represented that some of the Management

Defendants were currently investing their own money. Tannin was making similar

misrepresentations, and stated in a March 16, 2007 email to Stillwater:

> As far as I'm concerned, my professional opinion is that this is a
> time for us to be committing capital. If someone were to ask me
> - I would tell them that this is a very good time to add money to
> our Funds. My opinion is that this is a good time to invest. I am
> investing myself. I could, of course, be wrong and we could
> underperform. Full disclosure clearly requires that everyone
> always understand that we are in a risk taking business here.
> Spreads are wider because lots of people are worried. They may
> turn out to be right. I don't think so - but I don't know the
> future. I only make calculated bets. My calculated bet is to
> NOT be on the sidelines now.

Buxton's and Tannin's statements were outright lies. In fact, the exact opposite

was occurring. ***None of the Management Defendants were investing their own***

***money in the High-Grade or High-Grade Enhanced Funds at that time, and in***

***fact, Defendant Cioffi withdrew his personal $2,000,000 investment from the***

***High-Grade Enhanced Fund in March 2007.***

163.    Cioffi's withdrawal further hurt the High-Grade Enhanced

Funds by causing them to pay out $2,000,000 at a time when markets were weak

and the High-Grade Enhanced Funds were facing another month of losses, as well

as escalating margin calls and forced sales. The SEC and federal prosecutors have

been investigating charges of insider trading against Cioffi based on this

transaction. On June 19, 2008, the SEC filed a complaint against Cioffi and

Tannin, a Brooklyn, New York Grand Jury issued an Indictment of them, and the

FBI arrested Cioffi and Tannin at their homes based on their roles in the collapse

of the Funds.

164.   In addition, BSAM was well compensated for its operation of

the Funds through 2% advisory fees (*i.e.*, two percent of all monies under

management) and, if BSAM was eligible during the period, 20% incentive or

profit-sharing payments from the Funds and their investors.  The calculation of

BSAM's compensation from the Funds turned on various formulas related to the

NAVs of the feeder funds, which, in turn, were derived from the NAVs of the

Master Funds. A growing NAV in the Funds would lead to greater compensation,

whereas a falling NAV would decrease BSAM's 2% advisory fees and could

completely foreclose the 20% incentive or profit-sharing payments because of the

"high water mark" method used to calculate the incentive payments. Thus, the

BSAM Defendants also deceived investors with erroneously high NAV reports in

order to attempt to preserve and maximize BSAM's compensation.

165.   Cioffi's and Tannin's compensation and reputations also turned

on the success of the Funds.  BSAM had a practice of splitting advisory and

incentive fees from its funds with the funds' managers to reward well-performing

managers.  Thus, a higher NAV would translate into larger advisory and incentive

fees for the managers as well. In addition, BSAM awarded its successful managers

Bear Stearns stock as a form of deferred compensation. Cioffi and Tannin also

stood to gain greater stock awards with better High-Grade Enhanced Fund

performance numbers, and through their stock ownership had interests that aligned

with other Bear Stearns affiliates and Bear Stearns as a whole. Further, Cioffi and

Tannin were concerned with their reputations in the industry. Cioffi stated in a

June 2007 email: "If I can't [turn the Funds around] I've effectively washed a 30

year career down the drain."

166. Thus, the misconduct detailed herein by the Bear Stearns

Defendants, including fraudulently inflating the Funds' NAVs through the manager

marks scheme and transferring risky collateral from other Bear Stearns investments

to the Funds at inflated values, was committed for the exclusive benefit of the Bear

Stearns Defendants, was entirely adverse to the interests of the Funds and

represented a total abandonment of their duties to act in the best interest of the

Funds.

167. Against this backdrop, the Bear Stearns Defendants continued

to represent, both through the High-Grade Enhanced Funds COMs, and through

individual representations to investors, that they were guarding against related-

party transactions through the specific measures laid out in the High-Grade

Enhanced Funds COMs. These representations by the Bear Stearns Defendants

with regard to the High-Grade Enhanced Funds were particularly specious, as

notwithstanding the ongoing moratorium on transactions with Bear Stearns, which

remained in place from the birth of the High-Grade Enhanced Funds in November

2006 through approximately April 2007, countless unreviewed insider transactions

took place.

168.    Furthermore, the Walkers Defendants reviewed the High-Grade

Enhanced Funds COMs, and defendants Lennon and Wilson-Clarke again served

as "independent" directors for the High-Grade Enhanced Overseas Fund and the

High-Grade Enhanced Master Fund. Each of the Walkers Defendants thereby

willfully furthered the High-Grade Enhanced Funds' fraud by facilitating the

misrepresentations that the Walkers Independent Directors were reviewing all

insider transactions and otherwise participating in the governance of the High-

Grade Enhanced Funds.

169.    And, as with the High-Grade Funds, the Bear Stearns

Defendants represented that the High-Grade Enhanced Funds' books would be

maintained in accordance with GAAP, and would be audited by the Deloitte

Defendants in accordance with GAAS, which was critical to investors' decisions to

invest in the High-Grade Enhanced Funds.

170.    By these representations, the Bear Stearns Defendants intended

to, and did, communicate that the High-Grade Enhanced Funds were designed to

- 70 -

generate returns greater than their predecessors, the High-Grade Funds, but still would be relatively safe investments, which would permit investors to participate in the booming housing market with little risk of loss due to defaults. By so doing, the Bear Stearns Defendants were able to obtain over $500 million in investments into the High-Grade Enhanced Funds between the second quarter of 2006 and the second quarter of 2007. In addition, the Bear Stearns Defendants were successful with their lies and misrepresentations and convinced Stillwater, Essex and other investors to sell their investments in the High-Grade Funds and use the full value of those sales to purchase new investments in the High-Grade Enhanced Funds, thereby avoiding having to pay redemptions from the High-Grade Funds in 2006.

171.    And again, the Deloitte Defendants failed to "pull the plug" on these "marked to myth" numbers, thereby allowing the fraud to continue. As discussed in detail below, in the "Deloitte Defendants' Unique Role in the Fraud" section, from the High-Grade Enhanced Funds' inception through their demise, the Deloitte Defendants further perpetuated the Bear Stearns Defendants' fraud by certifying the "mark to model" valuations, in violation of GAAS and GAAP and basic professional standards. Indeed, the Deloitte Defendants knew, should have known or recklessly disregarded the fact that (i) the model used by the Bear Stearns Defendants to the value assets in the funds' portfolio was flawed, and (ii) the values could not have been as reported by the Bear Stearns Defendants.

- 71 -

Nevertheless, the Deloitte Defendants issued clean audit opinions certifying the financial statements each year. Through these artifices, the Bear Stearns Defendants were able to present to the investing public the fiction that the High-Grade Funds were successful and profitable.

172. As discussed in the "Insider Transactions," "Failed Everquest IPO," and "Blow-Up" sections below, each of the Bear Stearns Defendants, the Walkers Defendants, and the Deloitte Defendants continued to play a material role in the frauds relating to the High-Grade Funds through their ultimate demise in July 2007.

**All Funds' Pervasive Insider Transactions with Bear Stearns and BSAM**

173. As discussed above, throughout the life of the High-Grade Funds, from at least 2004 forward, the Bear Stearns Defendants consistently engaged in insider transactions, without regard to the independent director approval and PTL requirements built into each of the Funds' governing documents.

174. These insider transactions resulted in countless overpriced trades being executed by the High-Grade Funds, to their and their investors' ultimate detriment, and to the great benefit of the Bear Stearns Defendants.

175. Following imposition of the purported "moratorium" on transactions among the Funds and Bear Stearns in the summer of 2006, the Bear

Stearns Defendants continued their practice of insider transactions, when it suited them, largely unimpeded.

176.   This course of conduct persisted throughout the lives of the High-Grade Funds, and from the inception through the demise of the High-Grade Enhanced Funds.

177.   Furthermore, throughout the lives of the Funds, the Bear Stearns Defendants mis-marked the Funds' assets with a willful bias toward keeping the prices of Bear Stearns-related CDOs and other assets especially steady, and not to reflect actual downward variation in the prices of those securities, because keeping Bear Stearns-related CDOs at high values would help BSAM and Bear Stearns in other ways.  If the High-Grade Enhanced Funds had marked those assets down to the prices that they should have, similar lower prices would then have followed for other Bear Stearns assets, hurting **all** of the Bear Stearns Defendants' fee income and compensation.

178.   During the spring of 2007, Bear Stearns wanted to keep selling its inventory of mortgages and mortgage-related securities at high prices, keep Bear Stearns' underwriting of those kinds of security offerings going, pave the way for the Everquest IPO, stave off any market price disruption in this core, mortgage-backed securities area of the firm's business, and avoid detection of their wrongdoing in connection with the Funds.

- 73 -

179.    Defendant Cioffi had deep ties to other affiliates within the Bear Stearns Defendants' group, including the mortgage-backed securities underwriting, broker-dealer, and trading groups, due to his history at Bear Stearns since 1985.

180.    Thus, continuing the consistent practice of refraining from re-marking assets downward in the High-Grade Funds and the High-Grade Enhanced Funds, BSAM, through Cioffi and his team, made particularly sure to artificially prop up the Bear Stearns-related assets in the Funds.

181.    The Bear Stearns Defendants also recognized that in all of their failures to re-price fully and fairly, even for assets unrelated to Bear Stearns, they would be helping to keep the overall market up and active for their colleagues.

182.    As Bear Stearns' public statements and actions in June 2007 indicated, and as a post-mortem analysis of the High-Grade and High-Grade Enhanced Fund portfolios reveal, during the months prior to June 2007 the Bear Stearns Defendants were accelerating their ongoing fraud and practice of unfettered insider trading, funneling excessively risky or troubled assets at inflated prices into the High-Grade and High-Grade Enhanced Funds.

183.    The Bear Stearns Defendants did this, among other things, to enable them to mitigate investment risks in other Bear Stearns-branded investment vehicles that were subject to closer investor scrutiny, while continuing to generate

multiple levels of fees for the entire Bear Stearns family. This accelerated, and further assured, the demise of the High-Grade and High-Grade Enhanced Funds, and further hid the Bear Stearns Defendants' wrongdoing.

184.    By this misconduct, the Bear Stearns Defendants were further concentrating inappropriate risks and overstated marks in the Funds, despite BSAM's represented surveillance strategies, risk controls and insider transaction protections.

185.    The Walkers Defendants knowingly permitted all of this to happen on an ongoing basis.

186.    Throughout the lives of each of the Funds, the Bear Stearns Defendants took full advantage of this absence of outside controls to load the Funds with the riskiest CDO tranches, creating "CDO-squareds" and otherwise dumping the worst investments from Bear Stearns' balance sheet onto those of the Funds.

187.    In particular, it is now known that the Bear Stearns Defendants conspired to load the Funds with CDO-squared securities throughout 2006 and at an accelerating pace from January through April 2007.

188.    By May 2007, the Bear Stearns Defendants had filled the High-Grade Enhanced Fund with at least $2.5 billion of such CDO securities that were built from, in whole or in part, other CDO securities.

189.    These complex CDO-squared securities violated Investment Guidelines that the Bear Stearns Defendants had represented to investors that the High-Grade Enhanced Funds would follow.  They violated these guidelines because most, if not all, CDO-squared securities did not have regular independent pricing available.  As CDOs were created out of other CDOs, the securities became especially difficult to mark and had very illiquid markets.

190.    The Bear Stearns Defendants dumped so many CDO-squared securities into the High-Grade Enhanced Funds that they owned a significant percentage of **all** outstanding CDO-squared securities in existence, which were relatively rare and a small percentage of the overall CDO market.

191.    An International Monetary Fund report, using Credit Suisse numbers, estimated that as of July 2007, all U.S. outstanding CDO-squared securities totaled $28 billion.  In May of 2007, the High-Grade Enhanced Fund itself owned at least approximately 9% of that total, or approximately $2.5 billion.

192.    As of mid-June, over 46% of the asset-backed CDO-related investments ("ABS CDOs") in the High-Grade Enhanced Funds' portfolio were in fact CDO-squared securities.  In the High-Grade Funds, that number was approximately 36%.  These concentrations served to increase the leverage embedded within each of the Funds, beyond their already unsustainable levels.

193.    At the same time that the Bear Stearns Defendants were filling the Funds with CDO-squared securities, they were selling less complex, more liquid and stronger asset-backed investments from the portfolio.

194.    In or about March 2007, the Bear Stearns Defendants purchased $200,000,000 in unrated CDO-squared securities known as CLSVF 2007-3A A2 for the High-Grade Enhanced Funds.  Simultaneously, the Bear Stearns Defendants added $325,000,000 in CDO-squared securities from three lower tranches of the structure called TWOLF 2007-1A.  Also in March 2007, the Bear Stearns Defendants caused the High-Grade Enhanced Funds to buy $90,000,000 in the CDO-squared security ADMSQ 2007-2A, as well as many other pieces of CDO-squared deals.  These are just a few examples, and do not include the purchases from BSAM-managed structures discussed below.

195.    Throughout this period, the Bear Stearns Defendants were not only purchasing CDO-squared securities, they were purchasing many of those securities from structures that BSAM itself managed, or from deals that Bear Stearns underwrote.

196.    Indeed, the Bear Stearns Defendants caused the High-Grade Enhanced Funds to buy **all** the securities in all except the highest tranche of an April 18, 2007 Tahoma 2007-3A CDO-squared offering that BSAM was managing – with a combined price for the five lower tranches that went completely into the

- 77 -

High-Grade Enhanced Funds of approximately $150 million. This means that no independent third-party market participant priced those securities or ascertained their fair market value; instead, the Bear Stearns Defendants caused the High-Grade Enhanced Funds to purchase them all at non-arms-length prices, to the detriment of the Funds.

197. In addition, in the CDO markets, it is highly unusual for a CDO structure manager to retain in its own investment funds all but the highest tranche of an offering for which it will serve as the manager. BSAM was serving its own interests by helping its CDO deals close and its management business appear to flourish, while at the same time filling the High-Grade Enhanced Fund with impermissible assets with heightened risk.

198. In March 2007, the Bear Stearns Defendants also caused the High-Grade Enhanced Fund to purchase over $60,000,000 in two tranches of the Tahoma 2007-2A CDO-squared offering that BSAM managed. In late October 2006, they had caused the High-Grade Enhanced Fund to purchase over $250,000,000 in three tranches of a Tahoma 2006-1A CDO-squared offering that, again, BSAM managed. BSAM was helping its ongoing business partner, Tahoma, to sell out its offerings, to BSAM's own benefit and to the detriment of the High-Grade Enhanced Funds and their investors.

199.   Similarly, in late February or March 2007, the Bear Stearns Defendants caused the High-Grade Enhanced Fund to buy **all** of the securities in four tranches of a CDO-squared refinancing deal, Tricadia 2003-1AR, with a combined price of approximately $140 million, that was underwritten by Bear Stearns and a co-underwriter.  Because the moratorium on trading with Bear Stearns was apparently still in place, BSAM may have transacted with the co-underwriter.  Nonetheless, BSAM's purchase for the High-Grade Enhanced Fund assisted Bear Stearns in succeeding with its underwriting business, to the detriment of the Funds and their investors.

200.   Again, because the High-Grade Enhanced Fund bought all the securities in many tranches, the prices for those securities were not determined by any independent third-party market participant.  BSAM and the other Bear Stearns Defendants therefore could and did cause the securities to come into the fund at an inflated price.  When the securities' true value subsequently fell further, the High-Grade Enhanced Fund realized an even greater loss.

201.   BSAM was accumulating illiquid assets in the High-Grade Enhanced Fund that were sold into that fund in non-arms-length arrangements, in order to help BSAM and Bear Stearns succeed in other roles.  In the process, BSAM was collecting fees as the CDO arranger and manager, and collecting another set of fees from the High-Grade Enhanced Funds.

202.    Throughout the High-Grade Enhanced Funds' existence in 2006 and 2007, there was another facet to the Bear Stearns Defendants' concealment of the true performance facts and unstable nature of the funds.

203.    The Funds' administrator ("PFPC") was required to deliver to the Funds' investors monthly or semi-monthly NAVs.  Under the administration agreement for the Funds, PFPC was taking instructions and gathering information from BSAM for the completion of these NAVs.  For the months of December 2006 through June 2007, PFPC either considerably delayed the delivery of the NAVs, or never provided them to investors at all.

204.    As an example, the report from PFPC for the month of December 2006 (triggered by the dealing date on January 1) was not released until late February 2007, long after the fifteen-day deadline.  That report showed a 1.60% increase in the fund for the month of December.  PFPC later revised that result to show a 1.76% increase.

205.    PFPC initially reported that the delay in the December report was due to year-end processing issues; but the delay in December was repeated in the subsequent months, and was part of BSAM's cover-up.

**The Bear Stearns Defendants' Ongoing Fraud, and Failed Efforts
to Foist the Funds' Risks Upon the Public Through the Everquest IPO**

206.    The Bear Stearns Defendants attempted to conceal their misconduct and self-dealing by promptly transferring the High-Grade Enhanced

- 80 -

Fund's highest-risk assets – CDO-squareds that contained the lowest rated tranches and unrated "equity" – out of the High-Grade Enhanced Fund and into another new BSAM-led entity – Everquest Financial Ltd. ("Everquest").

207.   By so doing, the Bear Stearns Defendants knew they would not have to report these low-quality investments on the balance sheet for the High-Grade Enhanced Fund, but the fund would still indirectly own the exact same assets because it held a significant percentage of the equity in Everquest.

208.   The Bear Stearns Defendants sought to further grow and diffuse their fraud's reach by conducting an initial public offering ("IPO") of Everquest.

209.   Everquest was jointly run by BSAM and Stone Tower LLC. Cioffi, in addition to his roles at BSAM, was also co-chief executive of Everquest.

210.   On May 9, 2007, Everquest filed a Form S-1 with the SEC for its planned IPO. Everquest's filing disclosed that a significant portion of the assets (valued by Everquest and BSAM at $548.8 million) in its approximately $720 million portfolio had been purchased in 2006 and 2007 from the High-Grade and High-Grade Enhanced Funds. In return, the funds received 16 million shares of Everquest (valued by Everquest and BSAM at $25 per share) and $148.8 million in cash.

211.   The largest transfer from the High-Grade and High-Grade Enhanced Funds to Everquest involved the lower/riskier tranches of Parapet, a

BSAM-managed vehicle that created CDOs out of CDO-squared and other CDO securities (potentially creating the first ever CDO Cubed), many of which were also from vehicles managed by BSAM. As detailed below, the Deloitte Defendants were the auditor for both Everquest and Parapet.

212. The Everquest S-1 listed Cioffi as a beneficial owner of Everquest shares. In addition, upon the IPO, BSAM would receive new share grants representing 2.5% of Everquest's outstanding shares for BSAM's designees.

213. BSAM also benefited from the Everquest arrangement because it was entitled to management and incentive fees from Everquest, in addition to its fees associated with the High-Grade and High-Grade Enhanced Fund structures. Likewise, the other Bear Stearns Defendants would benefit from an Everquest IPO through underwriting fees.

214. In addition to executing the above-referenced insider transfer, the Bear Stearns Defendants also planned the Everquest IPO without regard to the interests and rights of the High-Grade and High-Grade Enhanced Funds' shareholders.

215. But numerous press articles began describing BSAM's misconduct in connection with Everquest, bringing unwanted scrutiny onto the Bear Stearns Defendants. BusinessWeek on May 11, 2007 said:

> "Everquest is a fledgling financial-services company that has been buying up equity interests in risky bonds backed by

- 82 -

subprime mortgages form hedge funds managed by Bear
Stearns…. The deal appears to be an unprecedented attempt by
a Wall Street house to dump its mortgage bets."

216.   The article further noted that Everquest's portfolio of $720

million dollars of CDOs was primarily purchased from hedge funds managed by

Bear Stearns and noted that the interrelationships between Bear Stearns and

Everquest created significant conflicts of interest than could impact the success of

the investments.

217.   Shortly, thereafter, on June 5, 2007, the <u>New York Post</u> ran an

article regarding the alleged manipulation of the sub-prime market by Bear

Stearns:

> "At issue is the motivation behind efforts by Bear's EMC
> Mortgage unit to renegotiate subprime home loans, and whether
> it's solely to prevent homeowners from losing their houses,
> or… simply 'to artificially inflate the value of derivative
> securities.'"

### **The Blow-Ups That Launched the Worldwide Credit Crisis**

218.   By March 2007, when concerns surfaced respecting all of the

Funds, the Bear Stearns Defendants knew that they had to take action to prevent

their scheme from being discovered.  On March 12, 2007, Cioffi held a special

investor conference call, scheduled specifically to deal with growing investor

concerns about the Funds' performance and market conditions.  During this call,

Cioffi continued to knowingly or recklessly make false representations regarding

the Funds' performance.

- 83 -

219.   Just ten days earlier, Cioffi, Tannin and others attended an internal BSAM meeting where they discussed the difficult month of February, drank some vodka and directed those in attendance to keep the Funds' troubles quiet to those not at the meeting.

220.   On March 31, 2007 – prior to the release of the Deloitte Defendants' audits of the funds, BSAM sent letters to investors stating that the concerns were unfounded and that they were:

> "...the result of fear of an unprecedented increase in the cumulative losses these portfolios will suffer over time, not an actual deterioration in credit on the underlying bonds in our portfolio." Hedge Fund Alert (June 6, 2007), p. 2.

221.   BSAM also hosted its regularly scheduled conference call on April 25, 2007 – one day after the Deloitte Defendants issued clean audits for the Funds and shortly prior to the release of those audits.  However, the Bear Stearns Defendants made the decision not to inform investors during that call that the Funds were experiencing difficulties and were on the verge of collapsing.  Instead, Cioffi and Tannin represented that the outlook for the Funds and the CDO market was favorable.  Tannin opened the call by stating that "the key sort of big picture point for us at this point is our confidence that the structured credit market, and the sub-prime market in particular, has not systemically broken down .... So, from a structural point of view, from an asset point of view..., we're very comfortable with exactly, you know, where we are."

222.  Likewise, Cioffi stated that "we are – cautiously optimistic that the CDO market has found its footing. . . . We have a plan in place that'll get the Funds back on track to generate positive return." Further, Cioffi reported that although the Funds would have a loss of one percent from January through April 2007, returns for May through December were expected to be eight percent, resulting in an overall positive performance of seven percent for 2007.  Also during that call, Cioffi represented that the Funds had very little direct sub-prime holdings, the CDO market was stabilizing, the Bear Stearns Defendants were not pessimistic about the sub-prime market because until recently rising home prices helped to bail out those who might have otherwise been delinquent on their mortgages, delinquencies were flattening out in February and March 2007 already, their credit models were solid and could distinguish good versus bad credits based on their fundamentals, and that 2007 origination of credits would be of better credit quality as a result.

223.  Cioffi also arranged for a separate "breakout" call with Essex, because Essex was a large investor and, "for compliance reasons, they are able to say more in a one on one call than a 50 person conference."  At no point during the investor call or the separate breakout call did Cioffi mention that the Funds had a liquidity problem and might not be able to pay out redemptions.

224.   Notably, just days earlier – on April 19, 2007 – an employee of BSAM issued a report (the "CDO Report") showing that the CDOs in the Funds were worth substantially less that they previously had thought.

225.   In response, on April 22, 2007, Tannin sent an email to Cioffi using personal (*i.e.*, non-Bear Stearns) email accounts, stating:

> the subprime market looks pretty damn ugly . . . . If we believe the [CDO Report is] ANYWHERE CLOSE to accurate I think we should close the funds now.  The reason for this is that if [the CDO Report] is correct then the entire subprime market is toast . . . .  If AAA bonds are systematically downgraded then there is simply no way for us to make money – ever.  (emphasis in original).

Tannin then stated that "caution would lead us to conclude the [CDO Report] is right – and we're in bad bad shape."

226.   Undeterred, shortly after the April 25 call, when certain investors in the High-Grade Enhanced Funds, including Stillwater and Essex, gave notice of their intention to redeem their investments, BSAM provided "future outlooks" designed to show that the Funds were strong and flourishing, in an effort to persuade the investors to withdraw their redemption requests.

227.   Further, on or about May 22, 2007, Buxton reached out to investors and specifically stated that the High-Grade Enhanced Fund was up two percent and attempted to set up a meeting to share this "new improved future outlook."  One week later, the Bear Stearns Defendants still reported to investors

that fund performance was up, hoping that these positive reports would convince investors to cancel their redemption requests.

228.  However, despite their representations to Stillwater, Essex and other investors that the Funds were performing well and had a "new improved future outlook," internal communications among the Bear Stearns Defendants in May 2007 told a different story.

229.  In May 2007, emails between Defendants Tannin and Cioffi reveal that they were "building a plan" to cope with the Funds' severe troubles.

230.  By May 26, 2007, Tannin was sketching out a plan to sell the Funds to Cerberus Capital Management ("Cerberus") or some other similar entity. Tannin was preparing to present that plan to Cerberus, Warren Spector, and others. Spector had been consulted about the "building of the plan" and, according to a May 26 email from Tannin to Cioffi and McGarrigal, Spector was focused on simplicity and "insisting on a 7th grade level presentation."

231.  In the same email, Tannin explained that BSAM was selling "2 hedge funds (1.5 billion on capital) that are in danger of a wipe out because of a lack of liquidity" and further stated that BSAM has "almost the necessary systems" to run their operations.

232.  Tannin also stated in this May 26 email that the Funds had CDO-squared securities and single name hedges that did not have "a value and

- 87 -

liquidity profile." "This is the problem. There is simply no market. Too many variables."

233. On May 31, Tannin and Cioffi were contemplating what information to give investors regarding the Funds' performance. In an email to Cioffi, Tannin stated "issue is-do we give them the -6.5 april or the larger down april?" Cioffi responded, "Ah, that's correct I think that one deserves a phone call." As with their communications with Essex, the Management Defendants were often hesitant to communicate via email on sensitive topics, and preferred to speak by phone or off the Bear Stearns email system allegedly "for compliance reasons," really in order to avoid a written record of the details.

234. Recognizing the precarious state of the Funds at this time, when they did communicate by email, the Management Defendants attempted to "cover their tracks." Beginning for the first time in the days before the April 25, 2007 investor call, and continuing through the time of the Funds' collapse, all of the emails circulated by the Management Defendants to investors included a page-long footer stating, in part:

> While the primary focus of the Fund will be on highly-rated debt securities (AA- or higher), up to 10% of the investment portfolio (excluding Repackaging Vehicle Junior Interests), may be invested in lower-rated investment grade, below investment grade or unrated securities. [*note- this is different from early materials that said 90% AA to AAA, and 10% A-*]

> The Fund invests on a highly leveraged basis. The cumulative effect of the use of leverage with respect to any investments in a market that moves adversely to such investments could result in a substantial loss which would be greater than if the Fund were not leveraged.

Prospective investors must understand that securities otherwise outside of the Fund's investments parameters may constitute all or a significant portion of the underlying securities held by CDO, Synthetic Security or other investment of the Fund and that CDOs are therefore subject to risks particular to such securities.

235.    This disingenuous, eleventh hour partial disclosure ran counter to what investors had been told – and indeed, were simultaneously being told. It serves only to provide a small glimpse into the desperate measures that were being taken by the Bear Stearns Defendants as their fraud was beginning to unravel.

236.    As discussed in further detail above, throughout this period, in addition to directly lying to investors, the Bear Stearns Defendants further attempted to conceal their misconduct and self-dealing by foisting upon the public equity markets through the Everquest IPO.

237.    In the face of increasing public scrutiny, the Bear Stearns Defendants realized they could no longer keep their fraud in check.  While the High-Grade Enhanced Funds first told investors in late May that their loss for April was only about 1%, Cioffi later "adjusted" that number to minus 6% and, on June 5, 2007, admitted to investors that the High-Grade Enhanced Fund needed to remark its portfolio because four bonds were significantly overstated in April values.  The effect would be to drive the April 2007 return from minus 6 to minus 16, and to reduce the fund's cash position from $250 million to $100 million.  Cioffi further indicated that the High-Grade Enhanced Fund would be unable to liquidate positions to cover the redemptions that had been placed.

238.    The house of cards that was the High-Grade Enhanced Funds was so weakly supported that it did not tremble, but collapsed.  Thus, on June 7, 2007, BSAM held a conference call to inform High-Grade Enhanced Funds' investors that the losses in April had now been revised from minus 1% to minus 19%, and that the Funds were suspending all redemptions.

239.    By July 18, 2007, the Bear Stearns Defendants finally admitted that the Funds had not just lost profitability, but viability, and that liquidation was BSAM's only strategy.  In a letter dated July 17, 2007 to investors, Bear Stearns Co. stated as follows:

> Dear Client of Bear, Stearns & Co. Inc.:
>
> Let me take this opportunity to provide you with an update on the status of the High-Grade Structured Credit Strategies and High-Grade Structured Credit Strategies Enhanced Leveraged Funds managed by Bear Stearns Asset Management.  A team at BSAM has been working diligently to calculate the 2007 month-end performance for both May and June for the Funds. This process has been much more time-consuming than in prior months due to increasingly difficult market conditions.
>
> As you know, in early June, the Funds were faced with investor redemption requests and margin calls that they were unable to meet.  The Funds sold assets in an attempt to raise liquidity, but were unable to generate sufficient cash to meet the outstanding margin obligations.

240.    In the same letter, Bear Stearns Co. stated that it was restructuring the risk management function at BSAM.  Shortly thereafter, Bear Stearns Co. announced the resignation of its co-president and chief operating

- 90 -

officer, Warren Spector, stating that "In light of recent events concerning

[BSAM's]... High-Grade and Enhanced Leverage funds, we have determined to

make changes in our leadership structure." Associated Press Financial Wire

(August 5, 2007).

241.    But by then, of course, word of the Funds' collapse was out, the

Funds were, by every meaningful measure, dead.

**The Deloitte Defendants' Unique Role in the Fraud**

242.    The Bear Stearns Defendants' fraud would not have succeeded

without the assistance of the Deloitte Defendants.  One objective check on

financial statements prepared by investment funds such as the Funds, and the

ability of an investment manager such as BSAM to abuse the "manager mark"

system, is that investment funds of this sort are subject to timely audits by a

reputable "independent" third-party auditor.  Without such audits, the funds would

be unable to attract investors.

243.    Accordingly, such funds frequently utilize "household name"

auditors in an effort to acquire credibility by association – in other words, the

assumption is that engagement of the Deloitte Defendants, or another "big four"

auditor, will increase a fund's reputation than if the fund was to hire a lesser

known auditor, by reason of the market perception that the brand name auditor will

ensure that there are no material misrepresentations in respect of valuations or

other material balance sheet items by management, whether deliberate or accidental.

244.   Bear Stearns thus caused the Funds, and their respective Master Funds, to engage the Deloitte Defendants – the regular auditor for *all* Bear Stearns-related entities – as the supposedly independent auditor for the Funds and their respective Master Funds.  The Deloitte Defendants, in turn, rendered audit reports to the shareholders of the Funds and the Master Funds concerning the accuracy of their financial statements, including without limitation the Master Funds' investments and the valuations contained therein.

245.   The Deloitte Defendants served as the Funds' independent auditors for each of the audit years ended December 31, 2003 through December 31, 2006, and during that time the Deloitte Defendants worked closely with the Bear Stearns Defendants.  The audits for the Overseas Funds were performed by both the Deloitte Defendants' Cayman Islands office and their office in Philadelphia, Pennsylvania, and the audit reports were signed by the Deloitte Defendants' Cayman Islands office.  In addition to performing a majority of the work on the Overseas Funds' audits, the Deloitte Defendants' Philadelphia, Pennsylvania office also performed the audits for the Domestic Funds and the Master Funds.

246.   Bear Stearns, at one time Wall Street's fifth largest investment bank, was one of the Deloitte Defendants' largest and most significant customers. The Deloitte Defendants collected substantial fees from their Bear Stearns-related audit engagements, including over $1 million a year solely for their audits of certain Bear Stearns' funds.  In addition to the revenue from their audits of the Funds, Deloitte globally (which included the Deloitte Defendants) earned significant audit, tax and consulting fees from Bear Stearns as their provider of choice.  For fiscal 2007, these fees were in excess of $20 million.

247.   As a result, the Deloitte Defendants clearly were willing to "look the other way" on the Bear Stearns Defendants' fraudulent scheme in order to sustain their relationship with Bear Stearns.

248.   As the auditor for the Domestic Funds, the Overseas Funds and the Master Funds, the Deloitte Defendants played a critical role in the entire financial reporting process by lending credibility and legitimacy to the Funds' financial statements, and thereby lulled investors into a false sense of security that the Funds' financials were as represented by the Bear Stearns Defendants.  Indeed, the annual audits provided by the Deloitte Defendants were an integral component of the Bear Stearns Defendants' ability to commit the fraud set forth herein, as without the Deloitte Defendants' unqualified, clean audit reports, the Bear Stearns Defendants never would have been able to convince investors to continue to invest

capital in the Funds.  In fact, investors reasonably relied on Deloitte's continued clean audit reports when deciding to invest and/or remain invested in the Funds.

249.   The Deloitte Defendants' role as the Funds' auditor gave the Deloitte Defendants' personnel working on the engagement access to, and knowledge of, the Funds' internal corporate, financial, operating and business information.  The Deloitte Defendants' personnel had ample opportunity to examine and analyze the Funds' business and accounting practices, and to test and assess the transactions recorded in the Funds' internal and publicly reported financial statements.

250.   In addition to auditing the financial statements for the Funds and their respective Master Funds, the Deloitte Defendants also audited the financial statements of two Bear Stearns-related entities with substantial ties to the Funds.  As discussed earlier, one such entity was Everquest – an entity created and controlled by BSAM to which the Overseas Funds transferred a significant portion of their assets in late 2006 in exchange for an equity interest in Everquest – and for which the Deloitte Defendants served as the auditor for the period from September 28, 2006 through December 31, 2006.  The Deloitte Defendants also served as the auditor for Parapet – a BSAM-managed vehicle that created CDOs out of CDO-squared and other CDO securities, many of which were also from vehicles

managed by BSAM – for the period from September 28, 2006 through December 31, 2006.

251.    Through their audits of these various Bear Stearns-related entities over the years, the Deloitte Defendants became intimately familiar with and had unique and superior knowledge of the business and operations of the Funds and the Master Funds, none of which knowledge was available to investors in the Funds.

### The Deloitte Defendants' Years of Clean Audit Opinions

252.    On March 31, 2004, the Deloitte Defendants issued their audit report for the High-Grade Funds for the period from October 1, 2003 (the date of commencement of operations) to December 31, 2003, and for the related Master Fund for the period from September 12, 2003 (the commencement of operations) through December 31, 2003 (the "2003 Fiscal Year"). The Deloitte Defendants subsequently issued their audit reports for the High-Grade Funds and the related Master Fund for the year ended December 31, 2004, on April 15, 2005, and for the fiscal year ended December 31, 2005, on April 11, 2006.

253.    Each of the audit reports issued by the Deloitte Defendants for the fiscal periods identified above were "clean" and falsely represented that the financial statements presented fairly, in all material respects, the High-Grade Funds' and the related Master Fund's financial position as of December 31, 2003,

December 31, 2004 and December 31, 2005 in accordance with GAAP, and that

the Deloitte Defendants had performed their audits in accordance with GAAS.

254.   The Bear Stearns Defendants and Deloitte Defendants

understood and intended that the Funds, and the investors therein, would rely upon

the Deloitte Defendants' audit reports for each fiscal year.  In fact, the Deloitte

Defendants addressed the audit reports directly to the shareholders of the Funds.

255.   On April 24, 2007, the Deloitte Defendants rendered their audit

reports for the fiscal year ended December 31, 2006 (the "2006 Fiscal Year") for

each of the Funds.  With respect to the manager marks utilized by the Bear Stearns

Defendants to value assets in the High-Grade Funds, the Deloitte Defendants

included *for the first time* the following in their audit report for the 2006 Fiscal

Year:

> As described in Note 2 [to the audited financial statements],
> securities with a total market value of $616,023,080, 70.19% of
> the Master Fund's net assets, represents securities which were
> fair valued by the Master Fund's management.  The Master
> Fund's management has estimated the fair value of these
> securities in the absence of readily ascertainable market values.
> These values may differ from the values that would have been
> used ha[d] a ready market for these investments existed, and the
> differences could be material.

256.   With respect to the manager marks utilized by the Bear Stearns

Defendants to value assets in the High-Grade Enhanced Funds, the Deloitte

Defendants stated *for the first time* the following:

- 96 -

> As described in Note 2 [to the audited financial statements], 63.10% of the Master Fund's net assets, represents securities which were fair valued by the Master Fund's management. The Master Fund's management has estimated the fair values of these securities in the absence of readily ascertainable market values. These values may differ from the values that would have been used had a ready market for these investments existed, and the differences could be material.

257.   Despite including these explanatory paragraphs, the Deloitte Defendants nonetheless again delivered "clean" audit opinions on each of the Funds' financial statements for the 2006 Fiscal Year, opining just as they had with respect to the Funds' financial statements for each of the preceding fiscal years as follows:

> We conducted our audit in accordance with auditing standards generally accepted in the United States of America. ...

> In our opinion, the financial statements present fairly, in all material respects, the financial position of the Fund [or Partnership] as of December 31, 2006, the results of its operations, changes in its net assets, and its cash flows for the year then ended, in conformity with accounting principles generally accepted in the United States of America.

258.   Thus, the Deloitte Defendants represented to the Funds and their investors that the Funds' financial statements were presented in accordance with GAAP and accurately and fairly represented the Funds' financial condition for each fiscal year ended December 31, 2003 through December 31, 2006. The Deloitte Defendants also represented that each of their audits were conducted in accordance with GAAS.

- 97 -

259.   The Deloitte Defendants' certification for all years was false,
however, because the Funds' financial statements did not conform with GAAP,
contained material misstatements and omissions, and failed to portray the Funds'
true financial condition, and the audits had not been conducted in accordance with
GAAS.  The Deloitte Defendants knew, should have known, or were reckless in
not knowing that these financial statements, and their audit opinions concerning
the financial statements, were false and misleading.  Their provision of clean audit
opinions each and every year allowed the Bear Stearns Defendants to use these
financial statements in order to mislead and defraud investors.

The Ever-Growing Number of Improper Insider Transactions

260.   From the inception of their engagement as auditors for the
Funds, the Deloitte Defendants knew, or were required to know and recklessly
failed to know, for example, that there were numerous improper and unauthorized
related party transactions between the Funds and other Bear Stearns-related
entities.  Indeed, while the notes to the financial statements for the 2003 Fiscal
Year (*i.e.*, the first year of the Deloitte Defendants' audit of the Funds) reflect that
approximately 40% of the trades executed on a principal basis by the Master Fund
were with Bear Stearns Co., they fail to state that a large number of these trades
were not properly approved by the Funds' independent directors or a majority of

the investors, and were thus likely not "arms length" by any stretch of the imagination.

261.  As set forth below, the Deloitte Defendants were required to employ heightened scrutiny when reviewing these related party transactions and knew, should have known, or were reckless in not knowing, that the Bear Stearns Defendants were ignoring the requirement that the independent directors or a majority of the investors approve such transactions with increasing frequency. Significantly, while approximately 18% of the related party transactions requiring approval by the independent directors or a majority of the investors were consummated without such approval in 2003, and 29.73% were consummated without such approval in 2004, more than half – approximately – 59% were consummated without such approval in 2005.  By 2006, the overwhelming majority – approximately 79% – of the related party transactions were consummated without the necessary approvals, a fact known to, or recklessly disregarded by, the Deloitte Defendants, and which clearly was evidence of material internal control failures at the Funds – or much worse – which called into question the accuracy of the Funds' financial statements.

262.  Despite these ever-increasing numbers and the problems they foretold, and despite their obligation to do so, the Deloitte Defendants did nothing to cause the Funds to change their practices in this regard, nor did they even alert

investors to the problem. Notably, in their engagement letter, and consistent with the requirements in AU § 316, the Deloitte Defendants explicitly represented that they would "report to the Funds' senior management any fraud of which we become aware that involves senior management, and any fraud (whether caused by senior management or other employees) of which we become aware that causes a material misstatement of the financial statements." Citations to "AU § ___" are references to specific sections of the Statements of Auditing Standards, which are codified by the American Institute of Certified Public Accountants ("AICPA").

263.    The Deloitte Defendants also agreed in their engagement letter to "report to the Funds' management all significant deficiencies and material weaknesses identified during the audit." The Deloitte Defendants failed to do any such thing, despite their promises to the contrary and despite the requirements under GAAS.

264.    The Deloitte Defendants also knew from the inception of the Funds that the Bear Stearns Defendants were required to estimate the value of certain illiquid assets in the Funds' portfolios. Indeed, the Bear Stearns Defendants' use of manager marks was ongoing during the entire life of the Funds and did not change. What did change, however – in addition to the ever-increasing number of non-approved insider transactions – was the manner in which the Deloitte Defendants addressed the issue of manager marks in their audit opinions

and their attempts to detach themselves from those marks – which the Deloitte Defendants had certified previously without explanation – when they began to fear that the Bear Stearns Defendants might not be able to perpetuate their wrongdoing without detection, but were not willing to "pull the plug" as they should have.

265.    Specifically, the Deloitte Defendants' audit reports for the High-Grade Funds for fiscal years 2003 through 2005 did not contain any explanatory paragraphs concerning the use of manager marks. Sensing that there was a problem with the marks ascribed by the Bear Stearns Defendants to the assets in the portfolio, however, the Deloitte Defendants decided to bury in their audit report relating to the Master Fund's 2005 fiscal year an explanatory paragraph – which was *not* included in the Deloitte Defendants' audit reports relating to the financial statements of the High-Grade Funds for the 2005 fiscal year – indicating, without more, that "49.22% of the Master Fund's assets represent securities which were fair valued by the Master Fund's management."

266.    As noted above, however, by 2006, the manager marks scheme had gotten so far out of hand and the situation so grim, particularly in light of the declining U.S. housing market and the composition of the assets in the Funds' portfolios, that the Deloitte Defendants decided to attempt to "cover" themselves in some way by including an explanatory paragraph revealing the "manager marks" practice in their audit reports for all of the Funds even though that practice (and

scheme) had been ongoing since the beginning of the Deloitte Defendants'

engagement as independent auditor for the Funds.

267.   Undoubtedly, the only possible explanation for the Deloitte

Defendants' rash decision suddenly to include an explanatory paragraph in their

audit reports for the 2006 Fiscal Year is that the Deloitte Defendants were trying to

distance themselves from the manager marks scheme because they knew that:  (i)

the U.S. housing boom had begun to fizzle such that the values estimated by the

Bear Stearns Defendants of the assets in the portfolio were overstated; (ii) a

significant portion of the Funds' assets were backed by mortgage-backed

securities, including securities backed by risky subprime mortgages; and (iii) as a

result, that the Funds' financial statements did not present fairly, in all material

respects and in accordance with GAAP, the financial position of the Funds.

268.   Nonetheless, and despite their concerns, the Deloitte

Defendants issued a clean audit opinion for the 2006 Fiscal Year, just as they had

in all prior years, and collected their substantial fees, just as they had in all prior

years.

269.   As set forth below, the Deloitte Defendants did not fulfill their

contractual and other professional obligations because, among other things, they

failed to:

> (i) obtain sufficient competent evidence in order to
> provide a reasonable basis for their "clean" opinions for

each audit year, particularly in light of the significant related party transactions between the Funds and other Bear Stearns-related entities and the potential for abuse of the manager marks, as required by AU §§ 334 and 326;

(ii) test and evaluate adequately whether the manager marks incorporated information and assumptions available to other participants in the marketplace, as required by AU §§ 328 and 332;

(iii) disclose, or require the Bear Stearns Defendants to disclose, that material subsequent events had, by the time the Deloitte Defendants issued their 2006 Fiscal Year audit reports on or about April 24, 2007, significantly impacted the accuracy of the estimates made by the Bear Stearns Defendants of the Funds' NAVs reported in the financial statements for the 2006 Fiscal Year, as required by AU § 560;

(iv) include in their audit reports for the 2006 Fiscal Year a going concern opinion, as required under the circumstances by AU § 364; and

(v) provide an "adverse" opinion since the Funds' financial statements for each fiscal year did not present fairly in all material respects the financial position of the Funds, their results of operations and changes in their net assets in conformity with GAAP, as required by AU § 508.

270.    In particular, due to the Bear Stearns Defendants' overvaluation of the assets, including risky subprime-related assets, in the Funds' portfolios, the Deloitte Defendants knew, should have known or recklessly disregarded that asset amounts and thus the corresponding NAVs presented in the Funds' financial

statements were false and misleading, and that the assets had been acquired in transactions which did not have the proper approvals.

271.   Nevertheless, the Deloitte Defendants failed to disclose, or require the Bear Stearns Defendants to disclose, this critical information in any of the Funds' annual financial statements.  Rather, in order to continue their lucrative relationship with the Bear Stearns Defendants, the Deloitte Defendants "kept their mouths shut," and issued "clean" audit opinions on the Funds' financial statements each and every year, and unjustifiably certified that the Funds' financial statements complied with GAAP, to the detriment of investors who reasonably relied on the Deloitte Defendants' audit opinions.

272.   Had the Deloitte Defendants performed their audits in accordance with GAAS, including the standards of care imposed by the AICPA, and their contractual obligations to the Funds, the Deloitte Defendants would have either (i) caused the Funds to report their true financial condition, (ii) issued a qualified or adverse opinion; or (iii) resigned as the auditor of the Funds and thus informed investors in the Funds that the financial statements were not stated in accordance with GAAP.  Either way, the Funds' investors would have known that they could not rely on the Funds' financial statements as prepared and reported by the Bear Stearns Defendants, and would have been alerted to the need to take action in order to preserve value in the Funds.

273. The Deloitte Defendants' failure to fulfill their contractual obligations or comply with the standards imposed on professionals in the accounting industry when auditing the Funds' and the Master Funds' financial statements thus injured the Funds' investors.

274. Had the Deloitte Defendants fulfilled their contractual obligations and complied with the applicable professional standards, investors would have, among other things, (i) declined to invest or else redeemed their investments in the Funds; (ii) attempted to remove the Funds' directors; or (iii) sought to have management restructure or liquidate the Funds in an orderly fashion. Either way, investors would have avoided the losses attendant to their investments in the Funds, which are now worth nothing.

Generally Accepted Accounting Principles
Specifically Relating to Manager Estimates of Asset Values

275. Investment companies such as the Funds are required to report their investments at fair value. AICPA Audit and Accounting Guidelines, Audits of Investment Companies, ¶ 2.28. Where manager marks are used to derive fair value, management is required to use its best estimate (under the direction of the board of directors) in good faith to arrive at fair value, which should be based on, among other things:

> the consistent application of a variety of factors in accordance with the valuation policy followed by the fund with the objectives being to determine the amount at which the

investment could be exchanged in a current transaction between willing parties, other than in a forced liquidation sale.

Id.

276.   Auditing guidance provides further that when estimating fair value, the following factors, among others, should be taken into consideration:

- Financial standing of the issuer;

- Business and financial plan of the issuer and comparison of actual results with the plan;

- Cost at date of purchase;

- Size of position held and the liquidity of the market;

- Contractual restrictions on disposition;

- Reported prices and the extent of public trading in similar financial instruments of the issuer or comparable companies;

- Changes in the economic conditions affecting the issuer;

- A recent purchase or sale of a security of the company;

- Pricing by other dealers in similar securities; and

- Financial statements of investees.

AICPA Audit and Accounting Guidelines, Audits of Investment Companies, paragraph 2.37.

### Standards for a Proper Audit

277.   The Deloitte Defendants were required to conduct their audits of the Funds' financial statements in accordance with GAAS.  These standards are promulgated by the AICPA, and provide the basis to measure whether or not the

- 106 -

Deloitte Defendants fulfilled the obligation imposed by it profession and its contract when performing their audits of the Funds' financial statements.

278.   GAAS mandates that auditors exercise due professional care in the planning and performance of an audit and the preparation of an audit report. AU § 230.   In complying with this standard, the audit firm is required to render its services with that degree of skill, care, knowledge and judgment expected from members of that profession, in accordance with accepted professional standards and in good faith without fraud or collusion.

279.   In general, the objective of the auditor's financial statement audit is to express an opinion on the fairness with which the financial statements present, in all material respects, the financial condition, results of operations and cash flows of the company in accordance with GAAP.   The auditor's opinion is expressed in an auditor's report, which accompanies the entity's financial statements.

280.   In an audit engagement, the auditor generally assumes the responsibility for planning and performing the audit to obtain reasonable assurances of whether or not the financial statements are free and clear of material misstatements, regardless of whether the misstatement has occurred as a result of error or fraud.   If the financial statements, including accompanying notes, fail to disclose information that is required by GAAP, the auditor must express a qualified

or adverse opinion because of the departure from those principles. The audit is the process that provides the auditor the basis for expressing an opinion on the financial statements. <u>See</u> AU § 508. Thus, before they could issue the clean audit opinions which they did, the Deloitte Defendants were required to properly plan and perform their audits.

281.     The prevailing standards imposed, among others, the following requirements on the Deloitte Defendants:

- The Deloitte Defendants owed the Funds a duty to plan and perform their audits so as to detect material misstatements, caused by either fraud or error, and those acts having a direct and material impact on the determination of figures recorded in the financial statements and other reports. (AU § 110).

- The Deloitte Defendants owed the Funds a duty to maintain independence in mental attitude. (AU §§ 150, 220).

- The Deloitte Defendants owed the Funds a duty to exercise due care and professional skepticism while performing their audits. That is, the Deloitte Defendants were required to perform their audit using reasonable care and diligence, while maintaining an attitude that included a questioning mind and a critical assessment of audit evidence. (AU §§ 150, 230).

282.     Taken together, these and other auditing standards required the Deloitte Defendants to assess and analyze critically all material assertions contained in the Funds' financial statements and the attached notes. Examples of these material assertions that the Deloitte Defendants were obligated to analyze critically and on which it was retained to opine, included the Bear Stearns Defendants' representations concerning (i) each of the Funds' NAVs for the each

fiscal year from 2003 to 2006; (ii) the realized and unrealized gain or loss on investment transactions; and (iii) the net increase or decrease in net assets resulting from operations.

283.   These standards also required the Deloitte Defendants to determine whether or not the Funds' financial statements were stated in accordance with GAAP and, to the extent they were not, the Deloitte Defendants were required to include disclosure of such departures from GAAP in the Deloitte Defendants' audit report on the financial statements.  Under the circumstances, the auditing standards also required the Deloitte Defendants to employ a heightened level of scrutiny to and critically analyze the manager marks with professional skepticism, as well as the numerous related party transactions between and among the Funds, the Master Funds and other Bear Stearns related entities, including Everquest and Parapet.  The Deloitte Defendants failed entirely to meet the applicable standards, despite having agreed to do so in their retention agreement with the Funds.

<u>The Deloitte Defendants Failed to Fulfill the Proper Auditing Standards</u>

284.   The Deloitte Defendants were retained by the Funds to audit their year-end financial statements, render an opinion on the Funds' financial statements to the Funds' shareholders, and as required by GAAS, report weaknesses, misstatements or other problems to the Funds, their respective Master Funds and the shareholders of these funds.

285.   As detailed herein, the Bear Stearns Defendants prepared false financial statements and engaged in fraudulent and negligent conduct which assisted the Funds in inflating the Funds' asset values and concealing losses on their portfolios, which the Deloitte Defendants either knew or should have known, and investors in the Funds were defrauded as a result.

286.   The Deloitte Defendants breached their contract with, and the duties owed to, the Funds and their investors because the Deloitte Defendants issued "clean" audit reports on financial statements the Deloitte Defendants knew or should have known were fraudulent, flawed, misleading and/or incomplete.

287.   The Funds' financial statements, and the Deloitte Defendants' continued blessing of them, were intended to, and did, create a façade of healthy investment funds with dynamic and savvy management.  The financial statements represented a concerted effort, in which the Deloitte Defendants' role was critical, to falsify the Funds' financial condition essentially in order to attract new and/or retain old investors, as well as hide management's prior misdeeds.  But for the Deloitte Defendants' failure to uncover and/or force disclosure of the Funds' true and perilous financial condition, the Funds' investors would not have invested, or would have divested their investments, sought to remove the Funds' directors and/or caused the Bear Stearns Defendants to restructure or liquidate the Funds long before they collapsed.

288.  Importantly, shares of the Funds were not publicly traded. Hence, there was no independently verified third-party financial information about or analysis concerning the Funds or their performance available to any investor or prospective investor in the Funds other than the monthly NAV statements from PFPC and the Deloitte Defendants' audit reports and the audited financial statements referenced in the Deloitte Defendants' audit reports. Indeed, the Deloitte Defendants' audit reports for each fiscal year were addressed directly and prepared specifically for distribution to the Funds' shareholders.

289.  Accordingly, the Deloitte Defendants knew or should have known that its clean audit reports were material to investors' decision to invest in the Funds and/or to refrain from redeeming their investments or taking other actions, and that investors were placing substantial reliance on the Deloitte Defendants' audit reports.

290.  The Deloitte Defendants are responsible and liable for the losses that the Funds and their investors incurred as a result of the Deloitte Defendants' malfeasance and/or nonfeasance.

The Deloitte Defendants' Specific and Multiple Failings

291.  The Deloitte Defendants knew or should have known, or were reckless in not knowing, that the Funds' NAVs as reported in their financial statements were materially false.

- 111 -

292.   The Deloitte Defendants breached their obligations to the Funds and their investors and violated applicable auditing standards because, among other things, it failed (i) to obtain sufficient competent evidential matter in order to provide a reasonable basis for its "clean" opinions for each fiscal year; (ii) to test and evaluate adequately the manager marks used to compile the Funds' NAVs; (iii) to disclose, or require the Bear Stearns Defendants to disclose, material subsequent events which had, by the time the Deloitte Defendants issued their 2006 Fiscal Year audit reports on or about April 24, 2007, significantly impacted the accuracy of the manager marks reported in the financial statements for the 2006 Fiscal Year; (iv) to include in their audit reports for the 2006 Fiscal Year a going concern opinion; and (v) to provide an "adverse" opinion since the Funds' financial statements did not present fairly in all material respects the financial position of the Funds.

293.   The Deloitte Defendants knowingly, recklessly and/or grossly negligently failed in their responsibility to express an appropriate opinion on the Funds' financial statements. The Deloitte Defendants misrepresented in their opinions that the Funds' financial statements were prepared in accordance with GAAP, and that their audits were performed in accordance with GAAS.

<u>Evidential Matter (AU § 326)</u>

294.   First, the Deloitte Defendants failed to comply with their

obligation to gather sufficient evidential matter before issuing its "clean" opinions

of the Funds' financial statements.  The authoritative GAAS guidance for

requirements of evidential matter is found in AU § 326, which recognizes that

"[m]ost of the independent auditor's work in forming his or her opinion on

financial statements consists of obtaining and evaluating evidential matter

concerning the assertions in such financial statements."

295.   Accordingly, AU § 326.02 mandates that an independent

auditor obtain sufficient competent evidential matter "through inspection,

observation, inquiries, and confirmations to afford a reasonable basis for an

opinion regarding the financial statements under audit."  AU § 326.25 describes

the independent auditor's requirements for evaluating evidential matter as follows:

> In designing audit procedures to obtain competent evidential matter, he or she should recognize the possibility that the financial statements may not be fairly presented in conformity with generally accepted accounting principles or a comprehensive basis of accounting other than generally accepted accounting principles.  ... To the extent the auditor remains in substantial doubt about any assertion of material significance, he or she must refrain from forming an opinion until he or she has obtained sufficient competent evidential matter to remove such substantial doubt, or the auditor must express a qualified opinion or a disclaimer of opinion.

296.   Further, specific procedures for auditing fair value estimates

and disclosures are detailed in AU § 328, which provides in relevant part that the

auditor should consider "information available to the auditor at the time of the

audit," and requires that "valuation methods incorporate assumptions that marketplace participants would use in their estimates of fair value whenever that information is available without undue cost and effort." AU § 328.06.

297.    AU § 328 mandates that an auditor obtain an understanding of the entity's process for determining fair value measurements and disclosures and of the relevant controls sufficient to develop an effective audit approach. When obtaining such an understanding, the auditor should consider the following:

- Controls over the process used to determine fair value measurements, including, for example, controls over date and the segregation of duties between those committing the entity to the underlying transactions and those responsible for undertaking the valuations;

- The expertise and experience of those persons determining fair value measurements;

- The significant management assumptions used in determining fair value; and

- The controls over the consistency, timeliness and reliability of the data used in valuation models.

298.    When there are no observable market prices and the entity estimates fair value using a valuation method, the auditor is required to evaluate whether the entity's method of measurement is appropriate under the circumstances, which includes obtaining an understanding of management's rationale for utilizing a particular method. The auditor is also required to test the entity's fair value measurements and disclosures, which may involve (i) testing

management's significant assumptions, the valuation model and the underlying data; (ii) developing independent fair value estimates for corroborative purposes; or (iii) reviewing subsequent events and transactions.  AU § 328.23.

299.   Finally, when testing the entity's fair value measurements and disclosures, the auditor must evaluate whether: (i) management's assumptions are reasonable and reflect, or are not inconsistent with, market information; (ii) the fair value measurements were determined using an appropriate model; and (iii) management used relevant information that was reasonably available at the time. AU § 328.26.  To be reasonable, the assumptions on which the fair value measurements are based, individually and as a whole, need to be realistic and consistent with the general economic environment, as well as the environment of the specific industry, and incorporate existing market information.  AU § 328.26.

300.   In addition to the general requirements of obtaining sufficient evidential matter set forth in AU §§ 326 and 328, AU § 334 requires auditors to engage in a heightened level of scrutiny in the presence of related party transactions, including transactions that are outside the ordinary course of business, and to employ procedures "directed toward obtaining and evaluating sufficient competent evidential matter" under the circumstances.

301.   Thus, in order for the Deloitte Defendants to have issued their "clean" audit opinions, they had to employ a heightened level of scrutiny in

valuing and evaluating the many related party transactions on the financial

statements of the Funds and they had to be free of any substantial doubt about the

information presented in the Funds' financial statements. The Deloitte Defendants

failed to comply with the requirements of AU §§ 326, 328 and 334 before issuing

their audit opinions on the Funds' financial statements because the Deloitte

Defendants knew or should have known that the Funds' NAVs were significantly

overstated and were therefore materially false.

302. The Deloitte Defendants should have, at a minimum, required –

but they did not require – that the Funds revise the NAVs downward or make

proper disclosures that would have alerted investors or potential investors in the

Funds that the assets in the Funds which resulted, in part, from unapproved related

party transactions were not properly reported on the financial statements of the

Funds and/or that the Funds had a significant internal control failure which

precluded the Deloitte Defendants from issuing clean audit opinions.

303. Because the Deloitte Defendants knew, should have known or

were reckless in not knowing that the Bear Stearns Defendants were not following

the Funds' internal guidelines, the Deloitte Defendants should also have taken one

or more of the following actions:

- reported the internal control deficiency to their clients, the
  Funds, and the Funds' investors;

- withdrawn from the engagement;

- included a paragraph in their audit opinions emphasizing the internal control failures;

- disclaimed their earlier opinions;

- required that the Funds book a contingent liability relating to the unapproved related party transactions; and/or

- issued an adverse audit opinion on the Funds' financial statements.

The Everquest Debacle and the
Overstatement of Year End 2006 NAVs

304.   For example, as set forth above, in or about September 2006, in a continuing effort to conceal their losses, the Bear Stearns Defendants transferred the Funds' highest-risk assets out of the Funds and into Everquest.

305.   In essence, the Bear Stearns Defendants were able to "freshen up" the Funds in the Fall of 2006 – just as the sub-prime market was beginning to weaken – by transferring some of their worst-performing assets out of the Funds and into Everquest in exchange for the falsely valued shares of Everquest.  This maneuver had the added benefit to the Bear Stearns Defendants of allowing them to keep these toxic assets off of Bear Stearns' own balance sheets while "propping up" the High-Grade Fund at the same time the Bear Stearns Defendants were actively marketing and recruiting new investors for the High-Grade Enhanced Fund.

306.   The Deloitte Defendants were everywhere on the highly suspicious Everquest transaction.  As noted, not only did they audit the Funds, but

conveniently for the Bear Stearns Defendants, the Deloitte Defendants also audited

Everquest and Parapet. In fact, the Deloitte Defendants completed their audit of

Everquest's financial statements for the period ended December 31, 2006, and

issued its clean audit report relating to those financials, on April 5, 2007,

approximately three weeks before the Deloitte Defendants completed their audits

on the Funds.

307. This timing is noteworthy because in early May 2007 – only

weeks after the Funds' audits had been released by the Deloitte Defendants –

BSAM notified an investor in the High-Grade Fund that it had reduced the High-

Grade Fund's NAV as of December 2006. In response, that investor requested a

meeting with BSAM to discuss the causes for the revised NAV, and on or about

May 16, 2007, BSAM met with the investor.

308. Amazingly, the only explanation provided by BSAM at the

May 16th meeting for revising the High-Grade Fund's December 2006 NAV was

that the NAV *for Everquest* had been revised downward after review of the

Everquest financial statements by the Deloitte Defendants, resulting in a downward

revision to the December 2006 NAV for the High-Grade Fund given the size of its

investment in Everquest. Specifically, the investor in attendance at that meeting

was told the following:

- in September 2006, the High-Grade Fund transferred a large portion of its CDO investments into a separate vehicle (*i.e.*, Everquest), of which it owned a significant majority;

- although the High-Grade Fund's pricing group believed initially that it had sufficient information for purposes of determining the December 2006 NAV, the valuations for Everquest had not yet been finalized and were therefore estimated;

- on review, it was discovered that there was insufficient information relating to Everquest's cash flows which required a revision of Everquest's December 2006 NAV; and

- as a result, the December 2006 NAV for the High-Grade Fund had to be revised to accurately reflect the new information for Everquest.

309.   As noted, the Deloitte Defendants issued their audit of Everquest's financial statements for the period ended December 31, 2006 on or about April 5, 2007 – *approximately three weeks prior to the April 24, 2007 date of the Deloitte Defendants' audit report for the Funds and the Master Funds*. Even assuming the information concerning Everquest's December 2006 NAV was not available until the date the Deloitte Defendants signed the Everquest audit opinion, such information clearly was available as of the subsequent date when the Deloitte Defendants issued their audit report for the Funds.  Indeed, the Deloitte Defendants could not have issued its clean audit opinion on Everquest's financial statements on April 5, 2007 if they had not completed their work on the Everquest NAV for year-end 2006 by that date.

310.    This information clearly was available to the Deloitte Defendants and did not simply slip through the cracks.  The same Deloitte entity (*i.e.,* Deloitte's Philadelphia office) audited both Everquest and the High-Grade Funds.  Moreover, the Deloitte Defendants discovered or should have discovered the revision to Everquest's 2006 NAV when employing heightened scrutiny and paying particular attention to the High-Grade Fund's 2006 investment in and valuation of Everquest, a related party, as required by AU § 334.

311.    Nevertheless, the revised information concerning Everquest's December 2006 NAV was not included in the High-Grade Fund's financial statements for the 2006 Fiscal Year, even though the Deloitte Defendants knew or should have known of its existence and the material impact it would have on the High-Grade Fund's financial statements.  That the Deloitte Defendants possessed information concerning the material impact of the revised 2006 NAV for Everquest on the High-Grade Fund's 2006 NAV is evident from the fact that the Bear Stearns Defendants revised the December 2006 NAV for the High-Grade Fund *less than three weeks* after the Deloitte Defendants signed their "clean" audit report for the Funds.

312.    Indeed, on March 29, 2007, prior to the release of the Deloitte Defendants' audit opinion on the Funds' financial statements for the 2006 Fiscal Year, BSAM notified the Funds' investors by letter that the Funds' 2006 NAV was

- 120 -

being revised *upward* as "a result of the audit performed by Deloitte & Touche of a position held by both Funds, where it was decided that the valuation of that position should be adjusted slightly upwards." Upon information and belief, the position referenced in the March 29, 2007 letter was Everquest. Because of the revisions to the Funds' December 2006 NAVs due to the impact of the Funds' investment in Everquest, it is clear that the Bear Stearns Defendants simply were playing games with their valuation of the Everquest investment in order to inflate the NAVs reported in the 2006 Fiscal Year financial statements. The Deloitte Defendants knew about, or recklessly disregarded, these shenanigans when issuing the clean audit opinion for the 2006 Fiscal Year.

313.    Moreover, the 2006 Fiscal Year financials statement disclosures relating to Everquest are misleading and incomplete. The financial statements for the Master Fund, though noting that the investment in Everquest was an "investment in a related party," misleadingly refers readers to "see Note 5 for additional information." Note 5, however, relates to "Securities Sold Under Agreements to Repurchase and Securities Repurchased Under Agreements to Resell," and does not disclose the nature of the Everquest transaction (*i.e.,* the sale of certain of the Funds' CDO investments in exchange for an equity interest in Everquest with a made-up valuation).

314.   In fact, nowhere in the financial statements does the necessary disclosure appear, including within the notes dealing with related party transactions.  SFAS No. 57, "Related Party Disclosures," states that the disclosures concerning related party transactions shall include the nature of the relationships involved, a description of the transactions, and such other information deemed necessary to an understanding of the effects of the transaction on the financial statements.  The Everquest-related disclosure mandated by the applicable auditing standards are absent from the Funds' financial statements for the 2006 Fiscal Year.

315.   In any event, the Deloitte Defendants should have required the Bear Stearns Defendants to lower, instead of increase, the December 2006 NAV for the Funds before issuing their clean audit opinions.  The fact that the Deloitte Defendants failed to do so is material.

316.   The Bear Stearns Defendants suspended redemptions in the Funds in June 2007.  Had the Deloitte Defendants' audit report reflected the true financial condition of the Funds, investors would have been able to redeem their interests in the Funds before redemptions were suspended or attempted to remove the Funds' directors and replace them with directors who would have tried to maximize investor recoveries.

317.   The Bear Stearns Defendants knew that a downward revision in the Funds' 2006 NAV would cause some, if not all, investors to redeem their

investments, particularly since the Funds' performance had not been as expected. The Bear Stearns Defendants and the Deloitte Defendants withheld the 2006 Fiscal Year audit reports to avoid redemptions. Notably, investors did not receive the Deloitte Defendants' audit reports for the 2006 Fiscal Year until *after* the April 25, 2007 investor conference call on which Cioffi and Tannin assured investors that they remained confident in the Funds' performance. As noted above, the audits for the previous several fiscal periods all were signed by the Deloitte Defendants in late March or early April of the relevant year, and in any event well before April 24th of that year. At a minimum, the additional delay with the 2006 Fiscal Year audit indicates that the Deloitte Defendants had additional concerns which they failed to address and resolve properly before issuing their unqualified audit opinion.

318.   Due to the Deloitte Defendants' failure to include information relating to Everquest's revised 2006 NAV, the Bear Stearns Defendants were not required to modify the Fund's December 2006 NAV to accurately reflect the Everquest investment until after investors received the Deloitte Defendants' clean audit opinion. By the time of that revision, and unknown to investors at that time, redemptions were no longer possible.

319.   Thus, the Deloitte Defendants' failure to require accurate disclosure of this information was extremely detrimental to investors in the Funds

who relied on the Deloitte Defendants' audit reports for the 2006 Fiscal Year when

deciding not to redeem their investments or take other actions in late April 2007.

When investors finally learned the truth, it was too late because their investments

were subject to a 40 day notice period and redemptions were suspended less than

40 days later.

320.    The Everquest saga is but one piece of evidence that the Funds'

NAVs for the 2006 Fiscal Year were not as reported by management and as

represented in the financial statements. By July 18, 2007 – less than three months

after the date the Deloitte Defendants issued their audit reports – the Bear Stearns

Defendants reported that the Funds had lost viability and that the return was

effectively negative 100% net of fees and expenses.

321.    Even though the Deloitte Defendants included an explanatory

paragraph in their audit reports for the 2006 Fiscal Year relating to the use of

manager marks, the Deloitte Defendants nonetheless improperly opined that the

financial statements presented fairly the Funds' financial position in accordance

with GAAP. AU § 508.11 makes clear that the inclusion of an explanatory

paragraph is not intended to provide auditors a free-pass or an "out" if the evidence

reveals that the assets are not reported at fair value. For the Deloitte Defendants to

have so opined, they were required to obtain sufficient competent evidential matter

– including sufficient evidential matter to test properly and fully the manager

marks. Certainly in order for them to sign off on BSAM's manager marks, the Deloitte Defendants needed to fully understand and examine the inputs to the model used to calculate those marks, and incorporate all information available as of the date of their report. They improperly failed to do so.

322. Clearly the Deloitte Defendants disregarded their obligations and the standards imposed on them relating to the disclosures and representations made in the Funds' various financial statements, which the Deloitte Defendants audited. Had the Deloitte Defendants gathered sufficient competent evidential matter, particularly given the heightened level of scrutiny they were required to employ, and required the Bear Stearns Defendants to report accurately the Funds' financial statements, investors in the Funds could have declined to invest or taken appropriate action before the Bear Stearns Defendants suspended redemptions and the precipitous decline in value between May 2007 and July 2007 occurred.

Subsequent Events (AU § 560)

323. In connection with at least the 2006 Fiscal Year audit, the Deloitte Defendants also failed to comply with the guidance provided in AU § 560 for independent auditors, entitled "Subsequent Events." This section recognizes that although an auditor's report ordinarily is issued in connection with financial statements that purport to present an entity's financial position as of a stated date on the entity's balance sheet, "events or transactions sometimes occur subsequent

to the balance-sheet date, but prior to the issuance of the financial statements, that have a material effect on the financial statements *and therefore require adjustment or disclosure in the statements*." AU § 560.01 (emphasis added).

324.    AU § 560 describes two types of subsequent events which require evaluation by the independent auditor, both of which are applicable here to the Deloitte Defendants.  The first type consists of events that provide additional evidence with respect to conditions that existed *at the date of the balance sheet* and affect estimates inherent in the process of preparing the financial statements.

325.    When such events exist, management and the independent auditor are required to make an adjustment to the year-end financials to account for the subsequent events.  Specifically, AU § 560 mandates as follows:

> All information that becomes available prior to the issuance of the financial statements should be used by management in its evaluation of the conditions on which the estimates were based. *The financial statements should be adjusted for any changes in estimates resulting from the use of such evidence.*

AU § 560.03 (emphasis added).

326.    The second category of subsequent events requiring evaluation by the independent auditor is events that did not exist as of the date of the balance sheet *but arose subsequent to that date* and before the auditor issues its report. While the second category of subsequent events does not require that the balance

sheet be adjusted, AU § 560 does mandate disclosure of such events when necessary to "keep the financial statements from being misleading."

327.   Thus, under AU § 560, the Deloitte Defendants were required to advise the Funds to make appropriate disclosure of facts discovered after the balance sheet date (*i.e.*, December 31, 2006) but before the date of the Deloitte Defendants' audit report (*i.e.*, April 24, 2007) that provided additional evidence of conditions existing as of the balance sheet date and their impact on the financial statements (including their impact on the estimates made by the Bear Stearns Defendants of the Funds' net asset values) to persons known to be, or likely to be, relying on the financial statements and the accompanying auditor's reports. This disclosure should have consisted of issuing, as soon as practical, revised financial statements and auditor's reports and/or notification disclosing the impact of subsequent events on the financials statements in order to prevent the statements from being misleading.

328.   Instead of following the requirements detailed in AU § 560, however, and although the Deloitte Defendants knew or should have known of the existence of material subsequent information that negatively impacted the estimates prepared by the Bear Stearns Defendants to determine the portfolios' value, the Deloitte Defendants did not require that the Funds restate their financial statements or disclose the material subsequent information of which it was aware

to prevent the financials statements for the 2006 Fiscal Year from being misleading.

32 9.   As discussed below, the Deloitte Defendants knew or should have known at least as of the date of their April 24, 2007 audit report, if not months before then, that (i) the major decline in the housing and subprime-mortgage industry, which was well underway in late 2006 and got significantly worse in the first quarter of 2007, materially impacted in a negative way the estimates prepared by the Bear Stearns Defendants of the Funds' NAVs since, as the Deloitte Defendants knew or should have known, a majority of the Funds' investments were backed by residential mortgage-backed securities, including a significant number of subprime mortgages; and (ii) the original estimate of the NAVs as of December 2006 for Everquest – which represented a significant investment of the High-Grade Fund – had been reduced to such an extent *based on the Deloitte Defendants' own audit* that it should have (and ultimately did) require a downward revision to the High-Grade Fund's NAV as of December 2006.

330.   The Deloitte Defendants' failure to comply with the standards imposed by GAAS allowed the Bear Stearns Defendants to grossly overstate the true value of the assets in each of the Funds' portfolios and mislead the Funds and their investors to their detriment.  The Deloitte Defendants should be held accountable.

- 128 -

The Egregious Overstatement of Assets
in the 2006 Fiscal Year Financial Statements

331.   The Deloitte Defendants' opinion letters for the 2006 Fiscal

Year reported that more than 70% of the Master Fund's net assets and 63.10% of

the Enhanced Leverage Master Fund's net assets represented securities which were

valued by the funds' management in the absence of a readily ascertainable market.

As a result of their audits, however, the Deloitte Defendants also knew or should

have known that a majority of the underlying assets in the Master Funds' portfolios

(and thus in the Funds' portfolios as well) being estimated by management related

to residential, including a significant portion of subprime-backed, mortgages

which, as detailed below, should have been more closely checked and ultimately

reduced in value by the Deloitte Defendants.

332.   The subprime housing market began to decline in 2006.

However, between December 31, 2006 and April 24, 2007 – the date of the

Deloitte Defendants' audit reports – that market was in sharp decline because of

increasing default rates on residential and subprime mortgages, resulting in

declining values of residential and subprime mortgage-backed securities.  Indeed,

various sources of financial and other information known or at least available to

the Deloitte Defendants at the time they issued their audit report indicated that the

inputs to the model used by the Bear Stearns Defendants to calculate the "marks"

and thus the NAVs for the Funds should have been revised to reflect the status of

subprime debt in the industry and the increasing default rates at the time. Significantly, the increasing default rates on residential mortgages indicated that a negative shift had occurred in the marketplace, and that as a result the Funds' investments, including its CDO investments, would be worth less than the amount estimated by management.

333.    While the Deloitte Defendants should have required the Bear Stearns Defendants to revise their estimates to reflect accurately the effect the downturn in the subprime market necessarily had on the Bear Stearns Defendants' estimates in the financial statements or at least require appropriate disclosures, it failed to do so.

### The ABX Index

334.    The ABX index serves as a benchmark for the market for securities backed by subprime mortgages. It is based on the rating of the underlying subprime-backed securities, ranging from AAA to BBB-minus, and is calculated every six months to reflect the 20 largest securitizations issued during that period.

335.    Consequently, movement in the ABX index is a strong indication of movements in the prices not only of the securities it represents, but of other securitizations with similar characteristics. Accordingly, the ABX index is

considered by participants in the financial markets to be a fair proxy of the value of subprime-backed securities with similar average lives and characteristics.

336.    The ABX index for many vintages had been declining in late 2006, but was in sharp decline in early 2007, plunging approximately 30% in the first ten weeks of 2007.  Thus, the models used by the Bear Stearns Defendants to estimate the value of the Funds' portfolios, which contained significant subprime assets, should have been revised to reflect accurately the decline in the ABX index for purposes of estimating the Funds' asset values at the end of the 2006 Fiscal Year.

337.    Indeed, as the Deloitte Defendants instructed at a February 23, 2007 Deloitte Dbriefs Webcast titled "Subprime Consumer Finance: Know Your Blind Spots for 2007," when using a model to estimate asset values, it is important to remember that a statistical model is only as good as the data it was built on and that many models do not account for current conditions in the market. Participating in the Deloitte Defendants' February 23rd Webcast, which was hosted by Brenda White, a managing director of Deloitte & Touche Corporate Finance LLC and a principal at Deloitte Financial Advisory Services, LLP, were Deloitte Principal Jeff Green, and Deloitte senior managers Curtis C. Johnson, Neil Lynas and Elizabeth Jordan.

- 131 -

338.    Had the models used by the Bear Stearns Defendants to estimate the values of the assets in the Funds' portfolios for the 2006 Fiscal Year been revised to incorporate this information, as they should have been consistent with the Deloitte Defendants' protocols and duties, investors in the Funds would have received a more accurate picture of the Funds' financial condition.

339.    Investors with accurate information could have redeemed their investments before redemptions were suspended or required the Bear Stearns Defendants to replace the directors and/or restructure the Funds.

### Subprime Lenders Face Significant Problems

340.    In addition to (and consistent with) the sharp decline in the ABX index in the first quarter of 2007, several of the largest subprime-mortgage lenders were facing extreme financial difficulty in the period preceding April 24, 2007. By the end of March 2007, several of these subprime-mortgage lenders were reporting losses on their own asset portfolios, were selling off portions of their mortgage portfolio assets *at a discount*, and many, including New Century Financial Corp. ("New Century"), NovaStar Financial Corp. ("NovaStar") and General Electric's WMC Mortgage unit, had cut jobs significantly in order to defray losses suffered on their portfolios.

341.    For example, on or about February 7, 2007, rising defaults prompted New Century, the nation's second largest subprime-mortgage lender at

the time, to project a fourth-quarter 2006 loss and state that it would restate earnings downward for the first nine months of 2006.  By March 2, 2007, New Century had announced that it (i) had to restate most of its results from 2006 because of mistakes in how it accounted for losses on repurchased loans, (ii) was facing a federal criminal probe relating to accounting errors, and (iii) slashed its forecast for loan production because early-payment defaults and loan repurchases had led to tighter underwriting guidelines.  New Century's stock plunged 84% in four weeks by the end of March.  Ultimately, on April 2, 2007, New Century filed for Chapter 11 protection, joining two other large lenders – ResMae Mortgage and Mortgage Lenders Network – which had sought Chapter 11 protection in February 2007.  All of this was well publicized and known to the Deloitte Defendants.  Notably, investments in New Century comprised a significant percentage of the Funds' assets.

342.    Similarly, OceanFirst Financial Corp., the holding company for OceanFirst Bank, announced on March 12, 2007 that its earnings for the year ended December 31, 2006 would be revised from the earnings results the company previously reported in a January 18, 2007 press release after it received additional information relative to the incidence of early payment defaults on subprime loans sold by the company's mortgage banking subsidiary.  Reportedly, the result of this

revision was that instead of a $4.6 million profit, the bank reported a $1.6 million loss for 2006.

343.   Subprime-mortgage lender NovaStar announced in February 2007 that it projected that it would not produce any income through 2011.  At the same time, NovaStar posted a fourth quarter 2006 loss of $14.4 million, compared with a profit of $28.1 million a year earlier.  The Deloitte Defendants also were NovaStar's auditor.

344.   As a result of the significant decline in the subprime market in late 2006 and continuing into the first quarter of 2007, other financial institutions with subprime mortgage-related investments began calculating losses on their portfolios for 2006.  For example, on or about February 7, 2007, HSBC Holdings, Europe's largest bank, announced that it would take a charge for bad debts of more than $10.5 billion for 2006 due to problems with its U.S. mortgage portfolio. Notably, the Deloitte Defendants' member firms performed a number of services for HSBC in 2006, including financial advisory, tax and reorganization services.

345.   The Deloitte Defendants clearly were aware of the downturn in the residential and subprime-mortgage industries beginning in 2006 and continuing into 2007.  For example, in a Deloitte Financial Services Newsletter from March 2007, individuals employed by the Deloitte Defendants identified a number of

challenges already facing the subprime-mortgage industry at that time requiring

"immediate attention," including the following:

- <u>Increasing delinquency and foreclosures</u> -- the Deloitte Defendants noted that the foreclosure rate on subprime loans had doubled since 2002 to 20% and that, according to a report, subprime loans made in 2006 were defaulting at a rate 50% faster than loans originated in 2005;

- <u>Pullback by investors</u> -- the Deloitte Defendants noted that in 2006 the only category that saw a negative flow of funds in the hedge funds market was in subprime mortgage-backed securities, and that investors were increasingly leaving this area due to the increase in defaults;

- <u>Lenders forced to declare bankruptcy</u> -- the Deloitte Defendants noted that lenders without significant liquidity were facing problems because investors were forcing them to buy back defaulted loans and that, as a result, some of the lenders had been forced to declare bankruptcy;

- <u>Depreciating housing market</u> -- the Deloitte Defendants noted that the combination of aggressive lending practices in 2004 and 2005 and a slow sales market in 2006 with depreciating home values had diminished the effectiveness of property sales, forcing customers and lenders to divest from defaulted loans; and

- <u>Decreasing profits and increasing loan loss reserves</u> -- the Deloitte Defendants noted that an additional repercussion of higher defaults was that institutions were being forced to make greater allowances for loan losses, which in turn reduced their profits.

346.    Shockingly, despite the losses reported by the subprime

mortgage lenders and financial institutions with investments in subprime-backed

investments, the Funds' financial statements for the 2006 Fiscal Year reflected

minimal losses from writedowns of the Funds' investments, even though a

significant number of the Funds' investments were backed by residential and

subprime mortgages. In fact, the Bear Stearns Defendants' use of manager marks

(as opposed to marks to market) to value an increasing percentage of the funds'

portfolios in the 2006 Fiscal Year should have indicated to the Deloitte Defendants

that the market for the funds' assets had become illiquid, which ordinarily would

suggest that the value of the assets had declined.

347.   Based on the foregoing, the Deloitte Defendants undeniably

possessed information indicating that the decline in the subprime-mortgage market

would have a material negative impact on the model and the inputs to that model

used by the Bear Stearns Defendants to estimate the Funds' NAVs as presented in

their financial statements for the 2006 Fiscal Year. Nevertheless, the Deloitte

Defendants failed to fulfill their obligations under AU § 560 by failing to require

the Bear Stearns Defendants to adjust the financial statements for the 2006 Fiscal

Year to incorporate this information so that the financial statements would not be

misleading.

Everquest's Revised December 2006 NAV

348.   As set forth above, the Deloitte Defendants completed their

audit of Everquest's financial statements for the period ended December 31, 2006,

and issued its clean audit report relating to those financials, on or before April 5,

2007. In connection with their audit of Everquest, the Deloitte Defendants

required BSAM to modify Everquest's 2006 NAV.

349. Nevertheless, and despite the requirements of AU § 560 with

respect to subsequent events, the revised information concerning Everquest's

December 2006 NAV was not included in the Fund's financial statements for the

2006 Fiscal Year, even though the Deloitte Defendants were aware of its existence

and the material impact it would have on the Funds' financial statements.

350. The Deloitte Defendants should have required the Bear Stearns

Defendants to lower the December 2006 NAV for the Funds to reflect accurately

the value of its investment in Everquest before issuing its clean audit opinion. By

failing to do so and instead issuing a clean audit opinion for the 2006 Fiscal Year,

the Deloitte Defendants enabled the Bear Stearns Defendants to allow the

redemption period to pass before such information was made available to the

Funds' investors. Thus, it harmed the investors who relied on the financial

statements in not redeeming their investment while they still could have done so or

petitioning to remove the directors and/or restructure the Funds.

The Deloitte Defendants Were
Familiar With the Requirements of AU § 560

351. Although the Deloitte Defendants failed to disclose the impact

of the aforementioned subsequent events on the Funds' financial statements during

- 137 -

the 2006 Fiscal Year as required by AU § 560, the Deloitte Defendants clearly were aware of their obligation under that auditing standard.

352.  In or about the last week of August 2007, the Deloitte Defendants reportedly advised NovaStar, another company audited by the Deloitte Defendants, that they refused to participate in NovaStar's efforts to sell approximately $150 million in preferred stock unless NovaStar restated its 2006 financial statements to include disclosures regarding the company's problems related to the subprime market.  The Deloitte Defendants further advised the company that their reissued report on such financials also would include a paragraph expressing the Deloitte Defendants' uncertainty as to NovaStar's ability to continue as a going concern.

353.  Ironically, the 2006 financial statements disclose one subsequent event.  They disclose net investments into the Funds in the period between December 31, 2006 and the date of the Deloitte Defendants' audit report.  They do not, however, disclose Defendant Cioffi's $2 million redemption during this period.

354.  The Deloitte Defendants thus apparently went much further toward fulfilling its obligations in connection with the NovaStar engagement than it did on its engagement with the Funds.

The Deloitte Defendants Failed to Advise That the Funds
Lacked the Ability to Continue as a Going Concern (AU § 341)

355.   The Deloitte Defendants also did not comply with their
obligation under GAAS, in light of the information available to them at the time of
their audits, to test appropriately that each of the Funds would continue as a going
concern.  Guidance on the applicable requirement is set forth in AU § 341, which
provides that an auditor has a responsibility "to evaluate whether there is
substantial doubt about an entity's ability to continue as a going concern for a
reasonable period of time, not to exceed one year beyond the date of the financial
statements being audited."  AU § 341.02.

356.   Generally, there is an assumption in financial reporting that an
entity will be able to continue as a going concern absent significant information to
the contrary.  AU § 341 instructs, however, that this assumption is contradicted
where information indicates that the entity being audited will be unable "to
continue to meet its obligations as they become due without substantial disposition
of assets outside the ordinary course of business, restructuring of debt, externally
forced revision of its operations, or similar actions."

357.   The Funds ceased to exist as a going concern in or about July
2007.  The Deloitte Defendants should have seen, and were reckless and/or grossly
negligent in not seeing, this inevitable result coming based on the information they
obtained or should have obtained during their audits of the Funds in early 2007,

including the fact that the assets in the Funds' portfolios were illiquid and the valuations were overstated.

358.    The evaluation required by AU § 341 includes reviewing, among other things, subsequent events and the terms of debt and loan agreements. If the auditor concludes based on its evaluation that there is substantial doubt, AU § 341.12 instructs that the auditor must include an explanatory paragraph in the audit report to reflect its conclusion.

359.    Based on the information available to the Deloitte Defendants at the time they issued their clean opinions on the Funds' financial statements for the 2006 Fiscal Year, including information concerning the negative effect the subsequent events discussed above would have based on the Funds' financing arrangements, the Deloitte Defendants should have conducted an evaluation of the Funds' ability to continue as going concerns and, as a result, concluded that it was appropriate to include a going concern explanatory paragraph in their audit reports.

360.    Significantly, at the time the Deloitte Defendants completed their audit, a majority of the Funds' financing was through repo financing arrangements, with the securities in the Funds' portfolio serving as collateral.

361.    Beginning in early 2007, an overwhelming majority of the assets in the Funds' portfolio had been posted by the Bear Stearns Defendants as collateral on repo financing arrangements with lenders to the Funds.  As a result of

- 140 -

its repo financing arrangements with these lenders, the assets in the Funds'

portfolios were subject to significant risk of being seized by the lenders and sold.

362.   In fact, the result of these repo financing arrangements was that

when the subprime market declined in 2007 and the repo lenders made margin

calls requiring payment, which the Bear Stearns Defendants were unable to meet,

the Funds were forced to liquidate their assets to satisfy their obligations to the

Funds' repo lenders.  Because the market for the Funds' assets at the time of the

margin calls was in steep decline, the market values of the Funds' assets was

significantly less than the values which had been ascribed to those assets based on

the estimates made by the Bear Stearns Defendants and as reflected in the Funds'

financial statements for the 2006 Fiscal Year.

363.   The Deloitte Defendants knew, should have known, or were

reckless in not knowing, at the time they issued their April 24, 2007 audit reports

that many of the assets in the Funds' portfolio served as collateral on repo

financing arrangements, and would, in fact, result in a fire sale of those assets to

satisfy obligations to the repo lenders in 2007 due to a declining market.  As a

result, the Deloitte Defendants should have included a going concern opinion in

their audit reports for the Funds' financial statements for the 2006 Fiscal Year.

The Deloitte Defendants failed to do so.

- 141 -

364.    Based on the information known by or available to the Deloitte Defendants during their audit of the Funds' financial statements for each fiscal year, the Deloitte Defendants should not have issued clean audit opinions and instead provided adverse opinions because the financial statements did not present fairly in all material respects the Funds' financial positions, their results of operations and changes in their net assets in conformity with GAAP.

365.    Given the relevant standards and the Deloitte Defendants' failure to follow them, the Deloitte Defendants acted in reckless disregard of their contractual, fiduciary and other obligations to the Funds.  Given the Deloitte Defendants' actions in connection with other audits they conducted, they clearly bowed to pressure from the Bear Stearns Defendants to ignore the inaccurate and improper valuations being used by the Bear Stearns Defendants and/or failed to satisfy their obligations as auditors to the Funds.

366.    The Deloitte Defendants furthered the Bear Stearns Defendants' fraudulent scheme to continue in order to receive substantial fees for themselves. As noted above, the Deloitte Defendants were the exclusive auditor for Bear Stearns and collected tens of millions of dollars in fees annually from their audits of the various Bear Stearns-related entities.  The individuals on the Deloitte/Bear audit teams, including the partner in charge, Timothy Mundy, also reaped substantial monetary rewards for continuing to keep Bear Stearns happy.  As an

unfortunate result, although the Deloitte Defendants knew (or were reckless and/or grossly negligent in not knowing) that the Funds' annual financial statements were materially false and did not accurately reflect the Funds' true financial condition, the Deloitte Defendants nevertheless issued unqualified audit opinions on the financial statements in violation of GAAP.

367.    Had the Deloitte Defendants satisfied their duty of care and their other obligations, the true asset values for the Funds would have been revealed earlier, the Funds would have been able to attract valuable bids for the assets or a more orderly liquidation process would have generated far more than it did when the Funds were little more than a melting ice cube in the Spring/Summer of 2007. In addition, investors in the Funds would have refrained from investing in the Funds or would been able to redeem all or a part of their investments prior to the date on which the Bear Stearns Defendants suspended redemptions in June 2007, or taken other actions, and recovered at least some, if not all, value on their now worthless investments.

368.    The Deloitte Defendants should be held accountable for allowing the Bear Stearns Defendants to publish, and continue to publish, false and deceptive financial statements for the Funds for each fiscal year from 2003 through 2006. The Deloitte Defendants' participation was a critical part of the success of the Bear Stearns Defendants' plan to mislead investors in the Funds.

369. The Deloitte Defendants' failure to comply with the auditing standards and principles calls into question the very concept of an audit report. The integral role an auditor plays in adding to the transparency of the financial markets, and the confidence that investors and creditors have in their decisions to allocate capital, would all be eviscerated if auditors were able to issue "clean" audit reports when they are aware that the subject of the audit is materially flawed and that the financial statements they audited were inaccurate, incomplete and misleading.

37 0. The Deloitte Defendants thus played a direct role in the Bear Stearns Defendants' fraudulent scheme to dupe investors by, among other things, defrauding investors and aiding and abetting the Bear Stearns Defendants in the financial and reporting improprieties related to the Funds.

371. The machinations could only last for a limited amount of time, however, and the Funds' ensuing meltdown just over two months after the date of the Deloitte Defendants' 2006 Fiscal Year audit reports failed to provide any semblance of the value reflected on the Funds' financial statements.

**The Deloitte Defendants Have Significant
Contacts With the United States and New York**

372. A significant amount of the work that the Deloitte Defendants performed for, and in connection with, the Funds was centered in, connected to, and/or affected persons or property in the United States and New York.

- 144 -

373.   Deloitte US maintains its principal place of business in New York, New York.  Deloitte US and Deloitte Cayman are part of a single unified global professional services firm and are, either directly or indirectly, members of Deloitte Touche Tohmatsu ("DTT"), a Swiss Verein.  DTT maintains its principal place of business and executive offices in New York, New York.

374.   In addition, the Funds' financial statements were prepared by the Bear Stearns Defendants in New York, and were sent from New York to Deloitte Cayman in connection with its audit of the Overseas Funds for the relevant years.  In fact, the Deloitte Defendants' retention agreement was sent to and executed by BSAM in New York.

375.   The claims against the Deloitte Defendants in this action arise out of audits conducted, in substantial and material part, in the United States by Deloitte US.  Deloitte US worked with Deloitte Cayman in conducting the audits of the Overseas Funds.  Indeed, the Deloitte Defendants' audit reports for the Overseas Funds identify the "Independent Auditors" as being both Deloitte Cayman *and* Deloitte US.

376.   Deloitte Cayman knew or should reasonably have expected that its acts abroad would cause substantial, direct and foreseeable effects in New York and the United States.  This action arises, in part, out of the effects of the Deloitte Defendants' issuance of recklessly prepared audit reports for dissemination in

- 145 -

international and interstate commerce. The Deloitte Defendants addressed their audit reports concerning the Funds to the shareholders of the Funds, who the Deloitte Defendants knew or reasonably expected could include investors located in the United States and in New York.

377. Deloitte Cayman engages in continuous and systematic general business in New York, doing business with such a fair measure of permanence and continuity and availing itself of the privilege of doing business in New York that Deloitte Cayman reasonably could anticipate being brought into court in New York. Deloitte US and Deloitte Cayman derive substantial revenues from business in international commerce, from commerce in the United States, and from commerce in New York.

378. Deloitte Cayman regularly does, solicits and transacts business in New York in general and also specifically in connection with the matters giving rise to this case, as alleged herein. Deloitte Cayman reasonably expected or should have expected its tortious conduct to have consequences and to cause injury in the United States and New York such that Deloitte Cayman should reasonably anticipate being brought into court in New York in connection with actions arising out of such conduct.

## The Dereliction of Duties by the BSAM Directors

379.    As discussed in further detail below, the numerous acts of

fraud, breach of fiduciary duty and malpractice discussed above committed by both

the Bear Stearns Defendants and the Deloitte Defendants was facilitated by the

blatant failure of the directors nominated by BSAM to the Board of the Overseas

Funds to fulfill their fiduciary duties.  Rather than take action against this

wrongdoing, as they were obligated to do as directors of the Overseas Funds, the

BSAM Directors turned a blind eye to, if not collaborated with, the Bear Stearns

Defendants and the Deloitte Defendants in their wrongdoing.

380.    The BSAM nominees to the Board of the High-Grade Overseas

Fund were Cohen, Cummins, and Guarasci.  In October of 2005, Guarasci was

replaced by Sandelosvsky, and on or about March 28, 2007, Sandelovsky was

replaced by Quental.  The BSAM nominees to the Board of the High-Grade

Enhanced Overseas Fund were Cohen, Cummins, and Sandelovsky (until on or

about March 28, 2007, when Sandelovsky was similarly replaced by Quental).

381.    As directors of the Overseas Funds, the BSAM Directors owed

the Funds a duty of skill, care and loyalty.  In particular, as represented in the

offering materials provided in relation to the Overseas Funds, they were obligated

to "review and assess the investment policy and performance of the Funds and

generally supervise the conduct of the affairs of the Funds." The BSAM Directors breached these duties in a number of ways.

382.    First, the BSAM Directors failed to ensure that BSAM was following the stated investment guidelines for the Overseas Funds. As discussed above, BSAM represented that at least 90% of all investments in the Funds would have at least "AAA" or at worst "AA" ratings. BSAM also represented that the Funds would have (and had) minimal subprime exposure, particularly in late 2006 and 2007. As discussed at length above, BSAM flagrantly violated these representations by, among other things, filling the Funds with CDO-squared and other risky subprime investments. The BSAM Directors took absolutely no action to address these wrongs by BSAM – they never investigated the composition of the Funds' investments, nor did they take any action when it became apparent that these investments were not as BSAM represented. Rather, they sat back and allowed BSAM to perpetuate the fraud.

383.    Second, the BSAM Directors failed to monitor, or take any affirmative action with respect to, the Bear Stearns Defendants' "manager marks" scheme discussed above. The BSAM Directors permitted the Bear Stearns Defendants' "manager marks" scheme, pursuant to which they artificially inflated the value of the Overseas Funds, to continue unabated.

- 148 -

384.   At no time did the BSAM Directors question the NAVs assigned by BSAM and the Management Defendants to the Overseas Funds, or require BSAM and the Management Defendants to substantiate the basis therefor. Nor did they question BSAM's assertions regarding the positive performance of the Overseas Funds – despite the fact that such assertions, while reasonable to the outside world, were patently absurd to anyone with insider knowledge of the Overseas Funds' composition, which the BSAM Directors had, or willfully failed to have in violation of their duties.  As a result, the Overseas Funds' investors were unaware of the fact that the values of the Overseas Funds were never worth what the Bear Stearns Defendants asserted they were, or that their value had decreased precipitously throughout 2006 and into 2007.

385.   Because of the BSAM Directors' failures to fulfill their duties, investors in the Overseas Funds could not take action at any time before the Overseas Funds' blow-up – at any time from 2003 through 2007 – to halt the Bear Stearns Defendants' misconduct – as they could and would have done, had the BSAM Directors fulfilled their duties to stop, and even to report, this misconduct.

386.   Third, the BSAM Directors failed to independently assess the audits provided by the Deloitte Defendants.  The Deloitte Defendants' audits were provided to each of the BSAM Directors.  Indeed, some if not all of the Deloitte Defendants' engagement letters were addressed to Cummins.  Nevertheless,

- 149 -

despite the fact that they clearly received, and were obligated to critically review, the Deloitte Defendants' audits, the BSAM Directors failed to do so.  Specifically, for example, the BSAM Directors never inquired whether, or ensured that, the Deloitte Defendants tested and adequately evaluated the manager marks – which, as discussed above, the Deloitte Defendants failed to do.

387.    Furthermore, the BSAM Directors never questioned the clean bill of health the Deloitte Defendants gave to the Overseas Funds in their audits dated April 24, 2007 – despite the fact that the collapse of the subprime market, as well as the numerous restatements of earnings by other companies like New Century, OceanFirst Financial, and NovaStar Financial, clearly gave the BSAM Directors a compelling reason to do so.

388.    In sum, the BSAM Directors flagrantly breached the fiduciary and other duties they owed to the Overseas Funds.  They should be held liable for the huge losses the Funds suffered as a result.

**The Walkers Defendants' Unique Role in the Fraud**

389.    The Walkers Defendants also contributed materially to the Funds' collapse.

390.    As discussed herein, and as detailed below, Lennon and Wilson-Clarke, Senior Vice Presidents of Walkers FS, and the supposed "independent" nominees to the Boards of the Overseas Funds, failed entirely to

fulfill their obligations as directors thereof.  In particular, they (i) failed to ensure that the Bear Stearns Defendants complied with the stated investment guidelines for the Overseas Funds; (ii) failed to monitor, and take any action to address, the Bear Stearns Defendants' fraud in connection with their "managers mark" scheme; (iii) failed to independently assess the audits by Deloitte; and (iv) failed to fulfill their duty to review the numerous related party transactions effected between the Overseas Funds, Bear Stearns and BSAM.

391.   Additionally, all of the Walkers Defendants participated in the scheme initiated by the Bear Stearns Defendants to thwart investor efforts, following announcement of the Funds' collapse, to remove the incumbent management, and investigate the circumstances of the Funds' meltdown.

The Walkers Group

392.   The Walkers Group is an international organization with hundreds of employees located in offices around the globe, including in the Cayman Islands, London, Hong Kong, the British Virgin Islands, Jersey and Dubai.

393.   The Walkers Group serves leading corporations worldwide.  As the Walkers Group proclaims on its website, the Walkers Group "represents leading FORTUNE 100 and FTSE 100 global corporations and financial institutions, capital markets participants, investment fund managers and growth

and middle market companies." Specifically with regard to its practice relating to Investment Funds, the Walkers Group advertises that it has "an international reputation for having a premier practice in this area, advising some of the best known names in the investment world whether they be asset managers or international investors."

394.   The Walkers Group is comprised of the Walkers law firm (the "Walkers Firm"), which provides legal services, and Walkers Management Services, which provides corporate, special purpose vehicle, and fund services to the world's leading offshore jurisdictions.

395.   Walkers Management Services in turn is comprised of Walkers FS and Walkers SPV. As stated on the company website, Walkers FS provides "specialist offshore fund services to the full range of investment fund structures." Specifically, Walkers FS provides services to meet the "operational, legal and regulatory requirements of running an offshore fund, including: the (i) Provision of Directors, (ii) Acting as Trustee, (iii) Acting as General or Administrative partner for a limited partnership, and (iv) Consultation on set-up and structure of offshore investment vehicles."

396.   Lennon and Wilson-Clarke both were and are Senior Vice Presidents of Walkers FS.

397.    With respect to Walkers SPV, the Walkers Group website states that Walkers SPV "works closely with the law firm Walkers and with the combined depth of expertise available, is able to provide trustee and corporate management services to special purpose vehicles and other vehicles established by major international financial institutions and corporations."

398.    All of the members of the Walkers Group are closely inter-related.  For example, Walkers FS and Walkers SPV are both wholly-owned and controlled by the Walkers Firm.  Indeed, at least some (and possibly all) of the members of the board of directors of Walkers FS and Walkers SPV are also partners of the Walkers Firm.  Moreover, all of the Walkers Group share the same offices.  In addition, meetings of the boards of Walkers FS and Walkers SPV are all held at the offices of the Walkers Firm (and often involve the same people).

399.    The Walkers Group has a long-standing and extensive relationship with the Bear Stearns Defendants.  Specifically, the Walkers Firm has served as legal counsel for at least 16 hedge funds that BSAM advised, including Bear Stearns Systematic Equity Partners, Bear Stearns Global Alpha Funds, Bear Stearns Health Care Value, Bear Stearns Active Country – International Plus, Bear Stearns Offshore Fund of Hedge Funds, Bear Stearns Asset Backed Securities Master Fund, Bear Stearns Emerging Markets Macro Fund, Bear Stearns Europe Long/Short Fund, Bear Stearns Structured Risk Partners Master Fund, Hedge

- 153 -

Select (Offshore), Global Growth, the High-Grade Master Fund, and the High-Grade Enhanced Master Fund, the High-Grade Overseas Fund, and the High-Grade Enhanced Overseas Fund.

400.    In addition to the Walkers Firm, Walkers FS also provided services to at least nine of BSAM's hedge funds, including the Equity Focus Fund, Institutional Leveraged Loan Master Fund, Europe Long/Short Funds, Structured Risk Partners Fund, Hedge Select (Offshore) Funds, the High-Grade Master Fund, the High-Grade Enhanced Master Fund, the High-Grade Overseas Fund, and the High-Grade Enhanced Overseas Fund.

### The Walkers Defendants' Duties With Respect to the Overseas Funds

401.    Each of the Walkers Defendants had specific duties and obligations in relation to the Overseas Funds.

402.    Lennon and Wilson-Clarke of Walkers FS served as the alleged Independent Directors of the Boards of each of the Overseas Funds.  As discussed above, each of the Boards consisted of five directors, three of whom were appointed by BSAM, and two of whom were to be independent of Bear Stearns. During the summer of 2006, Lennon and Wilson-Clarke were appointed (as discussed below, essentially by BSAM) to fill these two independent director slots. As directors of the Boards, Lennon and Wilson-Clarke (and, thus, their employer Walkers FS) owed the Overseas Funds a fiduciary duty of care, skill and loyalty.

403.   Walkers SPV served as Trustee of the Star Trust of the Overseas Funds.  The Star Trust was the sole holder of the "Ordinary," or voting, non-participating shares of the Overseas Funds.  As Trustee of the Star Trust, Walkers SPV was obligated to, among other things (i) hold the voting, non-participating shares of the Overseas Funds in trust, and to (ii) exercise its vote of these shares to carry out the Business Plan of the Overseas Funds – which as defined in the Star Trust, included insuring that the objectives of the Overseas Funds remained as set forth in the offering materials.

404.   As detailed below, each of the Walkers Defendants breached their duties and committed numerous other acts of wrongdoing with respect to the Overseas Funds.

The Walkers Defendants' Pervasive Breaches
and Other Wrongful Acts During the Lives of the Funds

405.   As noted, Lennon and Wilson-Clarke served as the Independent Directors of each of the Overseas Funds (as well as the Master Funds).  In this capacity, Lennon and Wilson-Clarke owed a duty of skill, care and loyalty.  They blatantly failed to fulfill this duty.

406.   First, like the BSAM Directors, Lennon and Wilson-Clarke failed to ensure that the quality and nature of the investments in the Funds was as represented by BSAM – and failed to take any action when it became clear that they were not.

- 155 -

407. Second, each of the Walkers Independent Directors failed to monitor, or take any action against, the Bear Stearns Defendants' "manager marks" scheme discussed above. Thus, they failed to question the NAVs assigned by BSAM to the Funds, or the basis therefor, and similarly failed to question BSAM's assertions regarding the positive performance of the Funds. These duties were particularly incumbent upon Lennon and Wilson-Clarke as the supposed Independent Directors of the Funds – yet they blatantly failed to fulfill them. As a result, they denied the investors the ability to have knowledge of, and take action against, the Bear Stearns Defendants' misconduct.

408. Third, like the BSAM Directors, Lennon and Wilson-Clarke failed to monitor and independently evaluate the audit and other work performed by the Deloitte Defendants.

409. Fourth, Lennon and Wilson-Clarke failed to fulfill their duties as the Independent Directors to review related party transactions. They thus knowingly and willfully flouted their most important and most clearly documented duties as directors of the Overseas Funds.

410. As detailed above, BSAM, as investment manager of the Overseas and Domestic Funds, conducted numerous related party transactions with Bear Stearns entities on behalf of the Funds. For example, BSAM caused the Funds, on repeated occasions, to invest in special purpose vehicles structured,

underwritten, and/or managed by BSAM itself, to buy and sell securities from such special purpose vehicles, and/or to buy and sell securities from Bear Stearns and other Bear Stearns-related entities.

411.   The offering materials issued in connection with both the Overseas and Domestic Funds, in a subsection entitled "Principal Trades and Interested Party Transactions," acknowledged that such transactions required prior disclosure before they could be consummated.

412.   Specifically, the offering materials noted that

Section 206(3) of the U.S. Investment Advisers Act of 1940 (the "Advisers Act") provides that it is unlawful for any investment adviser, directly or indirectly, "acting as principal for his own account, knowingly to sell any security to or purchase any security from a client, or acting as a broker for a person other than such client, knowingly to effect any sale or purchase of any security for the account of such client, **without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction.**"

(emphasis added).

413.   The offering materials noted that "transactions subject to the foregoing requirements are sometimes referred to as 'principal trades.'"

414.   The offering materials represented that prior to consummation of a transaction which could be deemed a principal trade, disclosure thereof would be made to, and the required consent and approval would be obtained from, the

independent directors (or a majority of the Shareholders or Limited Partners not affiliated with BSAM).

415.   From the inception of the Funds until their collapse, many hundreds, if not thousands, of related party transactions were consummated by BSAM.  However, and in direct contravention of the representations in the offering materials, during 2003 and 2004 many – and, during 2005, 2006 and 2007, most – such related party transactions were consummated without the requisite prior review and approval.

416.   Specifically, of the transactions that required approval by the independent directors, 18% were consummated without such approval in 2003, 29.73% were consummated without such approval in 2004, 58.66% were consummated without such approval in 2005, and 78.85% were consummated without such approval in 2006.

417.   As investment advisor to the Funds, BSAM had a duty to ensure that such related party transactions which it consummated with other Bear entities received the requisite prior review and approval.  But BSAM failed consistently to do so.  Indeed, BSAM utilized untrained and unsupervised personnel – who had no idea what they were doing, or of the importance of what they were doing – to oversee the process for the review of related party transactions.

418.    Moreover, in 2006, BSAM replaced the prior independent directors on the Boards with Lennon and Wilson-Clarke of Walkers FS. As BSAM was well aware, Lennon and Wilson Clarke's employer Walkers FS – and its parent company Walkers Management Services – had long-standing relationships with both itself, and other Bear Stearns Defendants. Further, prior to joining Walkers, Lennon was employed for three years by the Deloitte Defendants – who, as noted, were the supposed "independent" auditors of the Funds. In light of these numerous ties and interrelationships, Lennon and Wilson-Clarke could hardly be considered truly "independent" – a fact which their subsequent conduct bore out.

419.    Lennon and Wilson-Clarke knew, or in the proper exercise of their fiduciary duties to the Funds were required to know, of the requirement that they review related party transactions prior to their consummation.

420.    Nevertheless, Lennon and Wilson-Clarke (and therefore their employer Walkers FS) blatantly failed to fulfill this duty to review related party transactions. Indeed, in 2006 – under Lennon and Wilson-Clarke's watch – almost 80% of the related party transactions that were consummated, were done so without the requisite prior approval by the Independent Directors.

421.    In addition, even when Lennon and Wilson did review related party transactions, they frequently did so based on insufficient information.

- 159 -

Specifically, on a number of occasions, Lennon and Wilson-Clarke approved related party transactions without knowing such essential, fundamental information as (i) the type and name of the security in question, (ii) the trade date, (iii) the notional amount, and (iv) the settlement date. Essentially, they acted as "rubber stamps" for BSAM's decisions.

422.    Moreover, they frequently reviewed (and approved) such transactions after they had already been effected. Indeed, BSAM frequently sent long lists of related party transactions that already had been effected (without the requisite approval) to Lennon and Wilson-Clarke, and sought Lennon and Wilson-Clarke's approval thereof after the fact – sometimes several months afterwards. Such ex post facto rubber stamping of numerous related transactions en masse is both contrary to the representations in the offering materials, and the entire purpose of such a purported "independent review."

423.    Indeed, it was impossible for Lennon and Wilson-Clarke to perform any type of meaningful, bona fide review of the related party transactions, in light of the time demands required by their numerous other obligations.

424.    For example, in addition to serving on the Boards at issue here, Lennon appears to have served on the boards of over 200 other funds. Notwithstanding representations that he dedicates anywhere from a few hours to a few days each month to each of these respective 200 engagements, clearly this was

mathematically impossible, as even if he dedicated only 5 hours per month to each engagement, this would total 1,000 hours – as compared to the approximately 720 total hours that exist in any given month. Upon information and belief, Wilson-Clarke had a comparable number of other engagements.

425.    In light of these numerous directorships and other competing engagements they both held, Lennon and Wilson-Clarke could not and did not devote adequate time and attention to their role as independent directors of the Overseas Funds, and the requirement of reviewing related party transactions that this role encompassed.

426.    Moreover, even if, and to the extent that, Lennon and Wilson-Clarke ever performed the requisite review of any individual trade, such review clearly was not truly independent. As noted, the Walkers Group, in particular the Walkers Firm and Lennon and Wilson-Clarke's employer Walkers FS, conducted a significant amount of business with BSAM and other Bear-related entities. Thus, Lennon and Wilson-Clarke could not objectively evaluate the transactions proposed by one of their employer's most important clients, and were not independent directors by any stretch of the imagination. Indeed, there is no indication that Lennon and Wilson-Clarke ever rejected any proposed related party transaction, or even required any further review or information before approving any such transaction.

427.   Lennon and Wilson-Clarke's failure to fulfill their duty to review these numerous related party transactions significantly damaged the Funds, in that most, if not all of these related party transactions were disadvantageous to them.  Indeed, they benefitted BSAM and other Bear Stearns Defendants to the detriment of the Funds.

428.   To cite just some of the most egregious examples, in September of 2006, during the moratorium on transactions among the Funds and Bear Stearns, the Funds transferred to Rampart, an entity managed by and related to BSAM, equity in 10 CDOs valued at $548.8 million, in exchange for 16 million shares of Rampart stock and $148.8 million in cash.  Notably, BSAM itself had concerns regarding Rampart, which was a CDO-squared  Specifically, in an e-mail from Tannin to McGarrigal and Cioffi dated September 5, 2006, Tannin expressed serious reservations regarding Rampart, stating:

> We are in essence, repackaging our Klio [Rampart] position . . . The two main benefits to investors are – the potential for this to price and trade above book value – and the greater liquidity provided by the public markets.  I think both of these are real questions – not that they won't happen – but there is very very little data to go on to make the case – so we are putting a lot of very big eggs in one basket . . . **Our hedge fund would be exposed to public market volatility.  If we were to have a problem in just one position that affected a distribution we face unknown price action.**

(Emphasis added).

429.   Despite the fact that, as demonstrated above, BSAM itself had serious reservations regarding Rampart, and despite the fact that this more than $500 million transaction between the Funds and Rampart affected by BSAM was clearly a related party transaction – of massive proportion – there is no indication that Lennon or Wilson-Clarke ever reviewed it.

430.   In May of 2007, BSAM effected yet another transaction with Rampart – specifically BSAM transferred between $20 million and $40 million of credit default swaps from the Funds to Rampart.  Notably, BSAM replaced the credit default swaps from the Funds to Rampart at cost – rather than their market value.  This caused a decrease in the value of the Funds in excess of $18 million. Once again, there is no indication that Lennon or Wilson-Clarke reviewed this transaction between the Funds and Rampart – despite the fact that it clearly was a related party transaction.  Lennon and Wilson-Clarke knew of this, and many other related-party transactions that occurred without their review, and willfully failed to do anything about them.

431.   In addition to these transactions with Rampart, under Lennon and Wilson-Clarke's watch, the Bear Stearns Defendants also consummated the numerous other related party transactions discussed above in furtherance of Bear Stearns' effort to use the Funds as a dumping ground for risky assets acquired or created by other Bear Stearns Defendants.

- 163 -

432.   For example, under Lennon and Wilson-Clarke's watch, in late October 2006, the Bear Stearns Defendants caused the High-Grade Enhanced Fund invest over $60,000,000 in two tranches of the Tahoma 2007-2A CDO-squared offering BSAM was managing.  In addition, also under Lennon and Wilson-Clarke's watch, in March of 2007, the Bear Stearns Defendants caused the High-Grade Enhanced Fund to invest over $250,000,000 in three tranches of a Tahoma 2006-1A offering that again BSAM managed.  Moreover, under Lennon and Wilson-Clarke's watch, in February or March of 2007, the Bear Stearns Defendants caused the High-Grade Enhanced Fund to spend $140,000,000 to purchase **all** of the securities in four tranches of a CDO-squared refinancing deal, Tricadia 2003-1AR, which was underwritten by Bear Stearns.

433.   Despite the fact that each of these transactions and the other insider deals discussed above were clearly related party transactions – of massive proportion – and despite the fact that as such, each of these transactions required Lennon and Wilson-Clarke's prior approval, there is no indication that Lennon or Wilson-Clarke ever reviewed **any** of them.

434.   Lennon and Wilson-Clarke's repeated failure to review related party transactions contributed to the moratorium on all related-party transactions (even those that might be beneficial to the Funds) that was put in place from the Summer of 2006 until Spring of 2007.  The imposition of this moratorium – which

was brought about at least in part by Lennon and Wilson-Clarke's failure to fulfill

their duties as independent directors in reviewing and approving related party

transactions – may even have further harmed the Funds.  As acknowledged by

BSAM, this moratorium hurt the investors because it eliminated Bear as a potential

counterparty and, thus, significantly reduced the Funds' liquidity.  Moreover, the

moratorium hurt investors because it terminated the Funds' ability to take

advantage of beneficial trades.  Indeed, in an e-mail from McGarrigal to Cioffi and

Tannin dated September 16, 2006, McGarrigal notes the importance of the ability

to conduct, where appropriate, related party trades:

> Do we have an official mandate to terminate our relationship
> with Bear?  This hurts our investors as it eliminates a repo
> counterparty (reducing liquidity) and eliminates a source of
> trading secondary CDOs.  Bear is among the best (reducing
> liquidity) and further eliminates a source for assets.  Bear is #1
> in MBS and in the top 5 of CDO issuers.  **All bad for our
> investors.**  I think we should work hard to put in place all
> necessary compliance procedures to allow to continue to
> operate as we have to date.

(Emphasis added).

435.   As McGarrigal admitted himself, the failure to comply with the

procedures for review of related party transactions, and the moratorium on related

party transaction that this failure caused, was "all bad for our investors."

436. Of course, the Bear Stearns Defendants did not abide the terms of their own moratorium, instead continuing to execute insider trades, each of which Lennon and Wilson-Clarke was aware of, and failed to act to stop.

437. For the foregoing reasons, each of Defendants Walkers FS, Lennon and Wilson-Clarke bear material responsibility for the losses sustained by the Funds and their investors, and must be held accountable.

### The Walkers Defendants Worked With the Bear Stearns Defendants to Thwart Any Exercise of Investor Rights, and to Avoid Commencement of This Action

438. In order to assist the Bear Stearns Defendants (and the Walkers Defendants) in attempting to cover up their wrongdoing for as long as possible, all of the Walkers Group, including the Walkers Defendants, participated in the Bear Stearns Defendants' scheme to thwart the petitions to remove the Board of the High-Grade Enhanced Overseas Fund, and BSAM as general partner of the High-Grade Enhanced Fund, which were served by an investor holding more than 10% of all outstanding shares on August 10, 2007 (the "Removal Petitions"). With the assistance of the Walkers Group, the Board of the High-Grade Enhanced Overseas Fund and BSAM delayed holding meetings to address the Removal Petitions for as long as possible, and ultimately attempted to thwart the Removal Petitions altogether by putting all of the Funds into voluntary liquidation.

439.  Pursuant to Section 81(a) of the Articles of Association of the

High-Grade Enhanced Overseas Fund, the shareholders could remove any or all of

the directors of the incumbent Board by serving a Removal petition.  Specifically:

> A petition (a "Removal Petition") to submit to Participating
> Shareholders a proposal to remove and/or replace a Director or
> Directors at a meeting of the Participating Shareholders may be
> submitted to the Directors by any Nonaffiliated Participating
> Shareholder . . . If the Removal Petition is properly made in
> accordance with the provisions of this Article, the Directors
> shall within 15 days after receipt of the Removal Petition mail
> the Removal Petition to all Nonaffiliated Participating
> Shareholders and the Trustee and Enforcer of the Bear Stearns
> High-Grade Structured Credit Strategies Enhanced Leverage
> (Overseas) Ltd. Star Trust together with written instructions
> specifying that a special meeting of the Participating
> Shareholders will be called to remove and/or replace, as
> applicable, the applicable Director(s), if the Removal Petition is
> signed by the Nonaffiliated Participating Shareholders owning
> at least 10% of the paid up Participating Share capital of the
> Company . . . and returned to the Company within 60 days after
> the date of such mailing.

An analogous provision is set forth in Section 3.2 of the Amended and Restated

Limited Partnership Agreement of the High-Grade Enhanced Fund.

440.  On August 10, 2007, an investor holding more than 10%

interest in both the Overseas and Domestic High-Grade Enhanced Funds (the

"Petitioning Investor"), sent Removal Petitions to the Board of the High-Grade

Enhanced Overseas Fund, and to BSAM as general partner of the High-Grade

Enhanced Fund.  In the Removal Petitions sent to the High-Grade Enhanced

Overseas Fund, the Petitioning Investor sought removal of each of the present

members of the Board -- specifically Cohen, Cummins, and Sandelovsky, each of whom, as noted, was nominated by BSAM, as well as Lennon and Wilson-Clarke, the "independent" nominees from Walkers FS. In the Removal Petition sent to the High-Grade Enhanced Fund, the Petitioning Investor sought removal of BSAM as general partner of the Fund. The Petitioning Investor stated that it was seeking such removal in light of the substantial losses sustained by the Overseas and Domestic High-Grade Enhanced Leverage Funds under, respectively, the Board and BSAM's watch. The Petitioning Investor further stated that it was requesting that Removal Petitions be transmitted to each of the Participating Shareholders of the High-Grade Enhanced Overseas Fund, and to each of the Limited Partners of the High-Grade Enhanced Fund, and that meetings to vote on the Removal Petitions be held within 30 days of the date of transmittal thereof.

441.    The Board of the High-Grade Enhanced Overseas Fund did not respond to the Removal Petitions until August 27, 2007 (the maximum time allotted under the Articles of Association). In that response, Lennon, writing on behalf of the Board, claimed that the Removal Petitions were "deficient" because (i) they were sent to the Fund care of BSAM at BSAM's principal place of business at 383 Madison Avenue in New York, rather than to the Fund's registered address care of Walkers SPV in the Cayman Islands, and (ii) because the Petitioning Investor proposed to replace the current directors of the Board with a

only a single director, FTI Capital Advisors, LLC ("FTI"), rather than at least two directors.  In addition, Lennon requested a meeting to discuss "the usefulness and propriety of making the Removal Petitions as such because the Company [the Fund] ha[s] no assets remaining to be distributed by replacement directors."

442.    The purported "deficiencies" alleged by Lennon in his August 27, 2007 letter were mere technicalities and/or baseless.  With regard to the alleged wrong address, in fact, they were sent to the Fund's registered address, in addition to BSAM's office.  Moreover, each member of the Board, including Lennon and Wilson-Clarke, received the Removal Petitions the very day they were sent, by transmittal from counsel for Bear Stearns.  With regard to the failure to name at least two replacement directors, in his letter, Lennon admitted that this was not technically a deficiency, as there was no requirement in the Articles of Association that the incumbent Board be replaced with at least two directors, but rather asserted that he merely viewed it as the better practice.

443.    BSAM asserted parallel – and equally frivolous – "deficiencies" in response to the Removal Petition served upon it by the Petitioning Investor.  Specifically, in a letter dated August 24, 2007, BSAM similarly asserted that the Removal Petition was sent to the wrong address – even though once again, BSAM clearly received it.

444.  On September 11, 2007, the Petitioning Investor sent a response to Lennon's August 27, 2007 letter, along with revised Removal Petitions addressed to the Board of the High-Grade Enhanced Overseas Fund to cure the "deficiencies" alleged, and requested that the Board immediately forward its letter to the Participating Shareholders and schedule a meeting to address the Removal Petitions.  The Petitioning Investor also sent a revised Removal Petition to BSAM as general partner of the High-Grade Enhanced Fund.

445.  The Board did not forward the Removal Petitions to the Participating Shareholders of the High-Grade Enhanced Overseas Fund until almost a month later, on October 9, 2007 – in violation of the requirement that the Board mail the Removal Petitions to all Nonaffiliated Participating Shareholders within 15 days after receipt.  Moreover, the Board only scheduled the requisite meeting to vote on the Removal Petitions for over a month later, or on November 14, 2007.  BSAM similarly only scheduled a meeting of the Limited Partners to vote on the Removal Petition served in connection with High-Grade Enhanced Fund for November 7, 2007 – and that meeting was subsequently delayed again until November 16, 2007.

446.  In total, the Board and BSAM improperly delayed any action on the Removal Petitions for over three months.

447.    Meanwhile, BSAM, along with the Board and the Walkers Group, was scheming to thwart the Removal Petitions altogether by putting all of the Overseas Funds into voluntary liquidation in the Cayman Islands, and by seeking to liquidate the Domestic Funds in the United States.  Thus, in late October 2007, BSAM negotiated with its handpicked liquidators – namely KPMG Cayman Islands – to have representatives of KPMG serve as voluntary liquidators for all of the Funds.  Simon Whicker ("Whicker") and Kristin Beighton (Beighton") of KPMG Cayman Islands agreed to do so with respect to the Overseas Funds, and Richard Heis ("Heis") and John Milson ("Milson") of KPMG (Canada) agreed to do so with respect to the Domestic Funds.  Significantly, BSAM already had appointed KPMG Cayman Islands (specifically Whicker and Beighton) as liquidators with respect to the Master Funds.

448.    On November 1, 2007 – or less than two weeks before the meeting of the Participating Shareholders of the High-Grade Enhanced Overseas Fund on the Removal Petitions was to be held, the Board passed written resolutions recommending that the sole holder of the voting non-participating shares of (both of) the Overseas Funds (namely Walkers SPV, Trustee of the Star Trust), place both Overseas Funds into voluntary liquidation, and appoint Whicker and Beighton of KPMG as joint voluntary liquidators.  That same day, or November 1, 2007, Walkers SPV passed a written resolution (again drafted by the

Walkers Firm), doing just that. This voluntary liquidation was designed to effectively moot the scheduled November 14, 2007 meeting of Shareholders of the High-Grade Enhanced Overseas Fund to vote on the Removal Petitions, as upon liquidation, the liquidators take control in place of the Board. Notably, the Bear Stearns Defendants had first asserted that the Overseas Funds were insolvent months earlier – thus making it blatantly obvious that their petition filed on November 1, 2007 to place the Overseas Funds into liquidation was not bona fide effort to address the Funds' insolvency, but rather only a ruse to thwart the Removal Petitions.

449.    Indeed, on November 8, 2007, a mere week after their appointment, Whicker and Beighton wrote to the Shareholders of the High-Grade Enhanced Overseas Fund, effectively discouraging them from attending the scheduled November 14, 2007 meeting. Specifically, Whicker and Beighton claimed the meeting would be pointless and have no effect, as their appointment as liquidators rendered any elected replacement directors powerless:

> [T]he meeting could proceed as previously notified, although investors may wish to consider that since the Feeder Fund [the High-Grade Enhanced Overseas Fund] is in voluntary liquidation and controlled by the JVLs [Whicker and Beighton], any replacement directors appointed would be powerless to control the Feeder Fund or its affairs.

Discouraging the investors from attending the meeting on the Removal Petition they had waited months for was clearly improper, and further demonstrates that

- 172 -

Whicker and Beighton (and the party behind their appointment, BSAM) wanted to avoid a change of control at all costs.

450.   BSAM engaged in similar tactics with respect to the Domestic Funds. Thus, on or around November 1, 2007 – only days before the scheduled meeting of the Limited Partners on the Removal Petition served in connection with the High-Grade Enhanced Fund (the U.S. entity) was supposed to occur – BSAM approached the Petitioning Investor seeking its consent to cancellation of the meeting of Limited Partners and placement of the Domestic Funds into liquidation, under the control of Heis and Milsom of KPMG Cayman Islands. This resulted in postponement of the High-Grade Enhanced Fund meeting, but once the Petitioner refused BSAM's request, the meeting was rescheduled to November 16, 2007.

451.   Notwithstanding the express bar in the High-Grade Enhanced Domestic Fund's governing documents on liquidation of the fund during the pendency of a Removal Petition, BSAM made a desperate, bad faith effort to obtain a judicial decree from the Delaware Chancery Court dissolving the High-Grade Enhanced Domestic Fund on November 13, 2007. The Chancery Court took no action on this petition, and on November 16, 2007 the High-Grade Enhanced Domestic Fund meeting occurred.

452.   On the morning of that meeting, the Bear Stearns Defendants succeeded in yet another desperate, bad faith effort to thwart the exercise of

investor will by buying off certain substantial High-Grade Enhanced Domestic Fund investors that held sufficiently large positions to block the Petitioner from attaining the majority necessary to unseat BSAM.

453.    Immediately following the unsuccessful November 16 meeting, the Petitioner submitted a renewed petition, seeking a further meeting of all investors to vote again on removal of BSAM.  BSAM, however, in bad faith ignored this renewed petition, and notwithstanding its pendency, issued a Notice of Dissolution of the High-Grade Enhanced Domestic Fund on Saturday, November 17, 2007, simultaneously therewith appointing Heis and Milsom as liquidators of the High-Grade Enhanced Domestic Fund.

454.    Earlier in the whirlwind week of November 12, 2007, despite all of the Bear Stearns Defendants' bad faith blocking efforts, on November 14, the scheduled meeting of the Shareholders of the High-Grade Enhanced Overseas Fund to vote on the Removal Petitions went forward.  At that meeting, the incumbent directors were removed, and were replaced by FTI and Bart Schwartz.

455.    On November 19, 2007, BSAM's hand-picked liquidators of the High-Grade Enhanced Overseas Fund, Whicker and Beighton, wrote to the new directors, claiming that despite their recent election, in light of the petition for liquidation, they were powerless.  Specifically, Whicker and Beighton wrote:

> [A]s a result of the appointment of [us as] the JVLs [Joint Voluntary Liquidators], any powers you may have inherited as

a Director of the Feeder Fund had already ceased upon the appointment of the JVLs. For the time being you are still regarded as a Director but you have no power to act on behalf of the Feeder Fund in any way whatsoever without the prior approval and explicit authority of the JVLs.

456.   This letter is both oddly worded, and oddly timed. A truly independent liquidator recently appointed to manage a fund clearly would not have addressed its newly elected board in this manner; rather, an independent liquidator would have sought the directors' assistance in investigating any wrongdoing leading to the fund's demise. The KPMG liquidators here were nothing of the sort; rather they were pawns in the Bear Stearns Defendants' scheme to avoid, or at least delay, any change in control. Indeed, it is clear that the Bear Stearns Defendants' actions, with the help and assistance of the Walkers Group, in putting each of the Funds into liquidation, and placing their hand-picked liquidators at the helm, was nothing more than a transparent attempt to thwart the Removal Petitions, and thereby cover up, or at least postpone, the day of reckoning for the Bear Stearns Defendants' numerous acts of wrongdoing leading to the complete collapse of the Funds.

457.   In participating in the Bear Stearns Defendants' scheme, following the Funds' collapse, the various Walkers Defendants committed a number of fiduciary breaches and other wrongs.

458.   In addition to the foregoing, by putting the Overseas Funds into liquidation while the Removal Petitions were pending, the Walkers Defendants (and Walkers SPV) violated Schedule 3.1(a)(i) of the Star Trust.  Schedule 3.1(a)(i) of the Star Trust specifically states that Trustee of the Star Trust "may not vote to wind-up [the Fund] during the pendency of a Removal Petition." The clear purpose of this prohibition is to avoid precisely those tactics employed here to avoid a change in control.  By putting the High-Grade Enhanced Overseas Fund into voluntary liquidation while the Removal Petitions were pending, in direct contravention of the terms of the Star Trust, and in a transparent effort to maintain control, the Walkers Defendants and Walkers SPV clearly breached both this provision, and their duties to the High-Grade Enhanced Overseas Fund and its investors.

459.   BSAM aided and abetted these breaches, by directing each of the meetings and/or calls concerning the Removal Petitions, and spearheading the efforts to thwart them.

460.   For example, on October 29, 2007, BSAM sent a letter to the Boards of each of the Overseas Funds, advising them that "in our judgment, it is in the best interest of" the Funds that the Board recommend to Walkers SPV that they "immediately be placed into voluntary liquidation."

- 176 -

461.   Then, on October 31, 2007, or the day before the resolution winding up the Funds was passed, BSAM provided Walkers SPV with an indemnity in connection with its exercise of its power to place the Overseas Funds in voluntary liquidation.  That indemnity stated:

> We hereby refer to your respective roles as Trustee . . . and our recommendation, and the recommendation of the directors of [the Funds], that you exercise your powers and rights . . . so as to cause them to be placed in voluntary liquidation.  In the event that you do so exercise your powers and rights as holders of the Ordinary Shares in the Controlled Companies in the manner described above, we hereby agree to indemnify you . . . promptly on demand against any actions, costs, claims, expenses, liabilities or losses which you may suffer arising directly or indirectly out of such exercise of your rights as holders of the Ordinary Shares.

462.   This indemnity demonstrates clear recognition on the part of both BSAM and Walkers SPV that putting the Overseas Funds into voluntary liquidation when the Removal Petitions were pending could, and likely would, result in liability.  Yet Walkers SPV took precisely this action, and in providing this indemnity against any liability resulting therefrom, BSAM induced Walkers SPV to do so.

463.   The Walkers Defendants should be held responsible for the significant damage that these numerous fiduciary breaches and other acts of wrongdoing have caused.

**The Walkers Defendants Have Significant**
**Contacts With the United States and New York**

464.   A significant amount of the work that the Walkers Defendants performed for, and its misconduct in connection with, the Funds was centered in, connected to, and/or affected persons and property located in New York.

465.   For example, as the Walkers Defendants were well aware, the day to day activities of the Funds, such as the management of the Funds, as well as the consummation of the numerous purchases, sales, and other transactions for the Funds (including the related party transactions discussed above), were primarily carried out by BSAM at its principal place of business in New York City.  Indeed, this fact was explicitly set out in the offering materials issued in connection with the Funds.

466.   Moreover, Lennon and Wilson Clarke's performance of their duties as directors of the Overseas Funds (or more aptly, their failure to perform these duties) was likewise focused in New York.  Specifically, for example, in connection with their review of related party transactions, personnel from BSAM or other Bear entities in New York would send from their offices in New York a list of the related party transactions they proposed to conduct (or had already conducted) to Lennon and Wilson-Clarke.  Lennon and Wilson-Clarke would then send their approval of these related party transactions back to such Bear personnel in New York.  Moreover, many, if not all of these related party transactions were

also actually consummated in New York. As discussed above, during Lennon and Wilson-Clarke's tenure, hundreds of such related party transactions were consummated by BSAM.

467.   Furthermore, Lennon and Wilson-Clarke's failure to monitor, and take action against, the Bear Stearns Defendants' fraud, similarly related to and focused on, conduct in New York. Specifically, for example, the persons responsible for the investment strategy of the Funds, as well as the "managers marks" scheme (namely Cioffi, Tannin and McGarrigal), were located in New York, and the investment strategy and "valuations" they proposed directly affected the management of the Funds in New York. This fraud also directly harmed persons and property located in New York.

468.   The activities conducted by BSAM, other Bear Stearns entities and the Walkers Defendants (along with Walkers SPV) in connection with their effort to thwart the Removal Petitions also had ties to and affected persons and property located in New York. For example, as noted, BSAM, other Bear Stearns-related parties, and their counsel all participated in both the Board and other meetings and conference calls conducted in connection with the scheme to thwart the Removal Petitions and put the Funds into voluntary liquidation. In addition, the Petitioning Investor was located in New York. Furthermore, the letters sent in response to the Removal Petitions were sent to the Petitioning Investor at its

offices in New York, BSAM's letter to the Board suggesting that it recommend to Walkers SPV that it vote to put the Overseas Funds into liquidation was drafted by the Walkers Firm and issued by BSAM out of its New York offices, and the October 31, 2007 indemnity from BSAM to Walkers SPV was similarly drafted by the Walkers Firm and issued by BSAM out of its offices in New York.

469.    Indeed, after it put the High-Grade Enhanced Overseas Fund into voluntary liquidation, BSAM, together with the Walkers Firm serving as its advisors, sought in the Bankruptcy Court in New York to have that voluntary liquidation recognized as a foreign non-main proceeding pursuant to Chapter 15 of the Bankruptcy Code.

470.    Moreover, many of the parties harmed by these efforts to thwart the Removal Petitions, such as the Petitioning Investor, as well as the other investors in the Funds, were and/or are also located in New York.

471.    In sum, in connection with their wrongdoing in failing to fulfill their duty to review the numerous related party transactions, in failing to take any action in response to the "manager's mark" scheme and other frauds perpetrated by the Bear Defendants, and in scheming to thwart the Removal Petitions, all of the Walkers Group had significant contacts with New York, caused harm to persons and property located in New York, and also sought to benefit from the laws of the

state of New York. They thus reasonably should expect to be brought into court in New York for this misconduct.

472.  Indeed, outside the context of the Funds, the Walkers Group has had numerous other contacts with, and has performed substantial amount of services for work for, a multitude of other businesses in New York. For example, as reported in a June 4, 2007 article in Hedgeweek, the "off-shore magic circle" of firms (which includes the Walkers Firm) have established longstanding relationships with top onshore lawyers in the main centers that provide referrals of fund business – including, specifically, New York. Moreover, as noted above, the Walkers Group touts, both on its own web site and elsewhere, its international presence and provision of service globally – including to FORTUNE 100 and FTSE 100 corporations and financial institutions, many of which are located in New York.

473.  Furthermore, in addition to its Chapter 15 petition in connection with the Funds, the Walkers Group has also sought relief in New York courts in other contexts. Specifically, for example, Walkers SPV, among other parties, brought litigation in this Court against the Coventry Group and other parties arising out of Walkers SPV's investments in the secondary market for life insurance policies. See, e.g., Richie Capital Management, LLC v. Coventry First LLC, No. 07 Civ. 3494, 2007 WL 2044656 (S.D.N.Y. July 17, 2007). The

Walkers Defendants and their affiliates cannot purposely avail themselves of the benefit of the courts of New York to their benefit, and then turn around and attempt to assert a lack of jurisdiction when hailed into those same courts as defendants.

474.    In sum, based on their significant solicitation of business in, contacts with, misconduct causing harm to persons and property located in, and purposeful availment of the courts of, the state of New York, the Walkers Defendants should have reasonably expected that they would be subject to jurisdiction here.

## DERIVATIVE ALLEGATIONS

475.    Through assignments from leverage counterparties through which they made their initial investments, approved by applicable representatives of the relevant Funds, Stillwater is a limited partner of the High-Grade Domestic Fund and Essex is a limited partner of the High-Grade Enhanced Domestic Fund. Stillwater and Essex each have had full economic exposure to the limited partnership interests during the relevant period in question, continue to hold their limited partnership interests as of the date of the filing of this Amended Complaint, and will retain their limited partnership interests through the course of this litigation.

476.   As discussed above, the Bear Stearns Defendants, the Deloitte Defendants and the Walkers Defendants committed numerous breaches of duties and other acts of wrongdoing with respect to the Domestic Funds. This wrongdoing led to, and indeed caused, the collapse of the Domestic Funds.

477.   With the exception of the claims asserted directly by Stillwater for violations of Rule 10(b) of the Exchange Act and Rule 10(b)(5) promulgated thereunder and for violation of § 20(a) of the Exchange Act in connection with its purchase and sale of shares in the High-Grade Domestic Fund, all of the claims asserted by Stillwater in this action are brought derivatively, on behalf of the High-Grade Domestic Fund, against the Bear Stearns Defendants, the Deloitte Defendants and the Walkers Defendants for the harm that they have caused to the High-Grade Domestic Fund based on their wrongdoing alleged herein.

478.   With the exception of the claims asserted directly by Essex for violations of Rule 10(b) of the Exchange Act and Rule 10(b)(5) promulgated thereunder and for violation of § 20(a) of the Exchange Act in connection with its purchase and sale of shares in the High-Grade Enhanced Domestic Fund, the claims asserted by Essex in this action are brought derivatively, on behalf of the High-Grade Enhanced Domestic Fund, against the Bear Stearns Defendants, the Deloitte Defendants and the Walkers Defendants for the harm that they have

caused to the High-Grade Enhanced Domestic Fund based on their wrongdoing alleged herein.

479.   Stillwater and Essex will fairly and adequately represent the interests of the High-Grade Domestic Fund and the High-Grade Enhanced Domestic Fund, respectively, in enforcing and prosecuting their rights, and have retained counsel competent and experienced in shareholder derivative litigation.

480.   The Domestic Funds are presently in liquidation.  On Saturday, November 17, 2007, BSAM issued a Notice of Dissolution of the High-Grade Enhanced Domestic Fund and, simultaneously therewith, appointed Heis and Milsom of KPMG (Canada) as liquidators thereof.

481.   Upon their appointment, Heis and Milsom, as liquidators, assumed control of the Domestic Funds.  It is thus Heis and Milsom of KPMG who would be required to respond to a demand that they bring the derivative claims against the Bear Stearns Defendants, the Deloitte Defendants and Walkers Defendants described herein.

482.   For the reasons set forth below, demanding that Heis and Milsom bring these derivative claims against the Bear Stearns Defendants, the Deloitte Defendants and/or the Walkers Defendants would be futile, because Heis and Milsom, and their employer KPMG, are neither independent, impartial nor disinterested.

483.    First, Heis and Milson's employer, KPMG, has significant

business and other relationships with BSAM and the other Bear Stearns

Defendants.  Indeed, KPMG was hand-picked by BSAM to serve as liquidators not

only of the Domestic Funds, but also of all the other Funds managed by BSAM,

including the Master Funds and the Overseas Funds.  BSAM's appointment of

KPMG as liquidators of all of these funds it managed makes clear that BSAM

expected that KPMG would do its bidding, and indeed it was an attempt to "ring

fence" BSAM's and the Funds' problems.

484.    Second, KPMG itself faces potential liability based upon the

collapse of the Funds.  KPMG served as auditor of sub-prime lender New Century

– which as has been well publicized, spiraled into bankruptcy in April of 2007

amidst allegations of flagrant financial fraud.  KPMG's work as auditor for New

Century has been widely and fiercely criticized – including in an over 500 page

report prepared by an independent investigator of the circumstances of New

Century's bankruptcy.  Notably, investments in New Century comprised a

significant percentage of the Funds' assets.  Thus, KPMG itself also faces possible

liability in connection with the collapse of the Funds.

485.    There is thus a reasonable doubt that Heis and Milsom and their

employer KPMG could and would exercise independent and disinterested business

judgment in responding to a demand that they bring this derivative claim against

BSAM and the other Defendants. Indeed, their conduct demonstrates that they are anything but independent and disinterested.

486.  As representatives of KPMG have acknowledged, a liquidator has the duty to "take independent control" of the entity in question and ensure that it is liquidated in an orderly manner, maximize realizations for the benefit of its shareholders, and independently examine whether or not any causes of action exist with respect that entity and the circumstances leading to its liquidation. Yet despite the fact that they clearly are aware of and acknowledge these specific duties of a liquidator, as detailed below, the KPMG liquidators have not fulfilled them.

487.  For example, despite the fact that they have been in their positions as liquidators of the Domestic Funds for almost eight months, Heis and Milsom have commenced absolutely no proceeding against any party or entity who worked with, advised, or otherwise performed services for any of the Domestic Funds. Indeed, Heis and Milsom have not even sought discovery of parties potentially responsible for the collapse of the Domestic Funds – for example by issuing subpoenas or similar requests. Their KPMG counterparts who serve as liquidators for the Master and Overseas Funds similarly have failed to take any action to identify and prosecute those persons responsible for the demise of the Funds. This is in sharp contrast to the conduct of other parties (not beholden to

Bear Stearns) such as the Massachusetts Attorney General, who commenced an investigation of BSAM during the Summer of 2007 shortly after the Funds' collapse, or Plaintiffs Varga and Cleghorn, who filed this action within a month of their appointment.

488.   In fact, KPMG has sought to *preclude* any independent investigation of the collapse of the Funds.  Thus, one of the very first actions the liquidators of the Master Funds (namely Simon Whicker and Kristin Beighton of KPMG Cayman) took upon their appointment was to seek to bar any such actions or proceedings aimed at investigating and holding liable those responsible for the collapse of the Master Funds – specifically by having the liquidation of the Funds recognized as foreign main proceeding in the United States.

489.   In August 2007, shortly after their appointment, Whicker and Beighton filed a petition in the Bankruptcy Court in New York to have the liquidation proceedings pending in the Cayman Islands with respect to the Master Funds recognized as "foreign main proceedings" or "foreign nonmain proceedings" pursuant to Chapter 15 of Title 11 of the United States Bankruptcy Code (the "Chapter 15 Petition").  Notably, in the Chapter 15 Petition, Whicker and Beighton sought entry of an order

> (i) Staying execution against the Funds' assets, (ii) prohibiting
> all persons from commencing or continuing any litigation or
> any other proceeding, including, without limitation, appeals,
> mediation or any judicial, quasi-judicial, administrative or

- 187 -

> regulatory action, proceeding or process whatsoever, or taking
> any other actions against or involving [the liquidators], the
> Funds, and their property in the United States, and (iii)
> entrusting the administration or the realization of the Funds to
> the [liquidators].

If they were truly independent and disinterested, clearly Whicker and Beighton and their employer KPMG would not have sought to preclude any and all such suits against or involving the Master Funds, as such suits would likely bring to justice those persons and/or entities responsible for the collapse of the Master Funds. Their swift filing of the Chapter 15 Petition in order to bar any actions arising from the collapse of the Master Funds demonstrates that they – and their employer KPMG – are in fact anything but independent.

490. Further evidence of KPMG's lack of independence was the effort by Whicker and Beighton also to put the liquidation of the Overseas Funds under court supervision – which would then allow KPMG to seek to have the liquidation of the Overseas Funds similarly recognized as foreign main proceeding in the United States – and thereby preclude any litigation arising out of the collapse of the Overseas Funds.

491. Notably, it was only the opposition by Plaintiffs here to this effort by KPMG to place the liquidation of the Overseas Funds under court supervision which stopped Whicker and Beighton from proceeding with this plan. The opposition by Plaintiffs here to the KPMG liquidators' (and BSAM's) effort to

put the liquidation of the Overseas Funds under the supervision of the Cayman

court led to extensive court proceedings and a trial in the Cayman Islands

regarding the circumstances of the appointment of the KPMG liquidators.

Significantly, these proceedings culminated in the removal of the KPMG

liquidators and their replacement by Messrs. Varga and Cleghorn – on the grounds

that, among other things, KPMG's independence was in question.

492.    Thus, in its decision appointing Messrs. Varga and Cleghorn to

replace KPMG as liquidators, the Cayman Court held that: (i) the circumstances of

the Overseas Funds being placed into "voluntary" liquidation by BSAM and its

controlled Board were "clandestine and suspicious;" (ii) KPMG serving as

liquidators for all of the various Funds created a clear conflict of interest, in light

of the fact that the investors in each of the Funds will seek investigation of, and

prosecution of claims based upon, the transactions between them; and (iii) in order

to provide assurance to the investors in the Funds that potential allegations against

BSAM and others relating to the Funds' demise "will be undertaken in an entirely

independent, impartial, and unfettered manner,'" KPMG should be replaced by

Plaintiffs Varga and Cleghorn. Thus, KPMG's independence and disinterestedness

has already been questioned – enough for the Cayman Court to have ordered that

KPMG be removed, and replaced by Messrs. Varga and Cleghorn.

493.    In sum, in light of the fact that:

- 189 -

- KPMG has significant relationships with BSAM and the other Bear Stearns Defendants;

- KPMG was hand-picked by the Bear Stearns Defendants to serve as liquidators for not only the Domestic Funds, but each of the other Funds managed by BSAM;

- KPMG itself faces potential liability in connection with the collapse of the Funds;

- the conduct of KPMG's appointees to date in fact demonstrates their clear lack of independence; and

- a court in the Cayman Islands has already determined that Plaintiffs Varga and Cleghorn, and not KPMG, were the proper parties to represent the interests of the Overseas Funds,

there is significant doubt that Heis and Milsom could and would independently and impartially consider a demand that they bring this derivative claim against the Bear Stearns Defendants, the Deloitte Defendants and/or the Walkers Defendants based on their fiduciary breaches and other acts of misconduct alleged herein. Rather, any such demand would be futile, and Stillwater and Essex should be allowed to proceed with the claims herein derivatively on behalf of the High-Grade Domestic Fund and High-Grade Enhanced Domestic Fund, respectively.

## CLAIMS FOR RELIEF

### AS AND FOR A FIRST CLAIM
### UPON WHICH RELIEF MAY BE GRANTED
**(For violations of Section 10(b) of the Exchange Act and Rule 10b-5
promulgated thereunder by the Liquidators, Stillwater and
Essex against the Bear Stearns Defendants and the Deloitte Defendants)**

494.    Paragraphs 1 through 494 are repeated and incorporated by

reference as though more fully stated herein.

495.    This count is asserted against the Bear Stearns Defendants and

the Deloitte Defendants and is brought by:  (i) Plaintiffs Varga and Cleghorn as

assignees of shares in the High-Grade Enhanced Leverage Overseas Fund

purchased by Essex; (ii) Plaintiff Stillwater in connection with its purchase and

sale of limited partnership interests in the High-Grade Domestic Fund; and (iii)

Plaintiff Essex in connection with its purchase and sale of limited partnership

interests in the High-Grade Enhanced Domestic Fund.

496.    Stillwater made purchases and sales of limited partnership

interests in the High-Grade Domestic Fund on numerous dates between February

2004 through April 2007, including, without limitation, on February 1, 2004,

September 1, 2004, October 1, 2004, November 1, 2004, December 1, 2004,

January 1, 2005, March 1, 2005, April 1, 2005, May 1, 2005, June 1, 2005,

October 1, 2005, November 1, 2005, February 1, 2006, January 1, 2007, February

1, 2007, March 1, 2007 and April 1, 2007.  Essex made purchases and sales of

- 191 -

limited partnership interests and/or shares in the High-Grade Enhanced Funds between February 2007 through their ultimate collapse in 2007, including, without limitation, on February 1, 2007.

497. From January 2004 through the ultimate collapse of the Funds in 2007, the Bear Stearns Defendants and the Deloitte Defendants, by use of the means or instrumentalities of interstate commerce or of the mails, disseminated and/or approved the materially false and misleading statements and representations specified throughout this Amended Complaint.

498. These representations, include, without limitation, representations made by the Bear Stearns Defendants that: (i) the Funds would invest in broadly diversified pools of credit-related investment instruments, including, among other things, favorably risk-rated tranches of CDOs; (ii) at least 90% of all investments would have 'AAA' or at worst 'AA' ratings; (iii) the Funds would have minimal exposure to sub-prime residential mortgages, and that the Bear Stearns Defendants would utilize their substantial, industry-leading risk management expertise and experience to ensure that the Funds were relatively safe, conservative investment vehicles; and (iv) management's estimates of the assets in the Funds' portfolios would be appropriate and made in good faith.

499. Additionally, the Bear Stearns Defendants lied to the Funds' investors, including Stillwater and Essex, in the Spring of 2007, claiming their

investments and value in the Funds was in tact when, in fact, the Management

Defendants acknowledged, in undisclosed communications, between and among

themselves, that the Funds were in free-fall.

500.   The Bear Stearns Defendants had access to detailed listings of

the Funds' holdings and the NAVs on at least a monthly basis, as these reports

were generated internally and the NAVs were supposed to be reported to investors

each month.

501.   These representations further include, without limitation,

representations made by the Deloitte Defendants, and contained in their "clean"

audit opinions for fiscal years 2003, 2004, and 2005, that:  (i) the Funds' financial

statements complied with GAAP and their audits complied with GAAS, when, in

fact, they did not, and (ii) the Funds' financial statements presented fairly, in all

material respects, the financial position of the Funds for fiscal years 2003 through

2005.  The Deloitte Defendants' unqualified audit reports were materially false and

misleading since the Funds' financial statements did not comply with GAAP and

did not present fairly, in all material respects, the financial position of the Funds

for fiscal years 2003 through 2005, and the audits were not conducted in

accordance with GAAS.

502.   The Deloitte Defendants had access to all of the Funds'

financial and other documents when conducting their audit each year, including,

without limitation, detailed listings of the Funds' holdings and the NAVs for each month.

503.   As detailed herein, the Bear Stearns Defendants and the Deloitte Defendants had the motive and the opportunity to commit the fraud alleged herein.

504.   The Bear Stearns Defendants' and the Deloitte Defendants' materially false and misleading representations described throughout this Amended Complaint occurred in connection with the purchase and/or sale of securities. Stillwater and Essex made numerous purchases and sales into and out of the Funds during the period of, and in reasonable reliance on, the Bear Stearns Defendants' and the Deloitte Defendants' fraudulent misrepresentations and omissions. The Bear Stearns Defendants' and the Deloitte Defendants' fraudulent material misrepresentations and omissions also were made in connection with the offer or sale of securities.

505.   Specifically, each fraudulent statement by the Bear Stearns Defendants alleged herein — and each omission of a material fact necessary to prevent another statement made by the Bear Stearns Defendants from being misleading — occurred in furtherance of the Bear Stearns Defendants' continuous and successful attempts to sell interests in the Funds to investors, including Stillwater and Essex.

506.   Additionally, each fraudulent audit opinion issued by the Deloitte Defendants was made in furtherance of the Bear Stearns Defendants' attempts to sell shares of the Funds to investors, including Stillwater and Essex, at inflated values.  Indeed, the Deloitte Defendants not only knew, but intended, that investors, including Stillwater and Essex, would receive and would reasonably rely on the clean audit opinions in making their decisions to purchase interests in the Funds.  In fact, and for this very reason, the Deloitte Defendants addressed each of the clean audit opinions to, among others, the investors in the Funds.

507.   Pursuant to the plan and course of conduct alleged above, each of the Bear Stearns Defendants and the Deloitte Defendants directly or indirectly participated in preparing and/or issuing the statements and documents described herein.

508.   At all relevant times, the Bear Stearns Defendants and the Deloitte Defendants had actual knowledge that the statements and documents complained of throughout this Amended Complaint were materially false and misleading when making the statements and/or omissions set forth herein in that they contained material misrepresentations and failed to disclose material facts necessary in order for the statements made, in light of the circumstances under which they were made, to not be misleading.

509.   In the alternative, the Bear Stearns Defendants and the Deloitte Defendants acted in reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would have revealed the materially false and misleading nature of the statements and documents complained of herein, although such facts were known by and/or readily available to the Bear Stearns Defendants and the Deloitte Defendants.  These misstatements and omissions of the Bear Stearns Defendants and the Deloitte Defendants, thus, were committed knowingly or with reckless disregard for the truth.

510.   Information showing that the Bear Stearns Defendants and the Deloitte Defendants acted knowingly or with reckless disregard for the truth was peculiarly within their respective knowledge and control, and they knew that the investors in the Funds, including Stillwater and Essex, did not and could not have known this information, and were acting on misinformation.  The Bear Stearns Defendants and the Deloitte Defendants thus owed the investors in the Funds, including Stillwater and Essex, a duty to disclose material information to the investors.  Through the course of conduct alleged herein, the Bear Stearns Defendants and the Deloitte Defendants intended to – and did – deceive Stillwater, Essex and other shareholders and investors.

511.   Stillwater and Essex reasonably relied, to their detriment, on the misstatements and omissions of the Bear Stearns Defendants and the Deloitte Defendants.

512.   But for these material misrepresentations and omissions, the investors in the Funds, including Stillwater and Essex, would not have invested in the Funds.

513.   The material misrepresentations and omissions particularized in this Amended Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by investors in the Funds, including Stillwater and Essex.  The misstatements and omissions complained of herein had the effect of, among other things, creating a false expectation that investments in the Funds would be a relatively safe investment, and providing unrealistically positive assessments of the performance of the Funds.  As a result, investors in the Funds, including Stillwater and Essex, invested in the Funds believing that (i) the Funds' financial statements would be prepared in accordance with GAAP, and (ii) the Funds were relatively low-risk, when in fact the Funds were extremely high-risk and designed by the Bear Stearns Defendants as a fee-generating dumping ground for worthless securities, and lost their entire investment when the Bear Stearns Defendants suspended redemptions and the Funds ultimately collapsed.

514.    The Bear Stearns Defendants and the Deloitte Defendants thus violated §10(b) of the 1934 Exchange Act and Rule 10b-5 in that they:

a.    Employed devices, schemes, and artifices to defraud;

b.    Made untrue statements of material facts or omitted to state facts necessary in order to make statements made, in light of the circumstances under which they were made not misleading; and/or

c.    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Stillwater, Essex, and other investors in connection with their investments in the High-Grade Funds in 2003 through 2005 and their investments in the High-Grade Enhanced Funds in 2006 and 2007.

515.    By virtue of the foregoing, each of the Bear Stearns Defendants and the Deloitte Defendants has violated § 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 24010b-5), and is liable for an amount to be determined at trial, but believed to be not less than $1.5 billion.

## AS AND FOR A SECOND CLAIM
## UPON WHICH RELIEF MAY BE GRANTED
### (For violations of Section 20(a) of the Exchange Act by the Liquidators, Stillwater and Essex against Bear Stearns Companies, Bear Stearns Co., the BSAM Directors and the Management Defendants)

516.    Paragraphs 1 through 516 are repeated and incorporated by reference as though more fully stated herein.

517.    This count is asserted against the Bear Stearns Companies, its principal subsidiary, Bear Stearns Co., the BSAM Directors and the Management

Defendants, and is brought by Plaintiffs Varga and Cleghorn as assignees of shares purchased by Essex in the High-Grade Enhanced Overseas Fund, Stillwater in connection with its purchase and sale of shares in the High-Grade Domestic Fund, and Essex in connection with its purchase and sale of shares in the High-Grade Enhanced Domestic Fund.

518.   As set forth in the first claim herein, the Bear Stearns Defendants engaged in deceptive and fraudulent activities in connection with Stillwater's and Essex's purchase and sale of securities in the Funds in violation of Section 10(b) of the Exchange Act.

519.   At all relevant times during the commission of the fraud, the Bear Stearns Companies, Bear Stearns Co., the BSAM Directors and the Management Defendants were asserting control over, and actively participating in, the operations and management of the entities and/or individuals that directly engaged in securities fraud. Notably, the Bear Stearns Companies, Bear Stearns Co., the BSAM Directors and the Management Defendants were all involved in drafting, producing, reviewing, and/or disseminating the false and misleading material misstatements concerning the Funds. They, therefore, are liable as "controlling persons" pursuant to Section 20(a) of the Securities Exchange Act.

520.   Specifically, the Bear Stearns Companies had direct and unfettered control over its wholly-owned subsidiary, BSAM. Likewise, Bear

Stearns Co. also had control over the activities of BSAM, both through its parent, the Bear Stearns Companies, with which it had a common interest, and through Cioffi, who served as a Managing Director of both Bear Stearns Co. and BSAM.

521.   The Bear Stearns Companies and Bear Stearns Co., at all relevant times, participated in and/or were aware of, among others, BSAM's fraudulent activities vis-à-vis the Funds.  In fact, the Bear Stearns Companies and Bear Stearns Co. had an intimate knowledge of the Funds' actual true values through internal corporate documents and communications.  At the same time, they also had access to documents evidencing the securities fraud violations, including, but not limited to, copies of financial reports, press releases and public documents that contained the false and misleading information previously described herein. The Bear Stearns Companies and Bear Stearns Co., therefore, at the very least were aware of the securities fraud, or were reckless in not being so aware.

522.   Although they had the ability to stop and/or expose the fraud, the Bear Stearns Companies and Bear Stearns Co. did not do so, motivated by, among other things, the desire to:  (i) bolster, support, or increase other aspects of the Bear Stearns' financial enterprise; (ii) prevent any negative impact upon the enterprise, including exposing its wrongdoing; (iii) engage in profitable insider transactions; and (iv) continue selling securities of other Bear Stearns-related entities at steady prices.  Thus, the Bear Stearns Companies and Bear Stearns Co.

knowingly or recklessly allowed the commission of the fraud for the benefit of the enterprise at large.

523.   The BSAM Directors and the Management Defendants all held positions as directors, officers, and/or board members of one or more of the Bear Stearns entities and all held management positions with responsibility for the management of the investment portfolios of one or more of the Funds.  As members of senior management of the Bear Stearns entities, and in their capacities as officers and managers of the Funds, the BSAM Directors and the Management Defendants, at all relevant times, were intimately involved in, and knowledgeable of, the day-to-day activities of the Funds, including the securities law violations. The BSAM Directors and the Management Defendants, therefore, knew of these violations and/or recklessly disregarded their occurrence, and failed to stop or expose the commission of the securities fraud.

524.   Because their compensation and reputation both were directly tied to the performance of the Funds, the BSAM Directors and the Management Defendants allowed the occurrence of the fraud.  In particular, BSAM Directors and the Management Defendants received larger compensation and advisory and incentive fees, and increased the value of their holding in Bear Stearns entities based on the Funds' performance.  Thus, the higher they inflated the Funds'

NAVs, the higher their bonuses, incentive and advisory fees and stock options would be.

525.   As a result of their control over BSAM, the Bear Stearns Companies, Bear Stearns Co., the BSAM Directors and/or the Management Defendants have directly or proximately caused Stillwater, Essex and other investors substantial damages, including the loss of the entirety of their investments in the Funds.  But for these Defendants' wrongdoing, Stillwater and Essex would not have invested in the Funds.

526.   By virtue of the foregoing, the Bear Stearns Companies, Bear Stearns Co., the BSAM Directors and/or the Management Defendants have violated Section 20(a) of the Securities Exchange Act (15 U.S.C. §78t) and are jointly and severally liable in an amount to be determined at trial, but believed to be not less than $1.5 billion.

### AS AND FOR A THIRD CLAIM
### UPON WHICH RELIEF MAY BE GRANTED
**(Common Law Fraud Brought by the Liquidators,
Stillwater and Essex against the Bear Stearns Defendants)**

527.   Paragraphs 1 through 527 are repeated and incorporated by reference as though more fully stated herein.

528.   In creating and managing the High-Grade and High-Grade Enhanced Funds, the Bear Stearns Defendants knowingly engaged in a series of

material misrepresentations and schemes and artifices to defraud, as more fully set forth above.

529. Specifically, from January 2004 through the ultimate collapse of the Funds in 2007, the Bear Stearns Defendants disseminated and/or approved the materially false and misleading statements and representations specified throughout this Amended Complaint including, without limitation, representations that (i) the Funds would invest in broadly diversified pools of credit-related investment instruments, including, among other things, favorably risk-rated tranches of CDOs; (ii) at least 90% of all investments would have 'AAA' or at worst 'AA' ratings; (iii) the Funds would have minimal exposure to sub-prime residential mortgages, and that the Bear Stearns Defendants would utilize their substantial, industry-leading risk management expertise and experience to ensure that the Funds were relatively safe, conservative investment vehicles; and (iv) management's estimates of the assets in the Funds' portfolios would be appropriate and made in good faith.

530. In addition, the Bear Stearns Defendants lied to the Funds' investors in the Spring of 2007, claiming their investments and value in the Funds was in tact when, in fact, the Management Defendants acknowledged in undisclosed communications between and among themselves that the Funds were in free fall.

531.    The Bear Stearns Defendants also dissuaded investors from redeeming their investments in the Funds through their fraudulent conduct and misrepresentations, which is detailed above.

532.    At all times during the pendency of these misrepresentations and schemes, the Funds had independent parties (including, without limitation, the investors in the Funds) with relevant decision making and/or other power who were not aware of, nor complicit in, the Bear Stearns Defendants' fraudulent scheme, and such parties, had they known the truth, would have taken immediate steps to stop it.

533.    In reliance upon the integrity of the market, and what the Bear Stearns Defendants made the Funds appear to be, these independent decision makers refrained from taking action until a time when it was too late, and the Funds were driven into liquidation as a direct and proximate cause of the Bear Stearns Defendants' misconduct. Because these independent decision makers did not have, nor could they reasonably have acquired, knowledge of the Bear Stearns Defendants' fraudulent scheme, they took no timely action, as a consequence of which, the Bear Stearns Defendants, individually and collectively, were able to continue the fraud.

534. Pursuant to the plan and course of conduct alleged above, each of the Bear Stearns Defendants directly or indirectly participated in preparing and/or issuing the statements and documents described herein.

535. At all relevant times, the Bear Stearns Defendants had actual knowledge that the statements and documents complained of throughout this Amended Complaint were materially false and misleading by making the statements and/or omissions set forth herein in that they contained material misrepresentations and failed to disclose material facts necessary in order for the statements made, in light of the circumstances under which they were made, to not be misleading.

536. The Bear Stearns Defendants had access to detailed listings of the Funds' holdings and the NAVs on at least a monthly basis, as these reports were generated internally and the NAVs were supposed to be reported to investors each month.

537. In the alternative, the Bear Stearns Defendants acted in reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would have revealed the materially false and misleading nature of the statements and documents complained of herein, although such facts were known by and/or readily available to the Bear Stearns Defendants. These misstatements

and omissions of the Bear Stearns Defendants were thus committed knowingly or with reckless disregard for the truth.

538.   As detailed herein, the Bear Stearns Defendants had the motive and the opportunity to commit the fraud alleged herein.

539.   Information showing that the Bear Stearns Defendants acted knowingly or with reckless disregard for the truth was peculiarly within the Bear Stearns Defendants' knowledge and control, and they knew that the investors in the Funds did not and could not have known this information, and were acting on misinformation.  They thus owed the investors in the Funds a duty to disclose material information to them.  Through the course of conduct alleged herein, the Bear Stearns Defendants intended to and did deceive the Funds' investors.

540.   The investors in the Funds reasonably relied, to their detriment, on the misstatements and omissions of the Bear Stearns Defendants.

541.   But for these misrepresentations and omissions, the investors in the Funds would not have invested in the Funds and/or would have sought redemption of their investments or taken other actions at a time when they could have recovered at least some value.

542.   The material misrepresentations and omissions particularized in this Amended Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by the Funds' investors.  The

misstatements and omissions complained of herein had the effect of, among other things, creating a false expectation that investments in the Funds would be a relatively safe investment, and providing unrealistically positive assessments of the performance of the Funds.  As a result, investors invested in the Funds believing they were relatively low-risk, when in fact the Funds were extremely high-risk and designed by the Bear Stearns Defendants as a fee-generating dumping ground for worthless securities, and lost their entire investment when the Bear Stearns Defendants suspended redemptions and the Funds ultimately collapsed.

543.    As a further consequence of the foregoing, the Bear Stearns Defendants are jointly and severally liable to the Funds, and their shareholders and investors, as the direct and foreseeable victims of the aforesaid fraudulent scheme, in an amount to be determined at trial, but believed to be not less than $1.5 billion.

544.    The conduct of the Bear Stearns Defendants' in disregarding their duties to, and the interests of, the Funds was purposeful, knowing, malicious, and without regard for the rights and interests of the Funds, and departed in the extreme from the norms expected of them.  Accordingly, the Bear Stearns Defendants should, in addition, be liable for punitive damages in an amount to be determined at trial.

## AS AND FOR A FOURTH CLAIM
## <u>UPON WHICH RELIEF MAY BE GRANTED</u>
### (Breach of Fiduciary Duty brought by the Liquidators, Stillwater and Essex against the Bear Stearns Defendants)

545.   Paragraphs 1 through 545 are repeated and incorporated by reference as though more fully stated herein.

546.   As fiduciaries, the control persons of fiduciaries, or persons who assumed for themselves the role in fact of fiduciaries, the Bear Stearns Defendants owed the Funds uncompromising fiduciary duties of care, skill, full and candid disclosure, loyalty and the highest good faith, integrity and fair dealing.

547.   The Bear Stearns Defendants violated their duties, among other ways, by:  (i) structuring the Funds so as not to be able to function in the very marketplace in which they intended the Funds to participate; (ii) mismanaging the Funds and failing to provide adequate managerial oversight and risk management; (iii) causing the Funds to engage in a pattern of misrepresentations and deceptive conduct; and (iv) placing their own interests ahead of the interests of the Funds for which they were fiduciaries.

548.   As a direct and proximate result of the Bear Stearns Defendants' wrongful conduct, the Funds suffered damages in an amount to be determined at trial, but believed to be not less than $1.5 billion, for which the Bear Stearns Defendants are jointly and severally liable to Plaintiffs.

549.   The conduct of the Bear Stearns Defendants in disregarding their duties to, and the interests of, the Funds was purposeful, knowing, malicious, and without regard for the rights and interests of the Funds and departed in the extreme from the norms expected of fiduciaries.  Accordingly, the Bear Stearns Defendants should, in addition, be liable for punitive damages in an amount to be determined at trial.

### AS AND FOR A FIFTH CLAIM
### UPON WHICH RELIEF MAY BE GRANTED
### (Breach of Contract Brought by the
### Liquidators, Stillwater and Essex against BSAM)

550.   Paragraphs 1 through 550 are repeated and incorporated by reference as though more fully stated herein.

551.   Defendant BSAM owed contractual obligations to each of the Funds as Investment Manager to the Funds pursuant to BSAM's professional management and/or service agreement with each of the Funds.

552.   Pursuant to those agreements, BSAM was obligated to provide the Funds with accurate and reasonable customary management advice and services.

553.   BSAM breached its contractual obligations to provide such management advice and services when it engaged in, and failed to advise the Funds of, the deceptive and improper practices engaged in by the Bear Stearns Defendants vis-à-vis the Funds, as outlined herein.

- 209 -

554.   While BSAM breached its obligations to the Funds, the Funds fulfilled their contractual duties by paying substantial fees to BSAM.

555.   As a direct and proximate result of BSAM's breaches of its contractual obligations to the Funds, the Funds suffered damages in an amount to be determined at trial, but believed to be not less than $1.5 billion.

### AS AND FOR A SIXTH CLAIM
### UPON WHICH RELIEF MAY BE GRANTED
**(Aiding and Abetting Breach of Fiduciary Duty
Brought by the Liquidators, Stillwater and
Essex against the Bear Stearns Defendants)**

556.   Paragraphs 1 through 556 are repeated and incorporated by reference as though more fully stated herein.

557.   The Bear Stearns Defendants knew that, in addition to themselves, certain other persons owed fiduciary duties to each of the Funds. These other persons include, but are not limited to, Walkers FS, Lennon and Wilson-Clark.

558.   The Bear Stearns Defendants knowingly procured the breaches of these other persons' fiduciary duties to the Funds without privilege or justification, by use of their control positions and power with these other persons. Furthermore, the Bear Stearns Defendants knowingly provided substantial assistance to the breaches, and derived a substantial benefit therefrom.

559.   But for the Bear Stearns Defendants' actions in inducing, encouraging, causing, and providing substantial assistance to the breaches of fiduciary duty committed by these other individuals or entities, those duties would not have been breached.

560.   As a direct and proximate result of the Bear Stearns Defendants' wrongful conduct, the Funds suffered damages in an amount to be determined at trial, but believed to be not less than $1.5 billion, for which the Bear Stearns Defendants are jointly and severally liable to Plaintiffs.

561.   The conduct of the Bear Stearns Defendants in disregarding their duties to, and the interests of, the Funds was purposeful, knowing, malicious, and without regard for the rights and interests of the Funds and departed in the extreme from the norms expected of them.  Accordingly, the Bear Stearns Defendants should, in addition, be liable for punitive damages in an amount to be determined at trial.

### AS AND FOR A SEVENTH CLAIM
### UPON WHICH RELIEF MAY BE GRANTED
**(Aiding and Abetting Fraud Brought by the Liquidators,
Stillwater and Essex against the Bear Stearns Defendants)**

562.   Paragraphs 1 through 562 are repeated and incorporated by reference as though more fully stated herein.

563.   As discussed herein, the Deloitte Defendants committed numerous acts of fraud in relation to the Funds, including by falsely representing

that they had conducted their audits of the Funds in accordance with GAAS and that the Funds' financial statements complied with GAAP, which statements were false.

564.   The Bear Stearns Defendants knew that the Deloitte Defendants' unqualified audit opinions were false and misleading.

565.   By failing to fulfill their obligations to the Funds as set forth herein, the Bear Stearns Defendants provided substantial assistance to the Deloitte Defendants in the commission of their fraud.

566.   As a result, the Bear Stearns Defendants are liable for aiding and abetting the Deloitte Defendants' fraud.

567.   As a direct and proximate result of the Bear Stearns Defendants' actions, the Funds suffered damages in an amount to be determined at trial, but which are alleged to be no less than $1.5 billion, for which the Bear Stearns Defendants are jointly and severally liable.

568.   The conduct of the Bear Stearns Defendants in disregarding their duties to, and the interests of, the Funds was purposeful, knowing, malicious, and without regard for the rights and interests of the Funds and departed in the extreme from the norms expected of them. Accordingly, the Bear Stearns Defendants should, in addition, be liable for punitive damages in an amount to be determined at trial.

## AS AND FOR AN EIGHTH CLAIM
## <u>UPON WHICH RELIEF MAY BE GRANTED</u>
### (Gross Negligence and Negligence Brought by the
### Liquidators, Stillwater and Essex against the Bear Stearns Defendants)

569.   Paragraphs 1 through 569 are repeated and incorporated by reference as though more fully stated herein.

570.   At all relevant times, the Bear Stearns Defendants owed the Funds a duty to exercise reasonable care, skill and diligence in performing their respective services.

571.   The pattern and practice of deceptive conduct engaged in by the Bear Stearns Defendants outlined herein violated the duty of care owed to the Funds.  The actions of the Bear Stearns Defendants as set forth throughout this Amended Complaint, if not knowing and purposeful, were at least grossly negligent or negligent and in derogation of the duty that they owed to the Funds.

572.   As a direct and proximate result of the Bear Stearns Defendants' negligent or grossly negligent conduct, the Funds suffered damages in an amount to be determined at trial, but which are believed to be not less than $1.5 billion, for which the Bear Stearns Defendants are jointly and severally liable to Plaintiffs.

573.   The conduct of the Bear Stearns Defendants in disregarding their duties to, and the interests of, the Funds was purposeful, knowing, malicious, and without regard for the rights and interests of the Funds and departed in the

- 213 -

extreme from the norms expected of them. Accordingly, the Bear Stearns

Defendants should, in addition, be liable for punitive damages in an amount to be

determined at trial.

### AS AND FOR A NINTH CLAIM
### UPON WHICH RELIEF MAY BE GRANTED
**(Common Law Fraud Brought by the
Liquidators, Stillwater and Essex against the Deloitte Defendants)**

574.   Paragraphs 1 through 574 are repeated and incorporated by

reference as though more fully stated herein.

575.   The Deloitte Defendants falsely represented that they had

conducted their 2003 through 2006 fiscal year audits for the funds in accordance

with GAAS and that the Funds' financial statements complied with GAAP.

576.   The Deloitte Defendants knew, should have known, or were

recklessly indifferent to the fact that their statements were false, and that the

Funds' financial statements that the Deloitte Defendants audited were materially

false and misleading, because the financial statements created an inaccurate picture

of the Funds' financial health and stability, and allowed the Funds to continue to

attract and/or retain investors. Among other things, as detailed herein, the Fund's

financial statements were inaccurate due to the Bear Stearns Defendants' improper

inflation of the NAVs presented in the Funds' financial statements, and the failure

to disclose the lack of approvals for a majority of related party transactions.

577.   The Deloitte Defendants had access to all of the Funds' financial and other documents when conducting their audit each year, including, without limitation, detailed listings of the Funds' holdings and the NAVs for each month.

578.   As detailed herein, the Deloitte Defendants had the motive and the opportunity to commit the fraud alleged herein.

579.   Information showing that the Deloitte Defendants acted knowingly or with reckless disregard for the truth was peculiarly within the Deloitte Defendants' knowledge and control, and they knew that the investors in the Funds did not and could not have known this information, and were acting on misinformation.  They thus owed investors in the Funds a duty to disclose material information to them.  Through the course of conduct alleged herein, the Deloitte Defendants intended to and did deceive the Funds' investors.

580.   The Deloitte Defendants knew and intended that the Funds and their investors would rely on the Deloitte Defendants' statements in connection with the financial statements for each fiscal year between and including 2003 and 2006 that the Deloitte Defendants audited when making decisions in connection with their investments in the Funds.  The investors reasonably did rely on these false statements by the Deloitte Defendants, to their detriment.

581.   But for the Deloitte Defendants' material misrepresentations, the investors would not have invested or else would not have remained invested in the Funds, and could have taken action and recovered a substantial portion, if not all, of their investments.

582.   In particular, proper audits by the Deloitte Defendants reflecting the impropriety of the manager marks and disclosing the lack of appropriate approvals for related party transactions, or in the alternative an inability of the Deloitte Defendants to certify as a whole the financial statements of the Funds and Master Funds, would have been a red flag to the shareholders and the investment community, and would have resulted in the termination of the Bear Stearns Defendants' fraudulent scheme at a point in time before the Funds lost all of their value.

583.   As a direct and proximate result of the Deloitte Defendants' actions, the Funds and their investors were injured and suffered damages in an amount to be proven at trial, but which are believed to be not less than $1.5 billion, for which the Deloitte Defendants are jointly and severally liable.

584.   The conduct of the Deloitte Defendants in disregarding their duties to, and the interests of, the Funds was purposeful, knowing, malicious, and without regard for the rights and interests of the Funds and departed in the extreme from the norms expected of professionals.  Accordingly, the Deloitte Defendants

should, in addition, be liable for punitive damages in an amount to be determined at trial.

**AS AND FOR A TENTH CLAIM**
**<u>UPON WHICH RELIEF MAY BE GRANTED</u>**
**(Professional Malpractice, Gross Negligence and Negligence Brought by the Liquidators, Stillwater and Essex against the Deloitte Defendants)**

585.    Paragraphs 1 through 585 are repeated and incorporated by reference as though more fully stated herein.

586.    At all times relevant hereto, the Deloitte Defendants were the auditors for the High-Grade and High-Grade Enhanced Funds and owed contractual and other duties to the Funds.

587.    At all times relevant hereto, the Deloitte Defendants also were the auditors for the Master Funds, and prepared audit reports knowing that a small, discreet group – the shareholders of the High-Grade and High-Grade Enhanced Funds – would rely upon those reports, and that the reports were being prepared with the sole aim and purpose of being utilized by the Bear Stearns Defendants to secure and retain investments from the Funds' investors.  The Deloitte Defendants also communicated directly with the Funds' investors their understanding and agreement that the investors could rely upon the Deloitte Defendants' audits of the Funds and the Master Funds for this purpose.

588.    The Deloitte Defendants had a duty to use such skill, prudence and diligence as accountants and auditors of ordinary skill and capacity commonly

- 217 -

possess and exercise in the performance of such services for or on behalf of entities such as the Funds.

589. For the reasons set forth herein, the Deloitte Defendants failed to use the requisite skill, prudence and diligence in the accounting and auditing services they provided to the Funds, and the Deloitte Defendants rendered their services in violation of GAAS. Indeed, the Deloitte Defendants' conduct was of such a high departure from professional standards as to indicate gross negligence on the part of the Deloitte Defendants.

590. But for the Deloitte Defendants' faulty audits, the Funds would not have suffered the damage that occurred. In particular, without limitation, proper audits by the Deloitte Defendants reflecting the impropriety of the manager marks, or in the alternative an inability of the Deloitte Defendants to certify as a whole the financial statements of the Funds and Master Funds, would have been a red flag to the shareholders and the investment community, and would have resulted in the investors declining to invest or the termination of the Bear Stearns Defendants' fraudulent scheme at a point in time before the Funds lost all of their value.

591. As a direct and proximate result of the Deloitte Defendants' wrongful conduct, the Funds suffered damages in an amount to be determined at

trial, but which are believed to be not less than $1.5 billion, for which the Deloitte

Defendants are jointly and severally liable.

592.   The conduct of the Deloitte Defendants in disregarding their

duties to, and the interests of, the Funds was purposeful, knowing, malicious, and

without regard for the rights and interests of the Funds and departed in the extreme

from the norms expected of professionals.  Accordingly, the Deloitte Defendants

should, in addition, be liable for punitive damages in an amount to be determined

at trial.

**AS AND FOR A ELEVENTH CLAIM**
**UPON WHICH RELIEF MAY BE GRANTED**
**(Breach of Contract Brought by the**
**Liquidators, Stillwater and Essex Against the Deloitte Defendants)**

593.   Paragraphs 1 through 593 are repeated and incorporated by

reference as though more fully stated herein.

594.   The Deloitte Defendants had a contractual relationship with the

Funds, namely their engagement letter, to conduct appropriate audits of the Funds.

595.   Pursuant to the engagement letter, the Deloitte Defendants were

required to provide accounting and auditing services to the Funds in consideration

for substantial fees from the Funds.

596.   The Deloitte Defendants had a contractual obligation to, among

other things, (i) conduct their audits in accordance with GAAS; (ii) plan and

perform their audits to obtain reasonable assurance about whether the Funds'

- 219 -

financial statements conformed with GAAP; (iii) examine evidence supporting the amounts and disclosures in the Funds' financial statements; (iv) assess the accounting principles used by the Bear Stearns Defendants; (v) assess significant accounting estimates by the Bear Stearns Defendants; and (vi) evaluate the overall presentation of the Funds' financial statements.

597.    Indeed, in their audit reports for each fiscal year, the Deloitte Defendants represented:

> We conducted out audit[s] in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misrepresentation. An audit includes consideration of internal control over financial reporting as a basis or designing audit procedures that are appropriate in the circumstances … An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

598.    Because of the Deloitte Defendants' acts and omissions set forth above, the Deloitte Defendants failed to meet the standards imposed by GAAS and their contract, and as a result failed to advise the Funds that their financial statements were not prepared in accordance with GAAP.

599.   The Deloitte Defendants failed to exercise reasonable care or competence in providing the alleged professional accounting and auditing services to the Funds.

600.   The Deloitte Defendants also failed to meet other standards imposed by the AICPA.

601.   By these acts and omissions, the Deloitte Defendants breached their contractual obligations to their clients, the Funds.

602.   While the Deloitte Defendants breached their obligations to the Funds, the Funds fulfilled their contractual duties by providing substantial fees to the Deloitte Defendants.

603.   As a direct and proximate result of the Deloitte Defendants' breaches, the Funds have suffered damages in an amount to be proven at trial, but which are believed to be not less than $1.5 billion, for which the Deloitte Defendants are jointly and severally liable to Plaintiffs.

### AS AND FOR AN TWELFTH CLAIM
### UPON WHICH RELIEF MAY BE GRANTED
(Aiding and Abetting Fraud Brought by the
Liquidators, Stillwater and Essex Against the Deloitte Defendants)

604.   Paragraphs 1 through 604 are repeated and incorporated by reference as though more fully stated herein.

605.   As discussed above, the Bear Stearns Defendants committed numerous acts of fraud in relation to the Funds, including by engaging in the manager marks scheme described above.

606.   By failing to fulfill their obligations to the Funds, particularly by failing to conduct their audits in accordance with GAAS and failing properly to evaluate the manager marks, the Deloitte Defendants provided substantial assistance to the Bear Stearns Defendants in the commission of their frauds, as discussed above.

607.   As a result, the Deloitte Defendants are liable for aiding and abetting the Bear Stearns Defendants' fraud.

608.   As a direct and proximate result of the Deloitte Defendants' breaches of their obligations to the Funds, the Funds suffered damages in an amount to be determined at trial, but which are believed to be not less than $1.5 billion, for which the Deloitte Defendants are jointly and severally liable.

609.   The conduct of the Deloitte Defendants in disregarding their duties to, and the interests of, the Funds was purposeful, knowing, malicious, and without regard for the rights and interests of the Funds and departed in the extreme from the norms expected of professionals.  Accordingly, the Deloitte Defendants should, in addition, be liable for punitive damages in an amount to be determined at trial.

## AS AND FOR A THIRTEENTH CLAIM
## <u>UPON WHICH RELIEF MAY BE GRANTED</u>
### (Aiding and Abetting Breach of Fiduciary Duty Brought by
### the Liquidators, Stillwater and Essex Against the Deloitte Defendants)

610.   Paragraphs 1 through 610 are repeated and incorporated by reference as though more fully stated herein.

611.   As fiduciaries, the control persons of fiduciaries, or persons who assumed for themselves the role in fact of fiduciaries, the Bear Stearns Defendants and the Walkers Defendants owed the Funds uncompromising fiduciary duties of care, skill, full and candid disclosure, loyalty and the highest good faith, integrity and fair dealing.

612.   As the supposed independent auditor of the Funds (and the Master Funds), the Deloitte Defendants knew or should have known that the Bear Stearns Defendants and the Walkers Defendants owed fiduciary duties, among other things, as investment manager and/or directors and officers of the Funds.

613.   The Bear Stearns Defendants breached their fiduciary duties to the Funds by, among other things, engaging in the manager marks scheme described above and preparing financial statements which did not conform with GAAP.  The Walkers Defendants breached their fiduciary duties to the Funds by, among other things, failing on at least many hundreds, if not thousands, of occasions to review related party transactions between the Funds and BSAM and other Bear Stearns entities for fairness.

614.   By failing, among other things, to analyze properly the manager marks and related party transactions, and by issuing clean audit opinions on the Funds' financial statements for the each fiscal year between and including 2003 and 2006, the Deloitte Defendants provided substantial assistance to the Bear Stearns Defendants and Walkers Defendants in committing breaches of their fiduciary duties.

615.   As a direct and proximate result of the wrongs by the Deloitte Defendants, the Funds suffered damages in an amount to be determined at trial, but which are believed to be not less than $1.5 billion, for which the Deloitte Defendants are jointly and severally liable.

616.   The conduct of the Deloitte Defendants in disregarding their duties to, and the interests of, the Funds was purposeful, knowing, malicious, and without regard for the rights and interests of the Funds and departed in the extreme from the norms expected of professionals.  Accordingly, the Deloitte Defendants should, in addition, be liable for punitive damages in an amount to be determined at trial.

### AS AND FOR A FOURTEENTH CLAIM
### UPON WHICH RELIEF MAY BE GRANTED
**(Breach of Fiduciary Duty Brought by the
Liquidators, Stillwater and Essex Against the Walkers Defendants)**

617.   Paragraphs 1 through 617 are repeated and incorporated by reference as though more fully stated herein.

618. As independent directors of the Overseas Funds, Lennon and Wilson-Clark owed the Overseas Funds a fiduciary duty of care, skill and loyalty. In addition, as independent directors of the Master Funds (the shares of which were the primary investments and/or assets of the Overseas and Domestic Funds), Lennon and Wilson-Clarke owed the Overseas and Domestic Funds a fiduciary duty of care, skill and loyalty. Furthermore, based on the fact that as represented in the COM of the Overseas and Domestic Funds, Lennon and Wilson-Clarke were charged with reviewing all related party transactions between the Funds and BSAM or other Bear entities, Lennon and Wilson-Clarke owed the Funds a fiduciary duty of care, skill loyalty.

619. Lennon and Wilson-Clarke breached the fiduciary duties they owed the Funds in a number of ways. Specifically, Lennon and Wilson-Clarke: (i) failed to ensure that BSAM was following the stated investment guidelines for the Overseas Funds; (ii) failed to in any way monitor, investigate or critically assess the Bear Stearns Defendants' "manager marks" valuations; (iii) failed to independently assess the audits provided by Deloitte; (iv) failed on hundreds, if not thousands of occasions, to fulfill their duty of reviewing related party transactions between the Funds and BSAM and other Bear Stearns entities for fairness; and (v) participated in the scheme with BSAM and the other Bear Stearns Defendants to

- 225 -

thwart the Removal Petitions filed by the Petitioning Investor, by forcing the Funds

into liquidation, and into the hands of their lackeys, KPMG.

620.   As Lennon and Wilson-Clarke's employer, Walkers FS is

responsible for the fiduciary breaches by them described above, which occurred in

the course of their employment at Walkers FS.

621.   As a direct and proximate result of these fiduciary breaches by

the Walkers Defendants, the Funds suffered damages in an amount to be

determined at trial, but which are believed to be not less than $1.5 billion, for

which the Walkers Defendants are jointly and severally liable to Plaintiffs.

622.   Moreover, the conduct of Lennon, Wilson-Clarke and Walkers

FS, in flagrantly disregarding their duties to, and the interests of, the Funds was

willful, purposeful, knowing, malicious, and without regard for the rights and

interests of the Funds and departed in the extreme from the norms expected of

fiduciaries.  Accordingly, Lennon, Wilson-Clarke and Walkers FS should, in

addition, be liable for punitive damages in an amount to be determined at trial.

### AS AND FOR A FIFTEENTH CLAIM
### UPON WHICH RELIEF MAY BE GRANTED
**(Aiding and Abetting Fraud Brought by the Liquidators,
Stillwater and Essex Against the Walkers Defendants)**

623.   Paragraphs 1 through 623 are repeated and incorporated by

reference as though more fully stated herein.

624.   As discussed above, the Bear Stearns Defendants and the Deloitte Defendants committed numerous acts of fraud in relation to the Funds, including by (i) failing to adhere to the investment guidelines set forth in the COM and their statements to investors; (ii) engaging in or approving the manager marks scheme described above; (iii) engaging in or approving the hundreds, if not thousands of related party transactions described above which unfairly benefitted BSAM to the detriment of the Funds, and/or (iv) outright lying to the investors of the Funds in the Spring of 2007, claiming their value was intact, when in fact, as Cioffi, Tannin and McGarrigal acknowledged in undisclosed correspondence amongst themselves, the Funds were in free fall.

625.   By failing to fulfill their fiduciary duties to the Funds as described herein, Lennon, Wilson-Clarke provided substantial assistance to the Bear Stearns Defendants and the Deloitte Defendants in the commission of their frauds discussed above.

626.   As Lennon and Wilson-Clarke's employer, Walkers FS is responsible for the breaches by them described above, which occurred in the course of their employment with Walkers FS.

627.   As a direct and proximate result of these breaches by Lennon, Wilson-Clarke, and Walkers FS, the Funds suffered damages in an amount to be

determined at trial, but which are believed to be not less than $1.5 billion, for which the Walkers Defendants are jointly and severally liable to Plaintiffs.

628.   Moreover, the conduct of Lennon, Wilson-Clarke and Walkers FS in flagrantly disregarding their duties to, and the interests of, the Funds was willful, purposeful, knowing, malicious, and without regard for the rights and interests of the Funds and departed in the extreme from the norms expected of fiduciaries.  Accordingly, Lennon, Wilson-Clarke and Walkers FS should, in addition, be liable for punitive damages in an amount to be determined at trial.

## IN AND FOR A SIXTEENTH CLAIM
## UPON WHICH RELIEF MAY BE GRANTED
### (Aiding and Abetting Breach of Fiduciary Duty Brought by the Liquidators, Stillwater and Essex Against the Walkers Defendants)

629.   Paragraphs 1 through 629 are repeated and incorporated by reference as though more fully stated herein.

630.   As fiduciaries, the control persons of fiduciaries, or persons who assumed for themselves the role in fact of fiduciaries, the Bear Stearns Defendants owed the Funds uncompromising fiduciary duties of care, skill, full and candid disclosure, loyalty and the highest good faith, integrity and fair dealing.

631.   As directors of the Overseas Funds (and the Master Funds), Lennon and Wilson-Clarke knew or should have known that the Bear Stearns Defendants owed fiduciary duties to the Funds.

632.    The Bear Stearns Defendants breached their fiduciary duties to the Funds by, among other things (i) failing to adhere to the investment guidelines set forth in the COM and their statements to investors; (ii) engaging in the manager marks scheme described above; (iii) engaging in the hundreds, if not thousands of related party transactions described above which unfairly benefitted the Bear Stearns Defendants to the detriment of the Funds; (iv) lying to the investors of the Funds in the Spring of 2007, claiming their value was intact when, in fact, as Cioffi, Tannin and McGarrigal acknowledged in undisclosed correspondence amongst themselves, the Funds were in free fall; and (v) engaging in the scheme described above to thwart the Removal Petitions served by the Petitioning Investor, by putting the Funds into liquidation.

633.    By their conduct alleged herein, the Walkers Defendants provided substantial assistance to the Bear Stearns Defendants in committing their numerous breaches of duty.

634.    As a direct and proximate result of these wrongs by Lennon, Wilson-Clarke, and Walkers FS, the Funds suffered damages in an amount to be determined at trial, but which are believed to be not less than $1.5 billion, for which the Walkers Defendants are jointly and severally liable to the Plaintiffs..

635.    Moreover, the conduct of the Walkers Defendants in disregarding their duties to, and the interests of, the Funds was willful, purposeful,

- 229 -

knowing, malicious, and without regard for the rights and interests of the Funds

and departed in the extreme from the norms expected of fiduciaries. Accordingly,

the Walkers Defendants should, in addition, be liable for punitive damages in an

amount to be determined at trial.

## AS AND FOR A SEVENTEENTH CLAIM
## UPON WHICH RELIEF MAY BE GRANTED
### (Unjust Enrichment Brought by
### the Liquidators, Stillwater and Essex against all Defendants)

636.    Paragraphs 1 through 636 are repeated and incorporated by

reference as though more fully stated herein.

637.    As a result of the fraudulent and improper scheme described

above and participated in by all of the Defendants, the High-Grade and High-Grade

Enhanced Funds have been rendered worthless, yet Defendants, individually and

collectively, have reaped substantial fees and bonuses.

638.    Defendants have therefore been unjustly enriched and should be

forced to disgorge to the Plaintiffs an amount to be determined at trial.

## JURY TRIAL DEMAND

639.    Plaintiffs demand a trial by jury on each issue triable thereby.

WHEREFORE, Plaintiffs demand judgment:

A.    on the First Cause of Action, for damages in an amount to be determined at trial, but not less than $1.5 billion, jointly and severally, against the Bear Stearns Defendants and the Deloitte Defendants;

B.    on the Second Cause of Action, for damages in an amount to be determined at trial, but not less than $1.5 billion, jointly and severally, against Bear Stearns Companies, Bear Stearns Co., the BSAM Directors and the Management Defendants;

C.    on the Third Cause of Action, for damages in an amount to be determined at trial, but not less than $1.5 billion, jointly and severally, against the Bear Stearns Defendants, together with punitive damages;

D.    on the Fourth Cause of Action, for damages in an amount to be determined at trial, but not less than $1.5 billion, jointly and severally, against the Bear Stearns Defendants, together with punitive damages;

E.    on the Fifth Cause of Action, for damages in an amount to be determined at trial, but not less than $1.5 billion, against BSAM;

F.    on the Sixth Cause of Action, for damages in an amount to be determined at trial, but not less than $1.5 billion, jointly and severally, against the Bear Stearns Defendants, together with punitive damages;

G.    on the Seventh Cause of Action, for damages in an amount to be determined at trial, but not less than $1.5 billion, jointly and severally, against the Bear Stearns Defendants, together with punitive damages;

H.    on the Eighth Cause of Action, for damages in an amount to be determined at trial, but not less than $1.5 billion, jointly and severally, against the Bear Stearns Defendants, together with punitive damages;

I.    on the Ninth Cause of Action, for damages in an amount to be determined at trial, but not less than $1.5 billion, jointly and severally, against the Deloitte Defendants, together with punitive damages;

J.    on the Tenth Cause of Action, for damages in an amount to be determined at trial, but not less than $1.5 billion, against the Deloitte Defendants, jointly and severally, together with punitive damages;

K.    on the Eleventh Cause of Action, for damages in an amount to be determined at trial, but not less than $1.5 billion, jointly and severally, against the Deloitte Defendants;

L.    on the Twelfth Cause of Action, for damages in an amount to be determined at trial, but not less than $1.5 billion, jointly and severally, against the Deloitte Defendants, together with punitive damages;

M.    on the Thirteenth Cause of Action, for damages in an amount to be determined at trial, but not less than $1.5 billion, jointly and severally, against the Deloitte Defendants, together with punitive damages;

N.    on the Fourteenth Cause of Action, for damages in an amount to be determined at trial, but not less than $1.5 billion, jointly and severally, against the Walkers Defendants, together with punitive damages;

O.    on the Fifteenth Cause of Action, for damages in an amount to be determined at trial, but not less than $1.5 billion, jointly and severally, against the Walkers Defendants, together with punitive damages;

P.    on the Sixteenth Cause of Action, for damages in an amount to be determined at trial, but not less than $1.5 billion, jointly and severally, against the Walkers Defendants, together with punitive damages;

Q.    on the Seventeenth Cause of Action, for damages in an amount to be determined at trial, but not less than $1.5 billion, against all Defendants;

- 233 -

R.    on all Causes of Action, an award of pre- and post-judgment

interest, Court costs, attorneys' fees and such other and further relief as the Court

deems just and proper against all Defendants.

Dated:  June 30, 2008
        New York, New York


                    **REED SMITH LLP**


                    _____
                    Robert A. Nicholas (RN - 2335)
                    James C. McCarroll (JM - 2758)
                    Jordan W. Siev (JS - 8043)
                    599 Lexington Avenue
                    New York, New York 10022
                    Tel:  212-521-5400
                    Fax:  212-521-5450
                    e-mail:  rnicholas@reedsmith.com
                             jmccarroll@reedsmith.com
                             jsiev@reedsmith.com


                    **ATTORNEYS FOR PLAINTIFFS**

EXHIBIT 1

IN THE GRAND COURT OF THE CAYMAN ISLANDS

CAUSE NO. 551 of 2007

IN THE MATTER OF THE COMPANIES LAW (2007 REVISION)

AND IN THE MATTER OF BEAR STEARNS HIGH-GRADE STRUCTURED CREDIT STRATEGIES ENHANCED LEVERAGE (OVERSEAS) LTD. (IN VOLUNTARY LIQUIDATION)

## ORDER

UPON hearing the Applicants' Ordinary Application filed herein on 7 December 2007

AND UPON reading the documents recorded on the Court file as having been read

AND UPON hearing Counsel for the Applicants, the Joint Voluntary Liquidators of the Company, Walkers SPV Limited and Bear Stearns Asset Management Inc

AND UPON no order being made on paragraphs 1-3 of the Ordinary Application

IT IS ORDERED AS FOLLOWS:

1.  The voluntary winding up of the Company should continue subject to the supervision of the Court.

2.  Geoffrey Varga and William Cleghorn of Kinetic Partners be appointed pursuant to section 153 of the Companies Law as liquidators of the Company in place of Simon Whicker and Kris Beighton of KPMG.

J:\12\12742\001\Court Documents\Cayman\Cause No 551 of 2007\Order 080222(5).doc

3.    The Applicants' costs of and occasioned by their Ordinary Application be borne equally by Walkers SPV Limited and Bear Stearns Asset Management Inc, such costs to be taxed if not agreed.

Dated this 22nd day of February 2008

Filed this 2ᵍᵗʰ day of March 2008

Hon. Justice Smellie, Q.C.

Judge of the Grand Court

APPROVED AS TO FORM AND CONTENT

*Appleby*

Appleby
Attorneys for the Applicants

*Conyers Dill & Pearman*

Conyers Dill & Pearman
Attorneys for the Joint Voluntary Liquidators

*Nelson + Company*

Nelson & Company
Attorneys for Walkers SPV Limited

*Turner + Roulstone*

Turner & Roulstone
Attorneys for Bear Stearns Asset Management Inc

Filed by Appleby, Attorneys-at-Law for the Applicants, whose address for service is that of its said
Attorneys, namely Clifton House, 75 Fort Street, PO Box 190, Grand Cayman KY1-1104,
Cayman Islands (Ref.: JST/12742.001).

IN THE GRAND COURT OF THE CAYMAN ISLANDS

CAUSE NO. 552 of 2007

IN THE MATTER OF THE COMPANIES LAW (2007 REVISION)

AND IN THE MATTER OF BEAR STEARNS HIGH-GRADE STRUCTURED CREDIT STRATEGIES (OVERSEAS) LTD. (IN VOLUNTARY LIQUIDATION)



ORDER

UPON hearing the Applicants' Ordinary Application filed herein on 14 December 2007

AND UPON reading the documents recorded on the Court file as having been read

AND UPON hearing Counsel for the Applicants, the Joint Voluntary Liquidators of the Company, Walkers SPV Limited and Bear Stearns Asset Management Inc

AND UPON no order being made on paragraphs 1-3 of the Ordinary Application

IT IS ORDERED AS FOLLOWS:

1.   The voluntary winding up of the Company should continue subject to the supervision of the Court.

2.   Geoffrey Varga and William Cleghorn of Kinetic Partners be appointed pursuant to section 153 of the Companies Law as liquidators of the Company in place of Simon Whicker and Kris Beighton of KPMG.

3.  The Applicants' costs of and occasioned by their Ordinary Application be borne
    equally by Walkers SPV Limited and Bear Stearns Asset Management Inc, such
    costs to be taxed if not agreed.

Dated this 22nd day of February 2008

Filed this 20th day of March 2008

Hon. Justice Smellie, Q.C.

Judge of the Grand Court

APPROVED AS TO FORM AND CONTENT

_Appleby_

Appleby
Attorneys for the Applicants

_Conyers Dill & Pearman_

Conyers Dill & Pearman
Attorneys for the Joint Voluntary Liquidators

_Nelson + Company_

Nelson & Company
Attorneys for Walkers SPV Limited

_Turner + Roulstone_

Turner & Roulstone
Attorneys for Bear Stearns Asset Management Inc

Filed by Appleby, Attorneys-at-Law for the Applicants, whose address for service is that of its said Attorneys, namely Clifton House, 75 Fort Street, PO Box 190, Grand Cayman KY1-1104, Cayman Islands (Ref.: JST/12742.001).