# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ x

GEOFFREY VARGA and WILLIAM
CLEGHORN, as Joint Voluntary Liquidators of
Bear Stearns High-Grade Structured Credit
Strategies (Overseas) Ltd. and Bear Stearns
High-Grade Structured Credit Strategies
Enhanced Leverage (Overseas) Ltd.,

                        Plaintiffs,

      -against-

THE BEAR STEARNS COMPANIES, INC.,
BEAR STEARNS ASSET MANAGEMENT
INC., BEAR, STEARNS & CO. INC., RALPH
CIOFFI, MATTHEW TANNIN, RAYMOND
MCGARRIGAL, BARRY JOSEPH COHEN,
GERALD R. CUMMINS, DAVID
SANDELOVSKY and GREG QUENTAL,

                      Defendants.

------------------------------------------------------ x

Case No. 08-CV-03397(AKH)

**SECOND AMENDED
COMPLAINT**

**(JURY TRIAL DEMANDED)**

**REED SMITH LLP**
Robert A. Nicholas (RN - 2335)
James C. McCarroll (JM - 2758)
Jordan W. Siev (JS - 8043)
599 Lexington Avenue
New York, New York 10022
Tel: 212-521-5400
Fax: 212-521-5450
e-mail: rnicholas@reedsmith.com
       jmccarroll@reedsmith.com
       jsiev@reedsmith.com

# TABLE OF CONTENTS

Page

DEFINED TERMS ................................................................................................. i

I.    NATURE OF THE ACTION ........................................................................ 1

II.   JURISDICTION AND VENUE ................................................................... 10

III.  PARTIES ..................................................................................................... 11

      A.    Plaintiffs ........................................................................................... 11

      B.    Defendants ........................................................................................ 12

      C.    Other Relevant Entities and Individuals ........................................ 17

IV.   FACTS ......................................................................................................... 22

      A.    The High-Grade Funds Fraud ......................................................... 22
            1.    Structure and Initial Marketing of the High-Grade Funds ...... 22
            2.    The Bear Stearns Defendants' Management of, and
                  Dealings with, the High-Grade Funds ...................................... 34

      B.    The High-Grade Enhanced Funds Fraud ........................................ 50
            1.    Structure and Initial Marketing of the High-Grade
                  Enhanced Funds ....................................................................... 50
            2.    The Bear Stearns Defendants' Management of, and
                  Dealings With, the High-Grade Enhanced Funds .................... 63

      C.    The Funds' Pervasive Insider Transactions with Bear Stearns
            and BSAM ........................................................................................ 70

      D.    The Bear Stearns Defendants' Ongoing Fraud, and Failed
            Efforts to Foist the Funds' Risks Upon the Public Through the
            Everquest IPO .................................................................................. 80

      E.    The Blow-Ups That Launched the Worldwide Credit Crisis ........... 82

      F.    The Dereliction of Duties by the BSAM Directors .......................... 90

      G.    The Bear Stearns Defendants Worked to Thwart Any Exercise
            of Investor Rights, and to Avoid Commencement of This
            Action ............................................................................................... 98

V.    CLAIMS FOR RELIEF .............................................................................. 107

VI.   JURY TRIAL DEMAND ............................................................................ 115

## DEFINED TERMS

<u>ABS CDOs</u>:  Asset-backed collateralized debt obligations-related investments.

<u>AIMA Questionnaire</u>:  Questionnaire prepared by the Bear Stearns Defendants, in 2005, for the Alternative Investment Management Association.

<u>Bear Measurisk</u>:  Bear Measurisk, LLC, a wholly-owned subsidiary of BSAM and provider of risk measurement tools and analytics to the investment community.

<u>Bear Stearns</u>:  Bear Stearns Companies, Bear Stearns Co., and BSAM.

<u>Bear Stearns Co.</u>:  Bear, Stearns & Co. Inc.

<u>Bear Stearns Companies</u>:  Bear Stearns Companies, Inc.

<u>Bear Stearns Defendants</u>:  Bear Stearns Companies, Bear Stearns Co., BSAM, Ralph Cioffi, Matthew Tannin, Ray McGarrigal, Barry Joseph Cohen, Gerald R. Cummins, David Sandelovsky, and Greg Quental.

<u>Beighton</u>:  Kristin Beighton, of KPMG Cayman, appointed as one of the liquidators of the Master Funds.

<u>BSAM</u>:  Bear Stearns Asset Management Inc.

<u>BSAM Directors</u>:  Defendants Cohen, Cummins, Sandelovsky and Quental.

<u>CDOs</u>:  Collateralized debt obligations.

<u>CDO-squareds</u>:  CDOs comprised of slices of other CDOs.

<u>CDO Report</u>:  Report issued by an employee of BSAM, on April 19, 2007, showing that the CDOs in the Funds were worth substantially less than previously thought.

<u>Cerberus</u>:  Cerberus Capital Management.

<u>Cioffi</u>:  Defendant, Ralph Cioffi, who was a Senior Managing Director of both BSAM and Bear Stearns Co. and a member of the Board of Directors of Bear Stearns Co.

<u>Cleghorn</u>:  Plaintiff, William Cleghorn, and together with Varga, the Liquidators of each of the High-Grade Overseas Fund and the High-Grade Enhanced Overseas Fund.

i

Cohen: Defendant, Barry Joseph Cohen, who was a director of the High-Grade Overseas Funds and its Master Fund, a Senior Managing Director and Director of Alternative Investments (Hedge Funds) for BSAM, and a member of the board of directors of Bear Stearns Co.

COMs (or Offering Memoranda): Confidential offering memoranda.

Cummins: Defendant, Gerald R. Cummins, who was a director of the High-Grade Overseas Fund and its Master Fund beginning in August 2006, a director of the High-Grade Enhanced Overseas Fund and its Master Funds at all relevant times, and a Managing Director of BSAM responsible for hedge fund middle office support and firm-wide operations risk.

Deloitte Cayman: Deloitte & Touche (Cayman).

Deloitte Entities: Deloitte US and Deloitte Cayman.

Deloitte US: Deloitte & Touche LLP.

Domestic Funds: The High-Grade Domestic Fund and the High-Grade Enhanced Domestic Fund.

Everquest: Everquest Financial Ltd.

FTI: FTI Capital Advisors, LLC.

Funds: The Domestic Funds, the Overseas Funds and the Master Funds.

GAAP: U.S. Generally Accepted Accounting Principles.

GAAS: Generally Accepted Auditing Standards.

Guarasci: Michael Ernest Guarasci, a director of the High-Grade Overseas Fund and its Master Fund from September 2003 until October 2005.

Heis: Richard Heis, of KPMG (Canada), appointed as one of the liquidators of the High-Grade Enhanced Domestic Fund.

High-Grade Domestic Fund: Bear Stearns High-Grade Structured Credit Strategies Fund, L.P.

High-Grade Enhanced Domestic Fund: Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Fund, L.P.

High-Grade Enhanced Funds:  The High-Grade Enhanced Domestic Fund and the High-Grade Enhanced Overseas Fund.

High-Grade Enhanced Master Fund:  Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Master Fund Ltd.

High-Grade Enhanced Overseas Fund:  Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage (Overseas) Ltd.

High-Grade Enhanced Overseas COM:  August 2006 Confidential Offering Memorandum for the High-Grade Enhanced Overseas Fund.

High-Grade Master Fund:  Bear Stearns High-Grade Structured Credit Strategies Master Fund Ltd.

High-Grade Funds:  The High-Grade Domestic Fund and the High-Grade Overseas Fund.

High-Grade Overseas Fund:  Bear Stearns High-Grade Structured Credit Strategies (Overseas) Ltd.

Independent Directors:  The Independent Directors of the Funds.

Investment Advisers Act:  U.S. Investment Advisers Act of 1940.

Investment Manager:  BSAM, who acted as investment manager to all or substantially all hedge funds developed by Bear Stearns, including, among others, the Funds.

IPO:  Initial public offering.

Lennon:  Scott Lennon, was, and still is, a Senior Vice President of Walkers FS, which provided services to many of the Funds managed by the Bear Stearns Defendants, and served on the Board of Directors of both of the Overseas Funds.

Liquidators:  The joint voluntary liquidators of the Overseas Funds, plaintiffs Varga and Cleghorn.

Management Defendants:  Cioffi, Tannin and McGarrigal.

Massachusetts Complaint:  Administrative complaint filed by the Securities Division of the Office of the Secretary of the Commonwealth of Massachusetts, on November 14, 2007, against BSAM (Docket No. E-2007-0064).

**Master Funds:**  Bear Stearns High-Grade Structured Credit Strategies Master Fund Ltd. and Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Master Fund Ltd.

**McGarrigal:**  Defendant, Ray McGarrigal, who was a Managing Director or Senior Managing Director of BSAM and a Portfolio Manager of both the High-Grade Overseas Fund and the High-Grade Enhanced Overseas Fund.

**Milsom:**  John Milsom, of KPMG (Canada), appointed as one of the liquidators of the High-Grade Enhanced Domestic Fund.

**NAV:**  Net asset value.

**New Century:**  New Century Financial Corp.

**NovaStar:**  NovaStar Financial Corp.

**Offering Memoranda (or OMs):**  Confidential offering memoranda.

**Overseas Funds:**  The High-Grade Overseas Fund and the High-Grade Enhanced Overseas Fund.

**Quental:**  Defendant, Greg Quental, who was a director of the High-Grade Overseas Fund and its Master Fund beginning on March 28, 2007, President and Chief Executive Officer of Bear Measurisk from February 2004 through April 2005, and a Senior Managing Director, Director of Hedge Funds and Chairman of Bear Measurisk's Board of Directors, responsible for BSAM's HedgeSelect business and Due Diligence Group.

**Petitioning Investor:**  An investor holding more than 10% interest in both the Overseas and Domestic High-Grade Enhanced Funds, who, on August 10, 2007, sent Removal Petitions to the Board of the High-Grade Enhanced Overseas Fund and to BSAM, as general partner of the High-Grade Enhanced Fund.

**PFPC:**  The Funds' administrator.

**Principal Trade Letters (or PTLs):**  Consent letters that, pursuant to the Investment Advisers Act of 1940, are required to be obtained from independent directors prior to any "principal trades," trades between the High-Grade Master Fund and other Bear Stearns entities or Bear Stearns clients which posed conflict of interest issues.

**Principal Transactions Chart:**  A working draft of a chart of principal transactions prepared by BSAM Compliance during the summer of 2006.

<u>Ratings Agencies:</u> U.S. commercial credit rating agencies Standard & Poors, Moody's and Fitch.

<u>Removal Petitions:</u> Petitions to remove the Board of the High-Grade Enhanced Overseas Fund, and BSAM, as general partner of the High-Grade Enhanced Fund, served on August 10, 2007, by an investor holding more than 10% of all outstanding shares.

<u>Sandelovsky:</u> Defendant, David Sandelovsky, who was a director of the High-Grade Overseas Fund and its Master Fund from October 2005 until March 28, 2007, a director of the High-Grade Enhanced Overseas Fund and its Master Fund from its inception until March 28, 2007, and a Senior Managing Director of Alternative Investments (Hedge Funds) for BSAM.

<u>SEC:</u> The Securities and Exchange Commission.

<u>Tannin:</u> Defendant, Matthew Tannin, who was a Senior Managing Director of BSAM and Chief Operating Officer of the High-Grade Enhanced Overseas Fund, and through BSAM, a Portfolio Manager of the High-Grade Overseas Fund.

<u>Varga:</u> Plaintiff, Geoffrey Varga, and together with Cleghorn, the Liquidators of each of the High-Grade Overseas Fund and the High-Grade Enhanced Overseas Fund.

<u>Walkers:</u> Walkers Group, Walkers FS, Walkers SPV and Walkers Firm.

<u>Walkers Firm:</u> The Walkers law firm.

<u>Walkers FS:</u> Walkers Fund Services Limited, an entity that provided services to the Overseas Funds, Master Funds, and many other funds managed by the Bear Stearns Defendants.

<u>Walkers Group:</u> The Walkers Group.

<u>Walkers SPV:</u> Walkers SPV Limited.

<u>Whicker:</u> Simon Whicker, of KPMG Cayman, appointed as one of the liquidators of the Master Funds.

<u>Wilson-Clarke:</u> Michele Wilson-Clarke, who was a Senior Vice President of Walkers FS and served on the Board of Directors of both of the Overseas Funds.

Plaintiffs Geoffrey Varga and William Cleghorn, as Joint Voluntary Liquidators (the "Liquidators") of Bear Stearns High-Grade Structured Credit Strategies (Overseas) Ltd. (the "High-Grade Overseas Fund") and Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage (Overseas) Ltd. (the "High-Grade Enhanced Overseas Fund," and together with the High-Grade Overseas Fund, the "Overseas Funds"), by their attorneys, Reed Smith LLP, as and for their Complaint against the above-named Defendants, respectfully allege as follows:

## NATURE OF THE ACTION

1. This action, brought by the court-appointed Liquidators of the Overseas Funds on behalf of those funds, seeks recovery of more than $1.1 billion of losses sustained by the Overseas Funds as a direct and proximate result of the actions of the Defendants – all of whom owed fiduciary, contractual and/or other duties to the Overseas Funds – and all of whom breached these duties through a series of actions which included self-dealing, bad faith, gross negligence and fraudulent conduct.

2. Among other things and as detailed herein, these Defendants failed to properly structure the Overseas Funds, failed to provide adequate managerial oversight and risk management to the Overseas Funds, engaged in a pattern of misrepresentations and deceptive conduct with respect to the Overseas

Funds, and continually placed their own interests ahead of the interests of the Overseas Funds.

3.      The Defendants herein are The Bear Stearns Companies, Inc. ("Bear Stearns Companies"), their co-defendant affiliates and subsidiaries, Bear, Stearns & Co. Inc. ("Bear Stearns Co.") and Bear Stearns Asset Management Inc. ("BSAM," and together with Bear Stearns Companies and Bear Stearns Co., "Bear Stearns"), and their officers, directors and employees, Ralph Cioffi, Matthew Tannin, Raymond McGarrigal, Barry Joseph Cohen, Gerald R. Cummins, David Sandelovsky and Greg Quental (collectively, with Bear Stearns, the "Bear Stearns Defendants").

4.      The Bear Stearns Defendants' actions resulted in the highly publicized collapse of the Overseas Funds, as well as the Bear Stearns High-Grade Structured Credit Strategies Fund, L.P. (the "High-Grade Domestic Fund") and Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Fund, L.P. (the "High-Grade Enhanced Domestic Fund," collectively, with the High-Grade Domestic Fund, the "Domestic Funds," and together with the Overseas Funds and the Master Funds, the "Funds"), in July 2007, which is widely believed to have been a significant precipitating factor in the global credit crisis through which we all continue to suffer.

5.    Defendants Cioffi and Tannin, high level Bear Stearns executives who, with others, managed the Funds at issue, have recently been indicted in the Eastern District of New York for mail fraud and conspiracy for their roles in orchestrating and perpetuating the fraud and other wrongful conduct with respect to the Funds, as detailed in this Second Amended Complaint.

6.    From their inception, the Funds were doomed to fail, because the Bear Stearns Defendants conceived, managed, and deceptively marketed them knowing that they would be viable so long as – but only so long as – the U.S. housing market continued to experience an unprecedented rise. The Bear Stearns Defendants also knew, however, that so long as they were viable, the Funds would generate massive, unprecedented fees and other benefits for each of the Bear Stearns Defendants.

7.    In short, the Bear Stearns Defendants' improper business model for the Funds was unsustainable as it allowed absolutely no margin for error and was only viable so long as the housing market continued to boom.

8.    As <u>Business Week</u> reported in the months following the Funds' implosion, it is clear that these "hedge funds were built so they were virtually guaranteed to implode if market conditions turned south." Matthew Goldstein & David Henry, *Bear Stearns' Bad Bet*, Bus. Wk. (Oct. 11, 2007).

- 3 -

9.    In structuring, marketing, and reporting the performance of the Funds, the Bear Stearns Defendants represented that the Funds would invest in broadly diversified pools of credit-related investment instruments, including, among other things, favorably risk-rated tranches of collateralized debt obligations ("CDOs"). They represented that at least 90% of all investments would have 'AAA' or at worst 'AA' default and valuation risk ratings conferred upon them by one or more of the three primary U.S. commercial credit rating agencies, Standard & Poors, Moody's and Fitch (the "Ratings Agencies").

10.    The Bear Stearns Defendants expressly represented that the Funds would have minimal exposure to sub-prime residential mortgages, and that the Bear Stearns Defendants would utilize their substantial, industry-leading risk management expertise and experience to ensure that the Funds were relatively safe, conservative investment vehicles. They engaged Deloitte & Touche LLP ("Deloitte US") and Deloitte & Touche (Cayman) ("Deloitte Cayman," and together with Deloitte US, the "Deloitte Entities") as the purportedly independent outside auditors of the Funds, as well as their respective Master Funds and numerous other Bear Stearns-related entities, for each fiscal year between at least 2003 and 2006, and the Deloitte Entities issued various certified audit reports to, and in respect of, these entities in connection with each of their engagements.

11.    By improperly issuing unqualified audit opinions on the Funds' financial statements, the Deloitte Entities assured investors that they had conducted independent, thorough, and objective audits – including, among other things, testing the Bear Stearns Defendants' estimates of the fair value of the assets in the Funds and testing that the Funds' purported independent directors (the "Independent Directors") performed the scrutiny over insider transactions between and among the Funds and other Bear Stearns-related entities, which investors expected.

12.    These improper audit opinions on the Funds' financial statements – which were issued by the Deloitte Entities, the "friendly" auditors for all Bear Stearns-related parties – were then used by Bear Stearns Defendants in order to mislead investors to their detriment and the detriment of the Funds.

13.    In fact, the Funds' financial statements were intended to, and did, create a façade of healthy investment funds with dynamic and savvy management. These false financial statements represented a concerted effort by the Bear Stearns Defendants to falsify the Funds' financial condition in order to attract new and/or retain old investors, generate fees for the Bear Stearns Defendants, and hide their prior misdeeds. As a result, investors were unable to obtain knowledge of, and take action against, the Bear Stearns Defendants' misconduct.

14.    Indeed, investors reasonably relied on these purportedly accurate financial statements when deciding to invest and/or remain invested in the Funds, and because of the allegedly positive results provided by the Funds and the statements of the Bear Stearns Defendants, did not take action to remove the Overseas Funds' directors or BSAM and/or cause the Bear Stearns Defendants to restructure or liquidate the Overseas Funds and Master Funds in an orderly fashion before the Funds collapsed. Either way, the Funds would have retained value, and investors would have avoided the losses attendant to their investments in the Overseas Funds, which are now worth nothing.

15.    Following the initial structuring of the High-Grade Domestic and Overseas Funds in 2003, the Bear Stearns Defendants began to systematically expose them to ever-increasing concentrations of aggressive and risky investments, including re-assembled CDO tranches and mortgage pools, as well as multiple "CDO-squareds" (CDOs comprised of slices of other CDOs). The High-Grade Enhanced Funds were immediately exposed to high concentrations of these sorts of investments from their inception in 2006. These then-undisclosed investments caused each of the Funds to have disproportionate exposure to sub-prime residential mortgages – far beyond the exposure that was permitted under the Funds' governing documents, or that was disclosed to, or reasonably discoverable by, investors.

16.    Further, although the Bear Stearns Defendants at times represented in their monthly performance reports that only 6-8% of each Fund's portfolio was invested in sub-prime mortgage-backed securities, the Bear Stearns Defendants failed to inform investors that investments within the Funds that were collateralized by sub-prime mortgages reached, in certain instances, as high as approximately 60% of the Funds' asset composition.

17.    The Bear Stearns Defendants also caused the Funds to use dramatically more borrowed capital (leverage) to multiply the size – and therefore, risk – of their investments than that which was disclosed to, or reasonably discoverable by, investors.  This was done through greater than disclosed (or prudent, by any measure) use of short-term financings, known as "repo" or repurchase transactions, and through the leveraged purchase of re-assembled investment pools and CDO-squareds that already included significant multiples of leverage.

18.    The Bear Stearns Defendants further perpetuated and expanded their misconduct by, among other things: (i) knowingly (and without regard for existing market conditions) inflating the net asset value ("NAV") of the Funds; and (ii) using each of the Funds as dumping grounds for toxic investments held elsewhere on Bear Stearns' books – including through an enormous number of impermissible insider transactions.

19.     Indeed, on November 14, 2007, the Securities Division of the Office of the Secretary of the Commonwealth of Massachusetts filed an administrative complaint, Docket No. E-2007-0064 (the "Massachusetts Complaint"), against BSAM alleging violations of the Massachusetts Uniform Securities Act, and recounting BSAM's failure to obtain approval from unaffiliated directors for numerous related-party transactions.  The Massachusetts Complaint attaches documents establishing that hundreds of related-party "principal transactions" -- including 78.95% of 342 principal transactions that took place in 2006 – were processed without prior approval by the Independent Directors.

20.     These pervasive, fraudulent courses of conduct exposed the Funds to untenable risks.  Thus, when the inevitable U.S. housing market downtick began, while other funds structured in fashions similar to those in which the Bear Stearns Defendants promised to structure the Funds here at issue suffered losses, but survived, the Funds' collapse was relatively quick and decisive.

21.     When the Funds began suffering growing losses during the decline in the U.S. housing and sub-prime markets in late 2006 and into the first quarter of 2007, the Bear Stearns Defendants continued to act in their own self interest and deceive investors by painting a rosy picture of the Funds' financial condition, even though the Bear Stearns Defendants knew that the Funds' situation was dire.

22.    For example, in an April 25, 2007, investor conference call, Defendants Cioffi and Tannin told investors that the Funds had "significant amounts of liquidity," "margin calls had easily been met," there were only a "couple of million [dollars] of redemptions," and they were "very comfortable" with the Funds' "portfolio construction."

23.    Just weeks before, however, Cioffi had redeemed $2 million of his personal investment in one of the Funds. On April 22, 2007 – three days before the investor call – Tannin noted in an email to Cioffi that the sub-prime market looked "pretty damn ugly" and argued for closing and liquidating all four of the Funds. Yet, Tannin's opening remarks on the April 25, 2007 investor call, included a statement that "the key sort of big picture point for us at this point is our <u>confidence that the structured credit market and the sub-prime market in particular, has not systemically broken down</u> ... So, from a structural point of view, from an asset point of view, from a surveillance point of view, <u>we're very comfortable with exactly, you know, where we are</u>."

24.    These representations, which were material to investors who were concerned about the Funds' performance and the impact of general market conditions at that time on the Funds, were patently false and misleading, and harmed the Funds themselves as well as investors in the Funds as they lulled the

Funds and their investors into a false sense of security and caused them not to take any corrective action.

25.   The Bear Stearns Defendants engaged in the improper behavior detailed herein to generate substantial fees and other benefits for themselves, and in order to attempt to continue to hide their wrongdoing.

26.   On June 19, 2008, Ralph Cioffi and Matthew Tannin were indicted for mail fraud and conspiracy for their roles in orchestrating and perpetuating the fraud detailed herein.  The Securities and Exchange Commission ("SEC") contemporaneously commenced a civil action against both. Investigations by the U.S. Justice Department and the SEC are ongoing.

27.   Plaintiffs now bring this action on behalf of the Overseas Funds for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of contract, gross negligence, negligence and unjust enrichment, in order to recover damages from the Bear Stearns Defendants for injury and losses suffered by the Overseas Funds as a result of the Bear Stearns Defendants' acts and/or failures to act.

## JURISDICTION AND VENUE

28.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because the matter in controversy exceeds the

sum or value of $75,000, exclusive of interest and costs, and is between citizens of a State and citizens or subjects of a foreign state.

29.   Jurisdiction is proper in New York, and venue is proper in this District pursuant to 28 U.S.C. § 1391(a), in that each defendant resides in this District and/or a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

### Plaintiffs

30.   Plaintiffs Geoffrey Varga ("Varga") and William Cleghorn ("Cleghorn") are the Liquidators of each of (i) the High-Grade Overseas Fund and (ii) the High-Grade Enhanced Overseas Fund.  Plaintiff Varga is a citizen of Canada and a resident of the Cayman Islands.  Plaintiff Cleghorn is a citizen and resident of the United Kingdom.

31.   Plaintiffs Varga and Cleghorn were appointed as liquidators by the Grand Court of the Cayman Islands by Order dated March 20, 2008, a copy of which is attached hereto as Exhibit 1.  Under Cayman law, Plaintiffs Varga and Cleghorn have all right and power to act for the Overseas Funds, including, without limitation, the power to bring suit to recover for the benefit of those funds' losses caused to them by third-parties.

32.   The Overseas Funds are both Cayman Islands exempted companies, organized under the Companies Law of the Cayman Islands.  Prior to

- 11 -

the events here complained of, they operated, along with the Domestic Funds, as "feeder funds" for Bear Stearns High-Grade Structured Credit Strategies Master Fund Ltd. (the "High-Grade Master Fund"), and Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Master Fund Ltd. (the "High-Grade Enhanced Master Fund," together with the High-Grade Master Fund, the "Master Funds").

33.    At all times, investors in the Overseas Funds had decision making and control powers conferred upon them by the Overseas Funds' governing documents – including, but not limited to, the right by majority vote, at any time, to remove and replace the parties in control of the Overseas Funds. With the exception of a small number of investors affiliated with Bear Stearns, the Overseas Funds' investors were unaware of – and could not reasonably have discovered – the wrongful acts pled herein, and had they been so aware, could and would have taken immediate steps to prevent such wrongful acts and avoid the damages that flowed proximately therefrom to the Overseas Funds.

**Defendants**

34.    Defendant Bear Stearns Companies, at all relevant times, was organized and existing under the laws of the State of Delaware, with its principal place of business at 383 Madison Avenue, New York, New York 10179. Bear Stearns Companies, through its various subsidiaries, provides a broad range of

financial services to clients and customers worldwide. Bear Stearns Companies
has held itself out as a leading financial services firm serving governments,
corporations, institutions and individuals worldwide. Its core business lines have
included institutional equities, fixed income, investment banking, global clearing
services, asset management, and private client services.

35.    On May 30, 2008, a wholly-owned subsidiary of JPMorgan
Chase & Co. merged with and into, Defendant Bear Stearns Companies, with Bear
Stearns Companies continuing as the surviving corporation and now as a
subsidiary of JPMorgan Chase & Co.

36.    Defendant BSAM, at all relevant times, was organized and
existing under the laws of the State of New York, with its principal place of
business at 383 Madison Avenue, New York, New York 10179. BSAM held itself
out as a market leader in the area of structured credit services, and an expert in
managing structured credit assets. BSAM also held itself out as an expert in risk
management, describing risk management as the cornerstone of its business
practice. BSAM acted as investment manager to all or substantially all hedge
funds developed by Bear Stearns, including, among others, the Funds (the
"Investment Manager"), and was responsible not only for the operation of these
feeder funds, but also for the operation and investment management of the Master
Funds to which the feeder funds' monies were entrusted. BSAM is registered with

- 13 -

the SEC as an investment advisor under the Investment Advisors Act of 1940, as amended, and continues to exist as a wholly-owned subsidiary of defendant Bear Stearns Companies.

37.    Defendant Bear Stearns Co., at all relevant times, was a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 383 Madison Avenue, New York, New York 10179. Bear Stearns Co. continues to exist as a subsidiary of defendant Bear Stearns Companies and is registered with the SEC as a broker-dealer and an investment advisor under the Investment Advisors Act of 1940, as amended.  Among other things, Bear Stearns Co. acted as a placement agent to the High-Grade Domestic Fund and the High-Grade Overseas Fund (collectively, the "High-Grade Funds"), as well as the High-Grade Enhanced Domestic Fund and the High-Grade Enhanced Overseas Fund (collectively, the "High-Grade Enhanced Funds"), for the purpose of finding investors willing and able to invest in the Funds.

38.    Defendant Ralph Cioffi ("Cioffi") is a citizen and resident of the State of New Jersey and, as relevant to this action, was a Senior Managing Director of both BSAM and Bear Stearns Co., and a member of the Board of Directors of Bear Stearns Co.  Through BSAM, Cioffi acted as Senior Portfolio Manager of the High-Grade Overseas Fund, the High-Grade Enhanced Overseas Fund, and the Master Funds, sharing with defendants Matthew Tannin and

- 14 -

Raymond McGarrigal responsibility for the management of the investment portfolios for the High-Grade Overseas Fund, the High-Grade Enhanced Overseas Fund, and the Master Funds.

39.    Defendant Matthew Tannin ("Tannin") is a citizen and resident of the State of New York and, as relevant to this action, was a Senior Managing Director of BSAM and Chief Operating Officer of the High-Grade Enhanced Overseas Fund, and through BSAM a Portfolio Manager of the High-Grade Overseas Fund, sharing with defendants Cioffi and Raymond McGarrigal responsibility for the management of the investment portfolio for the High-Grade Overseas Fund, the High-Grade Enhanced Overseas Fund, and the Master Funds.

40.    Defendant Raymond McGarrigal ("McGarrigal") is a citizen and resident of the State of New York and, as relevant to this action, was a Managing Director or Senior Managing Director of BSAM and a Portfolio Manager of both the High-Grade Overseas Fund and the High-Grade Enhanced Overseas Fund, sharing with defendants Cioffi and Tannin responsibility for the management of the investment portfolio for the High-Grade Overseas Fund, the High-Grade Enhanced Overseas Fund, and the Master Funds.

41.    Until the events giving rise to this action, Cioffi, Tannin and McGarrigal (collectively, the "Management Defendants") were responsible for,

among other things, the composition and risk management of the High-Grade Funds and the High-Grade Enhanced Funds, as well as the Master Funds.

42.    Defendant Barry Joseph Cohen ("Cohen") is a citizen and resident of the State of New York and, as relevant to this action, was a director of both the High-Grade Overseas Fund and its respective Master Fund at all relevant times.  Cohen was also a Senior Managing Director and Director of Alternative Investments (Hedge Funds) for BSAM and was a member of the board of directors of Bear Stearns Co.

43.    Defendant Gerald R. Cummins ("Cummins") is a citizen and resident of the State of New York and, as relevant to this action, was a director of the High-Grade Overseas Fund and its Master Fund beginning in August 2006 and was also a director of the High-Grade Enhanced Overseas Fund and its Master Fund at all relevant times.  Cummins was also a Managing Director of BSAM responsible for hedge fund middle office support and firm-wide operations risk.

44.    Defendant David Sandelovsky ("Sandelovsky") is a citizen and resident of the State of New Jersey and, as relevant to this action, was a director of the High-Grade Overseas Fund and its Master Fund from October 2005 until on or about March 28, 2007, and was also a director of the High-Grade Enhanced Overseas Fund and its Master Fund from its inception until on or about March 28,

2007. Sandelovsky was also a Senior Managing Director of Alternative Investments (Hedge Funds) for BSAM.

45.     Defendant Greg Quental ("Quental") is a citizen and resident of the State of Connecticut and, as relevant to this action, was a director of both the High-Grade Overseas Fund and its respective Master Fund beginning on or about March 28, 2007. Quental is also a Senior Managing Director, Director of Hedge Funds and Chairman of Bear Measurisk, LLC ("Bear Measurisk"), a wholly-owned subsidiary of BSAM and provider of risk measurement tools and analytics to the investment community. Quental joined BSAM in 2003, and from February 2004 through April 2005 served as President and Chief Executive Officer of Bear Measurisk. In April 2005, Mr. Quental was appointed Chairman of Bear Measurisk's Board of Directors and made responsible for BSAM's HedgeSelect business and Due Diligence Group.

46.     Defendants Cohen, Cummins, Sandelovsky and Quental are collectively referred to as the "BSAM Directors."

**Other Relevant Entities and Individuals**

47.     The High-Grade Master Fund is a Cayman Islands exempted company organized under the Companies Law of the Cayman Islands. BSAM was the investment manager for the High-Grade Master Fund. The Management Defendants all shared responsibility for the management of the High-Grade Master

Fund investment portfolio, and all of the High-Grade Funds' Directors were also directors of the High-Grade Master Fund.

48.    The High-Grade Enhanced Master Fund is a Cayman Islands exempted company organized under the Companies Law of the Cayman Islands. BSAM was the investment manager for the High-Grade Enhanced Master Fund. The Management Defendants all shared responsibility for the management of the High-Grade Enhanced Master Fund's investment portfolio, and the High-Grade Enhanced Funds' Directors were also directors of the High-Grade Enhanced Master Fund.

49.    The Master Funds, at Bear Stearns' insistence, were placed into official court-directed liquidation in the Cayman Islands in August 2007, with KPMG Cayman Islands as Bear Stearns' designated liquidators. That foreign liquidation was not recognized under Chapter 15 of the U.S. Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York because, by reason of domination of these Master Funds by Bear Stearns and its agents, the center of main interest of the Master Funds has been held to be New York rather than the Cayman Islands. See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd., 374 B.R. 122 (Bankr. S.D.N.Y. 2007), aff'd, Civ. Case. No. 07-8370, 2008 WL 2198272, at *1 (S.D.N.Y. May 27, 2008).

- 18 -

50.    The Walkers Group ("Walkers Group") is an international organization with offices located in, among other places, the Cayman Islands.

51.    Walkers SPV Limited ("Walkers SPV"), as discussed below, served as Star Trustee in relation to the Overseas Funds.

52.    Walkers Financial Services Limited ("Walkers FS"), as discussed below, provided services to the Overseas Funds, Master Funds, and many other funds managed by the Bear Stearns Defendants.

53.    Scott Lennon ("Lennon") was – and still is – a Senior Vice President of Walkers FS and, as discussed below, served on the Board of Directors of both of the Overseas Funds.

54.    Michele Wilson-Clarke ("Wilson-Clarke") also was – and still is – a Senior Vice President of Walkers FS and, as discussed below, served on the Board of Directors of both of the Overseas Funds.

55.    Lennon and Wilson-Clarke of Walkers FS served as the alleged Independent Directors of the Boards of each of the Overseas Funds. Each of the Boards consisted of five directors, three of whom were appointed by BSAM, and two of whom were to be independent of Bear Stearns. During the summer of 2006, Lennon and Wilson-Clarke were appointed (as discussed below, essentially by BSAM) to fill these two independent director slots.

- 19 -

56.    The Walkers Group is comprised of the Walkers law firm (the "Walkers Firm"), which provides legal services, and Walkers Management Services, which provides corporate, special purpose vehicle, and fund services to the world's leading offshore jurisdictions.

57.    Walkers Management Services, in turn, is comprised of Walkers FS and Walkers SPV (collectively with the Walkers Group, Walkers FS, Walkers SPV and Walkers Firm, "Walkers"). As stated on the company website, Walkers FS provides "specialist offshore fund services to the full range of investment fund structures." Specifically, Walkers FS provides services to meet the "operational, legal and regulatory requirements of running an offshore fund, including: the (i) Provision of Directors, (ii) Acting as Trustee, (iii) Acting as General or Administrative partner for a limited partnership, and (iv) Consultation on set-up and structure of offshore investment vehicles."

58.    The Walkers Group has a long-standing and extensive relationship with the Bear Stearns Defendants. Specifically, the Walkers Firm has served as legal counsel for at least 16 hedge funds that BSAM advised, including Bear Stearns Systematic Equity Partners, Bear Stearns Global Alpha Funds, Bear Stearns Health Care Value, Bear Stearns Active Country – International Plus, Bear Stearns Offshore Fund of Hedge Funds, Bear Stearns Asset Backed Securities Master Fund, Bear Stearns Emerging Markets Macro Fund, Bear Stearns Europe

Long/Short Fund, Bear Stearns Structured Risk Partners Master Fund, Hedge

Select (Offshore), Global Growth, the High-Grade Master Fund, and the High-

Grade Enhanced Master Fund, the High-Grade Overseas Fund, and the High-Grade

Enhanced Overseas Fund.

59.     In addition to the Walkers Firm, Walkers FS also provided

services to at least nine of BSAM's hedge funds, including the Equity Focus Fund,

Institutional Leveraged Loan Master Fund, Europe Long/Short Funds, Structured

Risk Partners Fund, Hedge Select (Offshore) Funds, the High-Grade Master Fund,

the High-Grade Enhanced Master Fund, the High-Grade Overseas Fund, and the

High-Grade Enhanced Overseas Fund.

60.     Deloitte US is engaged in business as, among other things, an

accounting and auditing firm.

61.     Deloitte Cayman is a member firm of Deloitte Touche

Tohmatsu, and is engaged in business as, among other things, an accounting and

auditing firm with offices located in (among other places) Grand Cayman, Cayman

Islands.

62.     In addition to auditing the financial statements for the Funds

and their respective Master Funds, Deloitte US also audited the financial

statements of many, if not all, other Bear Stearns entities, including two Bear

Stearns-related entities with substantial ties to the Funds.  As discussed in greater

detail below, one such entity was Everquest Financial Ltd. ("Everquest") – an entity created and controlled by BSAM to which the Overseas Funds transferred a significant portion of their assets in late 2006 in exchange for an equity interest in Everquest, and for which Deloitte US served as the auditor for the period from September 28, 2006 through December 31, 2006. Deloitte US also served as the auditor for Parapet – a BSAM-managed vehicle that created CDOs out of CDO-squared and other CDO securities, many of which were also from vehicles managed by BSAM – for the period from September 28, 2006 through December 31, 2006.

63.   For its part, Deloitte Cayman was auditor to at least nine (9) Bear Stearns-related hedge funds other than the Overseas Funds.

64.   As detailed herein, the Bear Stearns Defendants "circled the wagons" by concentrating their auditing work for the entities at issue herein with the Deloitte Entities, and by utilizing Walkers extensively in connection with the Funds – particularly when things began to deteriorate at the Funds.

## FACTS

### The High-Grade Funds Fraud

#### Structure and Initial Marketing of the High-Grade Funds

65.   In March 2003, the Bear Stearns Defendants, eager for investment management fees in an increasingly saturated investment market, created and began selling to investors the High-Grade Funds. By so doing, the

Bear Stearns Defendants sought to capitalize on the then-booming United States housing market in ways beyond those available through the existing, sizeable, and increasingly efficient CDO and related structured products markets.

66.    As of 2003, housing prices were increasing at a generally brisk pace throughout the United States. This, along with the Bear Stearns Defendants' then-stellar reputation for mortgage-backed securities analysis, allowed them to solicit institutional and high net worth investors to commit capital to the "High-Grade" Funds.

67.    The High-Grade Funds were designed to raise money to invest in the High-Grade Master Fund, also created by the Bear Stearns Defendants. The High-Grade Master Fund, in turn, would invest the capital it received from these two "feeder funds" as directed by defendant BSAM, which was the Investment Manager of the High-Grade Master Fund, as well as the Investment Manager of the High-Grade Funds, the sole general partner of the High-Grade Domestic Fund, and whose officers comprised the majority of the board of directors of the High-Grade Overseas Fund and the High-Grade Master Fund.

68.    Throughout, BSAM's role with regard to the High-Grade Funds was principally controlled by defendant Cioffi, who also was an officer and director of Bear Stearns Co. Working in concert with Cioffi throughout was

defendant Tannin, who was a Senior Managing Director of BSAM; and they were later joined by defendant McGarrigal.

69.    The Bear Stearns Defendants had unique knowledge, not available to investors or others, of the fact that even a slight downturn in the U.S. housing market – whether resulting from either a small percentage drop in home prices or sales volumes – would cause the High-Grade Funds to sustain such disproportionate, multiplicative losses, that all investor capital would vanish, and the High-Grade Funds' creditors and counterparties would be put at great risk.

70.    The Bear Stearns Defendants could not, and therefore did not, disclose any of this information to investors and have any hope of achieving their goal of securing investors for the High-Grade Funds.  Instead, they inveigled investors into committing their capital to the High-Grade Funds through the use of the Bear Stearns reputation and branding.  They started by affixing their brand name to the funds, starting each fund's name with "Bear Stearns."  Immediately after the name, they affixed the grossly misleading label "High-Grade."  They then went on to create the Confidential Offering Memoranda ("Offering Memoranda" or "COMs") for the High-Grade Funds.

71.    Although marketed as relatively safe, conservative investment funds seeking to obtain a moderate rate of return for investors – "high current income and capital appreciation relative to LIBOR" (High-Grade Overseas COM,

p. 1) — the High-Grade Funds were run with little or no regard to generating investor returns, or to protecting investor capital. Rather, they were structured in knowing contravention of their stated purposes, and were at all times operated by the Bear Stearns Defendants in furtherance of their own interests — and not the interests of the High-Grade Funds or their investors — notwithstanding the fiduciary and other duties the Bear Stearns Defendants owed to the High-Grade Funds and their investors.

72.    The Bear Stearns Defendants represented that the High-Grade Funds would be comprised of broadly diversified credit investments, including favorably risk-rated slices of CDOs. But while the tranches of CDOs in which the High-Grade Funds invested appear to have been individually deemed by the Ratings Agencies to be among the safest available — attaining AAA or AA ratings or their equivalents — as the Bear Stearns Defendants and their retained professionals knew and, due to the opacity of the High-Grade Funds, solely were able to know, the ways in which the Bear Stearns Defendants assembled and leveraged these otherwise relatively safe components into portfolios destined the High-Grade Funds for failure.

73.    Indeed, according to the complaint filed by the SEC on June 19, 2008, against Cioffi and Tannin in the United States District Court for the Eastern District of New York, Cioffi acknowledged in an internal email that the CDO-

squareds held by the Master Fund "were not really AAA" because of the significant default risk of the underlying collateral.

74.    Moreover, the Bear Stearns Defendants had free reign – in manners wholly inconsistent with the representations made to investors – to manipulate the High-Grade Funds' investments, and reported returns, as they saw fit, throughout the lives of the Funds.

75.    In the High-Grade Overseas COM, the Bear Stearns Defendants outlined the High-Grade Funds' investment strategy, with elaborate emphasis on the "high grade" of the collateral, as well as the sophistication of BSAM's management and risk control techniques.  Specifically, in the High-Grade Overseas COM and in sales pitches concerning the High-Grade Funds, the Bear Stearns Defendants knowingly made false and intentionally misleading representations concerning the credit quality of securities in which the High-Grade Funds would invest, the Bear Stearns Defendants' ability to manage risk, the methods that would be used to evaluate the High-Grade Funds' performance, and controls that were in place to resolve conflicts arising from related party transactions.

76.    For example, with regard to the quality of securities in which the High-Grade Funds would invest, the Bear Stearns Defendants made the following false and misleading representations:

> The Investment Manager [BSAM] will use its structuring and research experience to identify structured finance securities with fundamentally

strong credit risk profiles that are priced attractively. A significant portion of the investment return of the Master Fund is expected to be current income resulting from a positive yield spread between the investment income of the investments (together with any corresponding hedging instruments) of the Master Fund and the associated borrowing costs. Additionally, to the extent that the Master Fund's assets increase in value, the Master Fund may realize capital appreciation. (High-Grade Overseas COM at p. 11).

      \*            \*            \*            \*

The Master Fund intends to concentrate its investments in the investment-grade classes of structured finance securities. For all investments (excluding Repackaging Vehicle Junior Interests) the Master Fund has targeted a portfolio rating composition of approximately 90% structured finance securities rated from AAA to AA- by Standard & Poor's, from Aaa to Aa3 by Moody's or from AAA to AA- by Fitch. The 10% balance of the portfolio (excluding Repackaging Vehicle Junior Interests) may be rated below such ratings or be unrated. The above percentages are target concentrations only. The Master Fund will not be required to sell any security that is downgraded subsequent to its purchase by the Master Fund. It is anticipated that no more than 30% of the Master Fund's Net Asset Value will be invested in Repackaging Vehicle Junior Interests at the time any Repackaging Vehicle Junior Interest investment is made. The Repackaging Vehicle Junior Interests will generally not be rated. (High-Grade Overseas COM at p. 14).

      \*            \*            \*            \*

Targeted Portfolio Characteristics, Credit Quality: At least 90% 'AAA' and 'AA-.' (Sales pitch concerning High-Grade Funds).

      \*            \*            \*            \*

[the High-Grade Funds' p]rimary focus is to buy and hold 'AAA' and 'AA' structured finance securities. (Sales pitch concerning High-Grade Funds).

      \*            \*            \*            \*

Credit Quality:  At least 90% 'AAA' and 'AA-' structured finance securities with up to 10% in higher yielding lower rated securities.  (Sales pitch concerning High-Grade Funds).

77.    Notwithstanding BSAM's multiple, facially conflicting roles with regard to the High-Grade Funds, the Bear Stearns Defendants nonetheless touted the independent governance of the High-Grade Funds, including the presence of independent directors of the High-Grade Overseas Fund and High-Grade Master Fund, who would be charged with making all decisions relevant to insider transactions engaged in by the Funds and any affiliated entity.

78.    In the High-Grade Overseas COM, the Bear Stearns Defendants made the following false and misleading representations with regard to conflict management:

> As [investment] situations may involve conflicts between the interest of the Investment Manager or its related persons, on the one hand, and the interests of the Investment Manager's clients, on the other, the Investment Manager has established internal policies to ensure that the Investment Manager and its personnel do not prefer their own interests to those of the Investment Manager's clients and that clients are treated fairly.  (High-Grade Overseas COM at p. 26).

> *          *          *          *

> Members of the boards of directors of the Fund and the Master Fund who are not affiliated with the Investment Manager or their delegates or other authorized representatives of the Fund or the Master Fund will have the responsibility for approving any transactions between the Fund or the Master Fund and the Investment Manager or its affiliates involving significant conflicts of interest (including principal trades).

> More particularly, Directors unaffiliated with the Investment Manager or any delegate designated by such Directors will be responsible for

approving any principal transactions for which Master Fund consent is required pursuant to Rule 206(3) of the Advisers Act. (High-Grade Overseas COM at pp. 35-36).

79.    Through their Offering Memoranda, as well as through conversations with investors, the Bear Stearns Defendants represented that the High-Grade Funds were fully diversified investment vehicles, comparable to specialty finance companies, with investments across more than 10 asset classes falling within the broad category of fixed income securities.

80.    These representations were later reaffirmed in a questionnaire prepared by the Bear Stearns Defendants for the Alternative Investment Management Association in 2005 (the "AIMA Questionnaire"), which questionnaire was disseminated to, and relied upon by, investors.

81.    BSAM reiterated in the AIMA Questionnaire that the High-Grade Funds' primary objectives were "to seek high current income and capital appreciation relative to LIBOR primarily through leveraged investments in investment-grade structured finance securities with an emphasis on triple-A and double-A rated structured finance securities." (AIMA Questionnaire at p. 14).

82.    In the AIMA Questionnaire, BSAM also assured investors that the High-Grade Funds "generally take[] the position in the high end of the capital structure which is primarily hedged through the use of credit default swaps" and that these "investments coupled with broad diversification across positions and

sectors should mitigate a majority of credit oriented risks associated with fixed

income." (AIMA Questionnaire at p. 14)  In addition, BSAM represented in the

AIMA Questionnaire that "[c]urrently, there are no conflicts of interest to date

which may affect its trading, or trading flexibility, including use of an associated

broker/dealer." (AIMA Questionnaire at p. 20)  Finally, BSAM described the

Funds' operational risk management in the AIMA Questionnaire, emphasizing:

> There are three layers of risk management, the broker dealer, BSAM
> and the portfolio managers.  The Fund's daily mark to market, which
> is done in house by Bear Stearns' repo desk and the team, keeps them
> in touch with any price movements that could foretell problems in any
> one of the Fund's investments.  The team receives monthly marks on
> each of the Fund's investments from up to 15 broker dealers.
>
> The team monitors their positions through two main analytical
> systems... [which] allow them to monitor... monthly trustee reports
> on each deal and use technology to effectively monitor each position.
>
> In addition to the portfolio management team, Bear Stearns' and
> BSAM's risk management departments monitor the Fund's position as
> well.  They monitor things such as minimum rating requirements,
> overall and net leverage and any portfolio concentrations.  On a
> monthly basis, the portfolio mangers meet with BSAM's CIO and
> hedge fund risk management team to discuss the portfolio and its
> performance.  The team also meets with Bear Stearns' global credit
> department to discuss their positions, risk management and hedging
> techniques.  As part of managing the Fund's risk, the team actively
> engages [sic] in various hedging techniques in the credit derivatives
> market, monitor and maintain adequate liquidity and look to minimize
> leverage while attempting to achieve the Fund's cash on cash targets.
> (AIMA Questionnaire at p. 17).

      83.   The AIMA Questionnaire was publicly available to investors,

and investors therefore reasonably relied upon it.

84.     These representations were false and misleading from the start, and, as discussed in detail below, became increasingly further separated from reality throughout the lives of the High-Grade Funds.

85.     In addition to the representations in the AIMA Questionnaire, the Bear Stearns Defendants explained to investors, through the High-Grade Funds' Offering Memoranda and through direct communications, that the High-Grade Funds' strategy – and a core feature of the Bear Stearns Defendants' overall structured credit strategies' business model – was to select and monitor portfolio assets in a highly informed and careful way that would manage, and hedge against, any significant risks associated with fluctuations in particular segments of the credit market, including in asset-backed securities based on sub-prime mortgages. The Bear Stearns Defendants falsely portrayed their intent and ability, through their unmatched market presence, and proprietary systems, to use up-to-the-minute information to contain risk and to profit from a diversified, complex array of asset-backed securities:

> The Investment Manager carries out the Master Fund's investment process and risk control procedures by analyzing the potential interest and principal flows on the CDO or structured finance securities owned by the Master Fund.  Various models and valuation tools are used to quantify the likelihood of future payments on both the underlying assets held by a CDO or structured finance vehicle as well as securities issued by the CDO or structured finance vehicle. These tools are derived from internally constructed, broker-dealer and third-party vendor analytical systems.   The Investment Manager also utilizes   default   modeling   and   credit-adjusted   spread   pricing

applications to assess relative value opportunities in the structured finance market. (High-Grade Overseas COM at p. 12).

\*          \*          \*          \*

The primary focus of the Investment Manager will be to assess the credit risk inherent in every potential investment and to monitor the credit risk of the investments held by the Master Fund. The objective of the analysis is to determine how the frequency and severity of defaults of the underlying assets of each of the structured finance securities will impact the interest and principal payments on those securities. Because each of the investments held by the Master Fund is essentially a construct of a large and diversified collection of individual assets, it is possible to monitor the performance of the underlying assets in a quantitative way. Unlike investments in corporate fixed-income securities where the credit performance of the issue is binary (the bond is either current in its obligations to make interest and principal payments or it is in default) the credit performance of a structured finance security is directly related to the observable cash flow characteristics of the underlying assets. In addition, it is anticipated that substantially all of the structured finance securities purchased by the Master Fund will have credit enhancement mechanisms which, when the underlying pool of assets experiences credit degradation beyond objectively defined levels, cause cash flow to be diverted away from the more junior structured finance securities and towards the securities held by the Master Fund. (High-Grade Overseas COM at p. 13).

\*          \*          \*          \*

When market opportunities exist, [the High-Grade Funds will] recognize capital appreciation and restructure or unwind securities whose net asset value exceeds market price. (Sales pitch concerning High-Grade Funds).

\*          \*          \*          \*

Credit quality of assets is monitored using proprietary analytics system. (Sales pitch concerning High-Grade Funds).

\*          \*          \*          \*

As experienced participants in this market, the portfolio managers have the knowledge, experience and resources to

identify attractive assets and monitor the credit risk inherent in these assets. (Sales pitch concerning High-Grade Funds).

\*          \*          \*          \*

Investment Process . . . Filter out assets based upon collateral quality test performance, concentration limitations, payment frequency, maturity as well as weighted average life, and ratings. (Sales pitch concerning High-Grade Funds).

\*          \*          \*          \*

Investment Process . . . Verify Robustness of Rating and perform Quantitative Analysis using: -Proprietary Models, -Rating Agency Discussions, -Underwriter Discussions.

\*          \*          \*          \*

Investment Process . . . Portfolio Managers conduct final review:    -Inspection of final Offering Memorandum, Computation Materials and Indentures.  -Inspection of final portfolio.  -Order goes firm. (Sales pitch concerning High-Grade Funds).

\*          \*          \*          \*

Surveillance Process . . . Using a proprietary surveillance system, *all* assets are reviewed monthly and those showing signs of future credit deterioration or poor performance are "flagged" for further review. (Sales pitch concerning High-Grade Funds).

\*          \*          \*          \*

Portfolio Management and Surveillance System . . . –The Surveillance System is a specialized database, reporting and analysis tool designed especially for structured products and their underlying portfolios. (Sales pitch concerning High-Grade Funds).

86.    Investors in the High-Grade Overseas Fund relied to their ultimate detriment and failed to require that corrective action be taken based upon the Bear Stearns Defendants' misleading representations with regard to the low-risk nature of the High-Grade Funds, as well as the Bear Stearns Defendants' ability to manage any potential risk, and avert the risks of any conflicts.

- 33 -

### The Bear Stearns Defendants' Management
### of, and Dealings with, the High-Grade Funds

87.     Following their launch, the High-Grade Funds quickly became the prime engines driving BSAM's revenues. Fees derived from the High-Grade Funds contributed approximately 75% of BSAM's annual revenues in 2004 and 2005, according to Derivative Fitch.

88.     These massive fees were paid to BSAM based upon what appeared to be stellar performance by the High-Grade Funds. In fact, through August 2006, the High-Grade Funds had reportedly enjoyed cumulative returns in excess of 36%. As of January 31, 2007, they reportedly had not experienced a single down month in their 40 months of existence, and had earned a cumulative return of 50%. Only later, when the Bear Stearns Defendants were called upon to make actual payment in respect of these "on paper" returns, would their utterly fictitious nature be exposed.

89.     To create the false impression of such returns in funds like the High-Grade Funds, while surviving even cursory scrutiny by internal and external parties, the Bear Stearns Defendants had to engage in both fraudulent modeling of the High-Grade Funds' returns, and impermissible use of leverage far beyond that which was disclosed to, or reasonably foreseeable by, investors, so as to disguise the true nature of the High-Grade Funds' holdings. The Bear Stearns Defendants further compounded the High-Grade Funds' risk exposure through the direct

borrowing of money, utilizing repurchase (or "repo") financing, and also by repackaging existing, highly-rated CDO tranches into new vehicles that, as reassembled by the Bear Stearns Defendants, never could or would have received ratings as high as their individual components. The Bear Stearns Defendants did this through, among other things, creating and/or purchasing new investment vehicles known as CDO-squareds – unrated vehicles comprised of highly rated investment tranches of existing CDOs.

90.    In furtherance of these schemes, unknown to and undiscoverable by investors, beginning in 2003, and continuing throughout 2004, 2005, 2006 and 2007, the Management Defendants, BSAM, and the BSAM Directors were failing, on a widespread basis, to secure the Independent Directors' or a majority of investors' approvals that they had promised to secure in the High-Grade Funds' offering materials before engaging in "principal trades" between the High-Grade Master Fund and other Bear Stearns entities or Bear Stearns clients – trades that posed significant conflict of interest issues.

91.    The Investment Advisers Act of 1940 (the "Investment Advisors Act") required such consents (so-called "Principal Trade Letters" or "PTLs"), and prohibited principal transactions without them.

92.    The Bear Stearns Defendants willfully failed to secure PTLs for these many insider transactions to conceal from outside scrutiny the off-market

prices at which they were executing insider trades among the High-Grade Funds and other groups within Bear Stearns. They also had to do this to obscure the transactions that resulted in their creation of re-assembled CDO investment vehicles, CDO-squareds.

93.     By the summer of 2006, the failure to secure timely PTLs had reached epidemic proportions. BSAM had been willfully neglecting this necessary step in over 50% of its principal transactions in 2005, over 75% in 2006, and had persisted in this compliance failure despite repeated warnings that it must improve.

94.     Defendant Cioffi scrambled in the summer of 2006 to conceal his and the Bear Stearns Defendants' true reasons for failing chronically to secure PTLs, including through an e-mail to fellow Bear Stearns employee, Joanmarie Pusateri, on August 9, 2006, wherein he stated "… two people did not do their jobs on PTLs and BSAM did not have a process to catch the late PTLs. There is this whole uproar over PTLs and they want to make it into a big story about how we are not organized."

95.     In or about August 2006, fearing discovery by outsiders and possible revelation of the broader fraud that it and the other Bear Stearns Defendants were perpetrating, Bear Stearns attempted to create an illusion of separation by officially barring all trading between Bear Stearns and BSAM, by placing a "moratorium" on any such related-party transactions. The "moratorium"

- 36 -

lasted well into 2007, and, as a result of its ineffectiveness and lack of teeth, resulted in additional harm to the Funds.

96.     This moratorium, on its face, appeared to deprive BSAM of the ability to engage in off-market priced insider trades on behalf of the High-Grade Funds.  In fact, however, it had no such effect, and as described in detail in Paragraphs 182-212, unregulated trading between the High-Grade Funds, BSAM and Bear Stearns, if anything, accelerated during the life of the moratorium.  The moratorium did, however, deprive the High-Grade Funds of access to their principal repo financing counterparty – Bear Stearns.  This harmed the Funds, as there are a limited number of counterparties willing to engage in repo financing transactions on a portfolio such as this, and because such dealers, had they lent to the Funds, would have valued the collateral at lower, more accurate levels, exposing the fictitious nature of the moratorium.  The risks of exposure motivated BSAM not to even seek to enter into such outside party transactions.

97.     As acknowledged by BSAM, this moratorium hurt the Funds (and thus their investors) because it eliminated Bear Stearns as a potential counterparty and, thus, significantly reduced the Funds' liquidity.  Moreover, the moratorium hurt the Funds (and thus their investors) because it terminated the Funds' ability to take advantage of beneficial trades.  Indeed, in an e-mail from

McGarrigal to Cioffi and Tannin dated September 16, 2006, McGarrigal noted the

importance of the ability to conduct, where appropriate, related party trades:

> Do we have an official mandate to terminate our relationship with
> Bear? This hurts our investors as it eliminates a repo counterparty
> (reducing liquidity) and eliminates a source of trading secondary
> CDOs. Bear is among the best (reducing liquidity) and further
> eliminates a source for assets. Bear is #1 in MBS and in the top 5 of
> CDO issuers. All bad for our investors. I think we should work hard
> to put in place all necessary compliance procedures to allow to
> continue to operate as we have to date.

(Emphasis added).

      98.   A repurchase or "repo" agreement is the sale of securities

coupled with an agreement by the initial holder to repurchase them at a later date.

It is similar to a secured loan with the securities as collateral to protect against

default, except that in a repo arrangement legal title to the securities actually passes

to the lender. Thus, under certain margin call or default circumstances, the lender

has the power to liquidate the assets and close out the agreement.

      99.   In addition, repo agreements are short-term lending agreements

and have to be "rolled over" or replaced frequently. If a repo lender to a fund

declines to renew the agreement or establishes a moratorium, as Bear Stearns did,

the fund must find another lender or lenders to replace the liquidity that had been

provided by that lender.

      100.   Because Bear Stearns was a very large trader of CDOs and

most other asset-backed securities on the secondary market, and CDOs are not

widely traded after issuance, Bear Stearns was an important counterparty option for repo agreements.

101.   This moratorium came at a time when the High-Grade Funds were facing their first ever sizeable redemption requests – requests by investors to withdraw their capital.

102.   In mid-September 2006, in the midst of these problems, Cioffi and Tannin exchanged numerous emails discussing a "liquidity game plan."  Cioffi told Tannin in a September 17, 2006 email, "[w]hat we need to figure out is how to get the majority of our [High-Grade Fund investors] into the enhanced fund.  That will take some time but once we do that we have an easy liquidity source and that's Barclays."

103.   Tannin responded:

I've been working on that too.
There are three ways to roll our investors into Barclays
...
1.  Force them (I'm not really serious)
2. A sell out and sell in.  This is sticky because it forces us to raise liquidity in [the High-Grade Fund] – and over time would increase the more illiquid investments.
3. We do an in-kind exchange.  The issue here is that we have to get a "real" mark on all the assets.  I will speak to Jerry again about this.

(Emphasis added).

104.   In addition to scrambling for liquidity solutions, Tannin's e-mail demonstrates that BSAM was not using truthful, accurate or real marks (*i.e.*, values) for its portfolio assets as a matter of course, and indicates that marks used

to transfer assets between the High-Grade Funds and the High-Grade Enhanced Funds would not be truthful, accurate or real marks.

105.    In hedge funds of the kind here involved, underlying securities can be valued in a number of ways. The best and most accurate is the "mark-to-market" valuation system, whereby at stated intervals, the investment manager will take a security and adjust its value based on an external, published and reliable market price. Thus, where a fund invests in, for example, Google or gold, on the first day of a given period, it will look to one of several available published sources for the price of Google or gold at the end of the preceding monthly or other defined period, and be able to compute whether the value of the fund's investments has increased by some specified amount per unit.

106.    The mark-to-market system is the most desirable one because where a readily verifiable market exists, the correct valuation generally is relatively simple to obtain and not subject to dispute or manipulation by a fund manager.

107.    However, with respect to the CDOs and like securities in which the Master Funds were investing, there was no active market. Such securities do not trade on the New York Stock Exchange, the NYMEX, or any other recognized exchange. The valuation of such securities is thus left to a more subjective "manager marks" methodology – in other words, the investment manager is

responsible for determining at specific time periods the then-fair market value of the relevant securities, *i.e.*, what value the securities would bring, if liquidated in an arms-length transaction.

108. While a provision of "manager marks" is, by definition, a subjective exercise, especially where the manager has not itself purchased or sold the underlying securities in fair market transactions, managers are required to seek to ensure the reasonableness of their marks by external validation. This may include communications with brokers and other third parties who have had actual instances of buying or selling like securities, or who can otherwise provide objective, good faith estimates of value in the absence thereof.

109. BSAM was well aware of its obligations to ensure that its "manager marks" were not arbitrary, self-serving, or based on no or insufficient factual information, stating in the High-Grade Overseas COM that such valuations would be calculated with care and in good faith in order to establish probable realization values, and that prudent methods of valuation would be used to reflect fairly the values of all investments and liabilities where such valuation methods were utilized:

> Asset Valuation: The fees payable to the Investment Manager are based directly on the Net Asset Value of the Fund as of various dates. There may be no public market price for a portion of the Fund's assets. The Investment Manager [or General Partner] will generally value the Fund's assets. Any financial instruments for which market quotations are not readily available will be valued at fair value as

reasonably determined in good faith by the Investment Manager. The Investment Manager [or General Partner] will have a conflict of interest in making such valuations because the valuations directly affect the Net Asset Value of the Fund and thus the amount of the Management Fee and Incentive Fee that the Investment Manager [or General Partner] receives in respect of its services. Such valuations, however, will be performed by the Investment Manager [or the General Partner] in accordance with the methodology described in this Memorandum. (High-Grade Overseas COM at p. 29).

        \*        \*        \*        \*

If for specific assets the official close of business prices do not, in the opinion of the Investment Manager, reflect their fair value or are not available, the value shall be calculated with care and in good faith by the Investment Manager (or its duly appointed agent) with a view to establishing the probable realization value for such assets as at the close of business on the valuation date. (High-Grade Overseas COM at p. 46).

        \*        \*        \*        \*

There is no active market for Repackaging Vehicle Junior Interests. The Investment Manager will use a fair-value methodology for determining the value of Repackaging Vehicle Junior Interests. This methodology will consist of taking the present value of the future stream of projected cash flows to the Repackaging Vehicle Junior Interests over the projected life of the Repackaging Vehicle. The discount rate used in this analysis will be determined primarily by assessing the credit quality of the collateral pool of the Repackaging Vehicle.

The foregoing valuations may be modified by the Investment Manager or its designee, in its sole and absolute discretion, if and to the extent that it shall determine that such modifications are advisable in order to reflect restrictions upon marketability or other factors affecting the value of assets or to obtain asset valuations within the time frames set by the Investment Manager. Without limiting the generality of the foregoing, the valuation of an asset by the Investment Manager or its designee may reflect the amounts invested by the Fund

in such asset, notwithstanding that such amounts may not represent the market value of such asset.

The Investment Manager (or its duly appointed agent) may follow some other prudent method of valuation other than that referred to above if it considers that in the circumstances such other method of valuation should be adopted to reflect fairly the values of relevant investments or liabilities or to otherwise protect the interests of the Shareholders.

The Investment Manager is entitled to exercise its reasonable judgment in determining the values to be attributed to assets and liabilities and provided it is acting bona fide in the interest of the Fund as a whole, such valuation is not open to challenge by current or previous investors. (High-Grade Overseas COM at pp. 46-47).

110.    The Bear Stearns Defendants knew, or were reckless and/or negligent in not knowing, that the above misrepresentations, and others similar to them, were false and misleading.

111.    As noted above, in a purported effort to minimize the arbitrary and potentially inaccurate qualities of "manager marks" and thereby to discharge its duties to the Funds, BSAM asserted that it utilized various computer models that were supposed to provide a reasonable, fair value for the securities in which the Master Funds invested.

112.    However, utilization of such models can be reasonable only where a manager, among other things, periodically evaluates the model against its own sales of securities in the open market to see whether the model comports with reality or, failing that, looks to comparable sales by third parties of the same or similar securities, and adjusts the model if those comparable sales reflect that the

model does not comport to market realities. Indeed, BSAM specifically represented that it would obtain independent marks.

113.   BSAM could easily have seen – and, in fact, was required to analyze and adjust for – the fact that market values of CDOs worldwide were declining precipitously during the latter part of 2006 and early in 2007. It also may have found at any prior time that its models failed to reflect market reality regarding a portion of its CDO investments even before the 2006 decline began. Yet, BSAM failed to engage in any such market testing or adjustment of its models. Notably, the United States Securities and Exchange Commission's Office of Inspector General concluded in September 2008 that the Bear Stearns Defendants' pricing models were poorly constructed and ignored certain data critical to a meaningful valuation calculation.

114.   Had BSAM satisfied any of the foregoing duties – or had it not willfully ignored the information it received – it would have found that its computer models systemically overvalued the true market prices of the securities in which the High-Grade and High-Grade Enhanced Funds were investing, with the concomitant result that its "manager marks" were overvalued.

115.   Because securities that were "manager marked" rather than "marked-to-market" were a significant – and likely majority – portion of the High-Grade Funds' overall assets, and the manager marks were grossly overvalued, this

- 44 -

led to the High-Grade Funds having NAVs that were willfully overstated in material amounts each year.

116.   In this way, the Bear Stearns Defendants were able to report substantial "gains" to investors – gains that would never be distributed, but merely grew on paper within the High-Grade Funds, until their ultimate collapse.

117.   By so doing, BSAM significantly enhanced the amount of fees that it, and the other Bear Stearns Defendants, earned, and was able to keep its fraudulent scheme alive so as to continue earning undue fees in the future, and avoid the day of reckoning which now has arrived.

118.   Further, given the Bear Stearns Defendants' pre-eminence in the relevant investment community, their access to, and constant communication with, others investing in and selling the same or similar securities underlying the Funds' investments, and Bear Stearns' role as a broker, it is inherently incredible that BSAM did not have actual knowledge that its computer models were flawed, and were systemically overvaluing the relevant securities and NAVs of the High-Grade Funds.

119.   In addition, BSAM misled investors by reporting returns in, among other documents, monthly Preliminary Performance Profile Reports that listed investments by categories, and not by individual security.  Although these reports had a category "Sub-prime Market" and reflected, for example, that as of

March 31, 2007 only 6.0% of the High-Grade Master Fund's exposure was in the volatile and risky sub-prime market, it is now clear that, as structured, the Funds' embedded sub-prime exposure through other reported categories brought the total sub-prime exposure to a multiple of the asserted 6.0%.

120.    Sales of positions to fund redemptions were one method that would have permitted the Bear Stearns Defendants to test whether the values at which they carried the positions, and thus whether the NAVs comported with market realities.  However, when the Bear Stearns Defendants were faced with redemptions from their largest investor in the High-Grade Funds, they panicked because their scheme was on the verge of exposure, their model was flawed, and they were not able to pay any redemptions.

121.    The Bear Stearns Defendants' desperate attempt to avoid these redemptions indicates that they well knew their model did not comport with market realities.  Yet, instead of acknowledging that their model was flawed and revising it accordingly (as they were required to do), the Bear Stearns Defendants developed a plan to further conceal their scheme:  they would create the High-Grade Enhanced Funds, promise investors these funds would have greater returns while remaining a relative low-risk investment, and convince investors to switch to these "enhanced" funds rather than redeeming from the High-Grade Funds if the

High-Grade Funds were not performing at sufficiently high enough levels for them.

122.    Sales based upon redemptions were not the only method to test the Bear Stearns model against reality. From the inception of the High-Grade Funds and the High-Grade Enhanced Funds, until the time of the events giving rise to this action, given their role in the marketplace, the Bear Stearns Defendants had access to figures and information for innumerable sales of the same (or similar) underlying securities in which the High-Grade and High-Grade Enhanced Funds invested. BSAM could have looked – and, in fact, was required to look – to those transactions for purposes of testing the fairness and reliability of its computer model and the "manager marks" being generated pursuant to that model.

123.    Moreover, as discussed above, the Bear Stearns Defendants' desperate acts to avoid redemptions – redemptions that they knew could not be paid – further establish that they were well aware that their models were flawed and that they were overvaluing the Funds. Even after the Bear Stearns Defendants successfully avoided the largest High-Grade Funds investor's redemption in early 2006 by creating the High-Grade Enhanced Funds and convincing the investor to switch its investments from the High-Grade Funds to the High-Grade Enhanced Funds instead of redeeming, the Bear Stearns Defendants were constantly fearful

of redemptions, because they knew that redemptions would reveal their scheme and their models that willfully overvalued the Funds.

124.    As the U.S. housing market downturn continued, it became impossible for BSAM to keep up its fraudulent manager mark scheme. The situation became so dire that, beginning in September 2006, Cioffi considered closing the High-Grade Funds altogether. However, Cioffi knew that he could not risk any meaningful volume of redemptions from the High-Grade Funds, as that would expose the total absence of liquidity, and the fraudulent manager mark scheme. He therefore considered requesting that all of the High-Grade Funds' investors voluntarily transfer into the High-Grade Enhanced Funds' structure:

> What I was thinking was to build up 6 [months] of returns then send a letter to all the remaining investors and tell them we are closing the [High-Grade Funds] and ask everyone to convert to [the Enhanced Funds]. We'd have to handle it like we did thru an exchange of assets[.] I would not want to have to sell everything. This is the riskiest way to go because you know some [limited partners] will not convert but I feel comfortable that we can get almost all of them to.

125.    Ultimately, Cioffi and the other Bear Stearns Defendants made the decision that there was no need to shut down one revenue stream from their massive fraud in favor of another. They would just ask the High-Grade Funds' investors to "double down," investing in the new High-Grade Enhanced Funds as well. This had the dual benefit of avoiding meaningful redemptions from the

High-Grade Funds, and paving the way for the launch of the High-Grade Enhanced

Funds, with a baseline of investors that had already fallen prey to the scheme.

126.    To do this, the Bear Stearns Defendants knew they had to

ensure there were no redemptions from the High-Grade Funds, while selling

existing and prospective investors on the new "Enhanced" Funds – quite a

challenge as the U.S. housing market was turning down in the second half of 2006.

127.    Accordingly, BSAM, through Cioffi and his cohorts, provided

investors with information, financial updates and projections which they knew to

be false and unrealistic.  For example, they told investors that the High-Grade

Enhanced Funds would generate higher profits than the High-Grade Funds, but that

the enhanced funds would carry only a small amount of additional risk.  Cioffi and

Tannin also falsely represented to investors that they had invested their own money

in the High-Grade Funds and the High-Grade Enhanced Funds.

128.    These misrepresentations resulted not only in the investors

failing to take action in connection with the High-Grade Overseas Fund, but in,

among other things, certain investors shifting their investments from the High-

Grade Funds to the High-Grade Enhanced Funds, and some High-Grade Funds'

investors putting new, additional money into the High-Grade Enhanced Funds.

129.    To further bolster the legitimacy of the High-Grade Funds'

performance numbers, the Bear Stearns Defendants represented in the High-Grade

Overseas COMs that the High-Grade Funds' books would be maintained in accordance with Generally Accepted Accounting Principles ("GAAP"), and would be audited by the Deloitte Entities, a "big four" institutional accounting firm, in accordance with Generally Accepted Auditing Standards ("GAAS"). See High-Grade Overseas COM at pp. 45-47, 53.

130.    However, as the Bear Stearns Defendants knew, the Deloitte Entities would not "rock the boat" by issuing qualified audits on the High-Grade Funds' financial statements and risk their lucrative engagements with Bear Stearns, which netted the Deloitte Entities fees of $18.7 million in 2006, and over $20 million in 2007. Thus, the Bear Stearns Defendants were essentially assured of the ability to manipulate the reported financial performance of the High-Grade Funds at will.

131.    As discussed in the "Insider Transactions," "Failed Everquest IPO," and "Blow-Up" sections below, each of the Bear Stearns Defendants continued to play a material role in the frauds relating to the High-Grade Funds through their ultimate demise in July 2007.

## The High-Grade Enhanced Funds Fraud

### Structure and Initial Marketing of the High-Grade Enhanced Funds

132.    The Bear Stearns Defendants' quest for increasing fee generation, along with their inability to fulfill redemption notices for the High-

Grade Funds given in early 2006, led them to create the High-Grade Enhanced

Funds in the summer of 2006.

133.  The High-Grade Enhanced Funds were continuations and

expansions of the fraudulent scheme launched by the Bear Stearns Defendants in

2003 by way of the High-Grade Funds.

134.  The concept of the High-Grade Enhanced Funds appears to

have originated in or around February 2006, when one of the High-Grade Funds'

largest investors informed the Bear Stearns Defendants that it was going to redeem

its investments in the High-Grade Funds because the High-Grade Funds were not

performing as well as projected.

135.  Immediately upon receipt of that notice of redemption, the Bear

Stearns Defendants panicked, because they were not able to pay the redemption as

a result of the inherent illiquidity, and willful, substantial overvaluation of the

High-Grade Funds.

136.  In order to avoid having to admit that the NAVs were not as

represented and the redemption could not be paid, the Bear Stearns Defendants

decided to create an "enhanced" version of the High-Grade Funds – the High-

Grade Enhanced Funds – and sought to convince the redeeming investor and other

investors to switch their investments from the High-Grade Funds into the High-

Grade Enhanced Funds, and/or to make additional investments in the High-Grade
Enhanced Funds.

137.    As the Bear Stearns Defendants knew, by 2006, analysts and
economists were urgently warning of the inevitable coming correction, if not
collapse, of the U.S. housing market.  As such, the Bear Stearns Defendants knew
that to make the High-Grade Enhanced Funds saleable – and thereby to succeed in
generating undue incremental fees for themselves, while at the same time avoiding
having to admit that they could not pay redemptions – they had to persuade
prospective investors that the High-Grade Enhanced Funds would be even more
profitable than the High-Grade Funds, while remaining a relatively safe
investment, notwithstanding the foreseeable market changes.

138.    They did this, not by changing the structure or investment
strategy of the High-Grade Enhanced Funds to meet the forthcoming correction,
but by falsely marketing the High-Grade Enhanced Funds to existing High-Grade
Fund investors, as well as to new investor candidates, as a better, smarter and safer
version of the original High-Grade Funds, designed to generate greater investor
returns through the "enhanced" use of "leverage" – the borrowing of money to
multiply the invested cash.

139.    This representation, that a fund employing greater leverage
would be safer, bordered on the absurd, and the Bear Stearns Defendants

succeeded in selling sophisticated investors on it only by virtue of their then-stellar reputation as mortgage-backed securities industry leaders and their masterful execution of the ongoing sophisticated High-Grade Funds' fraud from 2003 through that time.

140.    This new "enhanced" fund was further marketed as a safe investment because the Bear Stearns Defendants represented it would invest in an even greater concentration of the "safest" tranches of CDOs – as measured by Ratings Agency rating levels.

141.    However, as with the High-Grade Funds, to create the false impression of such returns in funds such as the High-Grade Enhanced Funds while surviving even cursory scrutiny by internal and external parties, the Bear Stearns Defendants had to engage in impermissible use of leverage. In the case of the High-Grade Enhanced Funds, this went far beyond even the impermissibly inflated leverage employed in the High-Grade Funds, to levels which in certain instances exceeded 30 times. This multiple was not disclosed to, or reasonably foreseeable by, investors. It also made the High-Grade Enhanced Funds into ticking time bombs – destined to explode, and wiping out Investor equity if a 3.4% value drop occurred.

142.    As in the High-Grade Funds, the Bear Stearns Defendants employed excessive leverage and false valuations tactics through the direct

borrowing of money, utilizing "repo" or repurchase financing, but also through

even more extensive repackaging of, and purchasing of repackaged, existing,

highly rated CDO tranches into new CDO-squared vehicles that, as reassembled by

the Bear Stearns Defendants, could and would never have received ratings as high

as their individual components.  Also, as discussed in detail below, the Bear

Stearns Defendants engaged in many impermissible insider transactions to take in

ultra-risky CDO-squared investments created by other groups within Bear Stearns.

143.  Rather than disclose these increased risk exposures, the Bear

Stearns Defendants magnified their fraud on an ongoing basis through their

misrepresentations regarding the structure and characteristics of the High-Grade

Enhanced Funds.

144.  For example, Defendant Tannin represented to at least one

investor on or about February 17, 2006 that, compared to the High-Grade Funds,

the High-Grade Enhanced Funds' "returns should be higher but we believe our

volatility will remain low because we are implementing a funding strategy that will

optimize financing at the underlying asset level and Fund level."

145.  Further, the Bear Stearns Defendants represented that they were

fully capable of handling any possible risk associated with the use of increased

leverage.  For example, on or about March 14, 2006, Tannin, among others,

represented to at least one potential investor that:

It is our belief that the combination of cash flow and market
value leverage and the combination of asset based and portfolio
based leverage on assets that have no interest rate volatility
(they are all floating rate), very little credit volatility (AAA to A
assets) and a short spread duration (currently 3 years) is a very
efficient risk reward strategy. We have been very conservative
until now—and we believe we have developed the tools and the
systems and the risk infrastructure to run the portfolio [at these
levels].]

146.    Substantively similar misrepresentations were systematically
made by Tannin and other of the Bear Stearns Defendants to many other investors
to induce and maintain their investments, and to get them to refrain from taking
corrective action which might have exposed the wrongdoing and ended the fee
generation by the Bear Stearns Defendants.

147.    The Bear Stearns Defendants, at all times, knew or were
reckless in not knowing, that such representations were false and misleading.

148.    To further entice investors to participate in the High-Grade
Enhanced Funds, a reduced management fee was offered (1%, as compared to the
more standard 2%). Additionally, a reduced performance fee of 19% (as compared
to the more standard 20%) was offered to High-Grade Fund investors willing to
transfer their positions into the High-Grade Enhanced Funds.

149.    Moreover, because the Bear Stearns Defendants were especially
concerned about facing redemptions from one of the High-Grade Funds' largest
investors, which they could not pay and put their scheme at risk of exposure, they

made "special arrangements" just for that investor in order to ensure that it and other investors would cancel their redemptions in the High-Grade Funds, switch their current investments in the High-Grade Funds to the High-Grade Enhanced Funds, and potentially invest new money into the High-Grade Enhanced Funds.

150.   For example, on or about March 14, 2006, Defendant Tannin, among others, informed at least one investor that "because they have graciously agreed to hold off on their redemption pending the set-up of the leveraged classes," the Bear Stearns Defendants would "waive the notice period for any [future] redemption [it] may wish to make on the $48mm in redemption notices received for the March 31, 2006 redemption [from the High-Grade Fund]." This was a special arrangement "just for [that investor]" because the inability to pay out redemptions to the investor in the High-Grade Funds would have exposed the Bear Stearns Defendants' entire scheme.

151.   In addition, when the investor was dissatisfied with the liquidity terms of the High-Grade Enhanced Overseas Fund COM, the Bear Stearns Defendants changed the terms of the Offering Memorandum and issued a Supplement to the COM on July 28, 2006. The Bear Stearns Defendants were willing to do anything and everything to prevent the largest investor in the High-Grade Funds from redeeming.

152.    Despite the numerous false representations regarding the expected performance and risk level of the High-Grade Enhanced Funds, the Bear Stearns Defendants failed to disclose with respect to these new High-Grade Enhanced Funds that, as constructed, they were doomed to failure, owing to their untenable sensitivity to even the most miniscule risks of default in the mortgages underlying the CDOs in which they invested, and to even a small fractional slowdown in the unprecedented growth of the U.S. residential real estate market.

153.    The Bear Stearns Defendants also failed to disclose that these risks were not, and could not be, effectively hedged through any offsetting investment strategy; and owing to the opacity of the Funds' structures, only the Bear Stearns Defendants and other trusted Bear Stearns advisors knew or could know of the nature and magnitude of these risks.

154.    The Bear Stearns Defendants further failed to disclose the extreme amounts of leverage that would be utilized by the High-Grade Enhanced Funds, multiplying the capital contributed by investors – and therefore, the risk to which investors were exposed – by as much as 30 times.  This was more than triple the leverage level that was disclosed in the High-Grade Enhanced Funds' COM, and far more than reasonably could have been foreseen by investors.  (High-Grade Enhanced Overseas COM at p. 16).

155.   Instead, the Bear Stearns Defendants collaborated to make multiple misrepresentations in the Confidential Offering Memoranda for the August 2006 High-Grade Enhanced Overseas Fund ("High-Grade Enhanced Overseas COM") regarding the risk-levels of securities that the High-Grade Enhanced Funds would invest in, the risk-management skills of the Bear Stearns Defendants, performance evaluations that would be conducted on the High-Grade Enhanced Funds and controls that were in place with respect to related-party transactions.

156.   For example, regarding the quality of the securities in which the High-Grade Enhanced Overseas Fund would invest, the Bear Stearns Defendants made the following representations:

> The Investment Manager [BSAM] will use its structuring and research experience to identify structured finance securities with fundamentally strong credit risk profiles that are priced attractively. A significant portion of the investment return of the Master Fund is expected to be current income resulting from a positive yield spread between the investment income of the investments (together with any corresponding hedging instruments) of the Master Fund and the associated borrowing costs. Additionally, to the extent that the Master Fund's assets increase in value, the Master Fund may realize capital appreciation. (High-Grade Enhanced Overseas COM at p. 15).

> *          *          *          *

> [T]he Master Fund intends to concentrate its investments in the investment-grade classes of structured finance securities. For all investments (excluding Repackaging Vehicle Junior Interests) the Master Fund has targeted a portfolio rating composition of approximately 90% structured finance securities rated from AAA to

AA- by Standard & Poor's, from Aaa to Aa2 by Moody's or from
AAA to AA- by Fitch. The 10% balance of the portfolio (excluding
Repackaging Vehicle Junior Interests) may be rated below such
ratings. The above percentages are target concentrations only. The
Master Fund will not be required to sell any security that is
downgraded subsequent to its purchase by the Master Fund. It is
anticipated that no more than 30% of the Master Fund's Net Asset
Value will be invested in Repackaging Vehicle Junior Interests at the
time any Repackaging Vehicle Junior Interest investment is made.
The Repackaging Vehicle Junior Interests will generally not be rated.
(High-Grade Enhanced Overseas COM at p. 19-20).

     157.    The Bear Stearns Defendants knew, or were reckless and/or

negligent in not knowing, that the above misrepresentations, and others similar to

them, were false and misleading.

     158.    With regard to their ability to manage risk, the Bear Stearns

Defendants represented that:

The Investment Manager carries out the Master Fund's investment
process and risk control procedures by analyzing the potential interest
and principal flows on the CDO or structured finance securities owned
by the Master Fund. Various models and valuation tools are used to
quantify the likelihood of future payments on both the underlying
assets held by a CDO or structured finance vehicle as well as
securities issued by the CDO or structured finance vehicle. These
tools are derived from internally constructed, broker-dealer and third-
party vendor analytical systems. The Investment Manager also
utilizes default modeling and credit-adjusted spread pricing
applications to assess relative value opportunities in the structured
finance market. (High-Grade Enhanced Overseas COM at p. 16).

        *        *        *        *

The primary focus of the Investment Manager will be to assess the
credit risk inherent in every potential investment and to monitor the
credit risk of the investments held by the Master Fund. The objective
of the analysis is to determine how the frequency and severity of

defaults of the underlying assets of each of the structured finance securities will impact the interest and principal payments on those securities. Because each of the investments held by the Master Fund is essentially a construct of a large and diversified collection of individual assets, it is possible to monitor the performance of the underlying assets in a quantitative way. Unlike investments in corporate fixed-income securities where the credit performance of the issue is binary (the bond is either current in its obligations to make interest and principal payments or it is in default) the credit performance of a structured finance security is directly related to the observable cash flow characteristics of the underlying assets. In addition, it is anticipated that substantially all of the structured finance securities purchased by the Master Fund will have credit enhancement mechanisms which, when the underlying pool of assets experiences credit degradation beyond objectively defined levels, cause cash flow to be diverted away from the more junior structured finance securities and towards the securities held by the Master Fund. (High-Grade Enhanced Overseas COM at p. 16).

159. The Bear Stearns Defendants knew, or were reckless and/or

negligent in not knowing, that the above misrepresentations, and others similar to

them, were false and misleading.

160. With regard to performance evaluations of the High-Grade

Enhanced Overseas Fund, the Bear Stearns Defendants represented that:

Asset Valuation: The fees payable to the Investment Manager are based directly on the Net Asset Value of the Fund as of various dates. There may be no public market price for a portion of the Fund's assets. The Investment Manager will generally value the Fund's assets. Any financial instruments for which market quotations are not readily available will be valued at fair value as reasonably determined in good faith by the Investment Manager. The Investment Manager will have a conflict of interest in making such valuations because the valuations directly affect the Net Asset Value of the Fund and thus the amount of the Advisory Fee and Incentive Fee that the Investment Manager receives in respect of its services. Such valuations, however,

will be performed by the Investment Manager in accordance with the methodology described in this Memorandum. (High-Grade Enhanced Overseas COM at p. 39).

＊          ＊          ＊          ＊

If for specific assets the official close of business prices do not, in the opinion of the Investment Manager or its designee, reflect their fair value or are not available, the value shall be calculated with care and in good faith by the Investment Manager or its designee with a view to establishing the probable realization value for such assets as at the close of business on the valuation date. (High-Grade Enhanced Overseas COM at p. 61).

＊          ＊          ＊          ＊

There is no active market for Repackaging Vehicle Junior Interests. The Investment Manager will use a fair-value methodology for determining the value of Repackaging Vehicle Junior Interests. This methodology will consist of taking the present value of the future stream of projected cash flows to the Repackaging Vehicle Junior Interests over the projected life of the Repackaging Vehicle. The discount rate used in this analysis will be determined primarily by assessing the credit quality of the collateral pool of the Repackaging Vehicle.

The foregoing valuations may be modified by the Investment Manager or its designee, in its sole and absolute discretion, if and to the extent that it shall determine that such modifications are advisable in order to reflect restrictions upon marketability or other factors affecting the value of assets or to obtain asset valuations within the time frames set by the Investment Manager. Without limiting the generality of the foregoing, the valuation of an asset by the Investment Manager or its designee may reflect the amounts invested by the Fund in such asset, notwithstanding that such amounts may not represent the market value of such asset. The Investment Manager or its designee may also follow some other prudent method of valuation other than that referred to above if it considers that in the circumstances such other method of valuation should be adopted to reflect fairly the values of relevant investments or liabilities or to otherwise protect the interests of the Shareholders. The Investment

Manager is entitled to exercise its reasonable judgment in determining the values to be attributed to assets and liabilities and provided it is acting bona fide in the interest of the Fund as a whole, such valuation is not open to challenge by current or previous investors. (High-Grade Enhanced Overseas COM at p. 62).

161. The Bear Stearns Defendants knew, or were reckless and/or negligent in not knowing, that the above misrepresentations, and others similar to them, were false and misleading.

162. Finally, with regard to related-party transactions, the Bear Stearns Defendants represented that:

As [investment] situations may involve conflicts between the interest of the Investment Manager or its related persons, on the one hand, and the interests of the Investment Manager's clients, on the other, the Investment Manager has established internal policies to ensure that the Investment Manager and its personnel do not prefer their own interests to those of the Investment Manager's clients and that clients are treated fairly. (High-Grade Enhanced Overseas COM at p. 35).

\*　　　　\*　　　　\*　　　　\*

Transactions between the Fund and the Investment Manager or its Affiliates: Members of the boards of directors of the Fund and the Master Fund who are not affiliated with the Investment Manager or their delegates or other authorized representatives of the Fund or the Master Fund will have the responsibility for approving any transactions between the Fund or the Master Fund and the Investment Manager or its affiliates involving significant conflicts of interest (including principal trades).

More particularly, Directors unaffiliated with the Investment Manager or any delegate designated by such Directors will be responsible for approving any principal transactions for which Master Fund consent is required pursuant to Rule 206(3) of the Advisers Act. (High-Grade Enhanced Overseas COM at pp. 48–49).

163.   The Bear Stearns Defendants knew, or were reckless and/or negligent in not knowing, that the above misrepresentations, and others similar to them, were false and misleading.

### The Bear Stearns Defendants' Management of, and Dealings With, the High-Grade Enhanced Funds

164.   As with the High-Grade Funds, the Bear Stearns Defendants generated fictional paper returns for the High-Grade Enhanced Funds, by "marking" the investment portfolio to a "model" of Bear Stearns' own creation on a month-to-month basis, without properly testing or adjusting this model to reflect market realities.  The flaws and divergences from market reality in this model were even clearer than they were initially in respect of the High-Grade Funds' models.

165.   The Bear Stearns Defendants continued to face problems even after they were able to avoid redemptions in the High-Grade Funds.  For example, in the Fall of 2006, an investor in the High-Grade Enhanced Funds informed the Bear Stearns Defendants that it was not pleased with the Funds' performance and was considering redeeming its shares in the High-Grade Enhanced Funds.  The Bear Stearns Defendants begged that investor not to redeem, and promised that performance would improve, but insisted that it would take until the end of 2007 because the leverage for the High-Grade Enhanced Funds was still "ramping up."

166.   When, in early 2007, the High-Grade Enhanced Funds' performance still had not improved, and in fact was being outperformed by the

High-Grade Funds, the investor again communicated to the Bear Stearns Defendants that it was going to redeem its investments in the High-Grade Enhanced Funds. Considering that the Bear Stearns Defendants had told the investor that the investments of the High-Grade Enhanced Funds were going to be the same as the High-Grade Funds, with the only exception being that the High-Grade Enhanced Funds would use additional leverage, it made no sense that the High-Grade Funds were experiencing greater returns than the High-Grade Enhanced Funds.

167.    Once again, the Bear Stearns Defendants, upon learning of a possible sizeable redemption, were willing to go to any length to prevent the investor from redeeming so that their scheme could continue undetected. Upon learning of the investor's intention to redeem, the Bear Stearns Defendants fraudulently represented that, as of February 13, 2007, 93% of the assets in the High-Grade Enhanced Funds and 90% of the assets in the High-Grade Funds were in AA or better-rated credits, and that they had increased their hedges, generating positive results, and the High-Grade and High-Grade Enhanced Funds' portfolios were continuing to perform consistently. None of the Bear Stearns Defendants explained that AA and better-rated credits, as re-packaged and leveraged by the Bear Stearns Defendants, were in fact not high-quality credits.

168.  On February 28, 2007, still in the face of investors' expressed intentions to redeem, one or more of the Bear Stearns Defendants represented to investors in the High-Grade and High-Grade Enhanced Funds that the Funds were "doing quite well in this environment. Hedges are working and the team is taking advantage of structuring opportunities that have arisen because of market activity."

169.  When investors continued to express their intention to redeem, the Bear Stearns Defendants made a desperate attempt to stop the redemptions and Tannin, among others, insisted on meeting with at least one investor, offering to travel anywhere in the world for such a meeting.

170.  In or about mid-March 2007, Tannin falsely represented to investors that the High-Grade Enhanced Funds were doing well, and stated that not only was it not the time to redeem, but it was the time to invest more money in the High-Grade Enhanced Funds, and as a result some of the Management Defendants were currently investing their own money:

> As far as I'm concerned, my professional opinion is that this is a time for us to be committing capital. If someone were to ask me - I would tell them that this is a very good time to add money to our Funds. My opinion is that this is a good time to invest. I am investing myself. I could, of course, be wrong and we could underperform. Full disclosure clearly requires that everyone always understand that we are in a risk taking business here. Spreads are wider because lots of people are worried. They may turn out to be right. I don't think so - but I don't know the future. I only make calculated bets. My calculated bet is to NOT be on the sidelines now.

- 65 -

171. Tannin's statements were outright lies. In fact, the exact opposite was occurring. None of the Management Defendants were investing their own money in the High-Grade or High-Grade Enhanced Funds at that time, and in fact, Defendant Cioffi withdrew his personal $2,000,000 investment from the High-Grade Enhanced Funds in March 2007.

172. Cioffi's withdrawal further hurt the High-Grade Enhanced Funds by causing them to pay out $2,000,000 at a time when markets were weak and the High-Grade Enhanced Funds were facing another month of losses, as well as escalating margin calls and forced sales. The SEC and federal prosecutors have been investigating charges of insider trading against Cioffi based on this transaction. On June 19, 2008, the SEC filed a complaint against Cioffi and Tannin, a Brooklyn, New York Grand Jury issued an Indictment of them, and the FBI arrested Cioffi and Tannin at their homes based on their roles in the collapse of the Funds.

173. In addition, BSAM was well compensated for its operation of the Funds through 2% advisory fees (i.e., two percent of all monies under management) and, if BSAM was eligible during the period, 20% incentive or profit-sharing payments from the Funds and their investors. The calculation of BSAM's compensation from the Funds turned on various formulas related to the NAVs of the feeder funds, which, in turn, were derived from the NAVs of the

Master Funds. A growing NAV in the Funds would lead to greater compensation, whereas a falling NAV would decrease BSAM's 2% advisory fees and could completely foreclose the 20% incentive or profit-sharing payments because of the "high water mark" method used to calculate the incentive payments. Thus, the BSAM Defendants also deceived investors with erroneously high NAV reports in order to attempt to preserve and maximize BSAM's compensation.

174.  Cioffi's and Tannin's compensation and reputations also turned on the success of the Funds. BSAM had a practice of splitting advisory and incentive fees from its funds with the funds' managers to reward well-performing managers. Thus, a higher NAV would translate into larger advisory and incentive fees for the managers as well. In addition, BSAM awarded its successful managers Bear Stearns stock as a form of deferred compensation. Cioffi and Tannin also stood to gain greater stock awards with better High-Grade Enhanced Fund performance numbers, and through their stock ownership had interests that aligned with other Bear Stearns affiliates and Bear Stearns as a whole. Further, Cioffi and Tannin were concerned with their reputations in the industry. Cioffi stated in a June 2007 email: "If I can't [turn the Funds around] I've effectively washed a 30 year career down the drain."

175.  Thus, the misconduct detailed herein by the Bear Stearns Defendants, including improperly inflating the Funds' NAVs through the manager

marks scheme and transferring risky collateral from other Bear Stearns investments to the Funds at inflated values, was committed for the exclusive benefit of the Bear Stearns Defendants, was entirely adverse to the interests of the Overseas Funds and represented a total abandonment of their duties to act in the best interest of the Overseas Funds.

176.   Against this backdrop, the Bear Stearns Defendants continued to represent, both through the High-Grade Enhanced Overseas Fund COM, and through individual representations to investors, that they were guarding against related-party transactions through the specific measures laid out in the High-Grade Enhanced Overseas Fund COM.  These representations by the Bear Stearns Defendants with regard to the High-Grade Enhanced Overseas Fund were particularly specious, as notwithstanding the ongoing moratorium on transactions with Bear Stearns, which remained in place from the birth of the High-Grade Enhanced Overseas Fund in November 2006 through approximately April 2007, countless unreviewed insider transactions took place.

177.   This was not surprising as, when things were going badly for the Overseas Funds, the Bear Stearns Defendants installed their hand-picked but supposedly Independent Directors at the Overseas Funds, Lennon and Wilson-Clarke of Walkers FS.  However, as the Bear Stearns Defendants knew, like the

Deloitte Entities, Lennon, Wilson-Clarke and Walkers FS were beholden to Bear Stearns due to Walkers' extensive ties and dealings with Bear Stearns.

178.   And, as with the High-Grade Funds, the Bear Stearns Defendants represented that the High-Grade Enhanced Funds' books would be maintained in accordance with GAAP, and would be audited by the Deloitte Entities in accordance with GAAS, which was critical to investors' decisions to invest in the High-Grade Enhanced Funds.

179.   The Bear Stearns Defendants' selection of the Deloitte Entities and Walkers as service providers to its funds was no accident.  By concentrating these services among the Deloitte Entities and Walkers, the Bear Stearns Defendants were able to avoid exposing scrutiny of the Funds to other truly independent service providers and thus were able to continue perpetrating the wrongdoing and earning fees.

180.   By these representations, the Bear Stearns Defendants intended to, and did, communicate that the High-Grade Enhanced Funds were designed to generate returns greater than their predecessors, the High-Grade Funds, but still would be relatively safe investments, which would permit investors to participate in the booming housing market with little risk of loss due to defaults.  By so doing, the Bear Stearns Defendants were able to obtain over $500 million in investments into the High-Grade Enhanced Funds between the second quarter of 2006 and the

second quarter of 2007. In addition, the Bear Stearns Defendants were successful with their lies and misrepresentations and convinced investors to sell their investments in the High-Grade Funds and use the full value of those sales to purchase new investments in the High-Grade Enhanced Funds, thereby avoiding having to pay redemptions from the High-Grade Funds in 2006.

181. As discussed in the "Insider Transactions," "Failed Everquest IPO," and "Blow-Up" sections below, each of the Bear Stearns Defendants continued to play a material role in the frauds relating to the High-Grade Funds through their ultimate demise in July 2007.

**The Funds' Pervasive Insider Transactions with Bear Stearns and BSAM**

182. As discussed above, throughout the life of the High-Grade Funds, from 2003 forward, the Bear Stearns Defendants consistently engaged in insider transactions, without regard to the independent director approval and PTL requirements built into each of the Funds' governing documents.

183. According to a working draft of a chart of principal transactions prepared by BSAM Compliance during the summer of 2006 (the "Principal Transactions Chart"), the High-Grade Fund had engaged in more than 2,300 principal transactions since its inception less than three years earlier which required independent director approval prior to completion of such transactions. Of the more than 2,300 transactions that required prior approval, 1,108 (or

approximately 47%) of such transactions improperly were not approved prior to trade settlement as required by the Investment Advisors Act and the Offering Memoranda, thus giving rise to over 1,100 separate violations of the Investment Advisors Act.

184.    Specifically, 78.95% of the transactions that required prior approval from by the Independent Directors were missing such approval in 2006. Further, 58.66% of such transactions were missing the necessary approval in 2005, 29.73% were missing such approval in 2004, and 18% were missing such approval in 2003.

185.    As investment advisor to the Funds, BSAM had a duty to ensure that such related party transactions which it consummated with other Bear entities received the requisite prior review and approval. But BSAM failed consistently to do so. Indeed, BSAM utilized untrained and unsupervised personnel – who had no idea what they were doing, or of the importance of what they were doing – to oversee the process for the review of related party transactions.

186.    These insider transactions resulted in numerous overpriced trades being executed by the High-Grade Overseas Fund, to its and its investors' ultimate detriment, and to the great benefit of the Bear Stearns Defendants.

187.   Following imposition of the purported "moratorium" on transactions among the Funds and Bear Stearns in the summer of 2006, the Bear Stearns Defendants continued their practice of insider transactions, when it suited them, largely unimpeded.

188.   This course of conduct persisted throughout the life of the High-Grade Overseas Fund, and from the inception through the demise of the High-Grade Enhanced Overseas Fund.

189.   Furthermore, throughout the lives of the Overseas Funds, the Bear Stearns Defendants mis-marked the Funds' assets with a willful bias toward keeping the prices of Bear Stearns-related CDOs and other assets especially steady, and not to reflect actual downward variation in the prices of those securities, because keeping Bear Stearns-related CDOs at high values would help BSAM and Bear Stearns in other ways. The appearance of steady returns also helped the Bear Stearns Defendants present the Overseas Funds as less risky, further inducing investors to invest in the Overseas Funds. If the assets of the Overseas Funds had been marked down to the prices that they should have, similar lower prices would then have followed for other Bear Stearns assets, hurting all of the Bear Stearns Defendants' fee income and compensation.

190.   During the spring of 2007, Bear Stearns wanted to keep selling its inventory of mortgages and mortgage-related securities at high prices, keep

Bear Stearns' underwriting of those kinds of security offerings going, pave the way for the Everquest IPO, stave off any market price disruption in this core, mortgage-backed securities area of the firm's business, and avoid detection of their wrongdoing in connection with the Funds.

191.   Defendant Cioffi had deep ties to other affiliates within the Bear Stearns Defendants' group, including the mortgage-backed securities underwriting, broker-dealer, and trading groups, due to his history at Bear Stearns since 1985.

192.   Thus, continuing the consistent practice of refraining from re-marking assets downward in the High-Grade Funds and the High-Grade Enhanced Funds, BSAM, through Cioffi and his team, made particularly sure to artificially prop up the Bear Stearns-related assets in the Funds.

193.   The Bear Stearns Defendants also recognized that in all of their failures to re-price fully and fairly, even for assets unrelated to Bear Stearns, they would be helping to keep the overall market up and active for their colleagues.

194.   As Bear Stearns' public statements and actions in June 2007 indicated, and as a post-mortem analysis of the High-Grade and High-Grade Enhanced Fund portfolios reveal, during the months prior to June 2007 the Bear Stearns Defendants were accelerating their ongoing fraud and practice of

unfettered insider trading, funneling excessively risky or troubled assets at inflated prices into the High-Grade and High-Grade Enhanced Funds.

195.  The Bear Stearns Defendants did this, among other things, to enable them to mitigate investment risks in other Bear Stearns-branded investment vehicles that were subject to closer investor scrutiny, while continuing to generate multiple levels of fees for the entire Bear Stearns family.  This accelerated, and further assured, the demise of the Funds, and further hid the Bear Stearns Defendants' wrongdoing.

196.  By this misconduct, the Bear Stearns Defendants were further concentrating inappropriate risks and overstated marks in the Funds, despite BSAM's represented surveillance strategies, risk controls and insider transaction protections.

197.  Throughout the lives of each of the Funds, the Bear Stearns Defendants took full advantage of this absence of outside controls to load the Funds with the riskiest CDO tranches, creating "CDO-squareds" and otherwise dumping the worst investments from Bear Stearns' balance sheet onto those of the Funds.

198.  In particular, it is now known that the Bear Stearns Defendants conspired to load the Funds with CDO-squared securities throughout 2006 and at an accelerating pace from January through April 2007.

199.   By May 2007, the Bear Stearns Defendants had filled the High-Grade Enhanced Fund with at least $2.5 billion of such CDO securities that were built from, in whole or in part, other CDO securities.

200.   These complex CDO-squared securities violated Investment Guidelines that the Bear Stearns Defendants had represented to investors that the High-Grade Enhanced Funds would follow.  They violated these guidelines because most, if not all, CDO-squared securities did not have regular independent pricing available.  As CDOs were created out of other CDOs, the securities became especially difficult to mark and had very illiquid markets.

201.   The Bear Stearns Defendants dumped so many CDO-squared securities into the High-Grade Enhanced Funds that they owned a significant percentage of all outstanding CDO-squared securities in existence, which were relatively rare and a small percentage of the overall CDO market.

202.   An International Monetary Fund report, using Credit Suisse numbers, estimated that as of July 2007, all U.S. outstanding CDO-squared securities totaled $28 billion.  In May of 2007, the High-Grade Enhanced Fund itself owned at least approximately 9% of that total, or approximately $2.5 billion.

203.   As of mid-June 2007, over 46% of the asset-backed CDO-related investments ("ABS CDOs") in the High-Grade Enhanced Funds' portfolio were in fact CDO-squared securities.  In the High-Grade Funds, that number was

approximately 36%. These concentrations served to increase the leverage embedded within each of the Overseas Funds, beyond their already unsustainable levels.

204.    At the same time that the Bear Stearns Defendants were filling the Funds with CDO-squared securities, they were selling less complex, more liquid and stronger asset-backed investments from the portfolio.

205.    In or about March 2007, the Bear Stearns Defendants purchased $200,000,000 in unrated CDO-squared securities known as CLSVF 2007-3A A2 for the High-Grade Enhanced Funds. Simultaneously, the Bear Stearns Defendants added $325,000,000 in CDO-squared securities from three lower tranches of the structure called TWOLF 2007-1A. Also in March 2007, the Bear Stearns Defendants caused the High-Grade Enhanced Funds to buy $90,000,000 in the CDO-squared security ADMSQ 2007-2A, as well as many other pieces of CDO-squared deals. These are just a few examples.

206.    Throughout this period, the Bear Stearns Defendants were not only purchasing CDO-squared securities, they were purchasing many of those securities from structures that BSAM itself managed, or from deals that Bear Stearns underwrote.

207.    Indeed, the Bear Stearns Defendants caused the High-Grade Enhanced Funds to buy <u>all</u> the securities in all except the highest tranche of an

April 18, 2007 Tahoma 2007-3A CDO-squared offering that BSAM was managing – with a combined price for the five lower tranches that went completely into the High-Grade Enhanced Funds of approximately $150 million. This means that no independent third-party market participant priced those securities or ascertained their fair market value; instead, the Bear Stearns Defendants caused the High-Grade Enhanced Funds to purchase them all at non-arms-length prices, to the detriment of the Funds.

208.   In addition, in the CDO markets, it is highly unusual for a CDO structure manager to retain in its own investment funds all but the highest tranche of an offering for which it will serve as the manager. BSAM was serving its own interests by helping its CDO deals close and its management business appear to flourish, while at the same time filling the High-Grade Enhanced Fund with impermissible assets with heightened risk.

209.   In March 2007, the Bear Stearns Defendants also caused the High-Grade Enhanced Fund to purchase over $60,000,000 in two tranches of the Tahoma 2007-2A CDO-squared offering that BSAM managed.. In late October 2006, they had caused the High-Grade Enhanced Fund to purchase over $250,000,000 in three tranches of a Tahoma 2006-1A CDO-squared offering that, again, BSAM managed. BSAM was helping its ongoing business partner,

Tahoma, to sell out its offerings, to BSAM's own benefit and to the detriment of the High-Grade Enhanced Funds and their investors.

210.    Similarly, in late February or March 2007, the Bear Stearns Defendants caused the High-Grade Enhanced Fund to buy all of the securities in four tranches of a CDO-squared refinancing deal, Tricadia 2003-1AR, with a combined price of approximately $140 million, that was underwritten by Bear Stearns and a co-underwriter.  Because the moratorium on trading with Bear Stearns was apparently still in place, BSAM may have transacted with the co-underwriter.  Nonetheless, BSAM's purchase for the High-Grade Enhanced Fund assisted Bear Stearns in succeeding with its underwriting business, to the detriment of the Funds and their investors.

211.    Again, because the High-Grade Enhanced Fund bought all the securities in many tranches, the prices for those securities were not determined by any independent third-party market participant.  BSAM and the other Bear Stearns Defendants therefore could and did cause the securities to come into the High-Grade Enhanced Funds at inflated prices.  When the securities' true value subsequently fell further, the High-Grade Enhanced Funds realized an even greater loss.

212.    BSAM was accumulating illiquid assets in the High-Grade Enhanced Funds that were sold into that fund in non-arms-length arrangements, in

order to help BSAM and Bear Stearns succeed in other roles. In the process, BSAM was collecting fees as the CDO arranger and manager, and collecting another set of fees from the High-Grade Enhanced Funds.

213. Throughout the High-Grade Enhanced Funds' existence in 2006 and 2007, there was another facet to the Bear Stearns Defendants' concealment of the true performance facts and unstable nature of the funds.

214. The Funds' administrator ("PFPC") was required to deliver to the Funds' investors monthly or semi-monthly NAVs. Under the administration agreement for the Funds, PFPC was taking instructions and gathering information from BSAM for the completion of these NAVs. For the months of December 2006 through June 2007, PFPC either considerably delayed the delivery of the NAVs, or never provided them to investors at all.

215. As an example, the report from PFPC for the month of December 2006 (triggered by the dealing date on January 1) was not released until late February 2007, long after the fifteen-day deadline. That report showed a 1.60% increase in the High-Grade Enhanced Leverage Funds for the month of December. PFPC later revised that result to show a 1.76% increase.

216. PFPC initially reported that the delay in the December report was due to year-end processing issues; but the delay in December was repeated in the subsequent months, and was part of BSAM's cover-up.

**The Bear Stearns Defendants' Ongoing Fraud, and Failed Efforts**
**to Foist the Funds' Risks Upon the Public Through the Everquest IPO**

217.    The Bear Stearns Defendants attempted to conceal their

misconduct and self-dealing by promptly transferring the High-Grade Enhanced

Fund's highest-risk assets – CDO-squareds that contained the lowest rated tranches

and unrated "equity" – out of the High-Grade Enhanced Fund and into another new

BSAM-led entity – Everquest.

218.    By so doing, the Bear Stearns Defendants knew they would not

have to report these low-quality investments on the balance sheet for the High-

Grade Enhanced Fund, but the fund would still indirectly own the exact same

assets because it held a significant percentage of the equity in Everquest.

219.    The Bear Stearns Defendants sought to further grow and diffuse

their fraud's reach by conducting an initial public offering ("IPO") of Everquest.

220.    Everquest was jointly run by BSAM and Stone Tower LLC.

Cioffi, in addition to his roles at BSAM, was also co-chief executive of Everquest.

221.    On May 9, 2007, Everquest filed a Form S-1 with the SEC for

its planned IPO.  Everquest's filing disclosed that a significant portion of the assets

(valued by Everquest and BSAM at $548.8 million) in its approximately $720

million portfolio had been purchased in 2006 and 2007 from the High-Grade and

High-Grade Enhanced Funds.  In return, the funds received 16 million shares of

Everquest (valued by Everquest and BSAM at $25 per share) and $148.8 million in cash.

222.   The largest transfer from the High-Grade and High-Grade Enhanced Funds to Everquest involved the lower/riskier tranches of Parapet, a BSAM-managed vehicle that created CDOs out of CDO-squared and other CDO securities (potentially creating the first ever CDO Cubed), many of which were also from vehicles managed by BSAM. As noted earlier, the Deloitte Entities were the auditor for both Everquest and Parapet.

223.   The Everquest S-1 listed Cioffi as a beneficial owner of Everquest shares. In addition, upon the IPO, BSAM would receive new share grants representing 2.5% of Everquest's outstanding shares for BSAM's designees.

224.   BSAM also benefited from the Everquest arrangement because it was entitled to management and incentive fees from Everquest, in addition to its fees associated with the High-Grade and High-Grade Enhanced Fund structures. Likewise, the other Bear Stearns Defendants would benefit from an Everquest IPO through underwriting fees.

225.   In addition to executing the above-referenced insider transfer, the Bear Stearns Defendants also planned the Everquest IPO without regard to the interests and rights of the High-Grade and High-Grade Enhanced Funds or their shareholders.

226.  But numerous press articles began describing BSAM's misconduct in connection with Everquest, bringing unwanted scrutiny onto the Bear Stearns Defendants. BusinessWeek on May 11, 2007 said:

> "Everquest is a fledgling financial-services company that has been buying up equity interests in risky bonds backed by subprime mortgages from hedge funds managed by Bear Stearns.... The deal appears to be an unprecedented attempt by a Wall Street house to dump its mortgage bets."

227.  The article further noted that Everquest's portfolio of $720 million dollars of CDOs was primarily purchased from hedge funds managed by Bear Stearns and noted that the interrelationships between Bear Stearns and Everquest created significant conflicts of interest than could impact the success of the investments.

228.  Shortly, thereafter, on June 5, 2007, the New York Post ran an article regarding the alleged manipulation of the sub-prime market by Bear Stearns:

> "At issue is the motivation behind efforts by Bear's EMC Mortgage unit to renegotiate subprime home loans, and whether it's solely to prevent homeowners from losing their houses, or... simply 'to artificially inflate the value of derivative securities.'"

## The Blow-Ups That Launched the Worldwide Credit Crisis

229.  By March 2007, when concerns surfaced respecting all of the Funds, the Bear Stearns Defendants knew that they had to take action to prevent their scheme from being discovered. On March 12, 2007, Cioffi held a special

investor conference call, scheduled specifically to deal with growing investor concerns about the Funds' performance and market conditions. During this call, Cioffi continued to knowingly or recklessly make false representations regarding the Funds' performance.

230.   Just ten days earlier, Cioffi, Tannin and others attended an internal BSAM meeting where they discussed the difficult month of February, drank some vodka and directed those in attendance to keep the Funds' troubles quiet to those not at the meeting.

231.   On March 31, 2007, BSAM sent letters to investors stating that the concerns were unfounded and that they were:

> "...the result of fear of an unprecedented increase in the cumulative losses these portfolios will suffer over time, not an actual deterioration in credit on the underlying bonds in our portfolio." Hedge Fund Alert (June 6, 2007), p. 2.

232.   BSAM also hosted its regularly scheduled conference call on April 25, 2007. However, the Bear Stearns Defendants made the decision not to inform investors during that call that the Funds were experiencing difficulties and were on the verge of collapsing. Instead, Cioffi and Tannin represented that the outlook for the Funds and the CDO market was favorable. Tannin opened the call by stating that "the key sort of big picture point for us at this point is our confidence that the structured credit market, and the sub-prime market in particular, has not systemically broken down .... So, from a structural point of

- 83 -

view, from an asset point of view…, we're very comfortable with exactly, you know, where we are."

233.   Likewise, Cioffi stated that "we are – cautiously optimistic that the CDO market has found its footing. . . . We have a plan in place that'll get the Funds back on track to generate positive return." Further, Cioffi reported that although the Funds would have a loss of one percent from January through April 2007, returns for May through December were expected to be eight percent, resulting in an overall positive performance of seven percent for 2007.

234.   Also during that call, Cioffi represented that the Funds had very little direct sub-prime holdings, the CDO market was stabilizing, the Bear Stearns Defendants were not pessimistic about the sub-prime market because, until recently, rising home prices helped to bail out those who might have otherwise been delinquent on their mortgages, delinquencies were flattening out in February and March 2007 already, their credit models were solid and could distinguish good versus bad credits based on their fundamentals, and that 2007 origination of credits would be of better credit quality as a result.

235.   Cioffi also arranged for a separate "breakout" call for at least one investor since, "for compliance reasons, they [we]re able to say more in a one on one call than a 50 person conference." At no point during the investor call or

the separate breakout calls did Cioffi mention that the Funds had a liquidity problem and might not be able to pay out redemptions.

236.  Notably, just days earlier – on April 19, 2007 – an employee of BSAM issued a report (the "CDO Report") showing that the CDOs in the Funds were worth substantially less that they previously had thought.

237.  In response, on April 22, 2007, Tannin sent an email to Cioffi using personal (*i.e.*, non-Bear Stearns) email accounts, stating:

> the subprime market looks pretty damn ugly . . . . If we believe the [CDO Report is] ANYWHERE CLOSE to accurate I think we should close the funds now.  The reason for this is that if [the CDO Report] is correct then the entire subprime market is toast . . . .  If AAA bonds are systematically downgraded then there is simply no way for us to make money – ever.  (emphasis in original).

Tannin then stated that "caution would lead us to conclude the [CDO Report] is right – and we're in bad bad shape."

238.  Undeterred, shortly after the April 25 call, when certain investors in the High-Grade Enhanced Funds gave notice of their intention to redeem their investments, BSAM provided "future outlooks" designed to show that the Funds were strong and flourishing, in an effort to persuade the investors to withdraw their redemption requests.

239.  Further, on or about May 22, 2007, the Bear Stearns Defendants represented that the High-Grade Enhanced Fund was up two percent and attempted

to set up meetings with investors to share this "new improved future outlook." One week later, the Bear Stearns Defendants still reported to investors that the Funds' performance was up, hoping that these positive reports would convince investors to cancel their redemption requests.

240.    However, despite their representations to investors that the Funds were performing well and had a "new improved future outlook," internal communications among the Bear Stearns Defendants in May 2007 told a different story.

241.    In May 2007, emails between Defendants Tannin and Cioffi reveal that they were "building a plan" to cope with the Funds' severe troubles.

242.    By May 26, 2007, Tannin was sketching out a plan to sell the Funds to Cerberus Capital Management ("Cerberus") or some other similar entity. Tannin was preparing to present that plan to Cerberus, Warren Spector, and others. Spector had been consulted about the "building of the plan" and, according to a May 26 email from Tannin to Cioffi and McGarrigal, Spector was focused on simplicity and "insisting on a 7th grade level presentation."

243.    In the same email, Tannin explained that BSAM was selling "2 hedge funds (1.5 billion on capital) that are in danger of a wipe out because of a lack of liquidity" and further stated that BSAM has "almost the necessary systems" to run their operations.

- 86 -

244.    Tannin also stated in this May 26 email that the Funds had CDO-squared securities and single name hedges that did not have "a value and liquidity profile." "This is the problem. There is simply no market. Too many variables."

245.    On May 31, Tannin and Cioffi were contemplating what information to give investors regarding the Funds' performance. In an email to Cioffi, Tannin stated "issue is-do we give them the -6.5 april or the larger down april?" Cioffi responded, "Ah, that's correct I think that one deserves a phone call." Indeed, the Management Defendants were often hesitant to communicate via email on sensitive topics, and preferred to speak by phone or off the Bear Stearns email system allegedly "for compliance reasons," really in order to avoid a written record of the details.

246.    Recognizing the precarious state of the Funds at this time, when they did communicate by email, the Management Defendants attempted to "cover their tracks." Beginning for the first time in the days before the April 25, 2007 investor call, and continuing through the time of the Funds' collapse, all of the emails circulated by the Management Defendants to investors included a page-long footer stating, in part:

> While the primary focus of the Fund will be on highly-rated debt
> securities (AA- or higher), up to 10% of the investment portfolio
> (excluding Repackaging Vehicle Junior Interests), may be invested in
> lower-rated investment grade, below investment grade or unrated

securities. [*note- this is different from early materials that said 90% AA to AAA, and 10% A-*]

The Fund invests on a highly leveraged basis. The cumulative effect of the use of leverage with respect to any investments in a market that moves adversely to such investments could result in a substantial loss which would be greater than if the Fund were not leveraged.

Prospective investors must understand that securities otherwise outside of the Fund's investments parameters may constitute all or a significant portion of the underlying securities held by CDO, Synthetic Security or other investment of the Fund and that CDOs are therefore subject to risks particular to such securities.

247.   This disingenuous, eleventh hour partial disclosure ran counter to what investors had been told – and indeed, were simultaneously being told. It serves only to provide a small glimpse into the desperate measures that were being taken by the Bear Stearns Defendants as their fraud was beginning to unravel.

248.   As discussed in further detail above, throughout this period, in addition to directly lying to investors, the Bear Stearns Defendants further attempted to conceal their misconduct and self-dealing by foisting upon the public equity markets through the Everquest IPO.

249.   In the face of increasing public scrutiny, the Bear Stearns Defendants realized they could no longer keep their fraud in check. While the High-Grade Enhanced Funds first told investors in late May that their loss for April was only about 1%, Cioffi later "adjusted" that number to minus 6% and, on June 5, 2007, admitted to investors that the High-Grade Enhanced Fund needed to remark its portfolio because four bonds were significantly overstated in April values. The effect would be to drive the April 2007 return from minus 6 to

minus 16, and to reduce the fund's cash position from $250 million to $100 million. Cioffi further indicated that the High-Grade Enhanced Funds would be unable to liquidate positions to cover the redemptions that had been placed.

250.   By the Spring of 2007, the High-Grade Enhanced Funds were so weak that they did not tremble, but collapsed. Thus, on June 7, 2007, BSAM held a conference call to inform the High-Grade Enhanced Funds' investors that the losses in April had now been revised from minus 1% to minus 19%, and that the Funds were suspending all redemptions.

251.   The Bear Stearns Defendants suspended redemptions in the Funds in June 2007. Had the Bear Stearns Defendants told investors the truth concerning the Funds' performance, investors would have been able to redeem their interests in the Funds before redemptions were suspended or attempted to remove the Funds' directors and replace them with directors who would have tried to maximize investor recoveries.

252.   By July 18, 2007, the Bear Stearns Defendants finally admitted that the Funds had not just lost profitability, but viability, and that liquidation was BSAM's only strategy. In a letter dated July 17, 2007 to investors, Bear Stearns Co. stated as follows:

> Dear Client of Bear, Stearns & Co. Inc.:
>
> Let me take this opportunity to provide you with an update on the status of the High-Grade Structured Credit Strategies and High-Grade

Structured Credit Strategies Enhanced Leveraged Funds managed by
Bear Stearns Asset Management. A team at BSAM has been working
diligently to calculate the 2007 month-end performance for both May
and June for the Funds. This process has been much more time-
consuming than in prior months due to increasingly difficult market
conditions.

As you know, in early June, the Funds were faced with investor
redemption requests and margin calls that they were unable to meet.
The Funds sold assets in an attempt to raise liquidity, but were unable
to generate sufficient cash to meet the outstanding margin obligations.

253.   In the same letter, Bear Stearns Co. stated that it was

restructuring the risk management function at BSAM. Shortly thereafter, Bear

Stearns Co. announced the resignation of its co-president and chief operating

officer, Warren Spector, stating that "In light of recent events concerning

[BSAM's]... High-Grade and Enhanced Leverage funds, we have determined to

make changes in our leadership structure." Associated Press Financial Wire

(August 5, 2007).

254.   But by then, of course, word of the Funds' collapse was out, the

Funds were, by every meaningful measure, dead.

**The Dereliction of Duties by the BSAM Directors**

255.   As discussed in further detail below, the numerous acts of

breach of fiduciary duty, gross negligence and negligence committed by the Bear

Stearns Defendants was facilitated by the blatant failure of the directors nominated

by BSAM to the Board of the Overseas Funds to fulfill their fiduciary duties.

Rather than take action against this wrongdoing, as they were obligated to do as

directors of the Overseas Funds, the BSAM Directors turned a blind eye to, if not collaborated with, the Bear Stearns Defendants in their wrongdoing.

256.   The BSAM nominees to the Board of the High-Grade Overseas Fund were Cohen, Cummins, and Michael Ernest Guarasci ("Guarasci"), a director of the High-Grade Overseas Fund and its Master Fund from September 2003 until October 2005.  In October of 2005, Guarasci was replaced by Sandelovsky, and on or about March 28, 2007, Sandelovsky was replaced by Quental.  The BSAM nominees to the Board of the High-Grade Enhanced Overseas Fund were Cohen, Cummins, and Sandelovsky (until on or about March 28, 2007, when Sandelovsky was similarly replaced by Quental).

257.   As directors of the Overseas Funds, the BSAM Directors owed the Funds a duty of skill, care and loyalty.  In particular, as represented in the offering materials provided in relation to the Overseas Funds, they were obligated to "review and assess the investment policy and performance of the Funds and generally supervise the conduct of the affairs of the Funds."  The BSAM Directors breached these duties in a number of ways.

258.   First, the BSAM Directors failed to ensure that BSAM was following the stated investment guidelines for the Overseas Funds.  As discussed above, BSAM represented that at least 90% of all investments in the Funds would have at least "AAA" or at worst "AA" ratings.  BSAM also represented that the

Funds would have (and had) minimal sub-prime exposure, particularly in late 2006 and 2007. As discussed at length above, BSAM flagrantly violated these representations by, among other things, filling the Funds with CDO-squared and other risky sub-prime investments. The BSAM Directors took absolutely no action to address these wrongs by BSAM – they never investigated the composition of the Funds' investments, nor did they take any action when it became apparent that these investments were not as BSAM represented. Rather, they sat back and allowed BSAM to perpetuate the fraud.

259. Second, the BSAM Directors failed to monitor, or take any affirmative action with respect to, the Bear Stearns Defendants' "manager marks" scheme discussed above. The BSAM Directors permitted the Bear Stearns Defendants' "manager marks" scheme, pursuant to which they artificially inflated the value of the Overseas Funds, to continue unabated.

260. At no time did the BSAM Directors question the NAVs assigned by BSAM and the Management Defendants to the Overseas Funds' assets, or require BSAM and the Management Defendants to substantiate the basis therefor. Nor did they question BSAM's assertions regarding the positive performance of the Overseas Funds – despite the fact that such assertions, while reasonable to the outside world, were patently absurd to anyone with insider knowledge of the Overseas Funds' composition, which the BSAM Directors had,

or willfully failed to have in violation of their duties. As a result, the Overseas

Funds' investors were unaware of the fact that the values of the Overseas Funds

were never worth what the Bear Stearns Defendants asserted they were, or that

their value had decreased precipitously throughout 2006 and into 2007.

261. Because of the BSAM Directors' failures to fulfill their duties,

investors in the Overseas Funds could not take action at any time before the

Overseas Funds' blow-up – at any time from 2003 through 2007 – to halt the Bear

Stearns Defendants' misconduct – as they could and would have done, had the

BSAM Directors fulfilled their duties to stop, and even to report, this misconduct.

262. Third, the BSAM Directors failed to independently assess the

Deloitte Entities' audits which were provided to each of the BSAM Directors.

Indeed, some if not all of the Deloitte Entities' engagement letters were addressed

to Cummins. Nevertheless, despite the fact that they clearly received, and were

obligated to critically review, the Deloitte Entities' audits, the BSAM Directors

failed to do so. Specifically, for example, the BSAM Directors never inquired

whether, or ensured that, the Deloitte Entities tested and adequately evaluated the

manager marks – which the Deloitte Entities failed to do.

263. Furthermore, the BSAM Directors never questioned the clean

bill of health the Deloitte Entities gave to the Overseas Funds in their audits dated

April 24, 2007 – despite the fact that the collapse of the sub-prime market, as well

as the numerous restatements of earnings by other companies like New Century
Financial Corp., OceanFirst Financial Corp. and NovaStar Financial Corp., clearly
gave the BSAM Directors a compelling reason to do so.

264.    Moreover, as noted, in 2006, BSAM replaced the prior
Independent Directors on the Boards with Lennon and Wilson-Clarke of Walkers
FS.  As BSAM and the BSAM Directors were well aware, Lennon and Wilson
Clarke's employer, Walkers FS – and its parent company Walkers Management
Services – had long-standing relationships with BSAM and other Bear Stearns
Defendants.  Further, prior to joining Walkers, Lennon was employed for three
years by the Deloitte Entities – who, as noted, were the supposed "independent"
auditors of the Funds.  In light of these numerous ties and interrelationships,
Lennon and Wilson-Clarke could hardly be considered truly "independent" – a fact
which their subsequent conduct bore out.

265.    Indeed, it was impossible for Lennon and Wilson-Clarke to
perform any type of meaningful, bona fide review of the related party transactions,
in light of the time demands required by their numerous other obligations, which
the BSAM Directors knew or should have known.

266.    For example, in addition to serving on the Boards at issue here,
Lennon appears to have served on the boards of over 200 other funds.
Notwithstanding representations that he dedicates anywhere from a few hours to a

few days each month to each of these respective 200 engagements, clearly this was mathematically impossible, as even if he dedicated only 5 hours per month to each engagement, this would total 1,000 hours – as compared to the approximately 720 total hours that exist in any given month. Upon information and belief, Wilson-Clarke had a comparable number of other engagements.

267.    In light of these numerous directorships and other competing engagements they both held, the BSAM Directors knew or should have known that Lennon and Wilson-Clarke could not and did not devote adequate time and attention to their role as independent directors of the Overseas Funds, and the requirement of reviewing related party transactions that this role encompassed. Indeed, there is no indication that Lennon and Wilson-Clarke ever rejected any proposed related party transaction, or even required any further review or information before approving any such transaction.

268.    Lennon and Wilson-Clarke's failure to fulfill their duty to review these numerous related party transactions significantly damaged the Funds, in that most, if not all of these related party transactions were disadvantageous to them. Indeed, they benefitted BSAM and other Bear Stearns Defendants to the detriment of the Funds.

269.    To cite just some of the most egregious examples, in September of 2006, during the moratorium on transactions among the Funds and Bear Stearns,

the Funds transferred to Rampart, an entity managed by and related to BSAM,

equity in 10 CDOs valued at $548.8 million, in exchange for 16 million shares of

Rampart stock and $148.8 million in cash. Notably, BSAM itself had concerns

regarding Rampart, which was a CDO-squared Specifically, in an e-mail from

Tannin to McGarrigal and Cioffi dated September 5, 2006, Tannin expressed

serious reservations regarding Rampart, stating:

> We are in essence, repackaging our Klio [Rampart] position . . . The
> two main benefits to investors are – the potential for this to price and
> trade above book value – and the greater liquidity provided by the
> public markets. I think both of these are real questions – not that they
> won't happen – but there is very very little data to go on to make the
> case – so we are putting a lot of very big eggs in one basket . . . <u>Our
> hedge fund would be exposed to public market volatility. If we were
> to have a problem in just one position that affected a distribution we
> face unknown price action.</u>

(Emphasis added).

270.    Despite the fact that, as demonstrated above, BSAM itself had

serious reservations regarding Rampart, and despite the fact that this more than

$500 million transaction between the Funds and Rampart affected by BSAM was

clearly a related party transaction – of massive proportion – there is no indication

that Lennon or Wilson-Clarke ever reviewed it, or that any of the BSAM Directors

made inquiries about or otherwise scrutinized this related party transaction.

271.    In May of 2007, BSAM effected yet another transaction with

Rampart – specifically BSAM transferred between $20 million and $40 million of

credit default swaps from the Funds to Rampart. Notably, BSAM replaced the credit default swaps from the Funds to Rampart at cost – rather than their market value. This caused a decrease in the value of the Funds in excess of $18 million.. Once again, there is no indication that Lennon or Wilson-Clarke reviewed this transaction between the Funds and Rampart – or that any of the BSAM Directors made inquiries about it – despite the fact that it clearly was a related party transaction.

272.    In addition to these transactions with Rampart, under Lennon's, Wilson-Clarke's and the other BSAM Directors' watch, the Bear Stearns Defendants also consummated the numerous other related party transactions discussed above in furtherance of Bear Stearns' effort to use the Funds as a dumping ground for risky assets acquired or created by other Bear Stearns Defendants.

273.    Despite the fact that each of the insider deals discussed above were clearly related party transactions – of massive proportion – and despite the fact that as such, each of these transactions required Lennon and Wilson-Clarke's prior approval, there is no indication that the Bear Stearns Defendants sought or obtained Lennon's or Wilson-Clarke's review of any of them, which the BSAM Directors knew or should have known.

274. In sum, the BSAM Directors flagrantly breached the fiduciary and other duties they owed to the Overseas Funds. They should be held liable for the huge losses the Funds suffered as a result.

**The Bear Stearns Defendants Worked to Thwart Any Exercise**
**of Investor Rights, and to Avoid Commencement of This Action**

275. In order to attempt to cover up their wrongdoing for as long as possible, the Bear Stearns Defendants engaged in a scheme to thwart the petitions to remove the Board of the High-Grade Enhanced Overseas Fund, and BSAM as general partner of the High-Grade Enhanced Fund, which were served by an investor holding more than 10% of all outstanding shares on August 10, 2007 (the "Removal Petitions"). With the assistance of Walkers, the Board of the High-Grade Enhanced Overseas Fund and BSAM delayed holding meetings to address the Removal Petitions for as long as possible, and ultimately attempted to thwart the Removal Petitions altogether by putting all of the Funds into voluntary liquidation.

276. Pursuant to Section 81(a) of the Articles of Association of the High-Grade Enhanced Overseas Fund, the shareholders could remove any or all of the directors of the incumbent Board by serving a Removal petition. Specifically:

> A petition (a "Removal Petition") to submit to Participating Shareholders a proposal to remove and/or replace a Director or Directors at a meeting of the Participating Shareholders may be submitted to the Directors by any Nonaffiliated Participating Shareholder . . . If the Removal Petition is properly made in accordance with the provisions of this Article, the Directors shall

within 15 days after receipt of the Removal Petition mail the Removal Petition to all Nonaffiliated Participating Shareholders and the Trustee and Enforcer of the Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage (Overseas) Ltd. Star Trust together with written instructions specifying that a special meeting of the Participating Shareholders will be called to remove and/or replace, as applicable, the applicable Director(s), if the Removal Petition is signed by the Nonaffiliated Participating Shareholders owning at least 10% of the paid up Participating Share capital of the Company . . . and returned to the Company within 60 days after the date of such mailing.

An analogous provision is set forth in Section 3.2 of the Amended and Restated Limited Partnership Agreement of the High-Grade Enhanced Fund.

277.   On August 10, 2007, an investor holding more than 10% interest in both the Overseas and Domestic High-Grade Enhanced Funds (the "Petitioning Investor"), sent Removal Petitions to the Board of the High-Grade Enhanced Overseas Fund, and to BSAM as general partner of the High-Grade Enhanced Fund.  In the Removal Petitions sent to the High-Grade Enhanced Overseas Fund, the Petitioning Investor sought removal of each of the present members of the Board – specifically Cohen, Cummins, and Sandelovsky, each of whom, as noted, was nominated by BSAM, as well as Lennon and Wilson-Clarke, the "independent" nominees from Walkers FS.  In the Removal Petition sent to the High-Grade Enhanced Fund, the Petitioning Investor sought removal of BSAM as general partner of the Fund.

278.  The Petitioning Investor stated that it was seeking such removal in light of the substantial losses sustained by the Overseas and Domestic High-Grade Enhanced Leverage Funds under, respectively, the Board and BSAM's watch.  The Petitioning Investor further stated that it was requesting that Removal Petitions be transmitted to each of the Participating Shareholders of the High-Grade Enhanced Overseas Fund, and to each of the Limited Partners of the High-Grade Enhanced Fund, and that meetings to vote on the Removal Petitions be held within 30 days of the date of transmittal thereof.

279.  The Board of the High-Grade Enhanced Overseas Fund did not respond to the Removal Petitions until August 27, 2007 (the maximum time allotted under the Articles of Association).  In that response, Lennon, writing on behalf of the Board, claimed that the Removal Petitions were "deficient" because (i) they were sent to the Fund care of BSAM at BSAM's principal place of business at 383 Madison Avenue in New York, rather than to the Fund's registered address care of Walkers SPV in the Cayman Islands, and (ii) because the Petitioning Investor proposed to replace the current directors of the Board with a only a single director, FTI Capital Advisors, LLC ("FTI"), rather than at least two directors.  In addition, Lennon requested a meeting to discuss "the usefulness and propriety of making the Removal Petitions as such because the Company [the Fund] ha[s] no assets remaining to be distributed by replacement directors."

280.  The purported "deficiencies" alleged by Lennon in his August 27, 2007 letter were mere technicalities and/or baseless.  With regard to the alleged wrong address, in fact, they were sent to the Fund's registered address, in addition to BSAM's office.  Moreover, each member of the Board, including Lennon and Wilson-Clarke, received the Removal Petitions the very day they were sent, by transmittal from counsel for Bear Stearns.  With regard to the failure to name at least two replacement directors, in his letter, Lennon admitted that this was not technically a deficiency, as there was no requirement in the Articles of Association that the incumbent Board be replaced with at least two directors, but rather asserted that he merely viewed it as the better practice.

281.  BSAM asserted parallel – and equally frivolous – "deficiencies" in response to the Removal Petition served upon it by the Petitioning Investor. Specifically, in a letter dated August 24, 2007, BSAM similarly asserted that the Removal Petition was sent to the wrong address – even though once again, BSAM clearly received it.

282.  On September 11, 2007, the Petitioning Investor sent a response to Lennon's August 27, 2007 letter, along with revised Removal Petitions addressed to the Board of the High-Grade Enhanced Overseas Fund to cure the "deficiencies" alleged, and requested that the Board immediately forward its letter to the Participating Shareholders and schedule a meeting to address the Removal

Petitions. The Petitioning Investor also sent a revised Removal Petition to BSAM as general partner of the High-Grade Enhanced Fund.

283. The Board did not forward the Removal Petitions to the Participating Shareholders of the High-Grade Enhanced Overseas Fund until almost a month later, on October 9, 2007 – in violation of the requirement that the Board mail the Removal Petitions to all Nonaffiliated Participating Shareholders within 15 days after receipt. Moreover, the Board only scheduled the requisite meeting to vote on the Removal Petitions for over a month later, or on November 14, 2007. BSAM similarly only scheduled a meeting of the Limited Partners to vote on the Removal Petition served in connection with High-Grade Enhanced Fund for November 7, 2007 – and that meeting was subsequently delayed again until November 16, 2007.

284. In total, the Board and BSAM improperly delayed any action on the Removal Petitions for over three months.

285. Meanwhile, BSAM, along with the Board and Walkers, was scheming to thwart the Removal Petitions altogether by putting all of the Overseas Funds into voluntary liquidation in the Cayman Islands, and by seeking to liquidate the Domestic Funds in the United States. Thus, in late October 2007, BSAM negotiated with its handpicked liquidators – namely KPMG Cayman Islands – to have representatives of KPMG serve as voluntary liquidators for all of the Funds.

Simon Whicker ("Whicker") and Kristin Beighton (Beighton") of KPMG Cayman

Islands agreed to do so with respect to the Overseas Funds, and Richard Heis

("Heis") and John Milsom ("Milsom") of KPMG (Canada) agreed to do so with

respect to the Domestic Funds. Significantly, BSAM already had appointed

KPMG Cayman Islands (specifically Whicker and Beighton) as liquidators with

respect to the Master Funds.

        286.  On November 1, 2007 – or less than two weeks before the

meeting of the Participating Shareholders of the High-Grade Enhanced Overseas

Fund on the Removal Petitions was to be held, the Board passed written

resolutions recommending that the sole holder of the voting non-participating

shares of (both of) the Overseas Funds (namely Walkers SPV, Trustee of the Star

Trust), place both Overseas Funds into voluntary liquidation, and appoint Whicker

and Beighton of KPMG as joint voluntary liquidators. That same day, or

November 1, 2007, Walkers SPV passed a written resolution (again drafted by the

Walkers Firm), doing just that. This voluntary liquidation was designed to

effectively moot the scheduled November 14, 2007 meeting of Shareholders of the

High-Grade Enhanced Overseas Fund to vote on the Removal Petitions, as upon

liquidation, the liquidators take control in place of the Board. Notably, the Bear

Stearns Defendants had first asserted that the Overseas Funds were insolvent

months earlier – thus making it blatantly obvious that their petition filed on

November 1, 2007 to place the Overseas Funds into liquidation was not a bona fide
effort to address the Funds' insolvency, but rather only a ruse to thwart the
Removal Petitions.

287.   Indeed, on November 8, 2007, a mere week after their
appointment, Whicker and Beighton wrote to the Shareholders of the High-Grade
Enhanced Overseas Fund, effectively discouraging them from attending the
scheduled November 14, 2007 meeting.  Specifically, Whicker and Beighton
claimed the meeting would be pointless and have no effect, as their appointment as
liquidators rendered any elected replacement directors powerless:

> [T]he meeting could proceed as previously notified, although
> investors may wish to consider that since the Feeder Fund [the High-
> Grade Enhanced Overseas Fund] is in voluntary liquidation and
> controlled by the JVLs [Whicker and Beighton], any replacement
> directors appointed would be powerless to control the Feeder Fund or
> its affairs.

Discouraging the investors from attending the meeting on the Removal Petition
they had waited months for was clearly improper, and further demonstrates that
Whicker and Beighton (and the party behind their appointment, BSAM) wanted to
avoid a change of control at all costs.

288.   Despite all of the Bear Stearns Defendants' bad faith blocking
efforts, on November 14, the scheduled meeting of the Shareholders of the High-
Grade Enhanced Overseas Fund to vote on the Removal Petitions went forward.

At that meeting, the incumbent directors were removed, and were replaced by FTI and Bart Schwartz.

289. On November 19, 2007, BSAM's hand-picked liquidators of the High-Grade Enhanced Overseas Fund, Whicker and Beighton, wrote to the new directors, claiming that despite their recent election, in light of the petition for liquidation, they were powerless. Specifically, Whicker and Beighton wrote:

> [A]s a result of the appointment of [us as] the JVLs [Joint Voluntary Liquidators], any powers you may have inherited as a Director of the Feeder Fund had already ceased upon the appointment of the JVLs. For the time being you are still regarded as a Director but you have no power to act on behalf of the Feeder Fund in any way whatsoever without the prior approval and explicit authority of the JVLs.

290. This letter is both oddly worded, and oddly timed. A truly independent liquidator recently appointed to manage a fund clearly would not have addressed its newly elected board in this manner; rather, an independent liquidator would have sought the directors' assistance in investigating any wrongdoing leading to the fund's demise. The KPMG liquidators here were nothing of the sort; rather they were pawns in the Bear Stearns Defendants' scheme to avoid, or at least delay, any change in control. Indeed, it is clear that the Bear Stearns Defendants' actions, with the help and assistance of Walkers, in putting each of the Funds into liquidation, and placing their hand-picked liquidators at the helm, was nothing more than a transparent attempt to thwart the Removal Petitions, and thereby cover

up, or at least postpone, the day of reckoning for the Bear Stearns Defendants'
numerous acts of wrongdoing leading to the complete collapse of the Funds.

291. BSAM committed numerous breaches of duties by directing
each of the meetings and/or calls concerning the Removal Petitions, and
spearheading the efforts to thwart them.

292. For example, on October 29, 2007, BSAM sent a letter to the
Boards of each of the Overseas Funds, advising them that "in our judgment, it is in
the best interest of" the Overseas Funds that the Board recommend to Walkers
SPV that they "immediately be placed into voluntary liquidation."

293. Then, on October 31, 2007, or the day before the resolution
winding up the Funds was passed, BSAM provided Walkers SPV with an
indemnity in connection with its exercise of its power to place the Overseas Funds
in voluntary liquidation. That indemnity stated:

> We hereby refer to your respective roles as Trustee . . . and our
> recommendation, and the recommendation of the directors of [the
> Funds], that you exercise your powers and rights . . . so as to cause
> them to be placed in voluntary liquidation. In the event that you do so
> exercise your powers and rights as holders of the Ordinary Shares in
> the Controlled Companies in the manner described above, we hereby
> agree to indemnify you . . . promptly on demand against any actions,
> costs, claims, expenses, liabilities or losses which you may suffer
> arising directly or indirectly out of such exercise of your rights as
> holders of the Ordinary Shares.

294. This indemnity demonstrates clear recognition on the part of
both BSAM and Walkers SPV that putting the Overseas Funds into voluntary

liquidation when the Removal Petitions were pending could, and likely would, result in liability. Yet, Walkers SPV took precisely this action, and in providing this indemnity against any liability resulting therefrom, BSAM induced Walkers SPV to do so, further violating its duties to the Overseas Funds.

295. Based on the above, Varga and Cleghorn now seek redress for the harm to the Overseas Funds caused by the action of the Bear Stearns Defendants:

### CLAIMS FOR RELIEF

### AS AND FOR A FIRST CLAIM
### UPON WHICH RELIEF MAY BE GRANTED
**(Breach of Fiduciary Duty against the Bear Stearns Defendants)**

296. Paragraphs 1 through 295 are repeated and incorporated by reference as though more fully stated herein.

297. As fiduciaries, the control persons of fiduciaries, or persons who assumed for themselves the role in fact of fiduciaries, the Bear Stearns Defendants owed the Overseas Funds uncompromising fiduciary duties of care, skill, full and candid disclosure, loyalty and the highest good faith, integrity and fair dealing.

298. The Bear Stearns Defendants violated their duties, among other ways, by: (i) structuring the Overseas Funds so as not to be able to function in the very marketplace in which they intended the Overseas Funds to participate; (ii) mismanaging the Overseas Funds and failing to provide adequate managerial

oversight and risk management; (iii) causing the Overseas Funds to engage in a pattern of misrepresentations and deceptive conduct; and (iv) placing their own interests ahead of the interests of the Overseas Funds for which they were fiduciaries.

299. As a direct and proximate result of the Bear Stearns Defendants' wrongful conduct, the Overseas Funds suffered damages in an amount to be determined at trial, but believed to be not less than $1.1 billion, for which the Bear Stearns Defendants are jointly and severally liable to Plaintiffs.

300. The conduct of the Bear Stearns Defendants in disregarding their duties to, and the interests of, the Overseas Funds was purposeful, knowing, malicious, and without regard for the rights and interests of the Overseas Funds and departed in the extreme from the norms expected of fiduciaries. Accordingly, the Bear Stearns Defendants should, in addition, be liable for punitive damages in an amount to be determined at trial.

### AS AND FOR A SECOND CLAIM
### UPON WHICH RELIEF MAY BE GRANTED
#### (Aiding & Abetting Breach of Fiduciary Duty against Bear Stearns Co. and Bear Stearns Companies)

301. Paragraphs 1 through 300 are repeated and incorporated by reference as though more fully stated herein.

302.  BSAM, the BSAM Director and the Management Defendants owed the Overseas Funds uncompromising fiduciary duties of care, skill, full and candid disclosure, loyalty and the highest good faith, integrity and fair dealing.

303.  BSAM, the BSAM Directors and the Management Defendants violated their duties, among other ways, by:  (i) structuring the Overseas Funds so as not to be able to function in the very marketplace in which they intended the Overseas Funds to participate; (ii) mismanaging the Overseas Funds and failing to provide adequate managerial oversight and risk management; (iii) causing the Overseas Funds to engage in a pattern of misrepresentations and deceptive conduct; and (iv) placing their own interests ahead of the interests of the Overseas Funds for which they were fiduciaries.

304.  Bear Stearns Companies and Bear Stearns Co. had actual knowledge of the breaches of fiduciary duties by BSAM, the BSAM Directors and the Management Defendants, and substantially assisted in those breaches.

305.  As alleged herein, Bear Stearns Companies and Bear Stearns Co. failed adequately to supervise BSAM's, the BSAM Directors' and the Management Defendants' management of the Overseas Funds.  Among other things, Bear Stearns Companies and Bear Stearns Co. permitted BSAM, the BSAM Directors and the Management Defendants to engage in a systematic and continuous pattern of self-dealing.

306.   In addition, as alleged herein, the Overseas Funds were conceived of and sponsored collectively as investment vehicles that carried the imprimatur of Bear Stearns Companies, and were marketed based on Bear Stearns' alleged expertise in structured finance securities and risk-management capabilities.

307.   As a direct and proximate result of Bear Stearns Companies' and Bear Stearns Co.'s knowing participation in the breaches of fiduciary duties by BSAM, the BSAM Directors and the Management Defendants, the Overseas Funds suffered damages in an amount to be determined at trial, but believed to be not less than $1.1 billion, for which the Bear Stearns Defendants are jointly and severally liable to Plaintiffs.

308.   The conduct of Bear Stearns Companies and Bear Stearns Co. in disregarding their duties to, and the interests of, the Overseas Funds was purposeful, knowing, malicious, and without regard for the rights and interests of the Overseas Funds and departed in the extreme from the norms expected of them. Accordingly, Bear Stearns Companies and Bear Stearns Co. should, in addition, be liable for punitive damages in an amount to be determined at trial.

## AS AND FOR A THIRD CLAIM
## UPON WHICH RELIEF MAY BE GRANTED
### (Breach of Contract against BSAM)

309.   Paragraphs 1 through 308 are repeated and incorporated by reference as though more fully stated herein.

310.  Defendant BSAM owed contractual obligations to the Overseas Funds as Investment Manager to the Overseas Funds pursuant to BSAM's investment management agreements with the Overseas Funds dated August 31, 2004 (with the High-Grade Overseas Fund) and June 30, 2006 (with the High-Grade Enhanced Overseas Fund).

311.  Pursuant to those agreements, BSAM was obligated to provide the Overseas Funds with accurate and reasonable customary management advice and services.  BSAM was also required to conform its duties to, and act in accordance with, any requirements imposed by the provisions of the Overseas Funds' COMs and/or articles of incorporation, and applicable provisions of law, including, without limitation, the requirement to obtain approval from the Independent Directors for all related party transactions.

312.  BSAM breached its contractual obligations to provide such management advice and services when it engaged in, and failed to prevent and/or advise the Overseas Funds of, the deceptive and improper practices engaged in by the other Bear Stearns Defendants vis-à-vis the Overseas Funds, as outlined herein. BSAM also breached its contractual duties by, among other ways, fraudulently, in bad faith, gross negligently and/or willfully:  (i) mismanaging the Overseas Funds and failing to provide adequate managerial oversight and risk management; (ii) causing the Overseas Funds to engage in a pattern of misrepresentations and

deceptive conduct; and (iii) placing its own interests ahead of the interests of the Overseas Funds.

313.    BSAM expressly agreed in its investment management agreements with the Overseas Funds that it would be liable for any losses resulting from its fraud, bad faith, gross negligence, or willful misconduct in the performance of its duties to the Overseas Funds.

314.    While BSAM breached its obligations to the Overseas Funds, the Overseas Funds fulfilled their contractual duties by paying substantial fees to BSAM.

315.    As a direct and proximate result of BSAM's breaches of its contractual obligations to the Overseas Funds, the Overseas Funds suffered damages in an amount to be determined at trial, but believed to be not less than $1.1 billion.

### AS AND FOR A FOURTH CLAIM
### UPON WHICH RELIEF MAY BE GRANTED
(Gross Negligence against the Bear Stearns Defendants)

316.    Paragraphs 1 through 315 are repeated and incorporated by reference as though more fully stated herein.

317.    At all relevant times, the Bear Stearns Defendants owed the Overseas Funds a duty to exercise reasonable care, skill and diligence in performing their respective services.

- 112 -

318.    The pattern and practice of deceptive and other conduct engaged in by the Bear Stearns Defendants outlined herein violated the duty of care owed to the Overseas Funds. The actions of the Bear Stearns Defendants as set forth throughout this Complaint, if not knowing and purposeful, were at least grossly negligent and in derogation of the duty that they owed to the Overseas Funds.

319.    As a direct and proximate result of the Bear Stearns Defendants' grossly negligent conduct, the Overseas Funds suffered damages in an amount to be determined at trial, but which are believed to be not less than $1.1 billion, for which the Bear Stearns Defendants are jointly and severally liable to Plaintiffs.

320.    The conduct of the Bear Stearns Defendants in disregarding their duties to, and the interests of, the Overseas Funds was purposeful, knowing, malicious, and without regard for the rights and interests of the Overseas Funds and departed in the extreme from the norms expected of them. Accordingly, the Bear Stearns Defendants should, in addition, be liable for punitive damages in an amount to be determined at trial.

## AS AND FOR A FIFTH CLAIM
## UPON WHICH RELIEF MAY BE GRANTED
### (Negligence against the Bear Stearns Defendants)

321.   Paragraphs 1 through 320 are repeated and incorporated by reference as though more fully stated herein.

322.   At all relevant times, the Bear Stearns Defendants owed the Overseas Funds a duty to exercise reasonable care, skill and diligence in performing their respective services.

323.   The pattern and practice of deceptive and other conduct engaged in by the Bear Stearns Defendants outlined herein violated the duty of care owed to the Overseas Funds.  The actions of the Bear Stearns Defendants as set forth throughout this Complaint were at least negligent and in derogation of the duty that they owed to the Overseas Funds.

324.   As a direct and proximate result of the Bear Stearns Defendants' negligent conduct, the Overseas Funds suffered damages in an amount to be determined at trial, but which are believed to be not less than $1.1 billion, for which the Bear Stearns Defendants are jointly and severally liable to Plaintiffs.

## AS AND FOR A SIXTH CLAIM
## UPON WHICH RELIEF MAY BE GRANTED
### (Unjust Enrichment against the Bear Stearns Defendants)

325.   Paragraphs 1 through 324 are repeated and incorporated by reference as though more fully stated herein.

326.    As a result of the fraudulent and improper scheme described above and participated in by all of the Defendants, the Overseas Funds have been rendered worthless, yet the Bear Stearns Defendants, individually and collectively, have reaped substantial fees and bonuses.

327.    Defendants have therefore been unjustly enriched and should be forced to disgorge to the Plaintiffs an amount to be determined at trial.

### JURY TRIAL DEMAND

328.    Plaintiffs demand a trial by jury on each issue triable thereby.


WHEREFORE, Plaintiffs demand judgment:

A.    on the First Cause of Action, for damages in an amount to be determined at trial, but not less than $1.1 billion, jointly and severally, against the Bear Stearns Defendants, together with punitive damages;

B.    on the Second Cause of Action, for damages in an amount to be determined at trial, but not less than $1.1 billion, against Bear Stearns Companies and Bear Stearns Co., together with punitive damages;

C.    on the Third Cause of Action, for damages in an amount to be determined at trial, but not less than $1.1 billion, jointly and severally, against BSAM;

      D.    on the Fourth Cause of Action, for damages in an amount to be determined at trial, but not less than $1.1 billion, jointly and severally, against the Bear Stearns Defendants, together with punitive damages;

      E.    on the Fifth Cause of Action, for damages in an amount to be determined at trial, but not less than $1.1 billion, jointly and severally, against the Bear Stearns Defendants;

      F.    on the Sixth Cause of Action, for damages in an amount to be determined at trial,

      G.    on all Causes of Action, an award of pre- and post-judgment interest, Court costs, attorneys' fees and such other and further relief as the Court deems just and proper against all Defendants.

Dated: March 26, 2009
New York, New York

REED SMITH LLP

*Robert Nicholas*

Robert A. Nicholas (RN - 2335)
James C. McCarroll (JM - 2758)
Jordan W. Siev (JS - 8043)
599 Lexington Avenue
New York, New York 10022
Tel: 212-521-5400
Fax: 212-521-5450
e-mail: rnicholas@reedsmith.com
        jmccarroll@reedsmith.com
        jsiev@reedsmith.com

ATTORNEYS FOR PLAINTIFFS

EXHIBIT A

IN THE GRAND COURT OF THE CAYMAN ISLANDS

CAUSE NO. 551 of 2007

IN THE MATTER OF THE COMPANIES LAW (2007 REVISION)

AND IN THE MATTER OF BEAR STEARNS HIGH-GRADE STRUCTURED CREDIT STRATEGIES ENHANCED LEVERAGE (OVERSEAS) LTD. (IN VOLUNTARY LIQUIDATION)

---
ORDER
---

UPON hearing the Applicants' Ordinary Application filed herein on 7 December 2007

AND UPON reading the documents recorded on the Court file as having been read

AND UPON hearing Counsel for the Applicants, the Joint Voluntary Liquidators of the Company, Walkers SPV Limited and Bear Stearns Asset Management Inc

AND UPON no order being made on paragraphs 1-3 of the Ordinary Application

IT IS ORDERED AS FOLLOWS:

1.    The voluntary winding up of the Company should continue subject to the supervision of the Court.

2.    Geoffrey Varga and William Cleghorn of Kinetic Partners be appointed pursuant to section 153 of the Companies Law as liquidators of the Company in place of Simon Whicker and Kris Beighton of KPMG.

J:\171329\D\001\Court Documents\Orders\Cause No 551 of 2007\Order 08022251.doc

3.   The Applicants' costs of and occasioned by their Ordinary Application be borne equally by Walkers SPV Limited and Bear Stearns Asset Management Inc, such costs to be taxed if not agreed.

Dated this 22nd day of February 2008

Filed this _9_ of May of March 2008

Hon. Justice Smellie, C.J.C.
Judge of the Grand Court

APPROVED AS TO FORM AND CONTENT

_Appleby_

**Appleby**
Attorneys for the Applicants

_Conyers Dill & Pearman_

Attorneys for the Joint Voluntary Liquidators

_Nelson & Company_

Nelson & Company
Attorneys for Wakas SPV Limited

_Turner + Roulstone_

Turner & Roulstone
Attorneys for Bear Stearns Asset Management Inc

Filed by Appleby, Attorneys-at-Law for the Applicants, whose address for service is that of its said Attorneys, namely Clifton House, 75 Fort Street, PO Box 190, Grand Cayman KY1-1104, Cayman Islands (Ref.: JE/7/27742.891).

IN THE GRAND COURT OF THE CAYMAN ISLANDS

CAUSE NO. 552 of 2007

IN THE MATTER OF THE COMPANIES LAW (2007 REVISION)

AND IN THE MATTER OF BEAR STEARNS HIGH-GRADE STRUCTURED CREDIT STRATEGIES (OVERSEAS) LTD. (IN VOLUNTARY LIQUIDATION)



ORDER

UPON hearing the Applicants' Ordinary Application filed herein on 14 December 2007

AND UPON reading the documents recorded on the Court file as having been read

AND UPON hearing Counsel for the Applicants, the Joint Voluntary Liquidators of the Company, Walkers SPV Limited and Bear Stearns Asset Management Inc

AND UPON no order being made on paragraphs 1-3 of the Ordinary Application

IT IS ORDERED AS FOLLOWS:

1.    The voluntary winding up of the Company should continue subject to the supervision of the Court.

2.    Geoffrey Varga and William Cleghorn of Kinetic Partners be appointed pursuant to section 153 of the Companies Law as liquidators of the Company in place of Simon Whicker and Kris Beighton of KPMG.

J:\27\127\Cayman Documents\Cayman\Cause No 552 of 2007\Order (08272E).doc

3.    The Applicants' costs of and occasioned by their Ordinary Application be borne equally by Walkers SPV Limited and Bear Stearns Asset Management Inc, such costs to be taxed if not agreed.

Dated this 22nd day of February 2008

Filed this 20TH day of March 2008

Hon. Justice Smellie, Q.C.

Judge of the Grand Court

APPROVED AS TO FORM AND CONTENT

_Ashby_

Ashby
Attorneys for the Applicants

_Conyers Dill & Pearman_

Conyers Dill & Pearman
Attorneys for the Joint Voluntary Liquidators

_Nelson & Company_

Nelson & Company
Attorneys for Walkers SPV Limited

_Turner + Roulstone_

Turner & Roulstone
Attorneys for Bear Stearns Asset Management Inc